1　THADDEUS J. CULPEPPER, SBN 220194
　　CULPEPPER LAW GROUPE
2　556 S. Fair Oaks Avenue, Suite 101
　　No. 302
3　Pasadena, CA 91105
　　culpepper@alumni.pitt.edu
4　Tele: (626) 786-2779
　　Facsimile: (626) 628-3083
5　Attorneys for Plaintiffs DR. JERROLL B.R. DOLPHIN, et al.,

FILED
CLERK, U.S. DISTRICT COURT
MAR 11 2010
CENTRAL DISTRICT OF CALIFORNIA
BY　　　　　DEPUTY

6

7

8　　　　　　　UNITED STATES DISTRICT COURT

9　　　　CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

10　ST. LUKE SCHOOL OF MEDICINE; DR.
　　JERROLL B.R. DOLPHIN and DR.
11　ROBERT FARMER on behalf of himself
　　and all others similarly situated, as
12　applicable,

13　　　　　　　　Plaintiffs,

14　vs.

15　REPULIC OF LIBERIA; MINISTRY OF
　　HEALTH, a Liberian Governmental Agency;
16　MINISTRY OF EDUCATION, a Liberian
　　Governmental Agency; LIBERIAN
17　MEDICAL BOARD, a Liberian
　　Governmental Agency; NATIONAL
18　COMMISSION ON HIGHER
　　EDUCATION, a Liberian Governmental
19　Agency; NATIONAL TRANSITIONAL
　　LEGISLATIVE ASSEMBLY, a Liberian
20　Governmental Agency; DR. ISAAC
　　ROLAND; MOHAMMED SHERIFF; DR.
21　BENSON BARH; DR. GEORGE GOLLIN;
　　EDUCATION COMMISSION FOR
22　FOREIGN MEDICAL GRADUATES; a
　　Pennsylvania Non-Profit organization;
23　FOUNDATION FOR ADVANCEMENT
　　OF INTERNATIONAL EDUCATION AND
24　RESEARCH; a Pennsylvania Non-Profit
　　organization, UNIVERSITY OF ILLINOIS-
25　URBAN, an Illinois Institution of Higher
　　Learning,

26

27　　　　　　　　Defendants.

28

Case No. CV10 1791 RGK (SHx)

CLASS ACTION COMPLAINT FOR:

1. **TRADE LIBEL**
2. **FALSE IMPRISONMENT**
3. **NEGLIGENCE**
4. **VIOLATIONS OF DUE PROCESS**
5. **VIOLATIONS OF EQUAL PROTECTION**
6. **CONVERSION**
7. **CONSPIRACY TO COMMIT CIVIL RIGHTS VIOLATIONS**
8. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
9. **NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
10. **LOSS OF CONSORTIUM**

N/S

CLASS ACTION COMPLAINT

I.      JURISDICTION

    A.      FRIENDSHIP TREATY

        (A).      ARTICLE I

1.      "The Nationals of each of the High Contracting Parties shall be permitted to enter, to travel and reside in the territories of the other; to exercise liberty of conscience and freedom of worship; to engage in professional, scientific, religious, philanthropic, manufacturing and commercial work of every kind without interference; to carry on every form of commercial activity which is not forbidden by the local law; to own, erect or lease and occupy appropriate buildings and to lease lands for residential, scientific, religious, philanthropic, manufacturing, commercial and monetary purposes; to employ agents of their choice, and generally to do anything incidental to or necessary for the enjoyment of any of the foregoing privileges upon the same terms as nationals of the State of residence or as nationals of the nation hereafter to be most favored by it, submitting themselves to all local laws and regulations duly established.

2.      The nationals of either High Contracting Party within the territories of the other shall not be subjected to the payment of any internal charges or taxes other or higher than those that are exacted of and paid by nationals of the State of residence.

3.      The nationals of each High Contracting Party shall enjoy freedom of access to the courts of justice of the other on conforming to the local laws, as well for the prosecution as for the defense of their rights, and in all degrees of jurisdiction established by law.

4.      The nationals of each High Contracting Party shall receive within the territories of the other, upon submitting to conditions imposed upon its nationals, the most constant protection and security for their person and property, and shall enjoy in this respect that degree of protection that is required by international law.  Their property shall not be taken without due process of law and without

CLASS ACTION COMPLAINT

payment of just compensation." Treaty of friendship, commerce and navigation. (Article I) Entered into force November 21, 1939. 54 Stat. 1739; TS 956; 9 Bevans 595; 201 LNTS 163. (hereinafter "Friendship Treaty").

II.     ALIEN TORT CLAIMS ACT

5.     The Alien Tort Claims Act ("ATCA") of 1789 grants jurisdiction to US Federal Courts over "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."

III.    U.S. CONSTITUTION

6.     Sec. 1331. Federal question. The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

IV.     VENUE

7.     The proper venue for this matter is the Western Division of the Central District of California, United States District Court, as Dr. Jerroll B. R. Dolphin is a resident of Los Angeles, California and wherein St. Luke School of Medicine has its principal place of business.

V.      CLASS PARTICULARS

8.     Plaintiffs seek certification of the following Class pursuant to Fed. R. Civ. P. 23(b)(2):

> All students who attended St. Luke School of Medicine between 2000-
> present.

(a). The Class is so numerous that joinder of all members is impracticable.

(b). The claims of Plaintiffs are typical of the claims of the Class.

(c). Plaintiff will fairly and adequately protect the interests of the Class. Plaintiffs has no interests antagonistic to those of the Class, and he has retained counsel experienced in consumer class action litigation.

(d). Defendant has acted or refused to act on grounds generally applicable to the Class.

CLASS ACTION COMPLAINT

(e). Questions of law or fact common to the Class predominate over questions affecting only individual Class members.

(f).  A class action is superior to all other forms of adjudication.

(g). There are multiple questions of law or fact that are common to the class, including without limitation, whether Defendants' actions invalidated or devalued Plaintiff Medical Students' degrees and medical licensing examination test scores.

VI.      PARTIES

A.       ST. LUKE SCHOOL OF MEDICINE

8.      Plaintiff St. Luke School of Medicine, Liberia, was, at all times relevant to this Complaint, and is a Liberian corporation, 2001; and chartered by Act of Legislature, April 2003 and signed into the law by President, August 2003, in Monrovia, Liberia ("SLSOM").

B.       DR. JERROLL B.R. DOLPHIN

9.      Plaintiff Dr. Jerroll B. R. Dolphin was, at all times relevant to the causes of action herein, and is President of St. Luke School of Medicine. Dr. Dolphin is a graduate of San Jose State University with a Bachelor of Science in Physics, with a minor in Mathematics. Dr. Dolphin graduated with a Doctor of Medicine Degree from Spartan Health Sciences University, St. Lucia, West Indies.  Dr. Dolphin is also certified by the Educational Commission for Foreign Medical Graduates (ECFMG) for USMLE Step 1 and Step 2.

C.       FRANK TEAH

10.      Frank Teah was, at all times relevant to this Complaint, was a prominent Liberian businessman  He was introduced to Dr. Dolphin by the Liberian Ambassador to the United States. Frank Teah was also the Superintendent of the Monrovia School District, the largest school district in the Republic of Liberia.  Frank Teah was, and is, the Vice President of SLSOM and member of the Bard.

4

CLASS ACTION COMPLAINT

**D.      SENATOR BEATRICE SHERMAN**

11.    Sen. Beatrice Sherman was, at all times relevant to this Complaint, was a honorable member of the Senate of the Republic of Liberia until 2004 when the Senate was replace by the temporary National Transitional Legislative Assembly.  The Liberian Ambassador to the United States also introduced her to Dr. Dolphin.  Sen. Beatrice Sherman was, and is, the Secretary of SLSOM and member of the Board.

**E.      DR. MEIMEI DUKULY**

12.    Dr. Meimei Dukuly was, at all times relevant to this Complaint, was a consultant to the Ministry of Health of the Senate of the Republic of Liberia.  He was introduced to Dr. Dolphin by the Minister of Health of the Republic of Liberia.  Dr. Dukuly is the Treasurer of SLSOM and member of the Board.

**F.      MEDICAL STUDENTS**

13.    For the sake of clarity and organization the list of Plaintiff medical students are set forth in Exhibit "1 and are incorporated herein as if fully set forth verbatim ("Medical Students").  At all times relevant herein, the Medical Students were students or graduates of SLSOM and represent the Class members.

**G.      REPUBLIC OF LIBERIA**

14.    Defendant Republic of Liberia is a High Contracting Party to the Friendship Treaty.

**H.      MINISTRY OF HEALTH**

15.    At all times relevant to this Complaint, Defendant Ministry of Health was the primary institution for health care delivery services in the Republic of Liberia.  The Ministry of Health is responsible for providing health and social welfare services to the citizens of Liberia.

**I.      LIBERIAN MEDICAL BOARD**

CLASS ACTION COMPLAINT

16.     At all times relevant to this Complaint, Defendant Liberian Medical Board was the primary institution for the licensing of medical doctors in the Republic of Liberia.  It is a branch of the Ministry of Health of the Republic of Liberia.

J.      NATIONAL COMMISSION ON HIGHER EDUCATION

17.     At all times relevant to this Complaint, Defendant National Commission on Higher Education was the national accrediting agency for the Ministry of Education of the Republic of Liberia ("NCHE").

K.      NATIONAL TRANSITIONAL LEGISLATIVE ASSEMBLY

18.     Defendant National Transitional Legislative Assembly (NTLS) was the temporary legislative branch of the National Transitional Government (NTG) of Liberia that operated in Liberia after President Charles Taylor left Liberia, in 2004 until the inauguration of President Ellen Johnson-Sirleaf in January 2006.

L.      DR. ISAAC ROLAND

19.     At all times relevant to this Complaint, Defendant Dr. Isaac Roland was the Director General of the NCHE.

M.      MOHAMMED SHERIFF

20.     At all times relevant to this Complaint, Defendant Mohammed Sheriff was a member of the National Transitional Legislative Assembly of the Republic of Liberia from 2004 to 2006.  He was Chairman of the Health and Social Welfare Committee ("NTLA" or "NTLA-HSW") until June 2005, later becoming chairman of the NTLA's Executive Committee..

N.      DR. BENSON BARH

21.     At all times relevant to this Complaint, Defendant Dr. Benson Barh was Chief Medical Officer of Liberia and the Secretary of the Liberian Medical Board.

6

### O.     DR. GEORGE GOLLIN

22.     Defendant Professor of Physics at the University of Illinois, Champaign, Illinois, purports to be a higher education expert in "diploma mills" and fraudulent colleges and universities.  He also claims to be a consultant to the Republic of Liberia.

### P.     EDUCATION COMMISSION FOR FOREIGN MEDICAL GRADUATES

23.     At all times relevant to this Complaint, Defendant Education Commission for Foreign Medical Graduates ("ECFMG") administers the United States Medical Licensing Examination ("USMLE") to graduates of foreign medical education institutions. The USMLE is the standard medical examination for all medical students foreign and domestic.  ECFMG qualifies foreign medical graduates for residency in the United States by issuing an ECFMG certificate based upon successful completion of the USMLE Step 1 and Step 2.

### Q.     FOUNDATION FOR ADVANCEMENT OF INTERNATIONAL EDUCATION AND RESEARCH

24.     At all times relevant to this Complaint, Defendant Foundation for Advancement of International Education and Research ("FAIMER"), an ECFMG agency, maintained the International Medical Education Directory ("IMED"). The IMED is currently the sole source listing for qualified foreign medical schools in the United States.

### R.     MINISTRY OF HEALTH

24A.    At all times relevant to this Complaint, Defendant Ministry of Health was the health agency of the Republic of Liberia.

### S.     MINISTRY OF EDUCATION

24B.    At all times relevant to this Complaint, Defendant Ministry of Education was the education agency of the Republic of Liberia.

CLASS ACTION COMPLAINT

## VII.     INTRODUCTION

25.     In 2005, organized conspirators and government officials, who were angered because St. Luke School of Medicine ("SLSOM") refused to pay bribes, attacked SLSOM in the media and Internet. When Dr. Dolphin refused to pay the bribe demands, these same public officials began making false public statements to the media, and sending letters with false statements worldwide to principle agencies involved in the recognition and listing of medical degrees and medical licenses.

## VIII.    FACTS

26.     Dr. Jerroll Dolphin and Dr. Taliaferro Harris treated Liberian refugees in Ghana in September and October 1998 at the Bujumbura Refugee Camp, outside of Accra, Ghana. Over a course of three days in September 1998, and two days in October 1998, they treated more than 700 Liberian individuals and families. The refugees told the doctors that they were the first doctors in the ten years of the existence of the camp who touched them with their hands, gloved or otherwise, and brought medicine for the refugees.

27.     Dr. Jerroll Dolphin went to Liberia in April 2001 to meet with Minister of Health, Dr. Coleman, Frank Teah, Dr. Benson Barh, and other influential people. Dr. Dolphin brought with him 14 large boxes of medicine, mostly HIV/AIDS antiviral medicine, surgical equipment and supplies. During that visit, SLSOM, at the suggestion of Dr. Coleman, made arrangements to cooperate with A.M. Dogliotti School of Medicine, the University of Liberia's medical school. A.M. Dogliotti had come to a state of disrepair from neglect and lack of funds. Most professors at A.M. Dogliotti had not been paid for more than four years. The agreement to cooperate was signed in the early summer of 2001. SLSOM  would pay A. M. Dogliotti's professors a minimum of $500 USD per month and up to $1500 USD per month or more. SLSOM started advertising for medical students, mainly in Nigeria.

28.     During the one month of advertising, SLSOM had over 800 applications, to which approximately 200 students were accepted to the medical school. Most of the newly accepted

8

students were new to medicine, however, about three-dozen students were transfer students for other medical schools, mostly in Nigeria.

29.     Dr. Dolphin came back to Liberia in early August 2001 to make arrangements for the expected 150 students to come and study at SLSOM with regular A. M. Dogliotti students and because Dr. Benson Barh, the Dean of A. M. Dogliotti Medical School quit and there was no named replacement as Dean.

30.     Without a person to discuss issues that might arise, Dr. Dolphin felt that enrollment at SLSOM in Monrovia should be postponed until suitable arrangements could be made with officials of A. M. Dogliotti. So, in early September 2001, he sent an email to all 200 of the accepted students to postpone their travel to Liberia until further notice. However, a few dozen of the students had already come to, or were in route to Liberia when the email notice was sent.

31.     So, without an organized A. M. Dogliotti staff, and without anyone to discuss enrollment, class scheduling, and many other complex issues such as payment to professors, possession of classroom and building keys, responsibility of, and security of laboratory and classroom equipment, SLSOM could not practically keep its arrangement to partner with A.M. Dogliotti.

32.     Dr. Dolphin and SLSOM decided to start instruction without using A. M. Dogliotti. Therefore, in order to accommodate the students who had already arrived in Monrovia, SLSOM started classroom instruction at its offices in Monrovia in October 2001.  Simultaneously, SLSOM applied to the National Commission on Higher Education in October 2001 for approval as a tertiary institution.

33.     Also during this time, Mr. Frank Teah and Senator Beatrice Sherman, Teah's wife, reported to Dr. Dolphin, that Mohammed Sheriff, then head of the J. R. Kennedy Hospital in Monrovia, asked for a bribe of $6,000 USD a month to make SLSOM a "credible" institution in Liberia. Frank Teah

9

CLASS ACTION COMPLAINT

and Sen. Sherman did not reply to Sheriff's request. They reported to Dr. Dolphin that Sheriff was a very ruthless individual and was not to be trusted.

34.     In November 2001, the United States Department of State requested that Dr. Dolphin not send any additional U.S. medical students to Liberia, as the State Department had received intelligence of increasing rebel activity in northern Liberia and that there was an eminent threat of civil war there. When war did break out in February 2002, SLSOM students fled Liberia in whatever and however they could. Some of the Nigerian students took refuge at 'Nigeria House', the Nigerian Embassy. Others took leave by boat, airplane, bus transport, and some even 'hitch-hiked' their way to Ghana. None could remove to the Ivory Coast because it also was beset with rebellion.  Dr. Dolphin visited Liberia again in June and August 2002. The SLSOM office and classrooms were completely wrecked.  There were bullet holes in every wall along with shrapnel stuck in most of the walls of the campus. The roof was also in disrepair.  The floors were covered with dirt and mud.

35.     Dr. Dolphin and the SLSOM staff spent several thousand dollars to repair the facility. On September 17, 2002, the NCHE issued to SLSOM-Liberia a Temporary Permit to Operate St. Luke School of Medicine in the Republic of Liberia. See Exhibit "3"

36.     On April 24, 2003, the National Legislature of the Republic of Liberia granted SLSOM a Charter, despite the threat of civil war. See Exhibit "31"

37.     Frank Teah was called to Accra, Ghana to negotiate peace between the Liberian government and the warring Liberian factions. In the meantime, Sen. Beatrice Sherman carried on, personally carrying the Charter to President Taylor for his approval and signature while the fierce civil war was being fought for control of the city of Monrovia. On 7 August 2003, the President of Liberia signed into law "An act to incorporate St. Luke School of Medicine of the city of Monrovia, Montserrado County, Republic of Liberia, and grant SLSOM a Charter." See Exhibit "4"

CLASS ACTION COMPLAINT

38.    On August 8, 2003, the Ministry of Foreign Affairs published "An act to incorporate St. Luke School of Medicine of the city of Monrovia, Monsterrado County, Republic of Liberia, and grant SLSOM a Charter", which, in part, states:

ARTICLE 1

SECTION 1:

St. Luke School of Medicine was established August 1, 2000, and incorporated August 22nd 2001 in the City of Monrovia, Montserrado County, Republic of Liberia, is hereby established in the name of St. Luke School of Medicine Incorporated (SLSOM), by and through its founders, Dr. Jerroll Dolphin, President.  Said school is hereby further granted this charter, which endows it with all the rights, privileges and benefits existing in similar institutions of higher learning within this Republic, and shall henceforth be known by the name and title "St. Luke School of Medicine".

SECTION 2: LEGAL STATUS

The St. Luke School of Medicine (SLSOM) is hereby made a legal and corporate entity with perpetual succession, and shall have the authority to contract, sue and be sued, plead and be impleaded in any court of competent jurisdiction within the Republic; to purchase or otherwise acquire and hold property, real and mixed up to the value of one hundred and fifty million United States dollars (US$150,000,000); the said St. Luke School of Medicine (SLSOM) shall be perpetually maintained in the Republic for medical education of the people of this nation, people of the other countries and for who may have the capacity to seek medical education.

"Article IX (page 6)  MISCELLANEOUS

CLASS ACTION COMPLAINT

SECTION

1.      This Charter may be amended by the Legislature of the Republic of Liberia upon application to them by and through the Founder of the St. Luke School of Medicine (SLSOM), passed by a two-third vote of the said Board of Trustees during a regular meeting of the Board of Trustees.

See Exhibit "31"

39.     Five days later, after President Charles Taylor signed the above-mentioned Charter, he resigned from the office of President and fled the country to Nigeria.

40.     When Dr. Dolphin returned to Liberia in early September 2003, the SLSOM campus, on the top floor of the Luke Building on Broad Street was, again, entirely destroyed. Dr. Dolphin and SLSOM staff conducted two complete renovations of the classrooms and offices on the top floors. Dr. Dolphin decided to move the campus to a new location as soon as possible.

41.     In November 2004, Dr. Dolphin found a suitable location for the SLSOM campus in Gaye Town, a residential area on the bay side of Monrovia, for a 5-year lease. The new campus was formerly used as a primary and junior secondary school.   Please see Exhibit "32"

42.     SLSOM assembled finances, staff, and equipment for the new campus. Dr. Isaac Roland, Director General of Liberia's National Commission on Higher Education, was aware of SLSOM's relocation and improvement efforts. Dr. Roland witnessed the transition of the SLSOM campus from its deplorable condition when SLSOM first took possession of the property to its new refurbished condition. Needless to say Dr. Roland was impressed with what he saw.  On January 18, 2005, the National Commission on Higher Education, through Dr. Roland, issued a letter to Madame Carole Bede of ECFMG:

"St. Luke School of Medicine has established an institution and is working hard towards

providing the necessary physical facilities. As we speak there is large quantity of quality

medical equipment including computers, modern books, microscopes, etc." See Exhibit "6"

43.     However, on January 20, 2005, Carole Bede issued a letter to Dr. Jerroll Dolphin, St. Luke

School of Medicine, wherein she stated:

"ECFMG and FAIMER have received an unsigned and undated statement apparently issued from the

National Commission on Higher Education, Liberia, stating the St. Luke School of Medicine is not

registered or accredited as a medical school in Liberia."

"Until such time as FAIMER receives confirmation that the government of Liberia recognizes St.

Luke School of Medicine and that the school is authorized by the government to issue the Doctor of

Medicine degree, students currently enrolled in, and graduates of, St. Luke School of Medicine are no

longer eligible to be registered for USMLE examinations or for ECFMG certification."

See Exhibit "5"

44.     ECFMG removed SLSOM from the IMED listing on January 20, 2005.

45.     On February 25, 2005, Mohammed Sheriff asked Dr. Dolphin to come to the Capitol Building

to meet with him. Dr. Dolphin met him at about 2 PM that same day. Sheriff was immediately

hostile, questioning Dr. Dolphin on the establishment of SLSOM, yelling incessantly all the while.

Dr. Dolphin asked him to calm down.  Sheriff told Dr. Dolphin, "$6000 a month".  Dr. Dolphin asked

"Liberian or U.S."?  Sheriff replied "U.S.".  Dr. Dolphin looked around and saw several others

looking at himself and Sheriff, waiting for Dr. Dolphin's answer to Sheriff's inquiry.  He knew that if

he said yes, then the others would be the first in the long line of others with their hands out.

46.     Dr. Dolphin, to avoid giving an answer, asked Sheriff to come see the campus. Sheriff agreed

and asked if he could bring a few other 'officials' with him. Dr. Dolphin and Sheriff agreed to limit

the number to three persons. They would meet at 11 AM on the next Tuesday, March 1, 2005.

13

47.     That Tuesday, March 1, 2005, when Dr. Dolphin arrived at the campus, Sheriff had brought 15 newspaper and radio reporters. Dr. Dolphin reminded Sheriff that they agreed to limit the number of people to three 'officials'. Sheriff sneered, and loudly announced that he had a 'Press Release' that he distributed, however, he refused to give a copy to Dr. Dolphin. Sheriff intended to smear Dr. Dolphin and SLSOM's reputation because of Dr. Dolphin's refusal to pay bribes.

48.     Then Sheriff loudly began to make a series of false accusations against Dr. Dolphin and SLSOM. Sheriff accused SLSOM of committing criminal acts. Then he insisted that the press be allowed to tour the facilities. Sheriff stated that if the press was not allowed to inspect the facilities Dr. Dolphin would be in violation of Article 44 of the Constitution of Liberia. Not knowing exactly what Article 44 was, Dr. Dolphin reluctantly allowed the reporters to enter the campus, take pictures, and ask questions. Dr. Dolphin explained to the reporters that the facility was not completed, and that it would be only a temporary campus until SLSOM's permanent campus was built. Nonetheless, most reporters were impressed with SLSOM's campus. They saw the computers, new microscopes, new library books, Internet service, SLSOM's online curriculum, and new classroom tables and chairs. The paint on each wall was fresh. However, SLSOM had not yet bought the glass for the windows, and parts of the roof were unfinished. The reporters saw that all the rooms and laboratories were wired for electricity and all bathrooms were plumbed. Many commented that the facilities were much better than A. M. Dogliotti's facilities (the University of Liberia's medical school), which did not have microscopes or other laboratory equipment at all.

49.     After 12 PM of the same day, Dr. Dolphin bade all the reporters to leave, and they all did. Several reporters came by later to visit Dr. Dolphin at his room at the Metropolitan Hotel later that evening. However, before Sheriff left SLSOM, he asked Dr. Dolphin to come to the Capitol Building at 2:00 PM to meet with him, again mentioning the bribe of $6,000 US per month. Dr. Dolphin agreed to come to the Capitol Building, however, after Sheriff left the SLSOM campus, Dr. Dolphin

14

CLASS ACTION COMPLAINT

called his lawyer, Counselor Charles Abdullai. Abdullai told Dr. Dolphin not to go to the Capitol Building without a summons and a lawyer.

50.     At 2 PM, Sheriff called Dr. Dolphin on the telephone asking him where he was.  Dr. Dolphin, knowing that Sheriff was going to again ask him outright for a bribe, told Sheriff that he was fearful of coming to the Capitol Building without the representation of a lawyer.  He asked Sheriff to write a summons so that he could have time to obtain adequate representation.  Sheriff became angry, telling Dr. Dolphin that he did not need a lawyer, and to "come now".  Dr. Dolphin reminded Sheriff that he had made some criminal allegations against Dr. Dolphin and SLSOM at the press conference at the campus, and that he (Dr. Dolphin) had the right to be suspicious and concerned if he would walk out of the Capitol Building in handcuffs or not.  Dr. Dolphin insisted on the summons, fearing that Sheriff wanted a bribe, and that without the payment of a bribe, Sheriff was going to make trouble for him and SLSOM.

51.     That evening several of the reporters who were at the SLSOM campus came over to discuss what happened earlier that morning. They told Dr. Dolphin about Sheriff.  If they didn't cooperate with him, he would have their National Press Passes revoked.  That meant that they would be "out of work" in a country where work was a 'privilege' of the few.  The unemployment rate of Liberia at that time was approximately 80 to 85 percent of the population.

52.     On March 3, 2005, the National Commission on Higher Education issued a Statement of Attestation, attesting SLSOM's right to establish and operate a medical school. A copy of the Statement of Attestation was sent to ECFMG. See Exhibit "8".

53.     On March 7, 2005, the Ministry of Health sent a letter to the Embassy of India in Liberia verifying that SLSOM Liberia was "…granted legislative permission to establish a college of medicine in Liberia in 2003." See Exhibit "34."

CLASS ACTION COMPLAINT

54.     Confident of the quality of its campus, and not wanting to be outwitted by Sheriff, SLSOM invited the Liberian Medical Board (LMB) to inspect its campus. Dr. Dolphin and SLSOM professor Dr. Dukuly, went to the office of Dr. Benson Barh on Tuesday, March 8, 2005, and presented SLSOM's documentation and all of its legal credentials to him. Dr. Barh appeared to be very upset and disturbed to see the documents shown to him. In fact, his face was flushed, turned red, and he shook his head slowly several times before he looked up to speak to Dr. Dukuly and Dr. Dolphin. Dr. Dukuly then presented SLSOM's Invitation for Inspection to Dr. Barh. See Exhibit "35"

55.     Barh told Dr. Dolphin, in front of Dr. Dukuly, that he wanted $3.000 a month.  Dr. Dolphin told Barh that he couldn't pay that amount of money until the school was running, and Dr. Dolphin asked Barh if he would be Dean of the medical school.  Barh said that he didn't have the time.  Dr. Dolphin understood that Barh wanted a bribe.  Over the next few minutes of the conversation Barh began more and more hostile and angry.

56.     Barh asked when SLSOM expected to start classes.  Dr. Dolphin answered saying "this September." To which Dr. Barh replied, "not if I can help it. Do you have professors?"  Dr. Dukuly replied, "We have plenty."  Dr. Dukuly and another Liberian doctor had been working on a list of professors to teach SLSOM's medical and nursing students to start the September 2005 term. Dr. Dolphin whispered to Dr. Dukuly not give Dr. Barh the list of professors, thinking that Barh would do something to block the start of SLSOM in September. Dr. Dolphin asked Barh what documents were required for the inspection, what the criteria was for the inspection team, and regarding the amount of the inspection fee. Dr. Barh did not reply to the questions. After exchanging pleasantries, Dolphin and Dukuly left Barh's office wherewith Dolphin expressed his reservations about Dr. Barh's reception of SLSOM's legal documents.

57.     During the meeting, Barh mentioned to Dr. Dukuly that the Liberian Medical Board had never done an inspection of any medical school.  A. M. Dogliotti, the University of Liberia's medical

16

school, had never been inspected nor had it ever been required for an inspection.  According to the National Commission on Higher Education, only the NCHE had the authority to accredit tertiary institutions.

58.     On March 12, 2005, the National Commission on Higher Education issued a letter to the ECFMG, Madame Carole Bede, which, amongst other things, states:

> "St. Luke School of Medicine is recognized by the Government of Liberia to award Doctor of Medicine degrees."
>
> "Recognition was granted from August 1, 2000 by the National Legislature of the Republic of Liberia"
>
> "Liberia presently recognizes St. Luke School of Medicine."
>
> "The government of Liberia previously recognized St. Luke School of Medicine."

See Exhibit "9"

59.     After receipt of the NCHE letter, ECFMG placed SLSOM back on the IMED listing on or around March 22, 2005.

60.     On or about the night of Sunday, March 13, 2005, Dr. Dolphin's friends in Liberia started calling him, frantically telling him about a doctor who called himself Dr. Kpoto on the radio denouncing SLSOM. They said that Kpoto stated that SLSOM was giving hundreds of 'fake' degrees to Indians from the streets who came to Liberia to register as doctors. He also said that SLSOM taking thousands of US dollars for these fake degrees.

61.     The National Security Agency, NSA, came to arrest and detain Dr. Dolphin at his room at the Metropolitan Hotel at 7 AM the morning of Tuesday March 15, 2005. The NSA agent asked Dr. Dolphin to pay for the taxi ride to the agency's headquarters in Mamba Point, not far from the US Embassy.  Dr. Dolphin was questioned by two NSA agents for more than 3 hours. They did allow Dr. Dolphin to make a phone call to his attorney, Counselor Charles Abdullai. Abdullai told him, and the

17

NSA agents that he would be there, at NSA headquarters at 11:30 AM. After the three hours of questioning, Dr. Dolphin waited in a sequestered area until Cllr. Abdullai arrived around 11:30 AM. Thereafter, they both went to the top floor of the NSA headquarters to the office of Fredy Taylor, NSA Director.

62.     There, they were met by Mr. Fredy Taylor, NSA Director, and the US Embassy Deputy C'harge de Affaires, David Kraehenbuehl.  Cllr. Abdullai presented SLSOM's official documentation that included the Minister of Health's letter to the World Health Organization (August 2000), SLSOM's Articles of Incorporation (August 2001), the NCHE's Permit to Operate (September 2002), the Act to Incorporate St. Luke School of Medicine approved by the Liberian legislature (April 2003), the Bill signed by President Charles Taylor (August 2003), and the Statement of Attestation (March 2005).

63.     After carefully reading the documents, Fredy Taylor told Cllr. Abdullai, the C'harge de Affaires, and Dr. Dolphin that SLSOM was operating legally in the Republic of Liberia, that there were no charges, criminal or civil, that SLSOM or its owners or operators could be charged with, and that SLSOM should go about its business. Mr. Taylor asked Dr. Dolphin to write a brief statement for the record, which Dr. Dolphin did deliver to Mr. Taylor, in person, several days later. The following day, March 16, 2005 a Monrovia newspaper issued the following front page:

> Another Degree Granting Medical College in Liberia?, The Inquirer, Monrovia, Liberia March 16, 2005.
>
> It has been gathered that an entity accredited by the Government of Liberia to run as Medical College has already issued degrees to individuals without running classes.
>
> According to investigation, the St. Luke School of Medicine said to be located in Gaye Town, Sinkor, was accredited by an Act of the National Legislature to run as a medical college. But

report said the school has not officially begun classes, but has already gone go-ahead issuing diplomas to some so-called graduates.

Investigation revealed that the existence of the school as a degree granting institution came to light recently when some students in Asia called the India Consul to verify the existence of the school, which has been issuing degrees.

The sources said the school was targeting students in Asia because most of the people in that part of the world want to be doctors, but can not afford the cost of acquiring such education and degree there, and have therefore decided to use the on-line program to get their "documents" since they believed that the St. Luke School of Medicine was operating in Liberia.

It was also said that the school has an affiliation with the University of Liberia, but this was denied by Dr. Al Hasan Conteh, president of the university when he was approached on the issue yesterday.

At the same time, some medical doctors contacted over the issue, expressed concern about this latest development because they said it has the potential to further damage the image of the country.

Assemblyman Dr. Mohammed Sheriff, chairman of the house standing committee on health, said the whole thing about the school is fake. He blamed some people in government for this situation.

He said, he has received complaints from some graduates of the A. M. Dogliotti College of Medicine of the University of Liberia, who said the issue of St. Like was an embarrassment to them.

He said his committee is investigating the matter as this was serious and must be dealt with accordingly. He said this was a scam that some individuals are using to extort money from

19

people desirous of getting in the medical profession. He said these individuals went to other countries and were thrown out, but some individuals in government are working with them to bring shame to this country.

Also, a statement of attestation issued by the National Commission on Higher Education is said to be raising eyebrows. Investigation revealed that the commission had gone ahead to grant rights and a statement to operate to the institution without it meeting all the requirements, something the school is said to be using.

Health Minister Dr. Peter Coleman who was contacted on the issue yesterday, confirmed that the school has been accredited by an act of the national legislature. He said the school was now preparing to operate as it has been also accredited by the Commission of Higher Education.

Asked about the issuance of diplomas without classes, Dr. Coleman said the school also runs an "online program." But said he is not aware of the issuance of diplomas. He said the medical authorities in Liberia do not "recognize" such online program, which is said to be existing in Nigeria and Ghana.

Efforts to get a word from Education Minister, Dr. Evelyn Kandakai, the president and chief executive officer of the school, Mr. Jerroll Dolphin, MD, and the Indian Consul proved futile as their cell phones were switched off.

64.   The very next day, on Thursday morning, March 17, 2005, after coming from Cllr. Abdullai's office, Dr. Dolphin was given by hotel staff a handwritten note from an agent of the Liberia Federal Bureau of Investigation, LFBI, to come to the LFBI headquarters for questioning.  Dr. Dolphin called Clr. Abdullai, who came immediately to the hotel to read the note. Abdullai called the Director of the LFBI, personally, and made arrangements to meet, along with Dr. Dolphin, at 1:30 in the afternoon.

CLASS ACTION COMPLAINT

65.      Abdullai met Dolphin at the Metropolitan Hotel at 1:00 PM, and they walked down the road to LFBI headquarters. They waited in the office of the FBI Director for a few minutes before he was ready to interview them. His first words after our introductions were "Why should I not have Dr. Dolphin arrested?" Abdullai replied him by saying "Sir, this is why" and he presented the same series of documents that he presented at NSA headquarters only a few days earlier.

66.      After reading the documents, silently, the LFBI Director told Abdullai and Dr. Dolphin that St. Luke School of Medicine was not violating any law in Liberia, and that SLSOM's documents were in order.  Then he called Mohammed Sheriff, National Transitional Legislative Assemblyman. He told him that Dolphin was there in the LFBI office and that Dr. Dolphin or SLSOM had "done no wrong". The Director asked Abdullai if we could hurry down to the Capitol Building for a hearing. Since it was after 3:00 PM, Cllr. Abdullai stated that any meeting should be requested in writing, in advance, with enough proper notice to attend the meeting.

67.      Dr. Dolphin and Abdullai left the LFBI headquarters and walked back to the Metropolitan Hotel and discussed some of the issues. Abdullai told Dr. Dolphin that if he was arrested, he should not panic. He should call Abdullai, who would schedule a hearing for a writ of habeus corpus, after 48 hours. At the hearing, a judge could put an end to this entire harassment matter by the government by ordering a hearing for a writ of prohibition.

68.      Without warning or notice, at 9 AM on Friday, March 18, 2005, Dr. Barh called Dr. Dukuly telling him that he wanted to conduct the Liberian Medical Board's inspection of the SLSOM campus at 11 AM.  Dr. Dukuly called Dr. Dolphin and told him that Barh wanted to conduct SLSOM's inspection "today" before 10:30 AM and Barh wanted an inspection fee of $1000.  Dr. Dolphin asked what the inspection fee was for because the Liberian law does not permit the LMB to charge money for inspections.  Dr. Dolphin then spoke with Barh telling him, and Dr. Dukuly, that part of the roof had been removed for repair so the computers and library books had to be moved because of the

possibility of rain. According to Dr. Dukuly, Dr. Barh said that it would be taken into consideration and that the inspection fee was $1000 USD. Dr. Dolphin said that he did not have that kind of money on him and that he could not get it before 11 o'clock in the morning.

69.     Dr. Dolphin said $500 was what he could pay because Barh would not accept later payment because he was traveling in the afternoon and needed the money immediately. Dr. Dolphin rushed to the Ministry of Health where the Liberian Medical Board was located and paid the $500 USD.   See Exhibit 9A.

70.     Dr. Barh immediately took the money, albeit with some apparent disappointment. Dr. Dolphin reminded Barh and Dukuly that part of the roof had been removed for repairs and the computers and library books had to be packed because of the possibility of rain.

71.     Upon arrival to the campus thirty minutes later, Dr. Barh expressed his disappointment and stated, "if this was in the United States, this would not pass inspection". Dr. Dolphin replied saying, "if this was in the United States, it would pass because they give new medical schools interim accreditation for three years, to see how the schools medical students perform on the required medical licensing examinations."

72.     Barh said to Dolphin that if he were in the United States, he would be paid at least $3,000 a month for what he was doing (as a Dean of the medical school). Dr. Dolphin told him that he would be paid more than $6000 a month for the same work, however, that "this is Liberia." Dolphin also reminded the inspection team that this was the best-equipped classroom and laboratories in all of Liberia and that A. M. Dogliotti's did not have the furniture, equipment, books, computers, Internet service, electricity, painting, and other facilities that SLSOM had at its campus.

73.     Dr. Dukuly reminded the inspection team that he had a list of professors for the school in every subject and that the professors would get paid. (It was well known that the A. M. Dogliotti professors had not been paid for more than 2 years at that time.)

22

CLASS ACTION COMPLAINT

74.     Dr. Barh did not want to look at SLSOM's curriculum, which was available online, and on every computer as well. See Exhibit "36."  He hurriedly walked to his taxi to go to the airport. After the Liberian Medical Board's inspection, Dr. Dolphin went to the United States Embassy in Liberia at the top of Mamba Point. The officials there stated that they would send some educational officers to visit the St. Luke School of Medicine campus the very next Monday morning to see for themselves.

75.     True to their word, officials from the United States Embassy called Dr. Dolphin telling him to meet them at SLSOM's campus the next Monday morning at 10 AM. On March 21, 2005, they arrived at the SLSOM campus in a United States Embassy truck. One younger man was an experienced teacher working at the United States Embassy, and the other middle-aged man was a nurse also working for the United States Embassy.

76.     They took pictures with a digital camera as they inspected the campus. The nurse noticed that the microscopes needed light sources to which Dr. Dolphin acknowledged the situation.  The nurse also said that it was a simple problem to fix and it was not significant. They told Dr. Dolphin that SLSOM was the best-equipped campus, medical or otherwise, in Liberia. They were impressed that SLSOM  had curriculum and studies online, and were also impressed with the quality and quantity of the CD-ROM's.

77.     Dr. Dolphin told the officials that compared to the United States the SLSOM campus is lacking, however, this is a temporary campus and it was the best that could be done at this time in Liberia.  The United States Embassy officials left saying that they would leave their report and pictures with the United States Embassy.  Some of Dr. Dolphin's pictures of the SLSOM campus in March 2005 are displayed in Exhibit "33"

CLASS ACTION COMPLAINT

78.     On Tuesday afternoon, March 22, 2005, Dr. Dukuly notified Dr. Dolphin that he had received word that the inspection report from the Liberian Medical Board was available and that they should collect it together. Dolphin and Dukuly were very disappointed to see the inspection report:

79.     The LMB short report was replete with false information:

The building was not undergoing major renovation. One small portion of the roof was undergoing repair when the inspection was done. The LMB knew about the repair in advance.

(a).     The SLSOM Student Handbook had been online for more than five years. A copy was given to the LMB officials.

(b).     The library was set up. SLSOM had 400 library books and 100 interactive medical CD-ROM's SLSOM expected to have 30-40 students, maximum, at that campus. This represented a book to student ratio of 10:1.

(c).     SLSOM had two laboratory rooms.  Each laboratory room could accommodate 12 students, or 24 students if working in pairs. The microscopes were displayed in one laboratory, and the stethoscopes, sphygmomanometers, various blood testing kits, centrifuges, stains, chemicals, and other lab equipment was displayed in the other laboratory.

See Exhibit "10"

80.     On Friday morning, March 25, 2005, Dr. Dolphin left Monrovia, traveling by taxi to Roberts International Airport, about 30 miles from downtown Monrovia, to catch an 11 AM flight to Accra, Ghana.  He wanted to be with his wife for Easter Sunday, March 27, 2005.  Just as he was about to board the airplane, several Immigration agents approached him, took him under arrest, took his passport, telephone, and boarding pass.

81.     They did not have a warrant, nor did they give him any reason for his arrest and detention. They escorted him to the Immigration and Naturalization Office at the airport. Despite his pleas to

allow him to catch the flight to Ghana so that he could be with his wife for Easter Sunday, they ignored him.

82.     Instead, they called Mohammed Sheriff and the Minister of Justice, Kabinah Janeh, former leader of LURD (Liberians United for Reconciliation and Democracy), one of the rebel coalitions that fought the civil war in 2002 and 2003 in Liberia. Mohammed Sheriff was also a known member of LURD.

83.     The immigration officers did not allow Dr. Dolphin to use his telephone until almost 2 PM, long after the airplane left for Ghana. Dr. Dolphin called Clr. Abdullai and the United States Embassy in Liberia, both of whom told him that it was Friday afternoon, and it was too late to do anything. Nothing could be done until Monday or Tuesday.

84.     On his release by the INS officers at 2:30 PM, Dr. Dolphin took a taxi back to Monrovia, to the Metropolitan Hotel. Without money, and on his word alone, they allowed him to stay at the hotel on his promise that he would pay them by the coming Tuesday. He called the airline to rearrange his flight schedule. Then he called his wife, Susana, who already knew that there was something wrong because Dr. Dolphin's flight should have already arrived in Accra, Ghana, and he would have already been home.

85.     On Monday morning, March 28, 2005, Dr. Dolphin went to the United States Embassy and discussed the situation with several deputy officials at the Embassy, namely William Douglas and Michael Hogan. That afternoon, Dr. Dolphin and Clr. Abdullai met with the Deputy Minister of Justice, Edward Gobah, at the Justice Ministry. Clr. Abdullai first discussed the arrest of Dr. Dolphin and the taking of his passport. Deputy Minister Gobah told Abdullai and Dr. Dolphin that he had talked with United States Embassy officials regarding the taking of the passport, which was a violation of the Friendship Treaty.

CLASS ACTION COMPLAINT

86.     Clr. Abdullai then gave Gobah copies of St. Luke School of Medicine's legal documents. After carefully reading the documents, Deputy Minister Gobah went on to tell Clr. Abdullai and Dr. Dolphin that "there is no way that the Ministry of Justice would prosecute Dr. Dolphin or St. Luke School of Medicine....... We would lose. St. Luke is a legal entity and a legal university. You have all the required documents. You can teach whatever you choose and anyway you want to teach it." Dr. Dolphin asked "What about online?" Gobah replied saying "Online instruction is not illegal in Liberia. Not even for medicine."

87.     Just as important is what Gobah said next. "This is really a fight between Mohammed Sheriff and Peter Coleman. Sheriff hates Coleman. They even had a fist fight once in Dr. Coleman's office." He went on to elucidate more about the bad blood between the two. Gobah added "The Ministry of Justice does not want to get involved in what is really a personal dispute that has spilled over into the public eye."

88.     Deputy Minister Gobah, then called the Director of Immigration and Naturalization Service, and told him "You know about Dr. Dolphin?" We heard the Director say "yes". "Do you have his passport?" Back came the reply: "Yes." Gobah told him to be in his office in 10 minutes. When the INS Director arrived he told him to "give Dr. Dolphin his passport immediately" and to never take it again. The director asked Clr. Abdullai and Dr. Dolphin to come to his office Tuesday afternoon to collect the passport. To which Clr. Abdullai agreed.

89.     On Tuesday morning, March 29, 2005, Dr. Dolphin had to go to Western Union to receive money so that he could pay his bill at the Metropolitan Hotel, since it opened at 8:30 AM. He was delayed at the Western Union office in the massive crowd following Easter because the banks and other business were closed for what Liberians call "Easter Monday". Dr. Dukuly kept calling Dr. Dolphin, over and over again, because Dukuly had an appointment to keep with Benson Barh and he needed money from Dr. Dolphin. Dr. Dolphin did not leave the Western Union office until 10:45

AM. Dr. Dukuly called Dr. Dolphin at 10:50 AM to tell him that if he wasn't there "in 5 minutes it would be too late". Dr. Dolphin had to catch at taxi to the Ministry of Health from downtown Monrovia, which is difficult at any time of the day, especially on a busy day, as it was that morning.

90.     At 11 AM, another friend of Dr. Dolphin called to tell him that Dr. Benson Barh, the Chief Medical Officer of Liberia and the Secretary of the Liberian Medical Board had called a press conference and was blasting SLSOM in front of 3-dozen reporters at the Ministry of Health conference room. Dr. Dolphin called Dr. Dukuly to find out if it was true. Dr. Dukuly confirmed it saying "I told you to get here." Dr. Dolphin replied, "I couldn't get there any sooner."  Benson Barh and Dr. Horatious Browne were conducting a press conference to which they were lying outright about SLSOM.  United States Embassy in Liberia officials were also at the press conference. See Exhibit "37".  At the conference, Dr. Barh began making false statements about SLSOM, screaming and condemning the school at the top of his voice. At the end of the press conference they called for the arrest of Dr. Dolphin, knowing by sight that Dr. Dolphin was in the conference room to which the reporters looked at Dr. Dolphin for his response, some taking pictures of Dr. Dolphin.  Later United States Embassy officials also told Dr. Dolphin that Barh was lying and that they already knew that he only wanted a bribe. Dr. Dolphin called Clr. Abdullai for consolation. They met at around 4 PM at the INS Office, directly adjacent to the Metropolitan Hotel and waited for the INS Director.

91.     The INS Director did not show up at his office that Tuesday afternoon or night. Dr. Dolphin and Clr. Abdullai waited until 7:30 PM that evening for the INS Director, nor did he answer his phone.  Dr. Dolphin was very worried about the situation because Dr. Dolphin's airline reservation was for the same time, 11 AM, Friday morning. Clr. Abdullai called Deputy Minister Gobah to complain. The INS Director called Abdullai within minutes telling him that Dr. Dolphin should go to the airport Friday and meet a certain Colonel Koteh of the INS, who would give him his passport as

CLASS ACTION COMPLAINT

he goes through customs. Abdullai agreed and Dr. Dolphin was given the officer's telephone number to call.

92.     Dr. Dolphin bought window glass and had a carpenter complete the window screens on the campus building much of the morning and afternoon of Wednesday, March 30, 2005.  When he returned to his room at the Metropolitan Hotel about 3 PM he laid down  for sleep to be awoken moments later by a knock on his door.  A strange man dressed in jeans and a T-shirt gave Dr. Dolphin a summons from Mohammed Sheriff, Chairman of the NTLA Health and Social Welfare Committee, requesting his appearance at a hearing the same afternoon, at the capitol building at 2 PM. Dr. Dolphin called Clr. Abdullai. The summons should have been delivered much sooner than the day of the hearing, and when the summons was delivered, it was after the hearing started. Dr. Dolphin told the strange man that he would not be coming to the hearing because the summons was delivered too late.

93.     That afternoon Clr. Abdullai wrote to Mohammed Sheriff, stating that delivery of a summons was not proper or enforceable unless it gave proper notice with enough time for the summoned person to acquire adequate legal representation, and time to arrange his affairs. Also in the letter he asked Mohammed Sheriff to consider the ability of Dr. Dolphin to properly comply with the summons.

94.     On the morning of Thursday, March 31, 2005, Dr. Dolphin read the bold front page newspaper headline "Medical Board Threatens to Prosecute Founder of 'Fake' Medical School". It read as follows:

Medical Board Threatens to Prosecute Founder of 'Fake' Medical School, Alloycious David, Monrovia, Liberia The News, March 31, 2005.

Liberia Medical Board has threatened to turn over the founder of the "fake" St. Luke Medical School and his collaborators to the Justice Ministry for prosecution if they

28

CLASS ACTION COMPLAINT

continue to "abuse and insult" the integrity and professionalism" of the country's Medical Board.

The Board said it cannot and will not discuss application of any doctor from the Medical School because there is no school in Liberia known as the St. Luke Medical School.

The Board noted that unless the "illegal school" can be accredited, it would not license any doctor that it has given diploma to.

Prof. S. Benson Barh, Chief Medical Officer of Liberia, told reporters Tuesday that the 'counterfeit school' through Dr. Meimei Dukuly presented a list of 19 doctors who reportedly completed studies at St. Luke Medical School for the degree of Doctor of Medicine (MD).

Annoyed over dubious existence of the institution, Dr. Barh said it was shameful to have learned that a list of reported trained doctors, who claimed to have passed through the walls of the school, was presented to the Medical Board.

"We are not aware and have no knowledge of the medical school, but we will rather warn representatives of the bogus school to legally and properly apply to operate a medical institution in Liberia," he stressed.

He, amongst many other things noted, that the Medical Broad visited the school's so-called campus and observed that what it saw does not even represent a status of an elementary school's campus, adding in reality, the building is a "run down" dwelling home under major renovation which lacks electricity, laboratory, class rooms, running water among others basic requirements for a representation of a medical institution...

CLASS ACTION COMPLAINT

95.     Benson Barh lied.  The previous year, 2004, Dr. Barh consulted for SLSOM to write a document on the equivalence of medical education in Liberia to medical education in the USA for a price of $3000 USD.  SLSOM paid him in full, See Exhibit 38.

96.     Furthermore, Barh failed to add that there was no college or university in Liberia with electricity, functioning laboratories, or running water.  SLSOM had three generators of different capacity for electricity, all wired to the facility; and SLSOM was newly plumbed.  Its laboratories were newly equipped and functional, and it had the only operating computer laboratory in Liberia, all computers were Internet connected.

97.     On Friday morning, April 1, 2005, Dr. Dolphin was served with another summons at 9 AM again, just as he was leaving the Metropolitan Hotel for the airport. The summons was for a hearing by the NTLA-Health and Social Welfare Committee, chaired by Mohammed Sheriff the very same day at 2 PM. Dr. Dolphin told the server that he was not coming and to talk to his attorney, Clr. Abdullai.. Dr. Dolphin proceeded to the airport where he met the Colonel. The Colonel escorted him to the desk of the Customs Department, wherewith he gave Dr. Dolphin his passport and left. Dr. Dolphin called Clr. Abdullai. Dr. Dolphin did not call his wife until the airplane landed in Accra, Ghana.

98.     Dr. Dolphin did not learn until a few weeks later that Mohammed Sheriff still conducted the hearing regarding SLSOM despite the fact that no one on the SLSOM staff was present for questioning. Some reporters who were present at the hearing, at the demand of Mohammed Sheriff, told Dr. Dolphin, later, that it was a "kangaroo court" where Sheriff had a list of 'haters' with prepared statements, with similar statements, almost word-for-word, coming forth to speak against SLSOM. The speakers did not have any facts to accuse SLSOM, only accusations such as "they are harming the people of Liberia", or " St. Luke is a 'fake' school", or " St. Luke School of Medicine does not exist in Liberia".

CLASS ACTION COMPLAINT

99.     Dr. Dolphin had not seen his wife in almost two months (Susana had a Non-Governmental Charity in Ghana, and worked occasionally at SLSOM, Ghana). He was enjoying the time he spent with her and the peace they had in Ghana. However, on Tuesday morning, April 5, 2005 to the dismay of Clr. Abdullai, he saw the headline of a major newspaper in Monrovia which read as follows:

Fake Medical College Boss Flees? Mensiegar Karnga, Monrovia, Liberia The Analyst, April 5, 2005.

Dr. Jerroll Dolphin, the proprietor and founder [of] the mysterious St. Luke Medical College, has reportedly left the country for fear of being prosecuted.

Informed sources say Dr. Dolphin has "surreptitiously" abandoned his Metropolitan hotel on Broad Street to return home in the United States of America.

There has been intense controversy over the whereabouts of the medical college.

The A. M. Dogliotti College of Medicine had denounced the existence of the alleged fake college in Liberia, even though the school was successful in granting medical degrees to Liberians and other foreign nationals most of whom were Nigerians and Indians.

Defending the existence of St. Luke Medical College in Liberia, the country's Health Minister, Dr. Peter Coleman told reporter at a new conference that the school was not a fake one, added that it met the approval of the 57th national Legislative Assembly during the NPP regime.

Dr. Coleman added that he was unaware whether the institution was registered with the committee on higher institution.

It appeared that the Health Minister's statement further increases tension with his professional colleagues at A. M. Dogliotti and the Chairman on Health at the NTLA,

31

Dr. Mohammed Sheriff who decided to take legal action against Dr. Dolphin [on behalf of] the medical profession.

100.     Clr. Abdullai called Dr. Dolphin in Ghana and told him " Dr. Dolphin, you must come back to Liberia." He explained that without Dr. Dolphin's appearance in Liberia, the public would assume that he is running to avoid prosecution. Indeed, Dr. Dolphin, against the wishes of his wife, agreed to return to Liberia.

101.     Dr. Dolphin left from Accra, Ghana, to Monrovia, Liberia, the next morning at 7 AM, April 6, 2005, and arrived in Monrovia at about 9 AM, and returned to the Metropolitan Hotel.  Once, in Liberia, Dr. Dolphin's mother, Mrs. Ruth Dolphin, called him from Los Angeles to tell him that she was worried.  She told him that there was an article in the Los Angeles Times newspaper stating that he had fled Liberia for fear of prosecution and was 'thought to be hiding' in Los Angeles.

102.     On Thursday April 7, 2005, Dr. Dolphin was not surprised when he received a summons from Mohammed Sheriff to appear on April 12, 2005 before the NTLA-Health and Social Welfare Committee, NTLA-HSW, one week away. So with the time available to him before the hearing, he and Clr. Abdullai planned on what to do before, during, and after the hearing.

103.     Meanwhile, Mohammed Sheriff was also planning. He was pressuring Dr. Isaac Roland to reverse the Statement of Attestation that he recently gave to St. Luke School of Medicine. Threatening Dr. Roland, Sheriff forced Dr. Roland sign a document that was typed on the typewriter of the Congressional Office at the Capitol Building. That letter had a devastating effect on SLSOM, an effect that the medical school is still suffering from.

104.     On April 11, 2005 the National Commission on Higher Education issued a letter to Madame Carole Bede, which stated SLSOM "does not exist" and was a "computer school." Upon receipt of this letter, the ECFMG-IMED without corroboration of the evidence or claims stated in this letter

CLASS ACTION COMPLAINT

immediately withdrew SLSOM from the IMED, and canceled the USMLE test results for all of its students and graduates, past and present.

105.    On April 12, 2005, at about 3 PM, Dr. Dolphin and Clr. Abdullai went to the Capitol Building to the office of Mohammed Sheriff. The hearing started about 3:30 PM and it was a farce. After being called to order by Mohammed Sheriff, a line of about a dozen people came to speak to the so-called committee that consisted of Sheriff and another LURD member of the NTLA, a friend of Sheriff.

106.    The first person to speak was Dr. Kpoto, whom Dr. Dolphin did not know personally. He accused Dr. Dolphin and SLSOM of fraudulently issuing medical diplomas to hundreds of Indians and Liberians 'off the streets', and that SLSOM "does not exist in Liberia." Kpoto offered no proof of his allegations.  Next to speak was Benson Barh who said SLSOM was a 'fake' school and that it "does not exist in Liberia." Several other Liberian doctors, most of whom Dr. Dolphin did not know at all, also came to speak. They all made similar false allegations about SLSOM harming the health and safety of Liberians and that "it does not exist in Liberia." Towards the end of the line was Dr. Isaac Roland, who was shaking. He ended his short speech again with "it does not exist in Liberia." Minister of Education. Dr. Evelyn Kondikai, came to the podium with a canned speech, which also ended with the phrase "it does not exist in Liberia."

107.    In between Kpoto and Kondikai came several doctors that Dr. Dolphin did know, Dr. Dopoe, Dr. Nathanial Bartee, and Dr. J. J. Jones.  Each said they know Dr. Dolphin and they knew about SLSOM and that was all they knew and left the podium.

108.    The next to last person to speak was the Minister of Health, Dr. Peter S. Coleman. Dr. Coleman spoke highly of St. Luke School of Medicine for several minutes then he stopped talking and held his head down. Mohammed Sheriff prodded Coleman for a few moments to continue by say

"and, Dr. Coleman…and Dr. Coleman…" several times. Dr. Coleman looked and Dr. Dolphin and nodded his head, then he looked at Mohammed Sheriff. Mohammed Sheriff said "and, Dr. Coleman", then Dr. Coleman said, "I was misled" and the room went quiet with awe. Dr. Coleman went on to say that his advisers mislead him and he made mistakes in giving SLSOM the support he had given it in the past.

109.    Dr. Dolphin was shocked and knew that there would be more controversy. After Dr. Coleman was dismissed from the podium, Dr. Dolphin was called to answer questions. Clr. Abdullai objected to many questions. Mohammed Sheriff started to yell at Abdullai saying that he should not be representing Dr. Dolphin. However, neither Clr. Abdullai nor Dr. Dolphin backed down from Mohammed Sheriff or the other member of the committee or some of SLSOM's angry accusers. Towards the end of the hearing, around 6 – 6:30 PM, the advantage had left Mohammed Sheriff and was steadily shifting to the support of Dr. Dolphin.

110.    Dr. Dolphin told Mohammed Sheriff and the audience that the speakers made allegations about SLSOM, most of them false allegations, and that they had no facts to prove anything about what they were saying. Even Mohammed Sheriff, with all of his allegations had no facts to support his claims and he was only misusing his position in the temporary National Transitional Legislative Assembly to abuse Dr. Dolphin and SLSOM. Sheriff started yelling, threatening to jail Dr. Dolphin for contempt of the NTLA. Dr. Dolphin yelled back saying that he would go to jail, and then to a court of law, and, in the court of law, he would put an end to these farce hearings and this 'kangaroo court'.

111.    Soon afterward, after 6:30, Mohammed Sheriff adjourned the hearing and told Dr. Dolphin that he must remain in the room because he was "held in contempt" of the NTLA. Abdullai had to leave for another meeting but he reminded Dr. Dolphin of what to do. It was already dark, and the Capitol Building was without electricity. Mohammed Sheriff lit a few candles.

CLASS ACTION COMPLAINT

112.    Soon thereafter, Sheriff and another hoodlum-looking fellow discussed amongst themselves for about 10 minutes. Then Mohammed Sheriff came to Dr. Dolphin and said he was going to take my passport. He took Dr. Dolphin's passport saying that he was going to copy it for NTLA purposes and use and left the room. Dr. Dolphin called the United States Embassy, when Sheriff refused to return his passport, and an embassy official answered. Dr. Dolphin told him that he was at the Capitol Building for a NTLA hearing. The official said that he knew Dr. Dolphin and identified himself. Dr. Dolphin explained that he was at the Liberia Capitol building for a NTLA – HSW hearing on SLSOM and that Mohammed Sheriff had taken his passport without his permission. The official asked if Sheriff was available and that he wanted to talk to Sheriff.

113.    Dr. Dolphin called aloud for Sheriff, telling him that a United States Embassy official was on Dolphin's telephone and that the official wanted to speak with Sheriff. When Sheriff took the telephone Dr. Dolphin could hear the United States Embassy officer yelling at Sheriff through his telephone. Sheriff was trying to allege that Dr. Dolphin's school was 'fake' and 'illegal.' However the United States Embassy officer did not want to hear any excuses from Sheriff about taking Dr. Dolphin's passport. After about 10 minutes of listening to the United States Embassy official screaming at Sheriff, Sheriff said "yes, sir" to the official and gave Dr. Dolphin the telephone.

114.    Then he went to another room and returned, and gave Dr. Dolphin his passport.  Then Sheriff asked Dr. Dolphin if he could use his telephone to explain something to the US Embassy official, to which Dr. Dolphin refused.  After another 30 minutes waiting for Sheriff and his hoodlum-looking friend conversing, Sheriff told Dr. Dolphin that he could leave because he did not want to make Dr. Dolphin a martyr, however, he could not leave Liberia and he would be stopped if he tried.

115.    Outside, waiting for Dr. Dolphin were several reporters who were concerned about Dr. Dolphin being left alone with Mohammed Sheriff. They all took a taxi back to downtown Monrovia and together went to Dr. Dolphin's room at the Metropolitan Hotel. At the Metropolitan Hotel, they

talked about Sheriff and what he had been doing since he had been at the NTLA. They said that Sheriff's concentration had been on upsetting and insulting the Minister of Health, Dr. Peter Coleman.

116.    On April 14, 2005, Dr. Dolphin went to the United States Embassy in Liberia and reported what happened at the Capitol Building in the hearing and with Mohammed Sheriff after the hearing. He opened a "human Rights Violation Report" against Mohammed Sheriff and the Republic of Liberia.

117.    On April 16, 2005, two of Dr. Dolphin's in-laws from Ghana, Benjamin Ofori-Atta and Fugah Benoni, came to assist the campus upgrade. They arrived in Liberia on Saturday, April 16, 2005. Their background was in construction and drafting.

118.    On or about Tuesday April 19, 2005, Dr. Dolphin's two in-laws from Ghana were arrested by INS agents in the "Red Light" District of Monrovia while shopping for food. They were taken for questioning to INS Headquarters in downtown Monrovia when they mentioned that they were in Liberia to work at SLSOM. Clr. Abdullai was called to get the two men out of INS detention. Dr. Dolphin went to the Ghana High Commission (Embassy) and asked the Ambassador to intervene, to which he did.

119.    As it turned out the Director of the INS was also a LURD member and a friend to Mohammed Sheriff. The INS, nightly, before the airplane leaves and after the airplane lands, examines the roster of every airplane entering or leaving Liberia. Dr. Dolphin's travels to Ghana were always available to the INS Director, who would contact Mohammed Sheriff, who would insist that the INS Director stop Dr. Dolphin from traveling.

120.    The INS agents were looking for Dr. Dolphin's in-laws because the immigration records from the airport stated that they traveled to Liberia for SLSOM business. They were released from INS

36

CLASS ACTION COMPLAINT

headquarters in the early night. Their passports were seized and they were told, that they would not get their passports back until they proved that they had return tickets to Ghana.

On or around April 20-22, 2005, Dr. Dolphin was contacted by the Hon. Frank Teah and Senator Beatrice Sherman. They were, and still are, officers of SLSOM.  Frank Teah and Sen. Sherman told Dr. Dolphin that he was doing the wrong thing by not going to the press to fight the false allegations being made against SLSOM.

121.    Frank Teah gathered together a few honest newspaper reporters to help SLSOM counter the numerous false allegations that were being made to the public through various and numerous newspaper articles and radio broadcasts.

122.    SLSOM was featured in several large newspaper articles that countered the false statements previously made in Liberia's press. Dr. Dolphin, Frank Teah, and Sen. Sherman made sure that they had organized opposition against Mohammed Sheriff and his friends. Most of the pro SLSOM newspaper articles featured pictures of the SLSOM campus, its rooms, equipment, library, computers, and laboratories.

123.    Dr. Dolphin, Frank Teah, and Sen. Sherman spoke on several radio broadcasts and mood was shifting. Teah wanted Dr. Dolphin to understand that in Liberia you must use the press to win support and counter any opposition. Otherwise, once accused, what was said against you would be considered to be true.

124.    On Friday April 22, 2005, Frank Teah, Sen. Sherman, Dr. Dukuly and Dr. Dolphin, all, received summonses from the NTLA-HSW Committee to appear on Tuesday August 26, 2005 for another hearing. SLSOM was supposed to provide documentation on several topics to which Dr. Dolphin said he would refuse to do so.

125.    Earlier that day the Analyst newspaper's headlines were disturbing to Dr. Dolphin, Frank Teah, and Sen. Sherman:

Health Minister Confesses: Says "My Advisers Misled Me", The Analyst, Monrovia, Liberia April 22, 2005.

> After fiercely defending the existence of a purported medical college which his professional colleagues had rowdily denounced, Health Minister Peter S. Coleman now appears to have realized that he was being "misled" by his "expert advisers." Leading members of the Liberia Medical Board had challenged Coleman's claim that the school exists and threatened to "prosecute those attempting to insult the integrity and professionalism of the board."

> Two of the board members, Dr. Benson Barh and Dr. Horatius Brown, told reporters at the Health Ministry that the board "has no knowledge of the existence of a medical school named "St. Luke Medical School" in Liberia.

> The fiasco about the existence of the college hit the news last January when the Dean of the A. M. Dogliotti College of Medicine, University of Liberia, Dr. Robert Kpoto, who is also a proprietor of the Med-Link Clinic in Monrovia, investigated the entire episode.

> After a careful research, Kpoto discovered that the non-existing medical school was "clandestinely issuing diplomas and medical degrees to Liberians and other foreign nationals to form part of the medical labor force..."

> [Health Minister Coleman] declared his intention to "suspend all interactions with St. Luke Medical School effective immediately pending the results of the various inquiries currently underway."

> Coleman also said the ministry will conduct an independent inquiry "to ensure that the procedures and vetting mechanism by which expert advice is preferred for the

CLASS ACTION COMPLAINT

Minister of Health is beyond reproach and that another St. Luke fiasco is never again allowed occurring.

Observers say the Health Minister's latest concession that the St' Luke Medical College does not actually exist seems to have ended the intense controversy over doubts about the school's presence in Liberia.

126.    At no time before, during, or after these announcements did anyone from the Ministry of Health, the NTLA-HSW committee, or from A. M. Dogliotti School of Medicine interview or question any staff member or executive of SLSOM.  No one other than Dr. Isaac Roland knew or even asked anything about SLSOM's curriculum, students, or graduates.  Nor was any written report about any investigation of SLSOM ever seen by anyone other than, if he did, Mohammed Sheriff. No agency or person who has publicly stated to have investigated SLSOM has ever produced any evidence to newspaper reporters or to a court of law.

127.    On April 23-25, 2005, SLSOM and staff prepared for the hearing to be conducted on April 26, 2005 at the Capitol Building. Parts of the SLSOM campus in Gaye Town were concreted and pavement was placed in areas where needed.

128.    The hearing got started around 2 PM on Tuesday, April 26, 2005.  The hearing was held in Mohammed Sheriff's office at the Capitol Building. The room was full of reporters, many with cameras, and a few 'witnesses' that Mohammed Sheriff had brought to impress the reporters. This time everyone was sworn-in by someone holding a Bible. Then there was a prayer ceremony. Dr. Dolphin, Frank Teah, Sen. Sherman, and Dr. Dukuly were in attendance, as were Dr. Dolphin's in-laws, Benjamin Ofori-Atta and Fugah Benoni, both Ghanians appearing as witnesses for SLSOM. A representative of the United States Embassy was also present during the hearing, at Dr. Dolphin's request.

CLASS ACTION COMPLAINT

129.    After the prayer Mohammed Sheriff began his 'inquiry' by introducing the Consul General of India. He accused SLSOM of being a 'diploma mill' that sold medical diplomas to more than 700 Indians off of the streets. He offered no proof. Sheriff then called Dr. Dukuly. He questioned the authenticity of Dukuly 's credentials, forgetting that Dr. Dukuly was once the Minister of Health of Liberia. Dukuly informed Sheriff that he was a graduate of Temple University, Philadelphia, Pennsylvania, medical school in 1966.

130.    Then Sheriff turned his attention to the Hon. Frank Teah who answered all questions with authority and facts. Frank Teah was questioned about the each of SLSOM's authorizing legal documents. He gave detailed facts about how each document was approved. Mohammed Sheriff backed off questioning Frank Teah because Sheriff saw the mood of the crowd, and more importantly the mood of the reporters, change to the favor of SLSOM during Teah's questioning..

131.    Then he called Dr. Dolphin's in-laws, who stood up in a corner of the room. He accused them of coming to teach medicine at SLSOM. When they replied that they were construction workers who had come only to help Dr. Dolphin finish the landscaping and fencing for the SLSOM campus in Gaye Town, the audience laughed loudly. Mohammed Sheriff was very embarrassed.

132.    Then Sheriff called Senator Beatrice Sherman to testify. She told how she met Dr. Dolphin and how she, the Hon. Frank Teah, Health Minister Dr. Peter Coleman, and Dr. Dukuly and others worked hard to get the SLSOM charter passed in the congress and senate of Liberia. Then she told of how she carried the Act and Bill to then President Charles Taylor, personally, risking her life due to the heavy fighting in Monrovia during the last days of the civil war in August 2003. She was at Taylor's home when he signed the documents. Then she carried them back to the Capitol Building where the Act and Bill were put into the Congressional and Senatorial records, and then the documents were also officially recorded in the Presidential records and the Ministry of Foreign Affairs.

133.    Mohammed Sheriff could not continue to question Sen. Sherman because now the mood had shifted even further and the audience turned against Sheriff. Sheriff said loudly "the Act is a fake". Then Sen. Sherman broke a 'bombshell'. She turned to Sheriff and very loudly said, "You are a fake. You asked us for a bribe of $6,000 United States Dollars a month."

134.    The Hon. Frank Teah immediately contributed, yelling, " St. Luke School of Medicine did not want you to be a part of this school. We knew your reputation as a troublemaker. Why would we pay you $6000 a month? Who are you?" The audience went crazy, some reporters accused Sheriff of a vendetta. Dukuly added, "You are the fake. You are not a real doctor.  You are only trying to get back at Minister Coleman". Dr. Dolphin yelled "You wanted a $6000 a month bribe from me, and Benson Barh wanted a bribe, too."

135.    The entire room was abuzz. Cameras were flashing. Reporters were running over to Sen. Sherman and Frank Teah for more comments, ignoring Mohammed Sheriff 's call to come to 'order' He immediately called the meeting to adjourn. Dr. Dolphin, Frank Teah, Sen. Sherman, Dr. Dukuly all stepped outside into the hallway to a circus of reporters wanting more information. Mohammed Sheriff walked quickly away to the stairway with a few reporters following him asking questions on the allegations made by Sen. Sherman, Frank Teah, Dr. Dolphin, and Dr. Dukuly.

136.    Needless to say there was no mention of the hearing in any newspaper the next day nor any other day to follow.  From that time on, Mohammed Sheriff had difficulty getting any comment about SLSOM into any newspaper in Liberia.  Some papers publicly criticized him for threatening to revoke the press passes reporters and newspapers that did not do what he wanted done.

137.    Dr. Dolphin was awakened at about 4 AM on Thursday April 27, 2005 by a call from a St. Luke School of Medicine student in Maryland, Masilomony Pauliah.  He told Dr. Dolphin that the ECFMG would not allow him to register for the United States Medical Licensing Examination, USMLE. He said that SLSOM was taken out of the International Medical Education Directory.

41

Dr. Dolphin immediately called Ms. Carole Bede at the Educational Commission for Foreign Medical Graduates in Philadelphia, Pennsylvania.  She told Dr. Dolphin that she just received a letter from Dr. Isaac Roland that revoked his previous letter that she received in March 2005. Dr. Dolphin asked her to send a copy of that letter immediately to him for his record.

138.    On 27 April 2005, Carole Bede issued a letter to St. Luke School of Medicine, which states: "On April 25, 2005, FAIMER received a letter dated April 11, 2005 from Isaac Roland, Ed. D. Director General, National Commission on Higher Education, Ministry of Education, Liberia. In his letter, Dr. Roland stated that although the Commission had issued a "letter of attestation to St. Luke School of Medicine," after investigation, it has been determined that St. Luke School of Medicine does not exist in the Republic of Liberia and that "the Secretariat of the National Commission therefore revokes the attestation effective immediately." A copy of this letter is enclosed."

139.    "Therefore, although previously listed in IMED, St. Luke School of Medicine-Liberia is no longer listed in IMED and students and graduates of the school are not eligible for the USMLE or ECFMG certification."

140.    Completely discrediting the documentation ECFMG-FAIMER-IMED received from trustworthy Liberian government officials prior to 2005, ECFMG, with bias removed St. Luke School of Medicine-Liberia from the IMED on April 27, 2005. ECFMG did not bother to corroborate SLSOM's removal with the NCHE, or verify the authenticity of the letter, the only letter concerning SLSOM sent to ECFMG from the NCHE using a typewriter instead of it being a word-processed document..

141.    Several days later Dr. Dolphin received the document that NCHE mailed to the Educational Commission for Foreign Medical Graduates that the ECFMG received on April 25, 2005.  The National Commission on Higher Education never sent a copy of this letter to St. Luke School of Medicine, as required by law. See Exhibit "11".  Seeing that the press was no longer interested in

running stories about SLSOM because of its improved relations and because most of the press agents and reporters were witnesses to the 2nd NTLA-Health and Social Welfare Committee hearing where Mohammed Sheriff was accused by SLSOM officers of extortion. Mohammed Sheriff went to the National Transitional Legislative Assembly to do his 'dirty work'.

142.    Dr. Dolphin was scheduled to leave Liberia Tuesday morning, May 10, 2005. At 6:30 AM. Frank Teah called Dr. Dolphin telling him that he could not leave Liberia. He asked Dr. Dolphin to turn on the radio and listen to any station. Dr. Dolphin did only to hear that the NTLA had ordered the closure of SLSOM and that all property of SLSOM would be seized immediately, and that all officers of SLSOM would be arrested and prosecuted. The radio broadcast went on to say that Dr. Dolphin was prohibited from leaving Liberia and that his passport would be seized and Dr. Dolphin will be arrested at Roberts International Airport. The Dr. Dolphin called Clr. Abdullai, who said he was coming to the SLSOM campus immediately

143.    Dr. Dolphin told one of his staff members to run and buy a newspaper about St. Luke School of Medicine. When the staff member returned Dr. Dolphin saw the headlines:

> NTLA Orders 'Bogus' St. Luke University Closed, James West, Liberian Observer, Monrovia, Liberia May 10, 2005.
>
> Lawmaking body of Liberia says it has established that the school of medicine is a fake medicine institute, has endangered the health of Liberians.
>
> Following several weeks of investigation into its operations in Liberia, the National Transitional Legislative Assembly (NTLA) says the management of St. Luke School of Medicine has endangered the health of the public and should be turned over to the Justice Ministry for prosecution.
>
> The transitional assembly said it has been established that St. Luke School of Medicine is a fake medical institute and is not a legal establishment.

43

CLASS ACTION COMPLAINT

The NTLA's Joint Committee on Health and Education which conducted the probe recommended to plenary that the purported medical school be closed down immediately and all banks be instructed to freeze their assets pending the conclusion of the Justice Ministry's inquiry.

144.    Frank Teah and Sen. Sherman called Dr. Dolphin telling him that they were lobbying lawmakers in the NTLA and they would vote that morning for reconsideration of the act that was passed late the previous night when most NTLA members had already gone home.

145.    Dr. Dolphin told his in-laws, Benjamin Ofori-Atta and Fugah Benoni to go on to the airport and fly to Ghana. When Abdullai arrived, he got into the waiting taxi and escorted Dr. Dolphin's in-laws to the airport in case there was any trouble. Dr. Dolphin called his wife to tell her what was happening and waited for Frank Teah and Sen. Sherman to call.

146.    About noon, Frank Teah and Sen. Sherman, again, called Dr. Dolphin to tell him that the NTLA did vote in favor of a reconsideration of the Act, and that the Act was tabled and would not be reconsidered for at least 30 days. As it turned out the act was never reconsidered and Sheriff was removed as Chairman of the NTLA-Health and Social Welfare Committee in June 2005. From then, he served as Chairman of the NTLA – Executive Committee that interfaced with the National Transitional Government President Gyude Bryant.

147.    Dr. Dolphin, nor SLSOM, nor any of its officials were ever investigated or charged for any crime by the Justice Ministry, however, because of the threats of Mohammed Sheriff, Benson Barh, and other Liberian government officials, Dr. Dolphin had lived in fear, and still lives in fear.

148.    On or around June 2005, Mohammed Sheriff did not waste time. He announced the formation of a "5-member Executive Committee" to study St. Luke School of Medicine. The five-members included:

    1.    Soko V. Sackor, LURD, NTLA Assemblyman

44

CLASS ACTION COMPLAINT

2.      Kabinah Janneh, LURD, Minister of Justice

3.      Vamba Kanneh , LURD, Minister of Transportation

4.      Dr. Evelyn Kondikai, Minister of Education

5.      Dr. Peter Coleman, Minister of Healthcare

149.    During the interim period Frank Teah, Sen. Sherman, Dr. Dolphin, and Dr. Dukuly worked to get the NTLA to approve the reconsideration.  However, Mohammed Sheriff lobbied very hard to postpone the vote.  Dr. Dolphin was forbidden to leave Liberia, constantly under threat, public and private by Mohammed Sheriff.

150.    On July 13, 2005, within 3-weeks of its formation, the "Five-Member Committee",  approve a report concerning SLSOM.  Through the Ministry of Information on Friday, July 15, 2005 the announcement below was broadcast on radio and television throughout Liberia. It was also published in the newspapers on Tuesday, July 19, 2005:

> Gov't Finally Closes St. Luke, Monrovia, Liberia The Inquirer, July 19, 2005.
>
> The Government of Liberia has ordered the immediate closure of the St. Luke School of Medicine for illegally operating in the country.
>
> According to an Information Ministry release issued over the weekend, the government's decision is based on the findings and recommendations of a five-member committee constituted last March to probe the existence of St. Luke.
>
> A full criminal investigation is to be conducted against the proprietor of the school and others who may have knowingly aided the process of opening the school.
>
> All medical degrees issued by St. Luke School of Medicine are nullified and the school pronounced non-existent in Liberia, in keeping with the committee's recommendations approved by the Chairman of the National Transitional Government of Liberia, His Excellency Charles Gyude Bryant.

45

CLASS ACTION COMPLAINT

The committee had observed that an Act to Incorporate St. Luke was approved in 2003, but was never enacted by the legislature in session.

The cabinet committee further observed that the St. Luke School issued medical degrees in December 2001, January 2002, June 2002, August 2002, February 2003 and June 2003 when Monrovia was under attack.

The Cabinet Committee chaired by Justice Minister Kabinah Ja'neh, included Education Minister Evelyn Kandakai, Transport Minister Vamba Kanneh, Health Minister Peter Coleman and the Director General of the Cabinet, Soko V. Sackor.

151.    On July 21, 2005, SLSOM filed a "Writ of Prohibition" in Liberia's Supreme Court against the Liberian Government seeking redress against the false claims made by Liberian government officials that SLSOM "does not exist" and prohibit further actions against SLSOM by the government. The defendants named were the Minister of Justice, the Minister of Education, The Five-Member Committee chaired by the Justice Minister, and any other Liberian agency.  See Exhibit "12"

152.    On the same day, July 21, 2005, simultaneously to SLSOM filing a "Writ of Prohibition" in Liberia's Supreme Court against the Liberian Government, the Minister of Justice, the Minister of Information, and Mr. Mohammed Sheriff accompanied by more than 2-dozen members of the Liberia National Police illegally raided the SLSOM campus, declared "non-existent" by select Liberian government officials, and arrested an innocent SLSOM employee, Jessie Sackie, who was held illegally for 24 hours.

153.    They were looking to arrest and detain Dr. Dolphin, who was filing at the Supreme Court of Liberia.  Note that the Minister of Justice and the Minister of Information were members or the Five-member committee, members of LURD, and friends of Mohammed Sheriff.  They did not present a warrant to enter and search the SLSOM premises, nor to arrest Jessie Sackie or Dr. Dolphin.

46

Dr. Dolphin went into hiding.  With the aid of a friend, Dr. Dolphin hid for the next two days outside of Monrovia until July 23, 2005, venturing into Monrovia to conduct SLSOM's business hidden under a cloth in a friend's car.

154.    On July 22, 2005, the Supreme Court issued an Order to Show Cause that prohibited the Liberian government from taking action against SLSOM.  The 'show cause' hearing was scheduled for Monday, July 24, 2005.  A Supreme Court justice ordered the Minister of Justice by telephone to release the SLSOM employee, Jessie Sackie.  See Exhibit "14"

155.    On July 24, 2005, only SLSOM attorneys and officials showed for the 'show cause' hearing. The order to 'prohibit Liberian government action against SLSOM was extended. Another hearing on the "Writ of Prohibition" was scheduled for August 4, 2005.

156.    On August 4, 2005, only SLSOM attorneys and officials showed for the 'Writ of Prohibition' hearing. The order to 'prohibit Liberian government action against St. Luke School of Medicine was extended, and another hearing on the "Writ of Prohibition" was scheduled for August 10, 2005 to which all defendants were duly served notices to appear by the Colonel Amos Dixon of the Court Marshall's Office. See Exhibit "15".

157.    On August 10, 2005, only SLSOM attorneys and officials showed for the 'Writ of Prohibition' hearing. The Supreme Court granted relief to SLSOM, ordering all agencies of the Liberian government to restore SLSOM to "status quo ante", that being an accredited medical school, complete with a charter, and an attestation. Additionally, the Supreme Court permanently ordered to "prohibit Liberian government action against SLSOM". A final Supreme Court hearing was scheduled on August 20, 2005 to which all defendants were duly served notices to appear by the Colonel Amos Dixon of the Court Marshall's Office.. An original copy of this order was sent to Madame Carole Bede at ECFMG, which was ignored. See Exhibit "16"

CLASS ACTION COMPLAINT

158.    On August 20, 2005, only St. Luke School of Medicine attorneys and officials showed for the 'Writ of Prohibition' hearings. On August 22, 2005, the Supreme Court granted SLSOM a "Clerk's Certificate", a default certificate indicating that Liberian government failed to respond or petition against SLSOM's "Writ of Prohibition." See Exhibit "17". All of the defendants were duly served copies of the "Clerk's Certificate" by the General Amos Dixon of the Court Marshall's Office on two occasions.

159.    Madame Carole Bede at ECFMG, told Dr. Dolphin both by telephone and by e-mail that she would not comply with the Supreme Court order in September 2005.  ECFMG would change SLSOM's status on the IMED only if it received instructions from the NCHE.  Dr. Dolphin objected stating that it was the very same organization that sent the false documentation in the first place.

160.    [Reserved]

161.    On October 3, 2005, the National Commission on Higher Education for Liberia sent a letter to ECFMG:

"Based upon the ruling of the Supreme Court of the Republic of Liberia regarding St. Luke School of Medicine, the court has ordered the medical school reinstated to its previous status it was during the accreditation process."

"Abiding by the Supreme Court Order, the National Commission on Higher Education hereby revokes the letter, dated April 11, 2005 (paragraph 12), which denied the existence of St. Luke School of Medicine and further advises that it should continue its existence" ………

"We also request that the St. Luke School of Medicine be included in the International Medical Education Directory as it was previously."

See Exhibit "18"

CLASS ACTION COMPLAINT

162.    ECFMG completely disregarded the NCHE letter. SLSOM was not listed on the IMED as it was previously, and has not been since.

163.    [Reserved]

164.    After staying only six days in Los Angeles, he returned to Ghana, where his wife insisted that he recover from the trauma he experienced in Liberia before returning. He returned to Liberia the third Tuesday of November 2005.

165.    On December 7 2005, the National Commission on Higher Education for Liberia sent another letter to ECFMG:

> "that a campus of the St. Luke School of Medicine has been formally established in Gaye Town, Monrovia. The National Commission on Higher Education has inspected the campus before, and re-inspected it recently, and found it to be satisfactory and ready to operate."

See Exhibit "19"

166.    On 26 January 2006, Carole Bede representing Foundation for Advancement of International Medical Education and Research, Philadelphia, PA, issued a letter to Dr. Isaac Roland, National Commission on Higher Education, Republic of Liberia, which stated:

> 1.    "What is the status of medical degrees awarded by St. Luke School of Medicine for the years 2000 to 2005? Are holders of degrees issued during those years recognized as physicians by the government of Liberia, and are they eligible to apply for medical licensure in Liberia?
>
> 2.    Are graduates of St. Luke School of Medicine who receive their medical degrees beginning January 2006 eligible for medical licensure in Liberia? If so, as of what date are (or will) these graduates be eligible for medical licensure in Liberia?
>
> 3.    Please confirm that instruction has begun at the campus of St. Luke School of Medicine in Gaye Town, Monrovia, and the date on which instruction began.

49

CLASS ACTION COMPLAINT

167.    The National Commission on Higher Education, NCHE, has NEVER replied to, or answered this inquiry from Madame Carole Bede, of the Foundation for Advancement of International Education and Research, FAIMER, an ECFMG foundation.  Similar questions about SLSOM's accreditation and campus were answered in a March 12, 2005, letter to ECFMG.  See Exhibit "13"

168.    In the meanwhile, on December 30, 2005, Dr. Dolphin was informed that his mother, Mrs. Ruth Dolphin, died at an Inglewood, California hospital on December 29, 2005 from a stroke.  Again, Dr. Dolphin now being a pauper, Dr. Dolphin's family bought return airplane tickets for Dr. Dolphin and his wife, Susana, to come to Los Angeles to attend his mother's funeral scheduled for Saturday, January 7, 2006.  Dr. Dolphin and his wife, both traumatized by the experience in Liberia stayed in Los Angeles until the middle of February 2006.  Dr. Dolphin, almost immediately after his arrival in Accra, Ghana, left for Monrovia, Liberia to further continue with SLSOM's business there.

169.    In February 2006, SLSOM bought two acres of land along the highway between Monrovia and Roberts Intentional Airport.  It is across the highway from the military base and the new campus of the Methodist University.

170.    In March 2006, Dr. Dolphin filed for a building permit on the SLSOM land for a 15,000 building for basic sciences.  The Department of Public Works would not give SLSOM the building permit because the Director knew of the SLSOM controversy.  SLSOM did not obtain the building permit until July 2007.

171.    In June 2006, the Liberian President Ellen Johnson-Sirleaf dismissed government officials for "acts of impropriety."

172.    One of the officials dismissed, Dr. Benson Barh, Chief Medical Officer and Executive Secretary of the Liberian Medical Board, was a primary government official involved with misrepresenting SLSOM's Liberia Accreditation and Charter status worldwide. See Exhibit "20"

50

CLASS ACTION COMPLAINT

173.    On September 18, 2006, St. Luke School of Medicine filed a lawsuit against the Republic of Liberia in Liberia Civil Court, in Monseratto County, Liberia, at the Temple of Justice in Monrovia. The lawsuit named the Ministry of Education, the Ministry of Health, and all those working under the scope and authority of the Republic of Liberia.  See Exhibit "21"

174.    Also see the following Exhibits regarding SLSOM's "Damages for Wrong" lawsuit in Liberia:

   1.  Exhibit "22 "

   2.  Exhibit "23"

   3.  Exhibit "24"

   4.  Exhibit "25"

   5.  Exhibit "26"

   6.  Exhibit "27"

   7.  Exhibit "28"

   8.  Exhibit "29"

   9.  Exhibit "30"

175.    On October 30, 2006, SLSOM obtained a "Default Certificate" against the Republic of Liberia. See Exhibit "30" Dr. Dolphin and SLSOM students are informed and believe that neither the Ministry of Education nor the Ministry of Health, the Liberian Medical Board, the National Commission on Higher Education, the National Transitional Legislative Assembly or any of the following individuals  answered SLSOM's last motion for fear of facing criminal conspiracy charges: Dr. Isaac Roland, Dr. Benson Bahr, Dr. Kpoto, Mohammed Sheriff, Dr. Horatius Browne, and Dr. Evelyn Kandiki

176.    Cllr. Ignatius Weah, SLSOM's attorney attempted to set hearings for both Default Certificates, so that both could be converted into an executable judgment. No court would allow him to set a hearing.  Further, Dr. Dolphin was told that he must take the Default Certificates to Claims

51

CLASS ACTION COMPLAINT

Court. However, then and up to the time of this writing, no Claims Court exists in Liberia, in violation of Liberia's own constitution.

177.    Cllr. Weah tried on numerous occasions to obtain an 'assignment' at Liberia Supreme Court for a final judgment on its "Writ of Prohibition", its civil court damage suit for $120,000,000 USD, and its civil court judgment against its campus landlord, Rebecca J. Moore.  Now, the former National Transitional Government's Minister of Justice, Kabinah Janeh, was appointed an Associate Justice of the Supreme Court.  The very same Minister of Justice who along with Mohammed Sheriff raided the SLSOM campus in 2005.  He scheduled all cases that came before the Supreme Court, and he would not schedule St. Luke School of Medicine vs. The Republic of Liberia.  Nor would Associate Justice Kabinah Janeh recuse himself from the case.

178.    From August 2007, SLSOM rehired Clr. Charles Abdullai to assist Clr. Weah to obtain an assignment from the Supreme Court of Liberia.  Until now, both lawyers have been unsuccessful in obtaining a date for the Supreme Court hearing.

179.    Dr. George Gollin has numerous links on the Internet about the SLSOM being a 'fake' school and a 'diploma mill'.  Many of his postings are fantastic, speculative, and imaginary.  One MS Power Point online presentation states that, "St. Luke is a diploma mill."; "A U.S. State Dept. official says it's fake"; "Liberia says it's illegal"; "A Ghanaian official said it's bogus";  "It's really run by a small group of Americans"; "Dr. Dolphin is an owner of Bio-Life Laboratories"; "Dr. David Karam and Steve Arnett are owners of SLSOM";  and "St. Luke School of Medicine: www.stluke.edu an entirely fake medical school run from TX, KY, CA."

180.    Gollin stated in a recent interview that he intends to put SLSOM out of business.  Gollin recently presented a 91-page document to the Ghana National Accreditation Board full of false, libelous, and slanderous statements about Dr. Dolphin, Dr. Dolphin's wife, Susanna Mitchell, and SLSOM.  The document was submitted to the Ghana Court of Appeals by the National Accreditation

Board to appeal a judgment in favor of St. Luke School of Medicine-Ghana (not the same institution as St. Luke School of Medicine-Liberia).

181.     The Ghana National Accreditation Board submitted Gollin's document to cast doubt on the credibility of Dr. Dolphin and St. Luke School of Medicine-Liberia because St. Luke School of Medicine-Ghana won accreditation in Ghana through a decision of the Ghana High Court in October 2009.  In Gollin's document, he claims that Dr. Dolphin is a fraudulent criminal despite the fact that he was never arrested in Liberia or sued for fraud by anyone from Liberia, or anywhere else in the world including the United States before, during, or after SLSOM's crisis in Liberia of 2005. SLSOM will present this libelous document to the court as evidence during trial.

It was a wanton, malicious, intentional, slander of Dr. Dolphin and his wife, again without any evidence and without providing any proof, just based on information anyone could get off of the Internet, and with complete disregard as to its validity, truth, and verifiability.  Gollin accused Dr. Dolphin of being a fraud.  Furthermore, he accused Dr. Dolphin's wife of embezzlement without any proof, just naked allegations that cause her name and reputation to be publicly disparaged in Ghana.

182.     The University of Illinois – Urbana is complicit in its support of George Gollin, who uses University of Illinois letterhead and insignia to lend credibility to his misinformation.  The University of Illinois has permitted Gollin to use its computers and servers in Gollin's campaign against SLSOM.  Gollin has slandered and libeled SLSOM in more than two dozen speaking engagements, as listed on his University of Illinois website: http://web.hep.uiuc.edu/home/g-gollin/ .

Gollin's University of Illinois website seven direct links full of false and misleading information about SLSOM.

183.     The online curriculum created by Dr. Dolphin for SLSOM was the first of its kind in the world. The online curriculum mirrored the curriculum offered in Liberia on the SLSOM campus. The

CLASS ACTION COMPLAINT

curriculum was and is based on the exam topics listed in the USMLE Annual Step 1 Bulletin for basic sciences, the first two years of medical school. See Exhibit "36".

184.    SLSOM records each and every examination score in the medical student's record, which is recorded in the student's transcript, which is then averaged for each course for the course final grade. A SLSOM medical student is not allowed to fail any examination in any course.  A student has four chances to pass any examination, otherwise that medical student must retake the entire course and cannot progress until that course is passed.  The transcripts of all SLSOM students and graduates will clearly demonstrate SLSOM's diligent record keeping.

185.    Accurate financial records were kept for each and every student enrolled in SLSOM.  At no time were hundreds of Indian or Liberian students ever enrolled at SLSOM.   Liberian students were not even charged tuition at SLSOM.  However, the Liberian campuses were destroyed from civil war on two occasions and closed as a result of governmental extortion,  interference and misconduct from 2005 until the present day.

186.    During the first eight years of SLSOM's existence, 1998 through 2006, SLSOM graduated 36 doctors.  This represents an average of 4.5 doctors a year.  This does not fit the definition of a "diploma mill".  SLSOM has never accepted a "fee" for a "degree".  All SLSOM graduates must pass a comprehensive 3-part, 400 question Clinical Science Comprehensive Examination, called a "qualifying examination."

187.    It is impossible for a medical student to graduate with a Doctorate of Medicine degree with courses completed online.  Even if a student completes SLSOM's online curriculum for basic sciences, which only 6 medical students did during SLSOM's operation in Liberia until 2006, the medical student would have to complete at least 80 weeks of clinical rotations at an accredited hospital to graduate, aside from other requirements needed for graduation.

188.    SLSOM medical students must complete at least 2200 hours of basic science instruction and 3200 hours of clinical clerkships, along with passing SLSOM's 3-part Clinical Science Comprehensive Examination and perform 100 hours of community service.  This information has been on SLSOM's Internet website since 2001 and is well documented.

189.    SLSOM's  students had accomplished much before its crisis with the government of Liberia in 2005.  This includes the following:

| Country or Region | Agency | Accomplishments* |
|---|---|---|
| United States | Educational Commission for Foreign Medical Graduates (ECFMG) | 80% + pass rate on the United States Medical Licensing Examinations (USMLE). 14 attempts, 12 passes |
| Nigeria | Medical and Dental Council | 100% pass rate on Nigerian medical licensing examinations. 3 attempts, 3 passes |
| Ghana | Medical and Dental Council | 75% pass rate on Ghanaian medical licensing examinations. 4 attempts, 3 passes. SLSOM graduates were the top scorers, 1-2-3, on the February 2004 examination. |
| Kenya | Medical and Dental Council | 100% pass rate. 1 attempt, 1 pass. SLSOM graduate is a licensed surgeon in Kenya |
| India | All India Medical Council | 100% pass rate. 1 attempt, 1 pass |

CLASS ACTION COMPLAINT

| Canada | General Medical Council | 100% pass rate. 1 attempt, 1 pass |
| Mexico | | 100% pass rate. 1 attempt, 1 pass |
| Worldwide | | 88% pass rate. 25 attempts, 22 passes |

\* The above figures are reliable estimates based on known results by Dr. Dolphin of Medical Students' accomplishments during and after they left SLSOM.

190.     The best evaluation of the rigor and effectiveness of St. Luke School of Medicine's online and clinical science curriculum is the pass rate for national and international medical licensing examinations.  SLSOM's worldwide medical licensing examination pass rate of 88% is exceptional. If the scores from medical students forced to transfer to other medical schools due to the IMED removal and subsequent fallout were included in this calculation, SLSOM's worldwide medical licensing examination pass rate would rise to 96%.

191.     Because there is no central foreign medical school accrediting body, a foreign medical school's listing on the IMED essentially acts as a de-facto accreditation. The hallmark used by ECFMG in assessing foreign medical programs is student passage rates on the USMLE.

192.     ECFMG and FAIMER removed SLSOM from IMED, surprisingly, among other things, without taking note of SLSOM students high USMLE pass rate. This meant that SLSOM graduates and degrees will not recognized worldwide. World Health Organization's Worldwide Directory of Medical Schools will no longer be updated.

VIII.   CAUSES OF ACTION

A.     TRADE LIBEL

193.     Plaintiffs incorporate paragraphs 1 through 192 herein. Defendants made several public statements concerning SLSOM.  On January 20, 2005, Carole Bede received an unnamed and

unsigned letter on NCHE letterhead that stated: "St. Luke School of Medicine is not registered or accredited as a medical school in Liberia." On March 16, 2005, in "The Inquirer", Monrovia, Liberia, Assemblyman Mohammed Sheriff stated that, "the whole thing about the school is fake."

194.    On March 22, 2005, in a letter addressed to SLSOM regarding a recent "inspection" Dr Horatius Browne of the Liberian Medical Board stated that SLSOM had no library, books, handbook or laboratories.  Dr. Browne also stated in his letter that SLSOM was not "representative of a Medical College."  On March 31, 2005, the Inquirer reported that the Liberian Medical Board, at a NCHE hearing called by Sheriff, stated, "there is no school in Liberia known as the St. Luke School of Medicine", that it was "illegal", and "counterfeit." Dr. Benson Barh, Chief Medical Officer of Liberia, stated "we are not aware and have no knowledge of *the* medical school."

195.    On that same day, Dr. Barh stated that the building where SLSOM was located was "a run down dwelling home under major renovation which lacks electricity, laboratory, class rooms, running water."  On April 11, 2005, the NCHE issued a letter to ECFMG that stated SLSOM "does not exist" and was a "computer school."  On April 12, 2005, Dr. Isaac Roland (NCHE) and Dr. Kondikai (Minister of Education) both stated at an NTLA hearing that SLSOM "does not exist in Liberia." May 10, 2005, the NTLA declared that SLSOM was "a fake medical institute and is not a legal establishment" and had endangered "the health of the public and should be turned over to the Justice Ministry for prosecution." (paragraphs 193 through 195 collectively "Public Statements")

196.    Defendants made Public Statements. SLSOM was accredited in August 1, 2000.  See Exhibit "12".  SLSOM was incorporated on August 22, 2001.  See Exhibit "31".  NCHE granted SLSOM a Temporary Permit to Operate on September 17, 2002.  See Exhibit "3".  The National Legislature of the Republic of Liberia granted SLSOM a Charter through an Act of the Legislature on April 24, 2003.  See Exhibit "31".  The Charter was signed by then President Charles Taylor on August 7, 2003.  See Exhibit "4".  The Ministry of Foreign Affairs published the Act and the Charter on August

8, 2003. See Exhibit "4". The NCHE issued a Statement of Attestation on March 2005. Exhibit "8". SLSOM was equipped with running water, electricity, computers, books, CD-ROMs, microscopes, a rigorous curriculum, qualified instructors, and diligent students. See Exhibits 1 through 41 (paragraphs 193 through 196 collectively "False Public Statements).

197.    Defendants' False Public Statements were published and so disparaged the quality of SLSOM's services that despite SLSOM's extraordinarily high medical licensing examination pass rate (96%), ECFMG removed SLSOM from the IMED twice, with the second removal continuing to the present time. Defendants' statements have also caused others to consequently disparage SLSOM's name, property and services; Dr. George Gollin and the University of Illinois have and continue to disparage SLSOM and its services, students, diplomas and degrees based on information gleaned solely from the aforementioned sources.

198.    Defendants knew or should have known that their False Public Statements were likely to cause pecuniary harm or loss. Defendants, and each of them, were well aware of the existence of SLSOM from 2000 and beyond. Dr. Peter Coleman, Dr. Isaac Roland, Dr. Barh, and Mohammed Sheriff, as representatives of Ministry of Health, National Commission on Higher Education, and the Liberia Medical Board, and National Transitional Legislative Assembly, each had intimate awareness and played integral roles in the development of SLSOM, as set forth above.

B.      INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE

199.    Plaintiffs incorporate paragraphs 1 through 198 herein. SLSOM owned a Charter and an Act of Legislature, making SLSOM a legal and corporate entity with perpetual succession, having the authority to contract, sue and be sued, plead and be impleaded in any court of competent jurisdiction within the Republic; to purchase or otherwise acquire and hold property, real and mixed up to the value of one hundred and fifty million United States dollars (US$150,000,000); making St. Luke School of Medicine (SLSOM) to be perpetually maintained in the Republic of Liberia for medical

58

education of the people of this nation, people of the other countries and for those who may have the capacity to seek medical education.

200.     Defendants, and each of them, were aware of SLSOM's economic relationship with the Republic of Liberia, ECFMG, potential medical students worldwide, and the World Health Organization, by virtue of the enabling documents: the Act, Charter, and Statement of Attestation. Defendants were aware of SLSOM's legitimate status, and SLSOM's profit making potential and actuality. Defendants False Public Statements were designed to disrupt SLSOM's worldwide economic relationships. Defendants False Public Statements caused ECFMG to permanently remove SLSOM from the IMED, even after a Liberian Supreme Court order and several subsequent NCHE letters requested that SLSOM be reinstated. As a consequence of SLSOM's removal from the IMED, Medical Students lost jobs, residencies, and positions. Additionally, Medical Students had legitimately earned licenses revoked and properly earned degrees invalidated, as set forth in Exhibit "1".

C.     FALSE IMPRISONMENT

201.     Plaintiffs incorporate paragraphs 1 through 200 herein. Defendants, without lawful privilege, confined Dr. Dolphin against his will by preventing him from traveling freely as is set forth in paragraphs 80 through 85.

D.     NEGLIGENCE

202.     Plaintiffs incorporate paragraphs 1 through 201 herein.  Defendants owed a duty to Plaintiffs to ensure that Plaintiffs not be deprived of life, liberty, or property, without due process of law. Defendants, by failing to present any meaningful evidence to support the accusations against Plaintiffs, breached its duty to provide Plaintiffs with due process of law.  Defendants' breach caused SLSOM to be removed from IMED, effectively nullifying Medical Students' degrees and medical licensing examination scores.  As a result, Medical Students have lost jobs, residencies and other

benefits; SLSOM has been completely shut down, unable to provide the services guaranteed by its Charter.

E.      LOSS OF CONSORTIUM

203.    Plaintiffs incorporate paragraphs 1 through 202 herein. Because of Defendants' Trade Libel and Negligence, above, Dr. Dolphin's wife, Susanna Mitchell, has abandoned him. As a result, Dr. Dolphin has lost the affection, support and love of his wife.

D.      CONVERSION

205.    "Their property shall not be taken without due process of law and without payment of just compensation." "The nationals of each High Contracting Party shall receive within the territories of the other, upon submitting to conditions imposed upon its nationals, the most constant protection and security for their person and property, and shall enjoy in this respect that degree of protection that is required by international law."

206.    Defendants through its arbitrary hearings and decision-making effectively converted Plaintiffs property, in that SLSOM has been unable to operate since 2005. Defendants' acts prevented and continues to prevent SLSOM from using its campus, equipment and materials.

D.      DUE PROCESS

207.    "No person shall…be deprived of life, liberty, or property, without due process of law." "The nationals of each High Contracting Party shall receive within the territories of the other, upon submitting to conditions imposed upon its nationals, the most constant protection and security for their person and property, and shall enjoy in this respect that degree of protection that is required by international law."

208.    Plaintiffs incorporate paragraphs 1 through 207 herein.  Defendants owed a duty to Plaintiffs to ensure that Plaintiffs not be deprived of life, liberty, or property, without due process of law. Defendants, by failing to present at any hearing any meaningful evidence to support their accusations

60

against Plaintiffs before illegally dismantling SLSOM, breached its duty to provide Plaintiffs with due process of law, and treated Plaintiffs differently than A.M. Dogliotti, a similarly situated medical school that suffered none of the harms to which SLSOM was subjected. Defendants' breach caused SLSOM to be removed from IMED, effectively nullifying Medical Students' degrees and medical licensing examination scores. As a result, Medical Students have lost jobs, residencies and other benefits.

D.     EQUAL PROTECTION

208.     "no state shall ... deny to any person within its jurisdiction the equal protection of the laws" "The nationals of each High Contracting Party shall receive within the territories of the other, upon submitting to conditions imposed upon its nationals, the most constant protection and security for their person and property, and shall enjoy in this respect that degree of protection that is required by international law."

208A.  Plaintiffs incorporate paragraphs 1 through 208 herein. Plaintiffs incorporate paragraphs 1 through 207 herein.  Defendants owed a duty to Plaintiffs to ensure that Plaintiffs not be deprived of life, liberty, or property, without due process of law.  Defendants, by failing to present at any hearing any meaningful evidence to support their accusations against Plaintiffs before illegally dismantling SLSOM, breached its duty to provide Plaintiffs with due process of law, and treated Plaintiffs differently than A.M. Dogliotti, a similarly situated medical school that suffered none of the harms to which SLSOM was subjected.  Defendants' breach caused SLSOM to be removed from IMED, effectively nullifying Medical Students' degrees and medical licensing examination scores.  As a result, Medical Students have lost jobs, residencies and other benefits.

F.     CONSPIRACY TO COMMIT CIVIL RIGHTS VIOLATIONS

209.     Plaintiffs incorporate paragraphs 1 through 209.  Defendant Dr. Isaac Roland, Dr. Peter Coleman, Mohammed Sheriff, Dr. Evelyn Kondakai, Dr. Horatius Browne and Dr. Benson Barh each

61

conspired with one another to denigrate SLSOM's reputation in an effort to secure bribes, as set forth above. Mohammed Sheriff used his position at the National Transitional Legislative Assembly to conduct hearings solely to denigrate and discredit SLSOM in the public eye.  Mohammed Sheriff used political and other pressures to secure the participation and cooperation of Dr. Peter Coleman, and Dr. Isaac Roland.  Drs. Barh and Browne used their position in the Liberian Medical Board to denigrate SLSOM in the public eye at the same hearings conducted by Sheriff. All Defendants were aware of SLSOM's legitimate status and sought to discredit SLSOM to secure monthly bribes.

G.     INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

210.     Plaintiffs incorporate paragraphs 1 through 209 herein.  Defendants intentionally took Dr. Dolphin's passport and prevented him from traveling on two separate occasions to visit his wife and family, as set forth above.  Additionally, Defendants' outright lies and fabrications regarding the integrity of SLSOM had a profound effect on Dr. Dolphin's psyche and emotional makeup and dramatically affected his marriage, as his wife has filed for divorce. Moreover, Dr. Dolphin was subjected to farcical hearings, was randomly and arbitrarily summonsed, and held for questioning at odd hours of the night in unkempt places. Because of his ordeal, Dr. Dolphin became gaunt, sickly and in need of medical care.

H.     NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

211.     Plaintiffs incorporate paragraphs 1 through 210 herein. Plaintiffs incorporate paragraphs 1 through 209 herein.  Defendants intentionally took Dr. Dolphin's passport and prevented him from traveling on two separate occasions to visit his wife and family, as set forth above.  Additionally, Defendants' outright lies and fabrications regarding the integrity of SLSOM had a profound effect on Dr. Dolphin's psyche and emotional makeup and dramatically affected his marriage, as his wife has filed for divorce. Moreover, Dr. Dolphin was subjected to farcical hearings, was randomly and

CLASS ACTION COMPLAINT

arbitrarily summonsed, and held for questioning at odd hours of the night in unkempt places. Because of his ordeal, Dr. Dolphin became gaunt, sickly and in need of medical care.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, jointly and severally, as follows and appropriate to the particular Causes of Action:

(1)    An Order certifying the Plaintiff Medical Student Class and appointing Plaintiffs and their counsel to represent the Class;

(2)    For monetary relief as requested in the Causes of Action as appropriate for the particular Causes of Action, in an amount to be proven at trial;

(3)    For actual, direct, incidental, consequential, statutory and exemplary damages, as appropriate for the particular Causes of Action, in an amount to be proven at trial;

(4)    For pre- and post-judgment interest;

(5)    For attorneys' fees and costs of suit pursuant to, inter alia, the common fund and private Attorney General doctrines, California Code of Civil Procedure section 1021.5 and/or the statutory Causes of Action asserted herein, as may be appropriate; and

(6)    For such other and further relief as this Court may deem just and proper.

DEMAND FOR JURYTRIAL

Plaintiffs demand a trial by jury on all claims so triable and an advisory jury for a factual determination on all equitable claims.

CLASS ACTION COMPLAINT

(2)   For monetary relief as requested in the Causes of Action as appropriate for the particular

Causes of Action, in an amount to be proven at trial; .

(3)   For actual, direct, incidental, consequential, statutory and exemplary damages, as

appropriate for the particular Causes of Action, in an amount to be proven at trial;

(4)   For pre- and post-judgment interest;

(5)   For attorneys' fees and costs of suit pursuant to, inter alia, the common fund and private

Attorney General doctrines, California Code of Civil Procedure section 1021.5 and/or the

statutory Causes of Action asserted herein, as may be appropriate; and

(6)   For such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURYTRIAL

Plaintiffs demand a trial by jury on all claims so triable and an advisory jury for a factual

determination on all equitable claims.

## VERIFICATION

I have read the foregoing and certify, under the penalty of perjury under the laws of the State

of California that the foregoing is true and correct and was executed in Los Angeles, California.

_____  11 Mar 2010

Dr. Jerroll B.R.Dolphin

63

1  Dated: March 7, 2010                    CULPEPPER LAW GROUPE

2

3                                    By: 

4                                        THADDEUS J. CULPEPPER
                                         Attorneys for Plaintiffs Dr. Dolphin, SLSOM
                                         and Medical Students
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                    64

## EXHIBIT 1 - LIST OF STUDENT AND GRADUATE PLAINTIFFS

| No. | Name | Country |
|---|---|---|
| 1 | Dr. Robert S. Farmer, Jr | USA |
| 2 | Suleiman Adekunle Omipidan | Nigeria |
| 3 | Pauline Ugochi Chilaka | Nigeria |
| 4 | Raymond Y Ofori | United Kingdom |
| 5 | Dr. Muhammed A.S.M. Al-Anzi | Saudi Arabia |
| 6 | Dr. Sid R. Rogers | USA |
| 7 | Dr. Karriem S. Watson | USA |
| 8 | Dr Emmanuel Okoye | Canada |
| 9 | Dr. Keith Patrick Steinhurst | USA |
| 10 | Dr. David Belshaw | USA |
| 11 | Linda Halisky | USA |
| 12 | Joseph Aiyegbusi | Nigeria |
| 13 | Ken Jordon | USA |
| 14 | Larry Lammers | USA |
| 15 | Dr. O. B. G. Nmorsi | Nigeria |
| 16 | Gbenga Gbayesola | Nigeria |
| 17 | Dr. Pius Ndubisi | Nigeria |
| 18 | Dr. Godwin Okonkwo | Nigeria |
| 19 | Chijioke Ejiogu | Nigeria |
| 20 | Steve Monday | Nigeria |
| 21 | Dr. Robin Ellsworth | USA |
| 22 | Dr. Miklos Major, III | USA |
| 23 | Dr. Amin Sain | United Kingdom |
| 24 | John Toluwani Oladele | Nigeria |
| 25 | Dr. Stanley Paul | USA |
| 26 | Darlington Esemuze | South Africa |
| 27 | Victoria Ofele | Nigeria |
| 28 | Dr. Mary Hulve | USA |
| 29 | Dr. Michael Hejazi | USA |
| 30 | Dr. Peter Kolosky | USA |
| 31 | Dr. Laurie Berg Kolosky | USA |
| 32 | Dervanna Troy Mckoy | USA |

| No. | Name | Country |
|-----|------|---------|
| 33 | Armand Dixon | USA |
| 34 | Carroll Braddy | USA |
| 35 | Christopher Sauda | Nigeria |
| 36 | Chukwuyem Obia | Nigeria |
| 37 | Dr. David Fyles | United Kingdom |
| 38 | Debrah Berger | USA |
| 39 | Felicia Jatto | Nigeria |
| 40 | Dr. Robert Hayes | USA |
| 41 | Dr. James Kyle | USA |
| 42 | Robert Irving | USA |
| 43 | Dr. Jason Payor | USA |
| 44 | Dr. Jerry Charles | USA |
| 45 | Dr. Kenneth Andronico | USA |
| 46 | M. C. K. Madubuike | USA |
| 47 | Dr. Manuel Faria | USA |
| 48 | Dr. Masilamony Pauliah | USA |
| 49 | Kathy Menefee | USA |
| 50 | Rebecca Hopkins | USA |
| 51 | Dr. Alexandra Schick | France |
| 52 | Dr. Wendy Westbrooks | USA |
| 53 | Dr. Yuri Soyferman | USA |
| 54 | Dr. Antwi Boakye | USA |
| 55 | Dr. Astara Burlingame | USA |
| 56 | Dr. David Karam | USA |
| 57 | Dr. Joan Nielsen | USA |
| 58 | Dr. Jonathan Mawere | USA |
| 59 | Dr. Mathew Skaria | USA |
| 60 | Dr. Peace Jessa | USA |
| 61 | Dr. Rita Patangia | USA |
|  | Does 1 through 99 | Worldwide |

**Exhibit 2 - World Health Organization Letter from Ministry of Health, August 2000**



# REPUBLIC OF LIBERIA
# MINISTRY OF HEALTH & SOCIAL WELFARE
P.O. BOX 10-9009
1000 MONROVIA, 10 LIBERIA
WEST AFRICA

OFFICE OF THE MINISTER

MH&SW/GOL/PSC-M/1255/°00/RL                                    August 15, 2000

Ms. Sandra Dumaoni
HDP ASU/HQ
World Health Organization
CH-1211, Geneva 27
Switzerland

Dear Madam:

This is to certify that the Government of Liberia has accredited the St. Luke School of
Medicine to operate within the Republic of Liberia. This Medical School will grant four-year
Doctor of Medicine (MD) and is regulated through the Ministry of Health.

The date of accreditation is effective August 1, 2000.

It is our hope that this information will be useful and that all necessary courtesies will be
accorded the above mentioned medical school.

Kind regards,

Sincerely yours,

Peter B. Coleman, MD, MS, FWACS
M I N I S T E R

**Exhibit 3 - PERMIT TO OPERATE ISSUED SEPTEMBER 2002 (NCHE)**

: ST LUKE SCHOOL OF MEDICINE        PHONE NO. : 1 310 419 3904        Apr. 07 200.

ROM : LTC TRAFFIC DEPT              PHONE NO. : 231 227 614           OCT. 24 2002 09:51



Republic of Liberia
### NATIONAL COMMISSION OF HIGHER EDUCATION
P. O. Box 9014;Tel: 225480
Monrovia, Liberia, West Africa

FFICE OF THE EXECUTIVE DIRECTOR

September 17, 2002

### TEMPORARY PERMIT TO OPERATE
### ST. LUKE SCHOOL OF MEDICINE IN THE
### REPUBLIC OF LIBERIA

Having met the Minimum Criteria set for by the National Commission of Higher Education to operate a higher education institution in the Republic of Liberia, the St. Luke School of Medicine is hereby granted this Temporary permit to operate in the City of Monrovia, Montserrado County, in the Republic of Liberia.

This Temporary Permit of operation is valid for a period of two calendar years (September 2002 – September 2004).

Renewable September 17, 2004

Approved: _Bestman_
Lawrence S. Bestman, Ph. D.
**EXECUTIVE DIRECTOR**

Motto: Promotion Quality and Equal Higher Educational Opportunities.

**Exhibit 4 - PRESIDENT SIGNED SLSOM CHARTER ACT IN AUGUST 2003**



# REPUBLIC OF LIBERIA

OFFICE OF THE PRESIDENT

August 7, 2003

The Honorable
The Liberian Senate(IN-SESSION)
Capitol Building
Monrovia

Ladies and Gentlemen;

I have the honor to inform that the following Acts of Legislature entitled:

"AN ACT AMENDING THE NEW MINERALS AND MINING LAW PART 1, ENTITLED 23, LCR, BY ADDING THERETO A NEW CHAPTER 40, PROVIDING FOR CONTROL ON THE EXPORT AND IMPORT AND TRANSIT OF ROUGH DIAMOND",

"AN ACT CREATING THE CITY OF FOYA WITHIN FOYA ADMINISTRATIVE DISTRICT, LOFA COUNTY, R.L.",

"AN ACT TO INCORPORATE ST LUKE SCHOOL OF MEDICINE(SLSOM) OF TH OF THE CITY OF MONROVIA, MONTSERRADO COUNTY, REPUBLIC OF LIBERIA, AND TO GRANT SLSOM A CHARTER",

"AN ACT CREATING MBOO STATUTORY DISTRICT WITHIN MARGIBI COUNTY WHICH CONTAINS THREE COUNTY DISTRICTS; MAMBAHN, FAAMINGTON, KARBAI AND FIVE CHIEFDOMS RESPECTIVELY WITH A PROVISIONAL MONTHLY AND PROBATE COURT MAJESTERIAL AREA AND PROVIDING FOR SAME",

have today received Executive Approval.

Cordially,



Please note the "Act to Incorporate SLSOM" is on the same bill that includes the raw diamond, "blood diamond", legislation that lifted United Nations sanctions from Liberia in August 2003.

## Exhibit 5 - LIBERIA EMBASSY WEBSITE DISCLAIMER

**REPUBLIC OF LIBERIA**
**NATIONAL COMMISSION OF HIGH EDUCATION**
**Fourth Floor, Room 407**
**MINISTRY OF EDUCATION**
**P. O. Box 9014**
**Monrovia , Liberia , West Africa**

URGENT DISCLAIMER ON THE ILLEGAL ESTABLISHMENT AND RECOGNITION OF HIGHER EDUCATION INSTITUTIONS IN THE REPUBLIC OF LIBERIA

In order to establish a Higher Education Institution in Liberia , there are two sets of requirements: One set of requirements relates to obtaining a charter to operate from the National Legislature. The other set of requirements has to do with conformity to policies as set by the National Commission on High Education. One stipulation in these policies is that institutions seeking to be established in Liberia must meet the requirements as set out in the policy, prior to obtaining charters from the National Legislature. The policy clearly provides guidelines regarding the establishment and operation of high education institutions in the Republic of Liberia . These policy guidelines are currently available at the Commission's Secretariat.

On the contrary, the National Commission on High Education has observed with dismay that some colleges or universities have been established without going through the proper channels. For one thing charters have been granted institutions without prior clearance from the National Commission on High Education. In other cases, several institutions appear to have obtained operational permits or statements of recognition to establish and operate in the country. However, some of these documents were exclusively signed by the former Executive Director of the past administration without the approval of the Commission. Hence, the Permit signed without the approval of the Chairperson is considered invalid, and any institution in possession of such permit is not recognized by the appropriate authorities of the Commission.

Particular references are made to the St. Regis University and St. Luke Medical College that fall in this category. The St. Regis University has publicly made known to the World that it has a legal status to operate in Liberia through the permission of the Commission on High Education. This is not true. Evidence suggests that whatever documents the University claims to have obtained from the Commission were never approved by the Commission and do not bear the signature of the Chairperson. Further, these two institutions are considered Distance Education Institutions and according to the Commission's policy:

*Institutions that are distance education-related and that have approached the National Commission on Higher Education for the operation in Liberia are being processed. Since this is a new area of exploration for the Commission, the public is advised that any decisions already reached reference these Institutions are tentative and that the Commission is continuing its deliberations on these Institutions to final conclusions vis-à-vis their place in the Liberian Higher Education System.*

Accordingly, the National Commission on Higher Education, Republic of Liberia , hereby declares **null** and **void** whatever documents St. Regis University may claim to possess emanating from the Commission until at such time when authorities of the Institution can go through the proper procedures for accreditation.

As regards the St. Luke Medical College, evidence also shows that no such college exists in Liberia ; therefore, it cannot claim to have obtained accreditation from the Commission. The Commission also nullifies the existence of such an institution in Liberia , until such time as all pertinent requirements as noted above are met. It therefore goes without saying that similar notice is being sent our to all institutions which are making claims similar to St. Regis and St. Luke that have not met the requirements as herein noted.

Signed: Isaac Roland, Ed,D. (**DIRECTOR GENERAL**)
Approved: D. Evelyn S. Kandakai, Ed,D. (**CHAIRPERSON**)

Feedback

**Exhibit 6 - 18 January 2005 NCHE letter issued to Madame Carole Bede, ECFMG**



REPUBLIC OF LIBERIA
**NATIONAL COMMISSION OF HIGHER EDUCATION**
Fourth Floor, Room 407
MINISTRY OF EDUCATION
P.O. Box 9014
Monrovia, Liberia, West Africa

OFFICE OF THE EXECUTIVE DIRECTOR

January 18, 2005

Madame Carole Bede

Senior Research Analyst

International Medical Education Directory

Foundation of Advancement of International Medical Education and Research

3634 Market Street, 4th Floor, Philadelphia, PA 19104-2685

Re:   St. Luke School of Medicine

Dear Madam Bede:

This will acknowledge receipt of your letter of inquiry dated October 26, 2004, concerning the above institution.

We regret the delay in responding to this inquiry. Meanwhile, we are pleased to provide the following information in relation to the request asked.

Although St. Luke School of Medicine did apply to the National Commission on Higher Education for recognition by government through accreditation, the Permit to operate, issued previously, only bore the signature of the former Executive Director, instead of two signatories, especially the signature of the Chairperson of the National Commission in keeping with the ACT, which created it. The lack of two signatures made the permit inappropriate.

However, the authorities of St. Luke have now realized that they were unaware of any problem with the previous permit. They have decided to remedy the problem by completing the process of accreditation to be granted by the National Commission.

Thus, the process of accreditation and subsequent official recognition had begun with the following preliminary steps in keeping with the National Policy on Higher Education in the Republic of Liberia.

- "An individual, a group of individuals, or any entity wishing to operate a higher education institution in Liberia must apply to the National Commission on Higher Education."

  St. Luke School of Medicine had applied and their application has been received and is being processed.

MOTTO: Promoting Quality and Equal Higher Educational Opportunities.

- It is also stipulated in the policy that "there shall be adequate physical facilities-classrooms, laboratories tools, instruments, equipment and provision for updating the facilities, and provide expendable supplies to give students proper learning experiences essential to achieving the education philosophy and objectives of the programs."

The St. Luke School of Medicine has established an institution and is working hard towards providing the necessary physical facilities. As we speak, there is large quantity of quality medical equipment including computers, modern books, microscopes, etc, most of which had already arrived in Liberia, for classroom and other purposes, to promote learning

"The Commission shall recommend institutions that meet the requirements to the National Legislature to be chartered; and only institutions qualified by the Commission and chartered by the National Legislature shall be issued a **TEMPORARY OPERATIONAL PERMIT PENDING THEIR ACCREDITATION**."

To conclude, The National Commission has observed that the previous attempt aimed at seeking accreditation was not done in a proper manner in that the temporary permit to operate possessed only one signature, and does not fault St. Luke authorities for this omission

Thank you for your cooperation.

Sincerely yours,

Isaac Roland, Ed.D.

**DIRECTOR GENERAL**

**Exhibit 7 - Adverse Letter from Madame Carole Bede, ECFMG**

**REPUBLIC OF LIBERIA**
**NATIONAL COMMISSION OF HIGH EDUCATION**
Fourth Floor, Room 407



**MINISTRY OF EDUCATION**

**P. O. Box 9014**

**Monrovia , Liberia , West Africa**

URGENT DISCLAIMER ON THE ILLEGAL ESTABLISHMENT AND RECOGNITION OF HIGHER EDUCATION INSTITUTIONS IN THE REPUBLIC OF LIBERIA

In order to establish a Higher Education Institution in Liberia , there are two sets of requirements: One set of requirements relates to obtaining a charter to operate from the National Legislature. The other set of requirements has to do with conformity to policies as set by the National Commission on High Education. One stipulation in these policies is that institutions seeking to be established in Liberia must meet the requirements as set out in the policy, prior to obtaining charters from the National Legislature. The policy clearly provides guidelines regarding the establishment and operation of high education institutions in the Republic of Liberia . These policy guidelines are currently available at the Commission's Secretariat.

On the contrary, the National Commission on High Education has observed with dismay that some colleges or universities have been established without going through the proper channels. For one thing charters have been granted institutions without prior clearance from the National Commission on High Education. In other cases, several institutions appear to have obtained operational permits or statements of recognition to establish and operate in the country. However, some of these documents were exclusively signed by the former Executive Director of the past administration without the approval of the Commission. Hence, the Permit signed without the approval of the Chairperson is considered invalid, and any institution in possession of such permit is not recognized by the appropriate authorities of the Commission.

Particular references are made to the St. Regis University and St. Luke Medical College that fall in this category. The St. Regis University has publicly made known to the World that it has a legal status to operate in Liberia through the permission of the Commission on High Education. This is not true. Evidence suggests that whatever documents the University claims to have obtained from the Commission were never approved by the Commission and do not bear the signature of the Chairperson. Further, these two institutions are considered Distance Education Institutions and according to the Commission's policy:

*Institutions that are distance education-related and that have approached the National Commission on Higher Education for the operation in Liberia are being processed. Since this is a new area of exploration for the Commission, the public is advised that any decisions already reached reference these Institutions are tentative and that the Commission is continuing its deliberations on these Institutions to final conclusions vis-à-vis their place in the Liberian Higher Education System.*

Accordingly, the National Commission on Higher Education, Republic of Liberia , hereby declares **null** and **void** whatever documents St. Regis University may claim to possess

emanating from the Commission until at such time when authorities of the Institution can go through the proper procedures for accreditation. .

As regards the St. Luke Medical College, evidence also shows that no such college exists in Liberia ; therefore, it cannot claim to have obtained accreditation from the Commission. The Commission also nullifies the existence of such an institution in Liberia , until such time as all pertinent requirements as noted above are met. It therefore goes without saying that similar notice is being sent our to all institutions which are making claims similar to St. Regis and St. Luke that have not met the requirements as herein noted.

Signed: Isaac Roland, Ed.D. (**DIRECTOR GENERAL**)

Approved: D. Evelyn S. Kandakai, Ed.D. (**CHAIRPERSON**)

**Exhibit 8 - ATTESTATION FROM NCHE, March 2005**



REPUBLIC OF LIBERIA
**NATIONAL COMMISSION ON HIGHER EDUCATION**
Fourth Floor, Room 407
MINISTRY OF EDUCATION
P.O. Box 9014
Monrovia, Liberia, West Africa



March 3, 2005

## STATEMENT OF ATTESTATION

This is to attest that the **St. Luke School of Medicine** has met some acceptable requirements for the establishment and operation of Post-Secondary institution in the Republic of Liberia. The National Commission on Higher Education hereby issues this statement of recognition to operate a higher learning institution in Liberia pending the complete processing of the **Permit of Operation.**

Thank you.

Signed: *Isaac Roland*

Dr. Isaac Roland
**Director-General/NCHE**

**Exhibit 9 - 12 March 2005 NCHE Letter to Madame Carole Bede**





REPUBLIC OF LIBERIA
**NATIONAL COMMISSION OF HIGHER EDUCATION**
Fourth Floor, Room 407
MINISTRY OF EDUCATION
P.O. Box 9014
Monrovia, Liberia, West Africa

OFFICE OF THE DIRECTOR GENERAL

March 12, 2005

Madame Carole Bede
Senior Research Analyst
International Medical Education Directory
Foundation of Advancement of International Medical Education and Research
3634 Market Street, 4th Floor
Philadelphia, PA 19104-2685

Re:     St. Luke School of Medicine

Dear Madam Bede:

This letter acknowledges receipt of your letter of inquiry dated January 11, 2005, concerning the above institution.

Again, we regret the delay in responding to this inquiry. We are pleased to provide the following information in relation to the questions posed.

1.      Is the St. Luke School of Medicine currently recognized by the government of Liberia for award of the Doctor of Medicine degree?

        Yes. St. Luke School of Medicine is recognized by the government of Liberia to award Doctor of Medicine degrees. The process of reaccredidation is ongoing. St. Luke School of Medicine has been issued an ATTESTATION, and is waiting for the new PERMIT TO OPERATE.

2.      On what date was recognition granted?

        Recognition was granted from August 1, 2000 by the National Legislature of the Republic of Liberia.

MOTTO: Promoting Quality and Equal Higher Educational Opportunities.

3.   If the St. Luke School of Medicine is not presently recognized by the government of Liberia for award of the Doctor of Medicine degree was the school previously granted recognition that has since been withdrawn? If so, please state the effective dates of the period of previous recognition.

Liberia presently recognizes St. Luke School of Medicine.

4,   If St. Luke School of Medicine was never granted any form of recognition by the government of Liberia for award of the Doctor of Medicine degree, what was the reason for the request to the World Health Organization to list the school in their publications?

The government of Liberia previously recognized St. Luke School of Medicine.

I thank you for your inquiry and your cooperation.

Sincerely yours,

Isaac Roland
Isaac Roland, Ed.D.

DIRECTOR GENERAL

**Exhibit 9A – Recepit for Payment of LMB's Inspection Fee**

**Exhibit 10 – Liberian Medical Board Assessment of SLSOM Campus**



**REPUBLIC OF LIBERIA**
## LIBERIA   MEDICAL BOARD
**MINISTRY OF HEALTH & SOCIAL WELFARE**
**P. O. BOX 10-9009**
**1000 MONROVIA 10,  LIBERIA**

Ref

Tel

March 22, 2005

Dr. Jerroll Dolphin
President
St. Luke School of Medicine
Monrovia, Liberia

Dear Dr. Dolphin:

### RE: ASSESSMENT OF ST. LUKE SCHOOL OF MEDICINE

In response to your letter of invitation, dated March 8, 2005, I am pleased to inform you that having assessed the premises of the proposed "St. Luke School of Medicine", we observed that the building for the school is still undergoing major renovation. There is no document on the school (hand book, curriculum, etc.), library and laboratories are not set up. The site is not representative of a Medical School, list of faculty and staff, etc, etc. When these concerns are addressed, the Board shall re-visit the site to determine if the school can be granted permit to start the admission process.

With regards.

Sincerely yours,

H. C. B.z.

Horatius C. Browne, MD, MS, FWACS
CHAIRMAN, LIBERIA MEDICAL BOARD

**Exhibit 11 - NCHE "Computer School" Letter to ECFMG**

# FAIMER

## Foundation for Advancement of
## International Medical Education and Research

3624 Market Street
4th Floor
Philadelphia, PA 19104-2685
USA

215-823-2268
215-386-9767 (FAX)
www.faimer.org

**PRESIDENT**
John J. Norcini, Ph.D.

**CHAIR**
James A. Hallock, M.D.

**VICE CHAIR**
Donald O. Nutter, M.D.

**SECRETARY**
Sharon Wood-Dauphinee, Ph.D.

**TREASURER**
Dennis M. Donohue, C.P.A.

**BOARD OF DIRECTORS**
Basheret Ahmad, M.D., F.A.C.S.
Ms. Suzanne T. Anderson
Sandra T. Barnes, M.D.
Joel A. DeLisa, M.D., M.S.
Richard R. Ealdn, Ph.D.
Lynn D. Fleisher, Ph.D., J.D.
James A. Hallock, M.D.
Arthur Kaufman, M.D.
Ian D. Krantz, M.D.
John J. Norcini, Ph.D.
Donald O. Nutter, M.D.
Richard J. Schmid
Jamsheer Talati, M.B., B.S.
Douglas W. Voth, M.D.
Sharon Wood-Dauphinee, Ph.D.

## FAX TRANSMISSION
### INTERNATIONAL MEDICAL EDUCATION DIRECTORY
### (IMED)
### FAX NUMBER  215-386-9767

Date:              April 27, 2005

To:                St. Luke School of Medicine

From:              Carole Bede
                   Senior Research Analyst
                   *International Medical Education Directory*

Subject:           National Commission of Higher Education
                   Liberia

Total Number of Pages:      4

Message:

RECEIVED

BY:_____ _____

*FAIMER is a non-profit foundation of the Educational Commission for Foreign
Medical Graduates that is committed to advancing international medical education.*

04/27/2005  13:58   13235652724                SLUSUM

APR. 27, 2005  8:40AM    ECFMG 215 387 9963                    NO. 590   P. 2

 **EDUCATIONAL COMMISSION for FOREIGN MEDICAL GRADUATES**

3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, U.S.A
TELEPHONE: 215-386-5900 ● FAX: 215-386-9767 ● INTERNET: www.ecfmg.org

April 27, 2005

St. Luke School of Medicine
8516 11th Avenue, 2nd Floor
Inglewood Ca 90305

Dear Sir or Madam:

In December, 2004, ECFMG and FAIMER received information that St. Luke School of Medicine
might not be recognized by the National Commission of Higher Education and the government of
Liberia. FAIMER subsequently wrote to the National Commission of Higher Education of Liberia
for additional information

On March 18, 2005 FAIMER received re-confirmation from the National Commission of Higher
Education, Ministry of Education, Liberia, that St. Luke School of Medicine was granted
recognition by the National Legislature of Liberia from August 1, 2000. St. Luke School of
Medicine Liberia continued to be listed in IMED with "current" graduation years.

However, on April 25, 2005, FAIMER received a letter dated April 11, 2005, from Isaac Roland,
Ed.D., Director-General, National Commission of Higher Education, Ministry of Education, Liberia.
In his letter, Dr. Roland stated that although the Commission had issued a "letter of attestation to
St. Luke School of Medicine," after investigation, it has been determined that St. Luke School of
Medicine does not exist in the Republic of Liberia and that "the Secretariat of the National
Commission therefore revokes the attestation effective immediately." A copy of this letter is
enclosed.

Therefore, although previously listed in IMED, St. Luke School of Medicine, Liberia is no longer
listed in IMED and students and graduates of the school are not eligible for the USMLE or for
ECFMG certification.

Sincerely,

Carole Bede

Carole Bede
Senior Research Analyst
Registration and Credential Services

*ECFMG® is an organization committed to promoting excellence in international medical education.*

04/27/2005  13:58   13235652724                    SLUSUM

APR. 27. 2005  8:40AM    ECFMG 215 387 9963                    NO. 90    P. 3





**REPUBLIC OF LIBERIA**
## NATIONAL COMMISSION OF HIGHER EDUCATION
Fourth Floor, Room 407
**MINISTRY OF EDUCATION**
P.O. Box 9014
Monrovia, Liberia, West Africa

OFFICE OF THE DIRECTOR GENERAL

April 11, 2005

Madam Carole Bede
Senior Research Analyst
International Medical Education Directory
Foundation for Advancement of
International Medical Education and Research
3824 Market Street
4th Floor
Philadelphia, PA 19104 - 2685
U. S. A.

RECEIVED

APR 25 2005

ECFMG
CREDENTIALS

Dear Madam Bede:

Recent investigation by the National Transitional Legislative
Assembly Joint Standing Committees on Health & Social Welfare and
Education regarding the existence of the St. Like School of
Medicine, substantiated by valid documentary evidence has revealed,
beyond all reasonable doubts, that such school does not exist in
the Republic of Liberia.

Although the National Commission on Higher Education had previously
issued and urgent disclaimer notice to the St. Luke School of
Medicine to stop awarding level degrees through distance education,
the authorities however later appealed to the Commission to operate
a Computer School. The Commission then issued a letter of attest-
ation to St. Luke School of Medicine indtead of St. Luke School...
The NTLA Committees observed that the Secretatiate of the Commission
made an error by issuing the attestation. In fact, the Commission
has never issued any Official Temporary Operational Permit to St.
Luke School of Medicine to operate in Liberia.

In view of the foregoing anomally, the Commission is in full agree-
ment with the NTLA Committees that the so-called St. Luke School
of Medicine or "College" or "University" does not exist in
the Republic of Liberia. The Secretariat of the National Comm-
ission therefore revokes the attestation effectively immediately.

Thank your very much.

Sincerely yours,

Isaac Roland, Ed.D.
DIRECTOR - GENERAL

CC:   The Chairman, NTLA Joint Committees On Health
      And Education

      The Chairperson,
      National Commission on Higher Education.

      **MOTTO: Promoting Quality and Equal Higher Educational Opportunities.**

.. 2 ..

The Dean
A. M. Dogliotti  College of Medicine
University of Liberia

## Exhibit 12 - TEXT OF SLSOM'S "WRIT OF PROHIBITION" PETITION

IN THE SUPREME COURT OF THE REPUBLIC OF LIBERIA
SITTING IN IT'S A.D. 2005 MARCH TERM.

CHAMBERS………………………CAMPBELL……………JUSTICE

| | | |
|---|---|---|
| St. Luke School of Medicine by & thru | ) | |
| Its President, Dr. Jerroll B.R. Dolphin, | ) | |
| M.D., of the City of Monrovia, R.L… | ) | |
| ……………………PETITIONER | ) | |
| | ) | |
| V E R S U S | ) | |
| | ) | **PETITION FOR A WRIT** |
| The Government of Liberia by & thru | ) | **OF** |
| The Ministry of Justice & the Ministry | ) | **PROHIBITION** |
| Of Education & the 5 – man Committee | ) | |
| Represented by its Chairman of the City | ) | |
| Of Monrovia, R.L…..RESPONDENTS | ) | |

**PETITIONER'S PETITION**

Petitioner most respectfully petitioning of and against Respondents showeth reasons therefor, to wit:

• That Petitioner, by Legislative Enactment approved April 24, 2003, and published on August 8, 2003, is a duly accredited legal entity existing under such Act (Law) with all rights and privileges to exist and operate a medical school within the Republic of Liberia, as will evidentially appear from photocopies of said Act hereto annexed and marked exhibit "A" and formal approval letter signed by the Chief Executive of Liberia, marked exhibit "B " hereof.

• That following its incorporation it was duly recognized and accredited by the various appropriate authorized functionaries of Government including the Ministry of Health and Social Welfare by & thru Minister Peter Coleman, MD, through a communication bearing date August 15, 2000, relevant excerpt of which reads verbatim:

REPUBLIC OF LIBERIA

MINISTRY OF HEALTH & SOCIAL WELFARE
P.O. BOX 10-0000
1000 – MONROVIA, 10 – LIBERIA

WEST AFRICA

AUGUST 15, 2005

OFFICE OF THE MINISTER

MH&SW/GOL/PSC – M/1255/"00/RL

Mr. Sandra Dumont
HDP ASU/HQ
World Health Organization
CH – 1211, Geneva 27, Switzerland

Dear Madam:

This is to certify that the government of Liberia has accredited the St. Luke School of Medicine to operate within the Republic of Liberia. This Medical School will grant four-year Doctor of Medicine (MD) and is regulated through the Ministry of Health.

The date of accreditation is effective August 1, 2000.

It is our hope that this information will be useful and that all necessary  courtesies will  be accorded the above mentioned Medical School.

Kind regards.

Sincerely yours,

Peter Coleman, MD, MS/FWAC
Minister

And attached hereto as exhibit "C" hereof.

Also,  Statement of Attestation dated March 3, 2005 duly issued and signed by Dr. Isaac Roland, Director General of NCHE, for and behalf of the said National Commission on Higher Education and a  Permit issued on September 17, 2002 by the National Commission on Higher Education, hereto attached and marked exhibits "D" & "E" respectively.

• That subsequent to the foregoing, Petitioner was duly granted a Charter by the Legislative Enactment proffered supra, thus authorizing it to exist and operate in Liberia as an educational Institution and/or medical school..

• That having been granted the right to operate as a school of medicine, Petitioner opened an office and began to identify a commodious and conducive space befitting of such an Institution, having already imported valuable medical pieces of equipment, as will evidentially appear from photocopies of an Articles of Incorporation and Lease Agreement hereto attached as exhibits "F" & "G" respectively.

• That Respondent being the second Branch of Government divested of the constitutional mandate and authority to annul, abrogate, invalidate and declare any Act or Law null and void ab initio, has arrogated unto itself the sole power of publicly declaring a Legislative Act null and

void, by which it has grossly usurped the function of the Judiciary by unconstitutionally nullifying the Act creating Petitioner and granting it charter to exist and operate as a legal entity, without due process of law. Quoted hereunder verbatim is the unconstitutional Executive Decision of Respondent:

"REPUBLIC OF LIBERIA
    **PUBLIC AFFAIRS**
MINISTRY OF INFORMATION, CULTURE AND TOURISM
P.O. BOX 10-9021 – CAPITOL HILL
1000 MONROVIA, 10 LIBERIA

Office Of  The Director Of Public Affairs

**<u>PRESS RELEASE</u>**

**MICAT/MONROVIA/JULY 15 2005: -** The Government of Liberia
Has ordered the immediate closure of the St. Luke School of Medicine
for illegally operating in the Country.

According to an information Ministry release issued today. The
Government's decision is based on the findings and recommendations of a five – member committee constituted last March to
prope the existence of St. Luke.

A full criminal investigation is to be conducted against the proprietor of the school and others who may have knowingly aided the
process of opening the school.

All medical degrees issued by St. Luke School of Medicine are nullified and the school pronounced non – existent in Liberia, in
keeping with the committee's recommendations approved by the Chairman of the National Transitional Government of Liberia.
His Excellency Charles Gyude Bryant.

The committee had observed that an Act to Incorporate St. Luke was approved in 2003, but was never enacted by the legislature
in session.

The cabinet committee further observed that the St. Luke School issued medical degrees in December 2001, January 2002, June
2002, August 2002, February 2003 and June 2003 when Monrovia was under attack.

The Cabinet Committee chaired by Justice Minister Kabineh Ja'neh, included Education Minister Evelyn Kandakai, Transport
Minister Vamba Kanneh, Health Minister Peter Coleman and the Director – General of the
Cabinet, Hon. Soko V. Sackor.

Signed:  Director of Public Affairs"

Also attached hereto as exhibit "H" is photocopy of said decision.

• That by operation of Law and under the doctrine of Separation of power, the Executive Branch of Government wantonly lacks the authority to abrogate any Act of the Legislature or to say the least to investigate and invalidate any Law, however odious it be, except the Judicial Branch which shall do so through judicial review. Hence, the Respondent utterly violated the constitution of Liberia when it declared the subject Act fraudulent and subsequently ordered the closure of the office of Petitioner, even without due process of Law.

•     That in furtherance of Respondent's unconstitutional act, it has ordered the arrest and incarceration of Petitioner's officers without recourse to judicial proceeding through due process of law.

Wherefore, Petitioner prays that this Honorable Court will prohibit Respondent from invalidating, nullifying and declaring null and void its legal charter or Legislative Enactment and to further prohibit Respondent from closing down its offices and to undo those acts done by Respondent appertaining thereto, without jurisdiction; and to further grant unto Petitioner such relief justice and right may demand in the premises.

Dated this 21 day of                           Respectfully submitted
July, A.D. 2005                             Petitioner by & thru its
                                                     Legal Counsel:

                                                    _____

                                                Francis Y.S. Garlawolu
                                             **COUNSELLOR-AT-LAW**

$5.00 Revenue Stamp affixed hereto on the original.

REPUBLIC OF LIBERIA      )   IN THE OFFICE OF THE JUSTICE OF THE PEACE
MONTSERRADO COUNTY)    FOR MONTSERRADO COUNTY, R.L.


St. Luke School of Medicine by & thru      )
Its President, Dr. Jerroll B.R. Dolphin,      )
M.D., of the City of Monrovia, R.L…      )
…………………PETITIONER      )
      )
V E R S U S      )
      )  **PETITION FOR A WRIT**
The Government of Liberia by & thru      )       **OF**
The Ministry of Justice & the Ministry      )   **PROHIBITION**
Of Education & the 5 – man Committee      )
Represented by its Chairman of the City      )
Of Monrovia, R.L…..RESPONDENTS      )


## PETITIONER'S AFFADAVIT

**PERSONALLY APPEARED BEFORE ME**, a duly qualified and commissioned Justice of the

Peace for the City of Monrovia, Montserrado County, Republic of Liberia, Jerroll B.R. Dolphin,

M.D, Petitioner in the above entitled cause of action and made oath according to law and facts

that every and singular the allegation as contained in the annexed PETITIONER'S PETITION

are true and correct to the best of his knowledge and belief and as to those matters of information

received he verily believes them to be true and correct.

Sworn and subscribed to before me
This ____day of July A.D. 2005


_____
Justice of the Peace for Montserrado
County, Republic of Liberia


_____
Jerroll B.R. Dolphin, M.D
          **PETITIONER**

$5.00 Revenue Stamp affixed hereto on the original.


**Exhibit 13 - Madame Carole Bede's Denial of NCHE Request to Restore SLSOM's IMED Listing**

January 24, 2006


Isaac Roland, Ed.D.
Director General
National Commission of Higher Education
Broad Street, 4th Floor, Room 407
Monrovia
Liberia


Re: St. Luke School of Medicine


Dear Dr. Roland:

Thank you for your letter of December 7, 2005 concerning the status of St. Luke School of Medicine.

In your letter, you stated that after inspection of the medical school's campus by the National Commission on Higher Education, a Temporary Permit to Operate would be issued for resumption of instruction at the medical school in January 2006.

According to information previously received by FAIMER, the first permit to operate was granted to St. Luke School of Medicine by the government of Liberia in 2000.  The permit to operate was revoked in April 2005 and reinstated in October 2005.  Consequently, we are writing to ask that you or a member of your staff write to FAIMER as soon as possible to provide the following information:


2.      What is the status of medical degrees awarded by St. Luke School of Medicine for the years 2000 to 2005?  Are holders of degrees issued during those years recognized as physicians by the government of Liberia, and are they eligible to apply for medical licensure in Liberia?

3.      Are graduates of St. Luke School of Medicine who receive their medical degrees beginning January 2006 eligible for medical licensure in Liberia?  If so, as of what date are (or will) these graduates be eligible for medical licensure in Liberia?

4.      Please confirm that instruction has begun at the campus of St. Luke School of Medicine in Gaye Town, Monrovia, and the date on which instruction began.

5.

Your assistance is greatly appreciated.  If possible, please reply by fax to +215-386-9767.

Sincerely,

Carole Bede
Senior Research Analyst
*International Medical Education Directory*

**Exhibit 14 - Liberia Supreme Court 'Stay Order' and Hearing Issued July 22, 2005**

OFFICE OF THE CLERK
SUPREME COURT OF LIBERIA
TEMPLE OF JUSTICE
MONROVIA, LIBERIA

July 22, 2005

The Honourable Minister
Minister of Education
Ministry of Education
Monrovia, Liberia

Dear Madam Minister:

By directive of His Honour Ishmael P. Campbell, Associate Justice presiding in Chambers, you are hereby cited to a conference with his Honour on Monday, July 25, 2005, at the hour of 4:00 p.m., in connection with the case:

St. Luke School of Medicine by & thru
its President, Dr. Jerrell H.R.
Dolphin, M.D., of the City of
Monrovia, R.L................PETITIONER

)
)
)
)PETITION FOR
)A WRIT OF
)PROHIBITION

Versus

The Government of Liberia by & thru
the Ministry of Justice & the Ministry
of Education & the 5 - man Committee
represented by its Chairman of the
City of Monrovia, R.L......RESPONDENTS

)
)
)
)
)

Meanwhile, you are hereby ordered to stay further action in this matter pending the outcome of the conference.

Kind regards,

Very truly yours,

Marian V. Bryant
CLERK, SUPREME COURT OF LIBERIA

S E A L:

MVB/sjp

**Exhibit 15 - Liberia Supreme Court 'Conference' Scheduled on Aug 4, for Aug 10, 2005**

OFFICE OF THE CLERK
SUPREME COURT OF LIBERIA
TEMPLE OF JUSTICE
MONROVIA, LIBERIA

August 4, 2005

The Honourable Minister
Minister of Justice
Ministry of Justice
Monrovia, Liberia

Dear Mr. Minister:

IN RE:   St. Luke School of Medicine by &
thru its President, Dr. Jerroll
B.R. Dolphin, M.D., of the City of
Monrovia, R.L..........PETITIONER      }  PETITION FOR
                                       }  A WRIT OF
                                       }  PROHIBITION
         Versus                        }
                                       }
The Government of Liberia &            }
thru the Ministry of Justice & the     }
Ministry of Education & the 5 - man    }
Committee represented by its Chair-    }
man of the City of Monrovia, R.L.      }
.....................RESPONDENTS       }

By directive of His Honour Ishmael P. Campbell, Associate
Justice presiding in Chambers, you are hereby cited to a con-
ference with His Honour on Wednesday, August 10, 2005, at the
hour of 1:00 p.m., in connection with the above captioned case.

Kind regards.

Very truly yours,

Martha G. Bryant
Martha G. Bryant
CLERK, SUPREME COURT OF LIBERIA

S E A L:

MGB/sjp

**Exhibit 16 - Liberia Supreme Court Restores SLSOM's Accreditation on Aug 10, 2005 Order**

IN THE HONOURABLE SUPREME COURT OF THE REPUBLIC OF LIBERIA
MARCH TERM, A.D. 2005

| CHAMBERS | JUSTICE | CAMPBELL |
|---|---|---|

St. Luke School of Medicine by & thru its President, Dr.    ) PETITION FOR
Jerrell B.R. Dolphin, M.D., of the City of Monrovia,    ) A WRIT OF
Liberia,.................................PETITIONER    ) PROHIBITION

Versus

The Government of Liberia by & thru the Ministry of Justice )
& the Ministry of Education & the 5 – man Committee repre- )
sented by its Chairman of the City of Monrovia, R.L. )
.............................................RESPONDENTS )

REPUBLIC OF LIBERIA
TO:  BRIG./GENERAL AMOS B. KESSEH DICKSON, SR.
MARSHAL, SUPREME COURT OF LIBERIA, OR HIS DEPUTY
MONROVIA

G R E E T I N G S:

     YOU ARE HEREBY COMMANDED to notify the Government of Liberia by and thru
the Ministry of Justice, the Ministry of Education and the Five (5) man Com-
mittee represented by its Chairman, Monrovia, Liberia, RESPONDENTS in the
above entitled cause of action to appear before His Honour Ishmael P. Campbell,
Associate Justice of the Republic of Liberia, presiding in Chambers at the
Supreme Court Room, Temple of Justice, on the 20th Day of August, A.D. 2005,
at the hour of 9:00 a.m., to show cause why PETITIONER'S PETITION as prayed
for should not be granted; and to require the RESPONDENTS herein above to
send up to the Chambers of the Supreme Court a full and complete copy of the
proceedings at issue; and

     YOU ARE FURTHER COMMANDED to instruct the RESPONDENTS herein to file
their RETURNS to this Writ in the Office of the Clerk of this Honourable
Court on or before the said 20th Day of August, A.D. 2005; and stay all
further proceedings until otherwise ordered and the Petitioner is to return
to Status Quo Ante.

     To read to them the original and leave a copy of the Writ together with
a copy of the PETITION with the RESPONDENTS each; and

     As to when and how you shall have served this Writ, you will make known
by filing your RETURNS officially thereto on the back of the original Writ
in the Office of the Clerk of this Honourable Court on or before the said
20th Day of August, A.D. 2005.

     AND FOR SO DOING, THIS SHALL CONSTITUTE YOUR LEGAL AND SUFFICIENT
AUTHORITY.

                    GIVEN UNDER MY HAND AND SEAL
                    OF THE HONOURABLE SUPREME
                    COURT THIS 10TH DAY OF AUGUST,
                    A.D. 2005.

S E A L:
                    Martha G. Bryant
                    CLERK, SUPREME COURT OF LIBERIA

MGB:ajp

Exhibit 17 - Liberia Government Defaults-Liberia Supreme Court Issues Default Certificate to SLSOM

CLERK'S   CERTIFICATE

IN RE:   St. Luke School of Medicine     ) PETITION FOR
         by & thru its President, Dr.     ) A WRIT OF
         Jerrell B.R. Delphin, M.D.,      ) PROHIBITION
         of the City of Monrevia,         )
         Liberia,..........PETITIONER     )
                                          )
                  Versus                  )
                                          )
         The Government of Liberia by &   )
         thru the Ministry of Justice     )
         & the Ministry of Education &    )
         the 5 - man Committee repre-     )
         sented by its Chairman of the    )
         City of Monrevia, R. L.          )
         ................RESPONDENTS )

         A careful perusal of the records in the above
entitled cause of action, reveals that there are
no RETURNS filed by the Respondents up to the
issuance of this Certificate.

         Hence, this Certificate.

                           GIVEN UNDER MY HAND AND
                           SEAL OF THE HONOURABLE
                           SUPREME COURT THIS 22ND
                           DAY OF AUGUST, A.D. 2005.
S E A L:

                           Martha G. Bryant
                      CLERK, SUPREME COURT OF LIBERIA

**Exhibit 18 - NCHE Requests ECFMG-IMED to Restore SLSOM's Previous Status in IMED**



**REPUBLIC OF LIBERIA**
**NATIONAL COMMISSION OF HIGHER EDUCATION**
Fourth Floor, Room 407
MINISTRY OF EDUCATION
P.O. Box 9014
Monrovia, Liberia, West Africa



OFFICE OF THE DIRECTOR GENERAL

October 3, 2005

Madame Carole Bede
Senior Research Analyst
International Medical Education Directory
Foundation for Advancement of International Education and Research
3824 Market Street, 4th Floor
Philadelphia, PA 19104-2685
U.S.A.

Dear Madame Bede:

Based upon the ruling of the Supreme Court of the Republic of Liberia regarding the St. Luke School of Medicine, the court has ordered the medical school reinstated to its previous status it was during the accreditation process.

Abiding by the Supreme Court order, the National Commission on Higher Education hereby revokes the letter, dated April 11, 2005, which denied the existence of St. Luke School of Medicine and further advises that it should continue its existence.

We also request that the St. Luke School of Medicine be included in the International Medical Education Directory as it was previously.

Thank you very much for your cooperation.

Isaac Roland, Ed.D.
Executive Director
National Commission on Higher Education
Republic of Liberia

**Exhibit 19 - NCHE Second Request for ECFMG-IMED to Restore SLSOM's Previous Status in IMED**



**REPUBLIC OF LIBERIA**
**NATIONAL COMMISSION OF HIGHER EDUCATION**
Fourth Floor, Room 407
**MINISTRY OF EDUCATION**
P.O. Box 9014
**Monrovia, Liberia, West Africa**

OFFICE OF THE DIRECTOR GENERAL

December 7, 2005

Madame Carole Bede
Senior Research Analyst
International Medical Education Directory
Foundation for Advancement of International Medical Education and Research
3624 Market Street, 4th Floor
Philadelphia, PA 19104-2685
U.S.A.

Dear Madame Bede,

This letter acknowledges receipt of your letter dated October 19, 2005, requesting our advice on the current status of St. Luke School of Medicine and its presence in Liberia.

I, therefore, write to inform you that a campus of the St. Luke School of Medicine has been formally established in Gaye Town, Monrovia. The National Commission on Higher Education has·inspected the campus before, and re-inspected it recently, and found it to be satisfactory and ready to operate.

Meanwhile, a Temporary Permit to Operate will be issued by the Commission for resumption of instruction in January 2006.

Thank you very much for your kind cooperation.

Sincerely yours,

Isaac Roland, Ed.D.
Director General
National Commission on Higher Education
Republic of Liberia

MOTTO: Promoting Quality and Equal Higher Educational Opportunities.

**Exhibit 20  - Benson Barh Fired by President Sirleaf for Corruption**

<span style="color:red">**Monday, June 12, 2006**</span>

# ELLEN'S AXE FALLS!

 **Swoops Upon Commerce, Health, Transport, and Finance Ministries**

**26 In Anti-Corruption, Administration Dragnets**

From campaign trails across the country to inauguration on to the onset of her administration, President Ellen Johnson Sirleaf remained undaunted about stabbing corruption in back.

Notwithstanding the level to which the political commitment raised the expectation of the Liberian people who know very well the effect of corruption on the growth and development of the nation, no one has seen much action in that direction, prompting murmuring and gossips amongst government critics, good governance crusaders, and international monitors about business remaining as usual.

But just before these groups started to adapt their suspicions as the truth, the Sirleaf Administration has lurched for its seemingly active slumber, taking some 28 alleged malefactors into a dragnet for corruption and presumably inefficiency.

"But will that alone help rid the government of these individuals?" **The Analyst Staff Writer** has been probing into the dismissals and transfers vis-à-vis pages from the past.

President Ellen Johnson-Sirleaf has dismissed three senior officials of government,  endorsed the dismissal of five civil servants, approved the transfer of 18, and ordered legal action against several yet-to-be-identified others.

The presidential press release which announced the multiple actions, yesterday, said those dismissed were Assistant Minister for Commerce for, Ministry of Commerce and Industry, Aaron Mathies; **Deputy Minister and Chief Medical Officer, Ministry of Health & Social Welfare, Dr. Benson Barh,** and the  Chairman of Civil Aviation Authority, Ministry of Transport.

These senior officials of government were dismissed, according to the presidential release, for acts of impropriety that the President said were not consistent with the principles of their offices.

The release gave no further details, but observers said the President has held fiscal transparency, accountability, respect for human rights, the avoidance of corruption and corrupt practices including misfeasance, and prudent management of state resources as proprieties that must serve as the guiding principles of every agency of government.

They therefore hold that those dismissed may have contravened one, two, or all of these principles with corruption and the siphoning of public property being amongst the highest possibilities.

In addition to the direct dismissals, the President also endorsed the request of Finance Minister, Antoinette Sayeh, to dismiss Joemagaria Teld who is the senior collector of the Ganta Collector and his two deputies Joseph Gbollie and Wille A. Kaibay.

Also endorsed for dismissal supposedly from the Bureau of Excise at the Ministry of Finance were senior economist/MFU, Jesse Mulbah, Sr., and the supervisor of foreign travel, Stanley T. Beh.

The release was silent on exactly what necessitated the dismissal of the revenue collectors all of who came from the Ganta Collectorate in Nimba. The Ganta Collectorate, which collects revenue from the border point with neighboring Guinea, is said to be the busiest dealing with several trans-border traders daily.

The collectorate was in the news recently for the mismanagement and misappropriation of large volume of revenue collected in excise, immigration, and other revenue collection activities.

Beside the Ganta Collectorate dismissals, President Sirleaf approved Minister Sayeh's request to transfer eight personnel from the Freeport of Monrovia amongst them Maliki Dukuly who served as chief examiner, Mary Wilson who served as director of liquidation, Varney Conneh who served as deputy collector for operations, and Tarnue Gowolo who served as chief ministerial.

Others were Akoi Gawolo who served as chief wharfinger, Alvin Gaye who served as deputy chief wharfinger for administration, Richard N. Gaye who served as chief boarding officer, Flomo Johnson who served as deputy chief examiner for administration, and David Meanyean who served as senior examiner for BIVAC Warehouse.

In the President's first ever swoop on corruption; she also approved the transfer from the head office of Mulbah Gouyou who served as deputy comptroller, Mulbah Kpassaquoi who served as deputy director of the Bureau of General Audit (BGA), Mayabah S. Bayour who served as special project officer, and Mohammed S. Saysay who served as executive assistant.

Others approved for transfer were Musa M. Sheriff who served as computer operator, Sekou Saysay who served as driver, and Matalie Kanneh, Catherine Saysay, and Ismail Jabateh all of who served as office assistants.

The release said the dismissals and transfers were not ends in themselves but part of the larger and far-reaching plan by President Sirleaf to fulfill the pledge to fight corruption in government.

As further manifestation of the attempt to fulfill that pledge, the release said, President Sirleaf has begun the publication of several audit reports for the public.

The first of these reports concerned the audit of the Ministry of Finance and government's procurement arm, the General Services Agency (GSA), which revealed that 132 vehicles paid for by the government of Liberia were unidentifiable for lack of transaction records and cooperation from suspected vehicle dealers.

It is not clear which audit report or group of audit reports would come next, but the release said the President would not be content with the mere publication of the reports. It said she has already instructed the Ministry of Justice to conclude actions on several of these audit reports and identify for prosecution individuals who have committed grave abuse of the public trust.

The release made no reference to timetable for these activities, which many believe would add significance to the dismissals and transfers being announced. But it noted, "The President once again reiterates her pledge to the Liberia people that she will fight corruption in government and will separate the officials who abuse the public trust."

Even though the President's action, whatever the gravity of the prompter, appears swift, timely, and in tune with the administration's pledge to rid public offices of debilitating corruption, observers say it was too early to jubilate.

"The reason is," Jubah Tamba of Sinkor Old Road said using a popular Liberian adage, "when you praise white chicken for being spotless while it is still hanging around a bowl of red oil, it may become egoistic, careless, and most likely to fall into the palm oil and turn red."

He said the government has only being in power for six months and that while most of these months were characterized by news of corruption on the level of the previous administration, it was only now that the government was taking what he called "low-key" action.

On a more serious note, according to Jeremiah V. Taryee, it was too early to praise the government because in his view, such actions were taken by past regimes without necessarily producing the desired effects.

"We saw individuals dismissed for corruption and incompetence. But what invariably followed these dismissals from administration to administration dating back to the Tolbert administration is that no sooner were these public servants dismissed than they were reemployed in higher positions," he said.

He said whether or not similar actions taken, then, were prompted by lack of qualified personnel to replace the dismissed, post-dismissal probe results that exonerated the dismissed officials, or presidential change of heart propelled by inner circle politics that ran deep into the social fabric of society is not clear.

But one thing that was clear, according to him, was the dismissed officials came back into government without explanation to the public bringing with them the stigma of corruption, vengeance for being unjustly dismissed, and feelings of vulnerability, and therefore prepared to grab as much as possible before the next dismissal is announced at the behest of the chief executive.

"This is the backbone of corruption: the job insecurity amongst political appointees who were dismissed as scapegoats or shifted around in circles to show that the president was doing something about corruption and inefficiency when the idea was to prove who is in charge and who is the only rooster in town," said Taryee.

It was once said during the Tolbert administration that individuals who were sacked for lateness in the morning were candidates for appointment by the afternoon hours to the extent that the president lost track of those dismissed.

Former presidents Doe and Taylor were also not freed of appointment and dismissals that were ends in themselves and therefore left the impression that they were political jockeys' rather serious attempts to address the problems of government.

"You know the government is like a football game with several competent persons on the bench. You have to make substitution," former President Charles Taylor once told journalists during one of his tête-à-têtes at the Executive Mansion.

What has never followed these presidential dismissals for which some hold them as witch-hunting and dismissals to give opportunities to supporters and partisans, according to observers, was prosecution in a court of competent jurisdiction to establish guilt and prescribe the appropriate legal remedy.

Now that President has taken the first step along those lines, analysts say, the distinguishing mark would be whether or not she follows through with the announcement ordering the Justice Ministry to prepare legal action for individuals that will be in the wrong.

The announcement made specific reference to those charged with wrongdoing in the audit reports, but whether that precludes those being dismissed for corruption is not clear.

Observers however believe that that will be made clear in the next few weeks when the actions announced are taken up. "But will the cycle of transfers and dismissals and reappointment with promotion ever be broken?" is the million-dollar question.

Copyright © 2006 - The Analyst Newspaper - All rights reserved

**Exhibit 21 - SLSOM's Civil Law Court Petition**

St. Luke School of Medicine                              )
Represented by and thru its President, Jerroll          )      *Filed sept. 15,*
Dolphin and all of its officials/ authorized Agent      )      *2006, at 3:38 pm*
.................................... PLAINTIFF           )      *BH Clerk of Court*
                                                        )
            VERSUS                                      )      ACTION: DAMAGES FOR WRONG
                                                        )
The Ministry of Health & Social Welfare.                )
Represented by and thru its Minister and The            )
Ministry of Education, represented by and thru          )
It's Minister and all of their principal Deputies,      )
And all of those working under the scope of             )
Authority. Republic of Liberia.                         )
.................................... DEFENDANTS          )


## PLAINTIFF'S COMPLAINT

Plaintiff in the above-entitled cause of Action, complains against the within named
Defendants for reason legally showth unto Your Honor, to wit: -

1.  That Plaintiff is a registered business and medical school entity/ Institution operating
    under the Liberia Business Association Laws, Photo copies of the Articles of
    Incorporation plus letters of accreditation from the Ministry of Health and Social
    Welfare are hereto attach and marked as exhibit P/1 in bulk to form part of this
    Complaint.

2.  Plaintiff further says and submits that to authenticate the credibility of Plaintiff, a
    Legislation was past, sign into law by the than Liberian President and subsequently
    printed into hand Bill. Photo copies of said instruments are herewith attached, and
    marked P/2 in bulk to form part of this Complaint.

3.  Plaintiff says and submits that since its accreditation by the relevant authorized
    authorities and Agencies of Government coupled with the Legislative Enactment
    none of which stated herein had been withdrawn or nullify by the Government of
    Liberia in keeping with the due process of law thus creating the atmosphere for
    Plaintiff to operate her school semesters and years and to put forth graduates while
    other students being enrolled. Plaintiff gives notice to Court to produce additional
    living and documentary evidence at the Trial in connection with the herein case.

4.  Plaintiff contends and says that to her greatest dismay and surprise, the Defendants
    under an organized unlawful and illegal scheme prompt and subjected Plaintiff to
    public ridicule, degradization, hardship and damage the face of said Institution, and
    ignored all of the instruments and accreditation Plaintiff have, and without any

regards for or to the law controlling, denounced the credibility of Plaintiff eventhough, the Legislative Enactment of St. Luke School of Medicine remains unratified and the accreditation along with the Articles of Incorporation unrevoked since then upto and including the fil ing of this complaint, as in keeping with the laws of the Republic of Liberia.

5. Plaintiff says and contends that as a result of Defendant's direct conduct, the credibility of Plaintiff has been questioned in some quarter and rejected in other quarters both within and out of Liberia thereby causing students who are presently been enrolled to abscorn the Institution/ University demanding US$ 500, 000.00 United States Dollars as refund for expenses incurred at the Plaintiff's University plus LD$ 1, 500, 000.00 Liberian dollars for the inconveniences suffered as a result of the abrupt closure of said University which amount Plaintiff seeks to recover from the Defendants. Plaintiff gives notice to prove same during trial.

   WHEREFORE, and in view of the foregoing, Plaintiff brings this Action of Damages for Wrong against the within named Defendants, praying Your Honor to hold Defendants to pay unto Plaintiff the amount of US$ 500,000.00 United States Dollars plus LD$ 1, 500,000.00 Liberian dollars as special damages plus US$ 115,000,000.00 United States dollars as general damage and grant unto Plaintiff any and all further relief as the end of justice demand.

                          RESPECTFULLY SUBMITTED:
                          The above named Plaintiff
                          By and thru Her Legal Counsel
                          WEAH AND ASSOCIATES LAW OFFICES
                          109 ASHMUN STREET, MONROVIA, LIBERIA.

                          _____

                          ATTORNEYS AND COUNSELLORS-AT-LAW

Dated this 4th day of

September , A.D. 2006

$ 4.00 Revenue stamp affixed on
the original copy.

REPUBLIC OF LIBERIA      )      IN THE OFFICE OF THE JUSTICE OF PEACE FOR
MONTSERRADO COUNTY)         MONTSERRADO COUNTY, CITY OF MONROVIA,
                            LIBERIA

St. Luke School of Medicine                    )
Represented by and thru its President, Jerroll )
Dolphin and all of its officials/ authorized Agent )
.............................................PLAINTIFF )
                                               )
                  .                            )
         VERSUS                                )      ACTION:  DAMAGES FOR WRONG
                                               )
The Ministry of Health & Social Welfare,       )
Represented by and thru its Minister and The   )
Ministry of Education, represented by and thru )
It's Minister and all of their principal Deputies, )
And all of those working under the scope of    )
Authority, Republic of Liberia,                )
.............................................DEFENDANTS )

### PLAINTIFF'S AFFIDAVIT

PRESONALLY APPEARED BEFORE ME, the undersigned, a duly qualified Justice of the Peace

for Montserrado County, at my office in the City of Monrovia, Liberia Counsellor Ignatius N. Weah,

one of counsel of PLAINTIFF in the above entitled cause of action and made Oath according to the

law and facts as set forth and contained in the annexed PLAINTIFF'S COMPLAINT, are true and

correct to the best of his knowledge and belief, and as these matters of information received, he

verify believes them to be true and correct.

SWORN AND SUBSCRIBED TO BEFORE ME
THIS 4th DAY OF September, A.D. 2006

JUSTICE OF THE PEACE, MONT. CO. RL

CLLR. IGNATIUS N. WEAH ONE OF
COUNSEL FOR PLAINTIFF / DEPONENT

L$ 5.00 Revenue stamp affixed on the original

BEFORE HIS HONOR EMERY S. PAYE                     ASSIGNED CIRCUIT JUDGE

*filed Sept. 15, 2006,*
*at 3:38 pm.*
*(the) Clerk of Court*

| | |
|---|---|
| St. Luke School of Medicine | ) |
| Represented by and thru its President, Jerroll | ) |
| Dolphin and all of its officials/ authorized Agent | ) |
| ..............................................PLAINTIFF | ) |
| | ) |
| VERSUS | ) |
| | ) |
| The Ministry of Health & Social Welfare, | ) |
| Represented by and thru its Minister and The | ) |
| Ministry of Education, represented by and thru | ) |
| It's Minister and all of their principal Deputies, | ) |
| And all of those working under the scope of | ) |
| Authority, Republic of Liberia, | ) |
| ...........................................DEFENDANTS | ) |

ACTION: DAMAGES FOR WRONG

## PLAINTIFF'S WRITTEN DIRECTION

The Clerk of Court
Sixth Judicial Circuit
Civil Law Court
Montserrado County
Republic of Liberia.

Madam Clerk of Court:

Upon the receipt of Plaintiff's Complaint, Affidavit and other relevant documents along with your usual filling fees, you will docket the said cause of action in the September Term A.D. 2006 of the Civil Law Court Sixth Judicial Circuit, Montserrado County, same being the 18th day of September, A.D. 2006.

You will also issue a writ of summons directed to the Sheriff of this Honorable Court to summons the within named Defendants to appear and / or file their Answers to Plaintiff's Complaint on the 14th day of September, A.D. 2006. That failure on the part of the Defendants to appear and / or Answer JUDGMENT BY DEFULT SHALL BE rendered against them.

You will also insert a clause in the said writ of summons commanding the Sheriff to make her final returns endorsed on the back of said writ of summons as to the form and manner of service on or before the said 14th day of September, A.D. 2006.

AND FOR SO DOING, THIS SHALL CONSTITUTE YOUR LEGAL AND SUFFICIENT AUTHORITY.

RESPECTFULLY SUBMITTED:
St. Luke School of Medicine
Represented by and thru its President
Jerroll Dolphin and all of its Officials / Authorized
Agents, PLAINTIFF, BY AND THRU THE
WEAH AND ASSOCIATES LAW OFFICE

Dated 4th day of
September, A.D. 2006.

_____
COUNSELLORS & ATTORNEYS AT-LAW

**Exhibit 22 - Ministry of Health & Social Welfare Answer to SLSOM's "Damages for Wrong" Complaint**

REPUBLIC OF LIBERIA)   IN THE CIVIL LAW COURT, SIXTH JUDICIAL CIRCUIT,
MONTSERRADO COUNTY)   MONTSERRADO COUNTY, SITTING IN ITS SEPT. TERM, A.D. 2006

BEFORE HIS HONOUR:   EMERY S. PAYE. ....ASSIGNED CIRCUIT JUDGE

IN RE:     St. Luke School of Medicine...........)
           Represented by and thru its                )
           President, Jerroll Dolphin and            )
           all of its officials authorized Agents  )
           all of the City of Monrovia,              )
           Liberia.....................PLAINTIFF)
                                                           )
           VERSUS                             )   **ACTION OF DAMAGES FOR WRONG**
                                                           )
           The Ministry of Health & Social       )
           Welfare, represented by and thru     )
           its Minister and the Minister of         )
           Education thru its Minister and all    )
           those working under the scope of     )
           authority, RL.........DEFENDANTS)

### CO-DEFENDANT HEALTH MINISTRY'S ANSWER

CO-DEFENDANT, MINISTRY OF HEALTH AND SOCIAL WELFARE, R.L., in the above entitled cause of Action answers the Plaintiff in the manner and form showeth as follows, to wit:

1.   That because as to the entire compliant of the Plaintiff, Co-Defendant, Ministry of Health & Social Welfare submits and contends that same is patently evasive, inconsistent and contradictory, and therefore does not present a clear-cut friable issue. Wherefore Co-Defendant prays court that the complaint, being thus evasive and self-contradictory, be dismissed and Plaintiff made to pay the costs of these proceedings.

2.   That because further above, Co-Defendant submits and contends that it is against public policy that people who are duly appointed and commissioned to serve the public would plan, connive and engage in the most wanton dangerous enterprise and moral decadency by supporting, misrepresenting, misleading and fraudulently creating the atmosphere that leads the public to commit general suicide by the use of their knowledge in the medical profession and through the issuance of medical degree to non-qualified individuals purporting to be graduates of a medical school that does not in fact exist at all

3.   That also because as to counts one (1) and (2) of the compliant, Co-Defendant submits and contends that said counts of the complaint are also fatally defective and bad in that Exhibits "P/1" and "P/2", the foundation stone of the entire Action of Damages for Wrong, is irreceivable in any court of justice in this Republic; for said Exhibits "P/1" & "P/2" which purport to be an alleged articles of incorporation and Hand Bill of legislative enactment constitute all fundamental elements of fraud and misrepresentation both in law and facts. Co-Defendant submits that said Exhibits not having met the requirements of law for their validity cannot and will not be an exhibit in support of any pleading in law and equity, for they are null and void ab initio. Hence, Co-Defendant prays Your Honour to dismiss Plaintiff's complaint in its entirety.

4.   That also because as to the entire five(5) counts complaint, Co-Defendant submits and contends that the Complainant in the instant case lacks legal capacity to institute this Action of Damages for Wrong because, the non-existence of the so-called St. Luke School of Medicine both de facto and de jure within the Republic of Liberia, the alleged articles of incorporation and legislative enactment not being in line with law, Plaintiff's complaint must crumble as a matter of law because, the both documents have been denounced by NTLA and the Ministry of Foreign Affairs of the Republic of Liberia. Attached hereto is a copy of the House Committee report which conducted investigation on the alleged establishment of St. Luke School of Medicine, marked as Exhibit "A" to form a material and cogent part of this Answer.

5.   That also because as to the five (5) counts complaint of the Plaintiff, Co-Defendant submits and contends that the so-called incorporators of the Articles of Incorporation of St. Luke School of Medicine, including Dr. Jerroll Dolphin, Dr. Meimei Dukuly and Mr. Frank E. Teah, Jr. and Dr. Peter S. Coleman, are all 419 gang of four in the medical field

- 2 -

of Liberia who are ready and prepared to mortgage the health and well-being of the people of this country in order to promote their own individual selfish gains at the expense of the medical profession.

6.    That because also as to the entire complaint of the Plaintiff, Co-defendant submits and contends that she will apply to the law that the so-called Plaintiff and all of its officers be charged with a criminal offense for falsification of government documents, with specific reference to the Articles of Incorporation of St. Luke School of Medicine and the alleged legislative enactment to establish St. Luke School of Medicine, and that the so-called incorporators being more dangerous than the war-lords in the Liberian civil war, be arrested and turned over to the special tribunal in Sierra Leone for their attempt to commit, and plan genocide through the use of medical knowledge against the people of Liberia.

7.    That also because as to counts four (4) and five (5) of Plaintiff's complaint, Co-Defendant submit and contends that said counts of the complaint are fatally defective and bad for pleading negative pregnant in that, while the burden of the complaint is non-existence of the so-called St. Luke School of Medicine, yet, and still in the prayer of complaint the Plaintiff is claiming the amount of US$500,000.00 and L$1,500,000,00 and as special damages plus US$115,000,000.00 as general damages in favor of an organization that does not exist de jure and de facto. Co-Defendant therefore submits and prays that the complaint being thus dismissably defective and bad, be ruled out of court and Plaintiff made to pay the costs of these proceedings.

8.    That because further above, Co-Defendant Ministry of Health & Social Welfare says that the entire complaint is merely public relations exercise on the part of St. Luke School of Medicine Incorporators to gain sympathy from the general public for the heinous medical offense or wrong doing they have committed against the people of this country.

9.    And that also because as to counts three (3) and four(4), and therefore the entire complaint, are irreconcilably inconsistent, self-contradictory and repugnant one to the other, in that, whereas the Plaintiff is alleging that the students at the so-called institution/university have absconded and are demanding a refund of US$500,000.00 and L$1,500,000.00 for inconveniences suffered as a result of the abrupt closure of said university, yet, in the prayer of the complaint the Plaintiff is demanding US$500,000.00 plus L$1,500,000.00 and US$115,000,000.00 shamelessly for what reasons only God knows. Because of this unorthodox mode of pleading, born of a crafty design to extort public funds, Co-Defendant prays that the entire complaint be dismissed and the Plaintiff made to pay the costs of these proceedings.

10.   That because further to the above, Co-Defendant submits and contends that the only legal agency authorized by law to publish acts passed by the Legislature of Liberia is the Foreign Ministry of the Republic of Liberia. Former Senator Beatrice Sherman has no legal authority to publish any act on behalf of the Government of Liberia, as was the case involving the so-called St. Luke School of Medicine legislative enactment of April 24, 2003.

11.   That also because C0-Defendant further submits and contends that it was impossible during August 7, 2003 for former President Charles Taylor of Liberia to have signed any act passed by the Legislature at that time when in fact the Legislature was completely out and the former President under the greatest international pressure which led to his departure on August 11, 2003. Between August 7, 2003 to August 11, 2003 former President Taylor was no longer in charge of things in Liberia. As such it was impossible for him to even contemplate signing an act to establish a school when his own future in Liberia was no longer certain. Who there see Former President Taylor between August 7 and August 11, 2003?

12.   That because further to the entire complaint of the Plaintiff, Co-Defendant submits and contends that the President of the so-called St. Luke School of Medicine, Dr. Jerroll Dolphin, who was in the country without work permit, Resident Permit and license to practice medicine within the Republic of Liberia, could not have established any legal institution without being legally qualified to do so. In the absence of the required documents mentioned supra, Dr. Dolphin is without legal capacity and authority to establish any institution in Liberia as an alien.

- 3 -

13. That also because further to the above, Co-Defendant submits and contends that it is unfortunate and highly regrettable that Liberians like Dr. Peter Coleman, Dr. Meimei Dukuly and Mr. Frank Teah would heartlessly and shamelessly abuse the medical profession by issuing medical degrees to individuals as graduates of a medical school that does not exist. More-besides, how could St. Luke School of Medicine award medical degrees to graduates of said school in 2001, 2002, 2003, for a school that was allegedly established in 2000? Can anybody with a sound mind award a medical degree to a graduate who has studied for one (1) year only? Co-Defendant gives notice that at the trial she will produce more documentary evidence in support of this Answer.

14. Co-Defendant hereby denies all and singular the averments as contained in the Plaintiff's complaint that is not specifically traversed in this Answer.

WHEREFORE, AND IN VIEW OF THE FOREGOING, Co-Defendant Ministry of Health and Social Welfare, R.L. prays Your Honour to deny and dismiss Plaintiff's complaint in its entirety, rule costs of these proceedings against the Plaintiff and grant unto Co-Defendant all further relief as Your Honour my deem just, legal and equitable in the instant.

 

Respectfully submitted,
Co-Defendant Ministry of Health & Social Welfare,
By and thru its Legal Counsel,
TULAY AND ASSOCIATES



Fomba O. Sherif
COUNSELLOR-AT-LAW

Dated this 20th day of September, A.D. 2006

$5.00 Revenue Stamps Affixed on the Original.



## CO-DEFENDANT'S AFFIDAVIT

PERSONALLY APPEARED BEFORE ME, a duly qualified Justice of the Peace for and in Montserrado County, Republic of Liberia, at my Office in the City of Monrovia, Liberia, Fomba O. Sherif, COUNSELLOR-AT-LAW and one of Counsel for Co-Defendant Ministry of Health & Social Welfare and made Oath According to Law that all and singular the allegations of facts and law as are seth forth and contained in the foregoing and annexed CO-DEFENDANT'S ANSWER are true and correct to the best of his knowledge and belief, and as to those matters of information thereto relating as relied upon, he verily believes them to be true and correct.

  

SWORN AND SUBSCRIBED TO BEFORE ME AT MY IN THE CITY OF MONROVIA, LIBERIA THIS 23rd DAY OF SEPTEMBER, A.D. 2006



JUSTICE OF THE PEACE, MONT. CO., R.L.

Fomba O. Sherif
COUNSELLOR-AT-LAW & ONE OF COUNSEL
FOR CO-DEFENDANT...DEPONENT/AFFIANT

$5.00 Revenue Stamps affixed on the original.

REPUBLIC OF LIBERIA)   IN THE CIVIL LAW COURT, SIXTH JUDICIAL CIRCUIT,
MONTSERRADO COUNTY)   MONTSERRADO COUNTY, SITTING IN ITS SEPT. TERM, A.D. 2006

### BEFORE HIS HONOUR:   EMERY S. PAYE, ....ASSIGNED CIRCUIT JUDGE

| | |
|---|---|
| The Ministry of Health & Social ) | |
| Welfare, represented by & thru ) | |
| its Minister............ ........MOVANT) | |
| ) | |
| **VERSUS** ) | **MOTION TO DISMISS** |
| ) | |
| St. Luke School of Medicine, ) | |
| represented by & thru its President, ) | |
| Jerroll Dolphin and all of its officials ) | |
| authorized Agents, all of the City of ) | |
| Monrovia, ) | |
| Liberia ........RESPONDENTS ) | |

### GROWING OUT OF THE CASE:

| | |
|---|---|
| St. Luke School of Medicine ) | |
| Represented by & thru its ) | |
| President, Jerroll Dolphin and all of ) | |
| its officials authorized Agents, all of ) | |
| the City of Monrovia, ) | |
| Liberia.................PLAINTIFF) | |
| ) | |
| **VERSUS** ) | **ACTION OF DAMAGES FOR WRONG** |
| ) | |
| The Ministry of Health & Social ) | |
| Welfare, represented by and thru ) | |
| its Minister and the Minister of ) | |
| Education thru its Minister and all ) | |
| those working under the scope of ) | |
| authority, ) | |
| R.L....................DEFENDANTS) | |

### MOVANT'S MOTION

MOVANT IN THE ABOVE ENTITLED CAUSE OF ACTION, most respectfully moves this Honourable Court for a dismissal of Respondent/Plaintiff's Action of Damages for Wrong and for the factual and legal reasons showeth as follows:

1. That because Movant submits and contends that the Respondent St. Luke School of Medicine lacks legal capacity to institute any action in this Republic, said institute not being a lawful and legal entity operating under the laws of Liberia, and that the laws of Liberia cannot and will not condone, sanction support and ratify any illegality and nobody can benefit from its own illegal acts.

2. That the Respondent/Plaintiff being and having been falsely created by its 419 incorporators in persons of Dr. Jerroll Dolphin, Dr. Meimei Dukuly, Mr. Frank E. Teah as well as their PROVOST Dr. Peter Coleman, under the most dubious criminal circumstances, said institution cannot benefit from its own illegal acts, fraud and misrepresentation.

3. That because only the ministry of Foreign Affairs of the Republic of Liberia is authorized by law to publish all legislative enactments in HANDBILL and to approve articles of incorporation to establish legal entities under the Association Laws of Liberia; both the House of Representatives (NTLA) and the Foreign Ministry of Liberia having denied the legal existence of the so-called St. Luke School of Medicine within the Republic of Liberia, said bogus St. Luke School of Medicine cannot now benefit from its own illegality because, for what is not done legally is not done at all, and that Respondent is 419 institution/university organized by the gaug of four fraud sters including Peter s. Coleman, Meimei Dukuly, Jerroll Dolphin and Frank E. Teah, must be arrested for planning a time bomb to exterminate the entire population of Liberia by means of spreading medical virus as graduates of medical school or doctors.

4    That because Movant further prays court to order and declared null and void the articles of incorporation as well as the alleged legislative enactment which was never the end product of NTLA as alleged by Respondent/Plaintiff in its complaint. Movant gives notice that at trial he will produce copy of take medical degree issued to the so-called graduates of St. Luke School of Medicine, even though, the school does not exist de jure and de facto. See attached copy of NTLA Report.

WHEREFORE, AND IN VIEW OF THE FOREGOING, MOVANT most respectfully prays court to deny and dismiss Respondent/Plaintiff's complaint in its entirety, rule costs of these proceedings against the Respondent, order the so-called St. Luke School of Medicine Closed, and grant unto Movant all further relief as Your Honour may deem just, legal, transparent and equitable in the instant.

 

Respectfully submitted,
The above named MOVANT,
By & thru its Legal Counsel,
TULAY & ASSOCIATES

Fomba O. Sherif
COUNSEL-AT-LAW

Dated this 20th day of September AD 2006

$5.00 Revenue Stamps affixed on the Original

### MOVANT'S AFFIDAVIT

PERSONALLY APPEARED BEFORE ME, a duly qualified Justice of the Peace for and in Montserrado County, Republic of Liberia, at my office in the City of Monrovia, Liberia, Fomba O. Sherif, COUNSELLOR-AT-LAW and one of Counsel for MOVANT in the above entitled cause of Action and Made Oath according to law that all and singular the allegations of facts and law as are setforth and contained in the foregoing and annexed MOVANT'S MOTION TO DISMISS are true and correct to the best of his knowledge and belief, and as to those matters of information thereto relating as relied upon, he verily believes them to be true and correct.



SWORN AND SUBSCRIBED TO BEFORE ME AT THE OFFICE IN THE CITY OF MONROVIA, LIBERIA THIS 20th DAY OF SEPTEMBER, AD 2006.

JUSTICE OF THE PEACE, MONT.CO., R.L.

Fomba O. Sherif
COUNSELLOR-AT-LAW & ONE OF COUNSEL
FOR MOVANT   DEPONENT/AFFIANT

$5.00 Revenue Stamps affixed on the Original

**Exhibit 23 - Ministry of Education Answer to SLSOM's "Damages for Wrong" Complaint**

REPUBLIC OF LIBERIA          )          IN THE CIVIL LAW COURT, SIXTH JUDICIAL CIRCUIT
MONTSERRADO COUNTY)                    MONTSERRADO COUNTY, SITTING IN ITS SEPTEMBER
                                       TERM A. D. 2006.

BEFORE HIS HONOR:          EMERY S. PAYE ...........................ASSIGNED CIRCUIT JUDGE

St. Luke School of Medicine                     )
Represented by and thru its President, Jerroll  )
Dolphin and all of its officials/ authorized Agent )
.................................PLANTIFF         )
                                                 )
           VERSUS                                )          ACTION:     **DAMAGES FOR WRONG**
The Ministry of Health & Social Welfare          )
Represented by and thru its Minister and The     )
Ministry of Education, represented by and thru   )
it's Minister and all of their principal Deputies, )
and all of those working under the cope of       )
authority, Republic of Liberia,                  )
.................................DEFENDANTS )

## DEFENDANT'S ANSWER

Defendant, Ministry of Education, in the above captioned cause of action denies the legal sufficiency of plaintiff's complaint and therefore requests this honorable Court to dismiss and over rule said complaint for reasons, both factual and legal, as shown below to wit:

1. That as to count one of plaintiff's complaint, defendant says that the school was incorporated under the laws of the Republic of Liberia but Article III of said articles has been violated for the fact that the school did engage in an unlawful act by issuing Fake Degrees to Students. This defendant stands ready to prove at trial.

2. That the acts of the school rely upon was enacted in violation of the rule or policy of the National Commission on Higher Education: this defendant stand ready to proof at trial.

3. That the Temporary Permit to operate St. Luke School of Medicine in the Republic of Liberia was obtained through fraud: This defendant stands ready to prove during trial by producing both living and documentary evidences.

4. That Section One of the act of St. Luke admits that the School was established on the first of August 2000 and incorporated August 22, 2001; meaning; the school was illegally operating before it was enacted on August 8, 2003 by the Legislature which was approved April 24, 2003.

5. That the School claimed to have campus at Gaye Town in 2005, but issued degrees before 2005 and attached a Lease Agreement for a building on Broad Street known and called Luke Building. This defendant stands ready to prove at trial by producing both living, oral and documentary evidences.

6.  That the school St. Luke is operating without a campus as claimed, a requirement for the operating of medical school, contrary to information for Accreditation – Part 1 St. Like school of Medicine, Liberia 2004. Defendant will proof at trial.

7.  That further to Plaintiff's complaint, defendant says indeed and in true, there exist and Articles of Incorporation and an Act of St. Luke School of Medicine plus the letter from the MOH but the purpose for which the act, the letter and the Articles of Incorporation was sought was defeated by the fraudulent action of the school. Hencefore, the action of damages can not lie. This defendant is ready to proof all of these during trial by producing oral, living and documentary evidences..

8.  Defendants says that Plaintiff defeated the intent and credibility it sought through Legislation by engaging itself into illegal activities. This defendant stands ready to prove during trial.

9.  Defendant says further that all legal documents can be nullified by the holder through the engagement of the holder into illegal act(s). That is, whatever that is not legally done, is not done at all. This defendant is ready to proof during trial.

10. Defendant further says that, every action of the Incorporation of the Institution relating to the provision of Higher Education in Liberia was violated by St. Luke School of Medicine. Defendant gives notice to Court that it shall produce living and documentary evidence to prove it case during trial.

11. Additionally, defendant says that Plaintiff has lost nothing since indeed and infact all of its actions were illegally done to claim damages from the Ministry of Education or any other Institution.

12. Finally, defendant says that Plaintiff has failed to state any instant or act/action of defendant, Ministry of Education contrary to law that damaged the school. Hencefore claim of damages cannot lie.

Wherefore, and in view of the foregoing, defendant prays this Honorable Court to dismiss Plaintiff's complaint in its entirely and rule costs against Plaintiff and grant unto defendant any and all further relief that this Court might deem just and legal.

Respectfully submitted,

Defendant By and thru its Legal
Counsel Viama J. Blama & NELAL

$5.00 Revenue Stamp
Affixed to original.

REPUBILIC OF LIBBERIA  )    IN THE OFFICE OF THE JUSTICE OF THE PEACE
MONTSERRADO COUNTY)    FOR AND IN MONTSERRADO COUNTY, LIBERIA

St. Luke School of Medicine    )
Represented by and thru its president, Jerrol    )
Dolphin and all of its officials/authorized Agent    )
...................................................**PLAINTIFF**  )

        **VERSUS**        ) ACTION: **DAMAGES FOR WRONG**

                )
The Ministry of health & Social Welfare,    )
Represented by and thru its Minister and The    )
Ministry of Education, represented by and thru    )
It's Minister and all of their principal Deputies,    )
And all of those working under the scope of    )
Authority, Republic of Liberia,    )
.......................................**DEFENDANTS**  )

## DEFENDANT'S AFFIDAVIT

    PERSONALLY APPEARED BEFORE ME, a duly qualified Justice of the Feace for and it Montserrado County, at my Office in the City of Monrovia, Liberia, Atty. Viama J. Blama, one of Counsels for Defendant in the above entitled cause of Action and make Oath according to law that all and singulat the allegations of facts as are set forth and contained in the Defendant's Answer, are true and correct to the best of his knowledge and belief, as to those matters of information, he verily believes them to the true and correct.

                Sworn and subscribed to before me,

                This 27th day of September A.D. 2006.

                _____
Viama J. Blama                JUSTICE OF THE PEACE MONT. CO. R/L
ATTORNEY-AT-LAW

## Exhibit 24 - SLSOM's REPLY TO CO-DEFENDANT MINISTRY OF EDUCATION ANSWER

REPUBLIC OF LIBERIA)     IN THE CIVIL LAW COURT, SIXTH JUDICIAL CIRCUIT,
MONTSERRADO COUNTY)     MONTSERRADO COUNTY, SITTING IN ITS SEPTEMBER
                     TERM A. D. 2006.

BEFORE HIS HONOR: EMERY S. PAYE......................     ASSIGNED CIRCUIT JUDGE:

*Filed oct. 6, 2006,
at 4:20 pm
CP Clerk of Court*

St. Luke School of Medicine     )
Represented by and thru its President, Jerroll     )
Dolphin and all of its officials/ authorized Agent     )
Of the City of Monrovia, Liberia ...... PLAINTIFF     )
                             )
       VERSUS            )     ACTION: DAMAGES FOR WRONG
                             )
The Ministry of Health & Social Welfare,     )
Represented by and thru its Minister and The     )
Ministry of Education, represented by and thru     )
It's Minister and all of their principal Deputies,     )
And all of those working under the scope of     )
Authority, Republic of Liberia.     )
...............................DEFENDANTS     )

PLAINTIFF'S REPLY TO CO- DEFENDANT MINISTRY OF EDUCATION ANSWER

Plaintiff in the above entitled cause of Action, denies the legal and factual
sufficiency of Co- Defendant's Ministry of Education Answer, pray Your Honor
for its dismissal in manner and form as follow, to wit: -

1. That as to the entire Co- Defendant 's Ministry of Education Answer, Plaintiff
says and submits that same should be dismiss, in that, the Co- Defendant
Ministry of Education woefully failed, refused and neglected to traverse on any
of the count, say, count (1) thru (5) of the Plaintiff's Complaint, as such, same
is an admission and an incurable legal blunder. The entire Co- Defendant's
Ministry of Education Answer should therefore be dismissed.

2. That as to the entire Co- Defendant's Ministry of Education Answer, Plaintiff
says and avers that the failure of Co- Defendant's Ministry of Education to
verify her Answer as can be seen from the attached Co- Defendant's Ministry of
Education Answer is subject to dismissal and should therefore be stricken from
the records of these proceedings. The entire Co- Defendant's Ministry of
Education Answer should be dismissed.

3. That as to count (1) of the Co- Defendant's Ministry of Education Answer,
Plaintiff contends and says that as far as her Articles of Incorporation is
concerned, and the Administration of the Institution of Plaintiff, there has been
no violation of any of said Articles, as such, the allegation made by Co-
Defendant's Ministry of Education being naked and without any justification
nor evidence thereto in support of said averment same should therefore be
dismissed. Count (1) of the Co- Defendant's Ministry of Education Answer
should therefore be dismissed.

4. That as to count (2) of the Co- Defendant's Ministry of Education Answer,
Plaintiff says and contends said count is ridiculous and unfortunate because if
the act rely upon by Plaintiff was enacted in violation of the rule or policy of
the National Commission on Higher Education,

then, said institution would not have given accreditation to Plaintiff, hence, said averment is repugnant and pregnant with deception, merely intended to mislead this Honorable Court. Count (2) of the Co- Defendant's Ministry of Education Answer should therefore be dismissed.

5. That as to count (3) of the Co- Defendant's Ministry of Education Answer, Plaintiff vehemently opposed and reject said averment on grounds that under our law one who alleges has the burden of prove but in the instant case, the Co- Defendant's Ministry of Education has failed, refused and neglected to authenticate the alleged fraud as such, count (3) is misleading and lacks legal basis. Count (3) of the Answer should therefore be dismissed.

6. That as to count (4) of the Co- Defendant's Ministry of Education Answer, Plaintiff says and submits that granted and not admitting said Institution was established August 1, 2000, and incorporated August 22, 2001, same does not in any way suggest that said school in operation or running a school semester. Plaintiff says that she is law abiding and that is why she obtained the necessary required documents in consonance with the Liberian Business Association Laws and as such, would not have done any thing contrary to law as alleged by co- Defendant Ministry of Education. Count (4) of the Answer should therefore be dismissed.

7. That as to count (5) and (6) of the Co- Defendant's Ministry of Education Answer, Plaintiff says and submits that said averments are ambiguous and incomprehensible because Plaintiff was granted letter of accreditation when all of its facilities had been inspected, as such, said accusation is muted and saturated with falsehood. Count ( 5) and (6) of the Answer should therefore be dismissed.

8. That as to count (7) and (8) of the Co- Defendant's Ministry of Education Answer, Plaintiff maintains and says that the intent and purpose of the Legislation has not been breached by Plaintiff nor has there been any point in time, Plaintiff had ever perpetrated fraud but instead, Plaintiff had met the pre- requisites as required and challenge Co- Defendant's Ministry of Education to authenticate by evidence said allegation. Plaintiff says the entire Co- Defendant's Ministry of Education Answer is saturated with falsehood and misrepresentation needless to say count(7) and (8) thereof, as such, same should be dismissed

9. That as to count (9) and (10) of Co- Defendant's Ministry of Education Answer, Plaintiff maintains and says that the relief sought for her complaint is germane and in consonance with the laws of the Republic of Liberia and therefore same should not be disturbed. Further, Plaintiff contends and says that she has not gone contrary to any principles as may be required by Plaintiff to warrant the nullification of said Plaintiff's Articles of Incorporation, Letters of Accreditations and Legislative Enactment, especially without due process, Plaintiff challenges the legal validity of Co- Defendant's Ministry of Education as well as Co- Defendant's Ministry of Health and Social Welfare act denounce the existence of said Institution and the authenticate of Plaintiff's credentials which qualified Plaintiff to operate Medical school in Liberia. Count (9) and (10) of the Answer should therefore be dismissed.

0. That as to count (11) and (12) of the Co- Defendant's Ministry of Education Answer, Plaintiff says further that she maintains and re- confirms the entire Complaint that Co- Defendant's Ministry of Education along with Co- Defendant's Ministry of Health & Social Welfare should be held liable for the malicious and calculated plan perpetrated against Plaintiff to damage, defame and subject Plaintiff to public ridicule especially, without due process when indeed and intruth, Plaintiff met the pre- requisite to operation as an institution. Count (11) and (12) of the Answer should therefore be dismissed.

11. Plaintiff denies all and singular the allegation of both law and fact as are set forth and contained in Co- Defendant's Ministry of Education Answer count (1) thru (12) which have been made subject of special traverse.

WHEREOF, and in view of the foregoing, Plaintiff prays Your Honor and this Honorable Court to dismiss and deny Co- Defendant's Ministry of Education answer in its entirety, rule the cost against Co- Defendant and grant unto Plaintiff any and all further relief as the end of justice demand.

RECPECTFULLY SUBMITTED
The above named PLAINTIFF
By & thru her legal counsel
WEAH & ASSOCIATES LAW OFFICES
109 ASHMUN STREET, OPPOSITE TELECOM.

Dated this 6th day of
October, A.D. 2006

$4.00 Revenue stamp affixed
on the original copy.

ATTORNEYS AND COUNSELLOR-AT-LAW

REPUBLIC OF LIBERIA )    IN THE OFFICE OF THE JUSTICE OF PEACE FOR
MONTSERRADO COUNTY)    MONTSERRADO COUNTY, CITY OF MONROVIA,
                    LIBERIA

St. Luke School of Medicine         )
Represented by and thru its President, Jerroll  )
Dolphin and all of its officials/ authorized Agent  )
..................................PLAINTIFF  )
                        )
        VERSUS         )    ACTION: DAMAGES FOR WRONG
                        )
The Ministry of Health & Social Welfare,    )
Represented by and thru its Minister and The  )
Ministry of Education, represented by and thru  )
It's Minister and all of their principal Deputies,  )
And all of those working under the scope of  )
Authority, Republic of Liberia,         )
............................ DEFENDANTS  )

## PLAINTIFF'S AFFIDAVIT

PERSONALLY APPEARED BEFORE ME, the undersigned, a duly qualified Justice of the Peace

for Montserrado County, at my office in the City of Monrovia, Liberia Counsellor Ignatius N. Weah,

one of counsel of PLAINTIFF in the above entitled cause of action and made Oath according to the

law and facts as set forth and contained in the annexed PLAINTIFF'S REPLY, are true and

correct to the best of his knowledge and belief, and as these matters of information received, he

verify believes them to be true and correct

                        SWORN AND SUBSCRIBED TO BEFORE ME
                        THIS _6th_ DAY OF _____ _Oct_ A.D. 2006

                        JUSTICE OF THE PEACE, MONT. CO. RL

CLLR. IGNATIUS N. WEAH ONE OF
COUNSEL FOR PLAINTIFF / DEPONENT

I.$ 3.00 Revenue stamp affixed on the original

**Exhibit 25 - SLSOM FILES RESPONDENT'S RESISTANCE**

| | |
|---|---|
| REPUBLIC OF LIBERIA) | IN THE CIVIL LAW COURT, SIXTH JUDICIAL CIRCUIT, |
| MONTSERRADO COUNTY) | MONTSERRADO COUNTY, SITTING IN ITS SEPT. TERM, A.D. 2006 |

**BEFORE HIS HONOUR:  EMERY S. PAYE, ....ASSIGNED CIRCUIT JUDGE**

The Ministry of Health & Social        )
Welfare, represented by & thru        )
its Minister................. MOVANT)
                                                      )
                **VERSUS**                     )            **MOTION TO DISMISS**
                                                      )
St. Luke School of Medicine,            )
represented by & thru its President,  )
Jerroll Dolphin and all of its officials )
authorized Agents, all of the City of )
Monrovia,                                         )
Liberia.........RESPONDENTS        )

**GROWING OUT OF THE CASE:**

St. Luke School of Medicine            )
Represented by & thru its               )
President, Jerroll Dolphin and all of  )
its officials authorized Agents, all of )
the City of Monrovia,                      )
Liberia.................PLAINTIFF )
                                                      )
                **VERSUS**                     )      **ACTION OF DAMAGES FOR WRONG**
                                                      )
The Ministry of Health & Social       )
Welfare, represented by and thru      )
its Minister and the Minister of         )
Education thru its Minister and all    )
those working under the scope of      )
authority,                                          )
R.L..................DEFENDANTS)

**MOVANT'S MOTION**

MOVANT IN THE ABOVE ENTITLED CAUSE OF ACTION, most respectfully moves this Honourable Court for a dismissal of Respondent/Plaintiff's Action of Damages for Wrong and for the factual and legal reasons showeth as follows:

1.    That because Movant submits and contends that the Respondent St. Luke School of Medicine lacks legal capacity to institute any action in this Republic, said institute not being a lawful and legal entity operating under the laws of Liberia, and that the laws of Liberia cannot and will not condone, sanction support and ratify any illegality and nobody can benefit from its own illegal acts.

2.    That the Respondent/Plaintiff being and having been falsely created by its 419 incorporators in persons of Dr. Jerroll Dolphin, Dr. Meimei Dukuly, Mr. Frank E. Teah as well as their PROVOST Dr. Peter Coleman, under the most dubious criminal circumstances, said institution cannot benefit from its own illegal acts, fraud and misrepresentation.

3.    That because only the ministry of Foreign Affairs of the Republic of Liberia is authorized by law to publish all legislative enactments in HANDBILL and to approve articles of incorporation to establish legal entities under the Association Laws of Liberia; both the House of Representatives (NTLA) and the Foreign Ministry of Liberia having denied the legal existence of the so-called St. Luke School of Medicine within the Republic of Liberia, said bogus St. Luke School of Medicine cannot now benefit from its own illegality because, for what is not done legally is not done at all, and that Respondent is 419 institution/university organized by the gaug of four fraud sters including Peter s. Coleman, Meimei Dukuly, Jerroll Dolphin and Frank E. Teah, must be arrested for planning a time bomb to exterminate the entire population of Liberia by means of spreading medical virus as graduates of medical school or doctors.

4.   That because Movant further prays court to order and declared null and void the articles of incorporation as well as the alleged legislative enactment which was never the end product of NTLA as alleged by Respondent/Plaintiff in its complaint.   Movant gives notice that at trial he will produce copy of take medical degree issued to the so-called graduates of St. Luke School of Medicine, even though, the school does not exist de jure and de facto.   See attached copy of NTLA Report.

WHEREFORE, AND IN VIEW OF THE FOREGOING, MOVANT most respectfully prays court to deny and dismiss Respondent/Plaintiff's complaint in its entirety, rule costs of these proceedings against the Respondent, order the so-called St. Luke School of Medicine Closed, and grant unto Movant all further relief as Your Honour may deem just, legal, transparent and equitable in the instant.

 

Respectfully submitted,
The above named MOVANT,
By & thru its Legal Counsel,
TULAY & ASSOCIATES

Fomba O. Sherif
COUNSEL-AT-LAW

Dated this 20th day of September AD 2006

$5.00 Revenue Stamps affixed on the Original.

## MOVANT'S AFFIDAVIT

PERSONALLY APPEARED BEFORE ME, a duly qualified Justice of the Peace for and in Montserrado County, Republic of Liberia, at my office in the City of Monrovia, Liberia, Fomba O. Sherif, COUNSELLOR-AT-LAW and one of Counsel for MOVANT in the above entitled cause of Action and Made Oath according to law that all and singular the allegations of facts and law as are setforth and contained in the foregoing and annexed MOVANT'S MOTION TO DISMISS are true and correct to the best of his knowledge and belief, and as to those matters of information thereto relating as relied upon, he verily believes them to be true and correct.



SWORN AND SUBSCRIBED TO BEFORE ME AT THE OFFICE IN THE CITY OF MONROVIA, LIBERIA THIS 23rd DAY OF SEPTEMBER 200...

JUSTICE OF THE PEACE MONT.CO., R.L.

Fomba O. Sherif
COUNSELLOR-AT-LAW & ONE OF COUNSEL
FOR MOVANT. .DEPONENT/AFFIANT

$5.00 Revenue Stamps affixed on the Original.

REPUBLIC OF LIBERIA   )   IN THE CIVIL LAW COURT, SIXTH JUDICIAL CIRCUIT,
MONTSERRADO COUNTY)   MONTSERRADO COUNTY, SITTING IN ITS SEPTEMBER
                         TERM A. D. 2006.

BEFORE HIS HONOR: EMERY S. PAYE..................................ASSIGNED CIRCUIT JUDGE:

The Ministry of Health & Social Welfare,   )
Represented by and thru its Minister............)
............................................MOVANT )
                                                )
          VERSUS                                )
                                                )   **MOTION TO DISMISS**
st. Luke School of Medicine, represented by  )
and thru its President, Jerroll Dolphin and all  )
of its officials authorized Agent, all of the city)
of Monrovia, Liberia........RESPONDENTS  )

*Filed oct. 2, 2006,*
*at 3:30 pm.*
*Clerk of*
*Court*

**GROWING OUT OT THE CASE:**

St. Luke School of Medicine                    )
Represented by and thru its President, Jerroll )
Dolphin and all of its officials/ authorized Agent  )
............................................PLAINTIFF )
                                                )
          VERSUS                                )   ACTION: **DAMAGES FOR WRONG**
                                                )
The Ministry of Health & Social Welfare,       )
Represented by and thru its Minister and The   )
Ministry of Education, represented by and thru )
It's Minister and all of their principal Deputies, )
And all of those working under the scope of    )
Authority, Republic of Liberia,                )
............................................DEFENDANTS  )

**RESPONDENT'S RESISTANCE**

RESPONDENTS in the above entitled cause of action, most respectfully resist both the legal and factual intent of Movant's Ministry of Health & Social Welfare Motion in manner and form legally showth unto Your Honor, to wit: -

1. Respondents says that as to the entire Movant's Ministry of Health & Social Welfare Motion same should be dismissed because Respondent/ Plaintiff is a legally established Institution which can sue or be sued as can be seen from Respondent/ Plaintiff's Articles of Incorporation, Letters of Accreditations and legislative Enactment attached in her Complaint which instruments duly authenticate the validity of Plaintiff/ Respondent's status. Henceforth, the entire Motion to dismiss being legally unsound and lacks legal sanity should crumble and falls.

2. That as to count (1) of the Movant's Ministry of Health & Social Welfare Motion, Plaintiff/ Respondent contend and says that as far as her records are concerned in consonance with the Liberian Business Association Law, all requirement set forth by Government had been met by Plaintiff/ Respondent, and therefore Plaintiff/ Respondent can sue or can be sued as it is done in the instant case. Count (1) of the Motion should therefore be dismissed.

3. That as to count (2) of the Movant's Ministry of Health & Social Welfare Motion, Plaintiff/ Respondent says that said count is vague and incomprehensible because Plaintiff/ Respondent does not know what Movant/ Defendant referred to as 419 Incorporators but instead Plaintiff/ Respondent's Incorporators are credible and professional individuals who have made high mark in the up- liftment in our health sector in this Republic, as such, it is unfortunate and disheartening for Co- Defendant/

.../2

Movant Ministry of Health & Social Welfare to question the credibility and status of Plaintiff/ Respondent's Incorporators thus referred to them as criminals. Respondent/ Plaintiff contends and says that count (2) of the Motion being far from the truth and the crux of Plaintiff's Complaint should therefore be dismissed.

4. That as to count (3) and (4) of the Movant's Ministry of Health & Social Welfare Motion, Respondent/ Plaintiff frowns and contends at said averment and says that same should therefore be dismissed because said averment is a complete admission since indeed and intruth Movant has established that Plaintiff/ Respondent's Articles of Incorporation as well as the Legislative Enactment have not been revoked nor declared null and void by any courts of competent jurisdiction within the Republic of Liberia, since Movant now praying court to declare Plaintiff/ Respondent's Articles of Incorporation and the Legislative Enactment null and void. Count (3) and (4) of the Motion should therefore be dismissed.

5. Plaintiff/ Respondent denies all and singular the allegation of Movant's Motion counts (1) thru (4) which have not been made subject of special travers.

WHEREFORE, and in view of the foregoing, Respondent/ Plaintiff prays Your Honor to dismiss and deny Movant/ Defendant's Motion in its entirety and rule the cost of these proceedings against Movant/ Defendant and grant unto Respondent any and all further relief as the end of justice demand.

REPECTFULLY SUBMITTED:
The above named PLAINTIFF/ RESPONDENT
By and thru her Legal Counsel
WEAH AND ASSOCIATES LAW OFFICES
109 ASHMUN STREET, OPPOSITE TELECOM
MONROIA, LIBERIA.

ATTORNEYS AND COUNSELLORS-AT-LAW

Dated September 30, 2006.

$ 4.00 Revenue Stamp affixed to the original copy.

REPUBLIC OF LIBERIA    )      IN THE OFFICE OF THE JUSTICE OF PEACE FOR
MONTSERRADO COUNTY)           MONTSERRADO COUNTY, CITY OF MONROVIA,
                                             LIBERIA.

The Ministry of Health & Social Welfare,        )
Represented by and thru its Minister............)
...............................................MOVANT )

                    **VERSUS**                   )         **MOTION TO DISMISS**
                                                 )
St. Luke School of Medicine, represented by  )
and thru its President, Jerroll Dolphin and all  )
of its officials authorized Agent, all of the city)
of Monrovia, Liberia........RESPONDENTS  )

**GROWING OUT OT THE CASE:**

St. Luke School of Medicine                         )
Represented by and thru its President, Jerroll  )
Dolphin and all of its officials/ authorized Agent  )
...............................................PLAINTIFF  )
                                                         )
                    **VERSUS**                      )      ACTION: **DAMAGES FOR WRONG**
                                                         )
The Ministry of Health & Social Welfare,      )
Represented by and thru its Minister and The  )
Ministry of Education, represented by and thru  )
It's Minister and all of their principal Deputies,  )
And all of those working under the scope of    )
Authority, Republic of Liberia,                     )
...............................................DEFENDANTS  )

## RESPONDENT'S AFFIDAVIT

PRESONALLY APPEARED BEFORE ME, the undersigned, a duly qualified Justice of the Peace

for Montserrado County, at my office in the City of Monrovia, Liberia Counsellor Ignatius N. Weah,

one of counsel of RESPONDENT in the above entitled cause of action and made Oath according to
the

law and facts as set forth and contained in the annexed RESPONDENT'S RESISTANCE, are true
and

correct to the best of his knowledge and belief, and as these matters of information received, he

verify believes them to be true and correct.

SWORN AND SUBSCRIBED TO BEFORE ME
THIS 2 h DAY OF ...................... A.D. 2006

JUSTICE OF THE PEACE MONT. CO. RL

CLLR. IGNATIUS N. WEAH ONE OF
COUNSEL FOR RESPONDENT / DEPONENT

**Exhibit 26 - SLSOM FILES REQUEST FOR SUMMARY JUDGEMENT**

| | |
|---|---|
| REPUBLIC OF LIBERIA) | IN THE CIVIL LAW COURT, SIXTH JUDICIAL CIRCUIT, |
| MONTSERRADO COUNTY) | MONTSERRADO COUNTY, SITTING IN ITS SEPTEMBER TERM A. D. 2006, |

BEFORE HIS HONOR. EMERY S. PAYE..................                    ASSIGNED CIRCUIT JUDGE:

St. Luke School of Medicine                          )
Represented by and thru its President, Jerroll       )
Dolphin and all of its officials/ authorized Agent   )
Of the City of Monrovia, Liberia ........MOVANT      )
                                                     )
              VERSUS                                  )     ACTION: MOTION FOR SUMMARY
                                                     )                JUDGMENT
                                                     )
The Ministry of Health & Social Welfare,             )
Represented by and thru its Minister and The         )
Ministry of Education, represented by and thru       )
It's Minister and all of those working under the     )
scope of Authority,................RESPONDENTS       )

**GROWING OT OT THE CASE:**

St. Luke School of Medicine                          )
Represented by and thru its President, Jerroll       )
Dolphin and all of its officials/ authorized Agent   )
.........................................PLAINTIFF   )
                                                     )
              VERSUS                                  )     ACTION: **DAMAGES FOR WRONG**
                                                     )
The Ministry of Health & Social Welfare,             )
Represented by and thru its Minister and The         )
Ministry of Education, represented by and thru       )
It's Minister and all of their principal Deputies,   )
And all of those working under the scope of          )
Authority, Republic of Liberia,                      )
.........................................DEFENDANTS  )

**MOVANT'S MOTION**

Movant in the above entitled cause of action, most respectfully moves this Honorable Court in manner and form as follow, to wit: -

1. Movant is Plaintiff in an Action of Damages for Wrong which is pending before this Honorable Court undetermined. Movant request Your Honor to take judicial notice of records in the case file.

2. Movant says and avers that Summary Judgment will lie since indeed and intruth Respondent herein are government institution which ought to be concise on the subject proceedings, but because Co- Respondent Ministry of Education admitted and agreed that indeed Movant/ Plaintiff met the pre- requisite to operate Medical School since indeed Movant secured her Articles of Incorporation, Letters of Accreditations from the appropriate government agencies and a Legislative Enactment which Co- Respondent Ministry of Education did not deny while Co- Respondent Ministry of Health & Social Welfare conceded that due process has not been accorded Movant/ Plaintiff and therefore same suggests that it was erroneous and illegal to declare Movant/ Plaintiff's Institution bogus and closed same down without due process, especially in the face of all those relevant documents.

3. Further above, Movant/ Plaintiff says and submits that summary judgment will lie because Co- Respondent Ministry of Education failed, refused and neglected to traverse on any of the counts in Plaintiff's Complaint nor made a general denial but instead made a naked and empty statement as though she was the complainant while Co- Respondent Ministry of Health & Social Welfare admitted that even though President Taylor signed said Enactment empowering Plaintiff to operate a medical school but did so under international pressure, as such, in-as-much President Taylor was in power what ever function was exercised by him during his tendency, same was legal and genuine, therefore, the Act empowering Plaintiff to operate cannot be questioned.

4. Movant/ Plaintiff says and submits the averments put forth in Defendants/ Respondents ought to be collaborative and concise but same is the contrary, in that, at one point of time Co- Respondent Ministry of Education admitting to the authenticity of Movant/ Plaintiff's credentials but argued that because Plaintiff does not have school yard while Co- Respondent Ministry of Health & Social Welfare agrees in principal that indeed President Taylor did signed or approved said Bill Enacting Plaintiff's institution to operate as medical school but claim same was done under international pressure, and also agreed that those who duly accredited Movant/ Plaintiff was authorized to do so but did same under a organized scheme. The question is granted and not admitting that same is true, were is the findings that established that those who accredited Movant/ Plaintiff did so clandestinely? Where are the records to show that indeed Movant/ Plaintiff was accorded due process as made and provided by operation of law, that is, which court of competent jurisdiction has adjudged Plaintiff/ Movant liable or guilty for such a bogus and misleading allegation? The failure on the part of Defendants/ Respondents to so do, same constitutes an admission and therefore Summary Judgment will lie.

5. Movant/ Plaintiff says this Motion is filed in good fate and not to baffle speedy trial.

WHEREFORE, and in view of the foregoing, Movant/ Plaintiff request Your Honor to grant her Motion of Summary Judgment against Co- Respondent/ Co- Defendant herein and hold her liable to Plaintiff and grant unto Movant/ Plaintiff any and all further relief as the end of justice demand.

RECPECTFULLY SUBMITTED
The above named PLAINTIFF
By & thru her legal counsel
WEAH & ASSOCIATES LAW OFFICES
109 ASHMUN STREET, OPPOSITE TELECOM.

Dated this _10th_ day of
October A.D. 2006.

ATTORNEYS AND COUNSELLOR-AT-LAW

$4.00 Revenue stamp affixed
on the original copy.

REPUBLIC OF LIBERIA        )        IN THE OFFICE OF THE JUSTICE OF PEACE FOR
MONTSERRADO COUNTY)                 MONTSERRADO COUNTY, CITY OF MONROVIA,
                                           LIBERIA

St. Luke School of Medicine                )
Represented by and thru its President, Jerroll     )
Dolphin and all of its officials/ authorized Agent  )
Of the City of Monrovia, Liberia      MOVANT  )
                                                   )
            VERSUS                          )   ACTION:  MOTION FOR SUMMARY
                                                   )            JUDGMENT
                                                   )
The Ministry of Health & Social Welfare,     )
Represented by and thru its Minister and The )
Ministry of Education, represented by and thru )
It's Minister and all of those working under the )
scope of Authority,.............. RESPONDENTS )

**GROWING OUT OT THE CASE:**

St. Luke School of Medicine                )
Represented by and thru its President, Jerroll     )
Dolphin and all of its officials/ authorized Agent  )
...................................... MOVANT  )
                                                   )
            VERSUS                          )   ACTION:  DAMAGES FOR WRONG
                                                   )
The Ministry of Health & Social Welfare,     )
Represented by and thru its Minister and The )
Ministry of Education, represented by and thru )
It's Minister and all of their principal Deputies, )
And all of those working under the scope of )
Authority, Republic of Liberia,              )
...................................... DEFENDANTS )

## MOVANT'S AFFIDAVIT

PRESONALLY APPEARED BEFORE ME, the undersigned, a duly qualified Justice of the Peace

for Montserrado County, at my office in the City of Monrovia, Liberia Counsellor Ignatius N. Weah,

one of counsel for MOVANT in the above entitled cause of action and made Oath according to the

law and facts as set forth and contained in the annexed MOVANT'S MOTION, are true and

correct to the best of his knowledge and belief, and as these matters of information received, he

verify believes them to be true and correct.

SWORN AND SUBSCRIBED BEFORE ME
THIS __/0/L__DAY _____  A.D. 2006

_____
JUSTICE OF THE PEACE MONT. CO. RL

_____
CLLR. IGNATIUS N. WEAH ONE OF
COUNSEL FOR MOVANT / DEPONENT

L$ 3.00 Revenue stamp affixed on the original

**Exhibit 27 - MINISTRY OF EDUCATION WITHDRAWAL**

| | |
|---|---|
| REPUBLIC OF LIBERIA          ) | IN THE CIVIL LAW COURT, SIXTH JUDICIAL CIRCUIT |
| MONTSERRADO COUNTY ) | MONTSERRADO COUNTY, SITTING IN ITS SEPTEMBER |
| | TERM A. D. 2006. |

BEFOR HIS HONOR:    EMERY'S PAYE _____ ASSIGNED CIRCUIT JUDGE

The Ministry of Health & Social                    )
Welfare, represented by & thru                     )
Its Minister ........................MOVANT          )
                                                   )
              VERSUS                                )       ACTION:    DAMAGES FOR WRONG
                                                   )
St. Luke School of Medicine,                       )
Represented by and thru its President,             )
Jerroll Dolphine and all of its officials          )
Authorized Agents, all of the City of              )
Mourovia,                                          )
Republic of Liberia............ RESPONDENTS )

### CO-DEFENDANT NOTICE OF WITHDRAWAL

The Clerk of Court
Sixth Judicial Circuit
Montserrado County
Temple of Justice Building
Monrovia, Liberia

Dear Madam Clerk:

Upon the receipt of these our Notice of Withdrawal, you will please spread upon records of this
Honorable Court that the within named Co-Defendant, Ministry of Education have withdrawn their
Answer with the reservation to re-file.

BY SO DOING, this shall constitute your legal and sufficient authority.

Respectfully submitted,
The within named Co-Defendant
By and thru it Legal Counsel and NEALA and
This _____ day of October, A.D. 2006

_____
Viama J. Blama
ATTORNEY – AT - LAW

**Exhibit 28 - SLSOM'S REQUEST FOR CLERK'S CERTIFICATE" (Default Certificate)**

REPUBLIC OF LIBERIA)  IN THE CIVIL LAW COURT, SIXTH JUDICIAL CIRCUIT, MONTSERRADO
MONTSERRADO  COUNTY):  COUNTY, SITTING IN ITS SEPTEMBER TERM A. D. 2006.

BEFORE HIS HONOUR:  EMERY S. PAYE,...............ASSIGNED CIRCUIT JUDGE:

St. Luke School of Medicine
Represented by and thru its President,
Jerroll Delphin and all of its officials
/authorized Agent...............PLAINTIFF)

              Versus

The Ministry of Health & Social Welfare,
Represented by and thru its Minister and
the Ministry of Education, represented
by and thru its Minister and all of their
principal Deputies, and all of those
working under their scope of authority
.................................DEFENDANTS)

*filed oct 28, 20..*
*at 10:55 ...*

ACTION:  DAMAGES FOR WRONG...

                REQUEST FOR CLERK'S CERTIFICATE

The Clerk of Court
Civil Law Court
Sixth Judicial Circuit
Montserrado County
Liberia

Madam Clerk of Court:

     You will please take due and timely notice of the above captioned case
and spread upon the records of this Honourable Court that eventhough the Co-
Defendant; Ministry of Education, had filed an Amended Answer but refused,
failed and neglected to file an withdrawal of previous Answer and from careful
perusal of the case file, there is no Withdrawal therein in support of said
Amended Answer.

     Hence, our request for Clerk Certificate.

     AND FOR SO DOING, THIS SHALL CONSTITUTES YOUR LEGAL AND SUFFICIENT
AUTHORITY.

                         RESPECTFULLY SUBMITTED:
                         The above named PLAINTIFF
                         By & Thru Her Legal Counsel
                         WEAH AND ASSOCIATES LAW OFFICES
                         109 ASHMUN STREET, OPPOSITE TELECOM.
                         MONROVIA, LIBERIA.

                         _____
                         ATTORNEYS AND COUNSELLORS-AT-LAW

REPUBLIC OF LIBERIA     )     IN THE CIVIL LAW COURT, SIXTH JUDICIAL CIRCUIT
MONTSERRADO COUNTY )     MONTSERRADO COUNTY, SITTING IN ITS SEPTEMBER
                                           TERM A. D. 2006.

BEFOR HIS HONOR:     EMERY'S PAYE.........................ASSIGNED CIRCUIT JUDGE

The Ministry of Health & Social            )
Welfare, represented by & thru             )
Its Minister..........................MOVANT     )
                                                          )
          VERSUS                               )     **ACTION:     DAMAGES FOR WRONG**
                                                          )
St. Luke School of Medicine,               )
Represented by and thru its President,     )
Jerroll Dolphine and all of its officials  )
Authorized Agents, all of the City of*     )
Monrovia,                                      )
Republic of Liberia.............RESPONDENTS )

### CO-DEFENDANT NOTICE OF WITHDRAWAL

The Clerk of Court
Sixth Judicial Circuit
Montserrado County
Temple of Justice Building
Monrovia, Liberia

Dear Madam Clerk:

Upon the receipt of these our Notice of Withdrawal, you will please spread upon records of this
Honorable Court that the within named Co-Defendant, Ministry of Education have withdrawn their
Answer with the reservation to re-file.

**BY SO DOING,** this shall constitute your legal and sufficient authority.

Respectfully submitted,
The within named Co-Defendant
By and thru it Legal Counsel and NEALA and
This _____ day of October, A.D. 2006

_____
     Viama J. Blama
**ATTORNEY – AT - LAW**

## Exhibit 29 - SLSOM FILES MOTION FOR BARE DENIAL

| | |
|---|---|
| REPUBLIC OF LIBERIA) | IN THE CIVIL LAW COURT, SIXTH JUDICIAL CIRCUIT, |
| MONTSERRADO COUNTY) | MONTSERRADO COUNTY, SITTING IN ITS SEPTEMBER |
| | TERM A. D. 2006. |

BEFORE HIS HONOR: EMERY S. PAYE                           ASSIGNED CIRCUIT JUDGE:

St. Luke School of Medicine                          )
Represented by and thru its President, Jerroll        )
Dolphin and all of its officials/ authorized Agent    )
Of the City of Monrovia, Liberia.........MOVANT       )
                                                      )           ACTION:  **MOTION FOR BARE DENIAL**
                VERSUS                                )
                                                      )
The Ministry of Health & Social Welfare,              )
Represented by and thru its Minister and all of its   )
Principal Deputies, and all of those working under    )
the scope of Authority, Republic of Liberia           )
.....................................RESPONDENT       )

**GROWING OUT OT THE CASE:**

St. Luke School of Medicine                          )
Represented by and thru its President, Jerroll        )
Dolphin and all of its officials/ authorized Agent    )
.....................................PLAINTIFF       )
                                                      )           ACTION:  **DAMAGES FOR WRONG**
                VERSUS                                )
                                                      )
The Ministry of Health & Social Welfare,              )
Represented by and thru its Minister and The          )
Ministry of Education, represented by and thru        )
It's Minister and all of their principal Deputies,    )
And all of those working under the scope of           )
Authority, Republic of Liberia,                       )
.....................................DEFENDANTS      )

### MOVANT'S MOTION

Movant, St. Luke School of Medicine, in the above entitled proceedings moves this Honorable court to rule Respondent Ministry of Health & Social Welfare to bare denial in manner and form as follow, to wit: -

1. Movant is Plaintiff in an action of Damages for Wrong, which was filed on the 15th day of September A. D. 2006 which Complaint is still pending before this Honorable court undetermined. Movant request Your Honor to take judicial notice of the case file.

2. Movant says and submits that on the 18th day of October A. D. 2006, she received copy of a notice of withdrawal from the Respondent Ministry of Health & Social Welfare by and thru one of counsels for Ministry of Education who also served other documents on the same date on Movant and was duly receipted, Since both institutions are principal Defendants and Government Institutions. Photo copy of the notice of withdrawal from the Ministry of Health & Social Welfare is herewith attached, marked exhibit P/1 to form part of this Motion.

3. Movant contends and says that since the filing of said Notice of Withdrawal, same being over ten (10) days as required by law for Respondent Ministry of Health &

Social Welfare to file her Amended Answer but since then, she has refused, failed and neglected to file same, as such, Movant obtained a Clerk Certificate to that effect, and since then upto- date, Respondent has not filed any Amended Answer. Photo copy of the Clerk Certificate is herewith attached, marked exhibit M/ 2 to form part of this Motion.

4. Movant says that this Motion is filed in good fate and not to baffle speedy trial.

WHEREFORE, and in view of the foregoing, Movant prays Your Honor to rule Respondent Ministry of Health & Social Welfare to bare denial and grant unto Movant any and all further relief as the end of justice demand.

RESPECTFULLY SUBMITTED
The above named PLAINTIFF
By & thru her legal counsel
WEAH & ASSOCIATES LAW OFFICES
109 ASHMUN STREET, OPPOSITE TELECOM.

Dated this 30th day of
October A.D. 2006

_____
ATTORNEYS AND COUNSELLOR-AT-LAW

$4.00 Revenue stamp affixed
on the original copy.

REPUBLIC OF LIBERIA)    IN THE CIVIL LAW COURT, SIXTH JUDICIAL CIRCUIT,
MONTSERRADO COUNTY)    MONTSERRADO COUNTY, SITTING IN ITS SEPTEMBER
                TERM A. D. 2006.

BEFORE HIS HONOR: EMERY S. PAYE.........................ASSIGNED CIRCUIT JUDGE:

| | | |
|---|---|---|
| The Ministry of Health & Social Welfare | ) | |
| Represented by and thru its Minister | ) | |
| ...........................MOVANT | ) | |
| | ) | MOTION TO DISMISS |
| VERSUS | ) | |
| | ) | |
| St. Luke School of Medicine | ) | |
| Represented by and thru its President, Jerroll | ) | |
| Dolphin and all of its officials/ authorized Agent | ) | |
| Of the City of Monrovia, Liberia...RESPONDENTS | ) | |

**GROWING OUT OF THE CASE :**

| | | |
|---|---|---|
| St. Luke School of Medicine | ) | |
| Represented by and thru its President, Jerroll | ) | |
| Dolphin and all of its officials/ authorized Agent | ) | |
| Of the City of Monrovia, Liberia........PLAINTIFF | ) | |
| | ) | |
| VERSUS | ) | ACTION: DAMAGES FOR WRONG |
| | ) | |
| The Ministry of Health & Social Welfare, | ) | |
| Represented by and thru its Minister and The | ) | |
| Ministry of Education, represented by and thru | ) | |
| It's Minister and all of their principal Deputies, | ) | |
| And all of those working under the scope of | ) | |
| Authority, Republic of Liberia, | ) | |
| ....................................DEFENDANTS | ) | |

**RESPONDENT'S RESISTANCE**

Respondent in the above entitled proceedings most respectfully resists, Movant's Ministry of Health & Social Welfare Motion in manner and form as follow, to wit: -

1. That as to the entire Movant's Ministry of Health & Social Welfare Motion, Respondents says same should crumble and fall, in that, under our law, a Motion must emanate from a main suit but Respondents have observed that since the withdrawal of Movant's Ministry of Health & Social Welfare Answer from the court, same been over ten (10) days as made and provided by statute, she has failed, refused and neglected to file any Amended Answer since then upto and including the filing of this Motion. Respondents request Your Honor to take judicial notice of the case file.

2. Further above, Respondents says that by virtue of Movant's Ministry of Health & Social Welfare withdrawal of her Answer, but subsequently failed to file an Amended Answer since then upto and including the filing of this Motion, same suggests that there is no Answer before Court since the Respondent's/ Plaintiff's Complaint was filed, that is, in favor of Co- Defendant's/ Movant's Ministry of Health & Social Welfare, of course, Movant is subject to bare denial, and as such, cannot raise law issues. Hence, the so- called Motion to dismiss should be dismissed.

3. Further above, Respondents says that said Motion cannot stand as stated above and in addition hereto, said Motion does not have a covering Affidavit as can be seen from the case file, as such, the entire Motion must be dismissed.

4. That as to count (1), (2), (3) and (4) of Movant's Ministry of Health & Social Welfare Motion, Respondent says said counts are misleading and misrepresentation of the facts, something far from reality, and therefore, the entire Motion Should be dismissed; needless to say, count (1), (2), (3) and (4) thereof; hence, Respondents/ Plaintiff maintains and reconfirms counts (1) thru (5) of her complaint and says same should not be disturbed.

5. Respondents deny all and singular the allegation contained in Movant's Ministry of Health & Social Welfare Motion, in that, count (1) thru (4) which have not been made subject of special traverse.

WHEREFORE, and in view of the foregoing, Respondent pray Your Honor to dismiss Movant's Ministry of Health & Social Welfare Motion, in its entirety and rule the cost therefrom against Movant and grant unto Respondents all further relief as the end of justice demand.

RESPECTFULLY SUBMITTED
The above named PLAINTIFF
By & thru her legal counsel
WEAH & ASSOCIATES LAW OFFICES
109 ASHMUN STREET, OPPOSITE TELECOM.

Dated this 30ᴿ day of
October A.D. 2006.

ATTORNEYS AND COUNSELLOR-AT-LAW

$4.00 Revenue stamp affixed
on the original copy.

**Exhibit 30 - Liberia Government Defaults-Liberia Civil Law Court Issues Default Certificate to SLSOM**

REPUBLIC OF LIBERIA )IN THE SIXTH JUDICIA L CIRCUIT, CIVIL LAW COURT FOR
MONTSERRADO COUNTY  )MONTSERRADO COUNTY, SITTING IN ITS SEPTEMBER TERM,
                    )A.D. 2006.


BEFORE HIS HONOUR: EMERY S. PAYE............ASSIGNED CIRCUIT JUDGE

IN RE:   St. Luke School of Medicine, represented
         by and thru its President, Jerroll Dolphin        **ACTION:**
         and all of its officials/authorized Agent
         of the City of Monrovia, Liberia...PLAINTIFF    )
                                                         ) **DAMAGES FOR**
                        VERSUS                           )
                                                         )   **WRONG.**
         The Ministry of Health & Social Welfare, re-    )
         presented by and thru its Minister and the Min- )
         istry of Education, represented by and thru its )
         Minister and all of their Deputies, a nd all of )
         those working under the scope of authority, Re- )
         public of Liberia ....................DEFENDANTS )

                        CLERK'S CERTIFICATE

AN INSPECTION OF THE CASE FILE IN THE ABOVE CAPTIONED CAUSE OF ACTION
REVEALS THAT THE NOTICE OF WITHDRAWAL CARRIES THE MINISTRY OF HEALTH
& SOCIAL WELFARE EXCLUSIVELY, WHILE THE AVERMENT CARRIES THE MINISTRY
                          AS MOVANT,
OF EDUCATION AS CO-DEFENDANT, UP TO AND INCLUDING THE ISSUANCE OF THIS
CLERK'S CERTIFICATE.

                    HENCE, THIS CLERK'S CERTIFICATE.

                    GIVEN UNDER OUR HANDS AND SEAL OF COURT,
                    THIS 30TH DAY OF OCTOBER, A.D. 2006.

COURT'S  SEAL:
                    Victor G. Gailor, ASST. CLERK, SIXTH JUDICIAL
                    CIRCUIT, CIVIL LAW COURT, MONT. CO., R. L.


ATTESTED:  *Nancy Washington*
           Nancy Washington, Clerk, Files & Records, Civil Law Court.

           *Margaret Browne*
           Margaret Browne, Asst. Clerk, Files & Records, Civil Law Court.

**Exhibit 31  - LEGISLATIVE ENACTMENT**

# AN ACT

## TO

## INCORPORATE

## ST. LUKE SCHOOL OF MEDICINE (SLSOM)

### OF

### THE CITY OF MONROVIA

### MONTSERRADO COUNTY
### REPUBLIC OF LIBERIA

### AND TO GRANT IT A CHARTER

### BY

### THE NATIONAL LEGISLATURE
### OF THE
### REPUBLIC OF LIBERIA

### APPROVED APRIL 24, 2003

### PUBLISHED BY AUTHORITY
### MINISTRY OF FOREIGN AFFAIRS
### August 8, 2003

### WELCOME TO ST. LUKE
### SCHOOL OF MEDICINE (SLSOM)

# AN ACT

## TO

### INCORPORATE

## ST. LUKE SCHOOL OF MEDICINE (SLSOM)

### OF

## THE CITY OF MONROVIA

## MONTSERRADO COUNTY
## REPUBLIC OF LIBERIA

## AND TO GRANT IT A CHARTER

### BY

## THE NATIONAL LEGISLATURE
### OF THE
## REPUBLIC OF LIBERIA

**APPROVED APRIL 24, 2003**

**PUBLISHED BY AUTHORITY
MINISTRY OF FOREIGN AFFAIRS**

**August 8, 2003**

**WELCOME TO ST. LUKE
SCHOOL OF MEDICINE (SLSOM)**

# AN ACT TO INCORPORATE

## ST. LUKE SCHOOL OF MEDICINE (SLSOM)

### OF

### THE CITY OF MONROVIA

### MONTSERRADO COUNTY
### REPUBLIC OF LIBERIA

AND TO GRANT (SLSOM) A CHARTER
IT IS ENACTED BY THE NATIONAL LEGISLATURE
OF THE
REPUBLIC OF LIBERIA, IN LEGISLATURE ASSEMBLED

### ARTICLE 1

**SECTION 1:**

ST. LUKE SCHOOL OF MEDICINE WAS ESTABLISHED AUGUST 1, 2000, AND INCORPORATED AUGUST 22nd, 2001 IN THE CITY OF MONROVIA, MONTSERRADO COUNTY, REPUBLIC OF LIBERIA, IS HEREBY ESTABLISHED IN THE NAME OF ST. LUKE SCHOOL OF MEDICINE INCORPORATED (SLSOM), BY AND THROUGH ITS FOUNDERS, DR. JERROLL DOLPHIN, PRESIDENT, HON. FRANK E. TEAH JR., VICE PRESIDENT, AND DR. MEIMEI DUKULY, DEAN OF ACADEMIC AFFAIRS. SAID SCHOOL IS HEREBY FURTHER GRANTED THIS CHAPTER, WHICH ENDOWS IT WITH ALL THE RIGHTS, PRIVILEGES AND BENEFITS EXISTING IN SIMILAR INSTITUTIONS OF HIGHER LEARNING WITHIN THIS REPUBLIC, AND SHALL HENCEFORTH BE KNOWN BY THE NAME AND TITLE "ST. LUKE SCHOOL OF MIDICINE"

**SECTION 2: LEGAL STATUS**

THE ST. LUKE SCHOOL OF MIDICINE (SLSOM) IS HEREBY MADE A LEGAL AND CORPORATE ENTITY WITH PERPETUAL SUCCESSION, AND SHALL HAVE THE AUTHORITY TO CONTACT, SUE AND BE SUED, PLEAD AND BE IMPLEADED IN ANY COURT OF COMPETENT JURISDICTION WITHIN THE REPUBLIC, TO PURCHASE OR OTHERWISE ACQUIRE AND HOLD PROPERTY, REAL AND MIXED UP TO THE VALUE OF ONE HUNDRED AND FIFTY MILLION UNITED STATES DOLLARS (US$150,000,000), THE SAID ST. LUKE SCHOOL OF MIDICINE (SLSOM) SHALL BE PERPETUALLY MAINTAINED IN THE REPUBLIC FOR MEDICAL EDUCATION OF THE PEOPLE OF THIS NATION, PEOPLE OF THE OTHER COUNTRIES AND FOR WHO MAY HAVE THE CAPACITY TO SEEK MEDICAL EDUCATION.

-1-

# ARTICLE III

## TRUSTEE BOARD

### SECTION I

The governance of St. Luke School of medicine (SLSOM) shall be vested in the trustee board, which is hereby made a corporate body under the name and style of the trustees of St. Luke School of Medicine (SLSOM) with perpetual succession of members to be chosen and appointed as herein provided in this charter

### SECTION II

### COMPOSITION OF THE BOARD

The board shall be composed of members appointed by the founders of St. Luke School of Medicine (SLSOM). The members appointed shall be seven(7) and they shall serve for the period of four(4) years. The minister of Health of the Republic of Liberia shall serve as provost.

### SECTION III

### QUORUM

A quorum shall consist of five(5) Board Members, including the Chairman.

### SECTION IV

### POWERS AND DUTIES OF THE TRUSTEES BOARD

The Trustees Board of St. Luke School of Medicine(SLSOM) shall exercise the following powers and perform the following duties in accordance with the objectives of St. Luke School of Medicine(SLSOM).

- to make and use a common seal and to alter same at its pleasure.

- To provide a faculty, establish procedures and standard control regulations and control for the functioning of St. Luke School of Medicine(SLSOM). To grant degrees appropriate for St. Luke School of Medicine.

To take gift, grant, devise purchase or otherwise acquire real property and hold same or to sell, let, invest and re-vest or in any lawful manner manage such property for the benefit of St. Luke School of Medicine(SLSOM). Income therefrom to be applied to the endowment and support of the ST. LUKE School Of Medicine (SLSOM) and in such manner, as shall most effectively promote the interest of the St. Luke school of medicine (SLSOM), the growth of the St. Luke School of Medicine (SLSOM) and improvement of its faculty and student body.

-3-

# ARTICLE II

## MEDICAL EDUCATION MISSION STATEMENT

### SECTION I

St. Luke School of Medicine has two major goals for its graduates: that they broadly and liberally educated men and women, and that they view medicine as a socially responsible human service profession.

St. Luke School of Medicine seeks students, who regard medicine as a noble profession rather than a trade to be learned, as a humanitarian pursuit, as well as a scholarly discipline, and as a unique lifetime experience. St. Luke School of Medicine graduates must be well-rounded, scientifically grounded, but also capable of approaching problems from a variety of perspectives, drawing upon the method of analysis of the humanist, the social scientist and the behavioral scientist. St. Luke School of Medicine intend that our students follow in the tradition of medicine, placing the welfare of their patients and society above self-interest. St. Luke School of Medicine teaches its students to prepare to meet the technologic innovations of the present and future.

St. Luke School of Medicine ensures that it's M.D recipients are exposed to a wide, sensitizing view of the human condition from both historical and contemporary perspectives. The result is a "liberal" medical supported by the entire faculty of a great instruction which does honor to the great disciple from the Medical School derives its name. This is our education mission.

To these aims we do strive.
June, 1998

-2-

## SECTION 11:

The Board of Trustees of St. Luke School of medicine may acquire public lands in the various counties and districts of the Republic of Liberia when necessary, as land grants, from the government of the Republic of Liberia, free of all charges and assessments for the furtherance of the objectives of the St. Luke School of Medicine (SLSOM) and its various departments.

## ARTICLE IV

## DUTIES OF THE PRESIDENT

### SECTION 1.

1. The president of the St. Luke School of Medicine(SLSOM) shall be nominated by the Founders and be confirmed by the Board of Trustees.

2. The president shall, in consultation with and upon the advice of the Founder, have authority. The affairs of the St. Luke School of Medicine(SLSOM) within the framework of the charter, by-laws, regulations, and establish policies of St. Luke School of Medicine(SLSOM), He shall submit to the board of Trustees through the Founders, and Annual Report covering the activities of the St. Luke School of Medicine(SLSOM).

3. The president of the St. Luke School of Medicine(SLSOM), after consultation with and upon prior approval of the Founders, shall nominate to the Board of Trustees such members of the faculty as may be required to carry out the work of the St. Luke School of Medicine, Vice President, Deans and/or Directors of the Various departments and other members of the Faculty for their consideration and approval.

4. The President of the St. Luke School of Medicine, in consultation with the founders, shall prepare and submit an Annual Budget, covering the expenditure of all institutional operations, to the Board of Trustees for their consideration and approval

- To inter into and execute and contracts and agreement, to mortgage real and personal property and, in pursuance thereof all deeds, bills of sale or other instruments in writing sealed with the common seal of the Board of trustees of the St. Luke School of medicine and signed by its order shall be considered in law as the act of the said Board of Trustees, when made in its corporate name

- To sue and be sued, to plead and be impleaded against in all action and to prosecute the same as necessary to final judgement and executive in the name the St Luke School of Medicine (SLSOM).

- To approve the appointment of the Deans and Directors of various departments and other members of the faculty and staff upon nomination by the President of the St. Luke School of Medicine (SLSOM).

- To make such by-laws, rules and regulations as may be necessary for itself and for the efficient governance of the St. Luke School of Medicine.

- To confer the usual academic honor and degrees granted to similar institutions upon recommendation of the faculty through the President of St. Luke School of Medicine (SLSOM) and to confer honorary degrees upon the recommendation of the President of the St. Luke School of Medicine (SLSOM) and approve by the Board of Trustees

- To do all other things laid within its by-laws and constitutions not inconsistent with this Charter and the Constitutions of the Republic of Liberia and to do all other acts necessary and expedient for the administration of the affairs and attainment of the purposes of the St. Luke School of Medicine(SLSOM) or similar non-profit making organizations,

- To elect its officers and members and to establish its standing and special committee.

To approve the annual budget of the St. Luke School of Medicine(SLSOM) as prepared and submitted by the President of St. Luke School of Medicine.

# ARTICLE VII

## COMPOSITION OF THE ST. LUKE SCHOOL OF MEDICINE

The following Divisions and Departments shall constitute the instructional program of St. Luke School of Medicine.

a) Academic Affairs (Basic Science and Clinical Science)

b) Administrative Affairs (Management and Control)

c) Financial Affairs (Fund Raising)

d) Research and Development (General/ Community Health)

# ARTICLE VIII

## EXEMPTION FROM TAXATION

All properties acquired by and given or donated to the St. Luke School of Medicine, including merchandise, furniture, fixtures, building materials and equipments of all kind, as well as all kinds of books and literature and real estate purchased by the institution or donated to it, shall be tax exempt at all times.

# ARTICLE IX

## MISCELLANEOUS

### SECTION

1. This Charter may be amended by the Legislature of the Republic of Liberia upon application to them by and through the Founder of the St. Luke School of Medicine(SLSOM), passed by a two-third vote of the said Board of Trustees during a regular meeting of the Board of Trustees.

2. If any provision of this Charter conflicts with any provision of the Constitution of Liberia then said Charter provision shall be declared null and void and be unenforceable without impairing the validity of the remaining provisions.

3. This Act shall take effect immediately upon publication in hand bills.

## Any Law To The Contrary Notwithstanding

-b-

**Exhibit 32 - Pictures of the SLSOM Gaye Town Campus before Renovation, November 2004**








































**Exhibit 33 - Pictures of SLSOM Gaye Town Campus after Renovation, Circa March 2005**





























## Exhibit 34 - Partial Transcript of Ministry of Health Letter to India Consulate General

March 16, 2005

Consul General of the Republic of India

Dear Consulate:

We are in receipt of your letter dated …………   This is our answer to the question posed.

St. Luke Medical College does not exist; however, St. Luke School of Medicine does exist.

St. Luke School of Medicine filed for a temporary permit to operate in 2001.  St. Luke School of Medicine was granted a temporary permit to operate a University from the Ministry of Education, National Commission on Higher Education.  St Luke School of Medicine also received an enactment from the Liberian legislature to operate a university. The school is also recognized by the World Health Organization.

Presently, St. Luke is recognized by the government of Liberia.  Moreover, St. Luke School of Medicine is going through the process of reaccredidation.  The National Commission on Higher Education has issued an attestation to the school.  St. Luke School of Medicine is now waiting to receive a new permit to operate.

I thank you for your inquiry.

Sincerely yours,

## Exhibit 35 – SLSOM Invitation to the LMB for Inspection of its Campus

March 8, 2005

Horatius Brown, M.D.
Chairman, Liberian Medical Board
Ministry of Health and Social Welfare
Capital Bypass
Monrovia, Liberia

### INSPECTION INVITATION

Dear Dr. Brown,

On behalf of the Board of Trustees and administrators of St. Luke School of Medicine (SLSOM), I invite the Liberian Medical Board to inspect the SLSOM campus in Monrovia for accreditation. This campus is located at Gaytown, Sinkor, Old Road, behind the University of Liberia Professor's Housing Quarters.

SLSOM will limit the number of students on the campus to 50 until the second half of the building, which has four (4) more classrooms, is renovated. At which time, SLSOM will ask the Liberian Medical Board to allow it to increase its enrollment to 100 students. The expected date of completion of the final phase of renovation is in April 2005.

SLSOM will continue to build its modern library and computer facilities. SLSOM has over 500 new volumes of medical and nursing books, CD-ROMS, and software. SLSOM has eight (8) computers, ten (10) new 1500X microscopes, with stains, solvents, solutions, and other equipment. SLSOM's CD-ROM collection includes some 22 approved courses of interactive learning at the university and graduate levels. SLSOM expects to have approximately 700 new volumes of medical and nursing literature by April 2005.

St. Luke School of Medicine wishes to be a working partner in higher education for the advancement of Liberia. It is with great pleasure that the administrators of the School of Medicine of St. Luke School of Medicine invite the Liberian Medical Board to inspect its facilities at its first opportunity to do so.

Detailed arrangements for this inspection can be made with myself at 05-670125, or Ms. Grace Dorbor, B.Sc., R.N., the Nursing Program Manager. Her telephone number is 540318.

This invitation is duly submitted and ratified, signified by the St. Luke School of Medicine insignia, below.



Jerroll B. R. Dolphin, M.D., M.Sc.
President, St. Luke School of Medicine

## Exhibit 36 – SLSOM Curriculum

### SLSOM Online Curriculum

The St. Luke School of Medicine online curriculum began in April 2001 by Dr. Jerroll Dolphin from his own medical school notes.  Its creation was a solution to the idea that medical students in both basic science and clinical clerkship may need supplemental instruction in state of the art medicine and science.  The first courses online were the 1st Trimester courses: Human Anatomy, Physiology, Histology, Embryology, and Biostatistics.  Over the next year and a half, the 2nd, 3rd, and 4th Trimester courses were added.  At that time, the end of 2002, St. Luke School of Medicine was the first medical school worldwide with a curriculum completely online.

Many organizations objected to learning medicine online, saying that medicine cannot and should not be be taught online.  St. Luke School of Medicine's philosophy supporting the development and use of online medical curriculum is that:
1.      SLSOM's medical students are intelligent and bright;
2.      An online curriculum supplements classroom instruction;
3.      An online curriculum reduces the time and effort of student note taking;
4.      An online curriculum helps the medical student focus on learning in class and increases memory retention;
5.      An online curriculum lesson can be repeated as many times as necessary to assist the medical student's learning;
6.      Online demonstrations, laboratory experiments, and interactive learning increase the medical students' learning efficiency;
7.      Online information is ever increasing and developing as well as being easily assessable;
8.      The need for classroom instruction is reduced;
9.      The number of professors required to teach is reduce;
10.     Laboratory sessions can be more intensive in training when routine fundamental experiments can be performed or simulated online, repeatedly.

Since St. Luke School of Medicine's posted its online curriculum in 2001, many medical schools have developed an online curriculum such as the University of California, University of Utah, Harvard University, Stanford University, Duke University, the University of Glascow, and many others.  However, they refer their online curriculum as 'independent study'.

Many states, medical licensing agencies, etc., in many countries have stated that they will not accept or disqualify applications for licensing if doctors have received any training as distance learning or online.  Those 'name' medical schools make classroom attendance

"optional" and not a requirement for learning.  However, the licensing agencies the other way when it comes to licensing graduates of 'name' medical schools.  The trend in modern medical education, however, is not to reduce online instruction, but to increase the number of courses available for online instruction and improve its quality and content.

St. Luke School of Medicine's examinations are also online.  In the beginning, the examinations were written in Microsoft Word.  They were 'paper' exams.  The medical student would take the examination and send it to SLSOM's office for grading.  With experience, SLSOM MS Word examinations became 'paperless' and the medical student would return the examinations to SLSOM's Exam Coordinator by e-mail for grading.  In 2004, St. Luke School of Medicine started converting all of its examinations to completely online system where each exam is taken online.  When the medical student finishes the examination, it is automatically scored, graded and the results are sent to the SLSOM Exam Coordinator.  The Exam Coordinator would only enter the score for the examination in the medical student's transcripts.

St. Luke School of Medicine has 104 automated examinations in virtually every course. These standardized exams assure that St. Luke School of Medicine medical students are adequately trained to its standard of learning.  SLSOM has an additional 160 other graded quizes, essays, and term projects for its medical students to complete in basic science, many of which are also automatically graded.

As a consequence of SLSOM's instructional and examination methods, no St. Luke School of Medicine medical can be 'black-balled' or mistreated by an instructor regarding grading.  Instructors only have the option of changing examination content, with departmental approval and the approval of SLSOM's Educational Coordinator.  A SLSOM instructor, generally, only grades essays, and never by himself.  Essays require two reviewers for grading.  This assures each SLSOM medical student of fair assessments.

A St. Luke School of Medicine transcript for its medical student is only based on the medical students grade, and likewise, honors and graduation are only determined by his academic achievement.

St. Luke School of Medicine only accepts advance students into its Independent Studies Program.  To be admitted into the Independent Studies Program, an applicant must have a graduate degree, M.Sc or PhD,  in a medically related field or a Bsc and at least 10 years experience as a medical professional.

St. Luke School of Medicine's students entering clinical clerkships have been said to be amongst the 'best trained' medical students at hospitals.  Many SLSOM students have letters from their proctors who have stated that they were the "best" medical student they have ever had the opportunity to train.

# Medicine Curriculum - Basic Science

BASIC SCIENCES

The first four trimesters are called the basic sciences; each trimester is approximately 16 weeks.   The basic science curriculum provides the scientific basis for medical understanding, diagnosis, and treatment.  It emphasizes the principles and mechanisms of health, disease and modes of therapy.  As stated by the USMLE, St. Luke's goal as a medical school is to ensure mastery of not only the basic medical sciences undergirding the safe practice of medicine, but to also present the scientific principles required for maintenance through lifelong learning.   St. Luke's curriculum for basic science is centered on the Content Description for USMLE Step 1.  All Students will provided with our written basic science curriculum, as well as the Instructors.   All lectures, examinations, homework, and the final examinations emphasize the requirements of the content descriptions of the USMLE Step 1.  The curriculum is revised annually to reflect the latest developments in medical science and to match the requirements for the USMLE Step 1.

Basic science specialists will teach the first two trimesters.  Doctors will teach the second two trimesters of basic sciences primary from the Liberia and United States.  Some courses will require laboratory work as well as lecture attendance Computer-aided learning is also provided for most subjects.

**Basic Science Courses - Year 1**

| TRIMESTER 1 (540 hours) | TRIMESTER 2 (540 hours) |
|---|---|
| Human Anatomy (200 hours) | Medical Biochemistry (160 hours) |
| Human Neuroanatomy (80 hours) | Medical Genetics (60 hours) |
| Histology & Embryology (80 hours) | Microbiology and Immunology (100 hours) |
| Human Physiology (160 hours) | Parasitology &Tropical Medicine (80 hours) |
| Biostatistics & Medical Writing (40 hours) - PH1 | Public Health Policy & Practice (40 hours) - PH2 |
| Ethics & Legal Medicine (20 hours) | Nutrition (40 hours) |
| | General Pathology (100 hours) |

**Basic Science Courses - Year 2**

| TRIMESTER 3 (580 hours) | TRIMESTER 4 (640 hours) |
|---|---|
| Systemic Pathology 1 (100 hours) | Systemic Pathology 2 (160 hours) |
| Pharmacology (160 hours) | Epidemiology & Preventive Medicine (80 hours) |
| Behavioral Science (120 hours) | Physical Diagnosis (80 hrs) |
| Child/Drug Abuse/Human Sexuality (40 hours) | Medical Diagnosis (40 hrs) |
| Occupational and Rehabilitation (40 hours) | Intro to Patient Care & Treatment (120 hours) |
| Community Medicine (20) - PH3 | Intro to Clinical Medicine (80 hours) |
| Molecular Biology (60 hours) | USMLE Review (80 hours) |

Preparation for the Basic Science Comprehensive Examination as well as the USMLE Part 1, Seminars will be held routinely throughout the Basic Science period at minimal cost to students, if any.  All basic science graduates are require to take the USMLE Step I or its equivalent (as defined in each students country of origin), or St. Luke School of Medicine's Comprehensive Basic Science Examination.

Continuation into clerkship (clinical rotations), however is not dependent on passing USMLE Part 1, however, all students must pass the St. Luke Basic Science Comprehensive Examination with a score of 75% or higher.  The Basic Science comprehensive examination is a one-day, 400-question examination, given in four parts. Each student is allowed 150 minutes to complete each part.

Students are encouraged to pass their countries licensing examinations before their graduation for many reasons.  The examinations may also show a student subjects where more study and learning are needed.

BASIC SCIENCE COURSE DESCRIPTIONS

HUMAN ANATOMY (160 hours) - This course consists of daily lectures and laboratory on human anatomy and function.  The students will dissect and identify the bones, muscles, organs, nerves, blood vessels, Connective tissues, and cavities of the human body.  This will include a discussions on nomenclature and orientation, anatomic terms,

direction and movement, classification of joints, surface and gross anatomy, blood flow and nervous system control of the head and neck, back, upper extremity, thorax, abdomen, pelvis and lower extremity.  Radiographic images will also be studied from x-ray, computerized assisted tomography (CAT), magnetic resonant images (MRI) angiographs, and sonographs.

HUMAN NEUROANATOMY (80 hours) - Human Neuroanatomy will consist of lectures and laboratory of surface and internal neuroanatomy. In this course students will learn about brain structure, neurons, neuroglia membrane potential and nerve impulse (action potential), receptors, nervous system development; detailed neuroanatomy of the brain and spinal cord including the cerebral cortex, medulla, pons, midbrain, and diencephalon, reticular formation cerebellum, peduncles, thalamus, hypothalamus, epithalamus and subthalamus, basal ganglia limbic system, cerebral hemispheres, cerebral cortex, pain and pain-inhibitions pathways; pathways; cranial nerves: the viscera nervous system including parasympathetic and sympathetic division; and support system of the central nervous system including blood supply venous drainage dural sinuses, meninges, ventricles, cerebrospinal fluid, and spinal cord blood circulation. Radiological images will also be studied from x-rays, computerized assisted tomography (CAT), magnetic resonant images (MRI), angiographs, and sonographs.

HISTOLOGY & EMBRYOLOGY (80 hours)  - Consists of two courses conducted simultaneously.  Histology is a lecture and laboratory courses, will cover the detail of cellular structure and function of all the different types of cells in the human body including skin, hair and nails, nervous tissue and eyes, striated and smooth muscle, cardiac muscle, connective tissue, bones, blood vessels, endocrine organs, lungs, gastrointestinal organs, reproductive organs and kidneys.   Embryology will cover embryonic staging, early development including fertilization, implantation, primitive streak, notochord, neural plate, tube and crest, coelon, somites, head and tail folds; placenta and fetal membranes (germ layers, yolk sac and allantois, chorion circulation, multiple pregnancy); cardiovascular system (blood and lymph formation, aortic arches, heart development, fetal blood flow and changes at birth, congenital malformations), nervous system development (early neurulation, alar and basal plates, spinal nerves, brain development), branchial apparatus, coelon, respiratory system, digestive system, urogenital system, bone development, muscles, limbs, integumentary system, and parturition.

HUMAN PHYSIOLOGY (160 hours) - Chemical and physical properties of physiology: cell Chemistry; cell metabolism; homeostasis; neural and endocrine control mechanisms; membrane transport; actions potentials, neural signals; brain function; somatosensory controls; special senses; skeletal, cardiac smooth muscle: somatic and automatic motor

systems; cardiac function; blood and vascular system; cardiovascular regulation; respiratory dynamics; gas exchange and transport; respiratory regulation, renal and function and function, body fluid, electrolyte, and acid-base balance control, gastrointestinal organization, secretion, motility and control, absorption and digestion; endocrine control of metabolism and growth; reproduction, pregnancy, birth and location; introduction to the physiology of the immune system.

MEDICAL BIOCHEMISTRY  (120 hours) - Lecture and laboratory studies of proteins, enzymes, lipids, biological membranes and membrane transport, carbohydrate structure, glycolysis, pentose phosphate pathway, glycogen metabolism and gluconeogenesis, citric acid cycle, oxidative phosphorylation, lipid metabolism, amino acid, metabolism, biosynthesis of purine and pyrimidine nucleotide, signal transduction pathways and harmony action, nucleic acid structure, replication, transcription, purine and pyrimidine nucleotides, signal transduction pathways and harmony action, nucleic acid  structure, replication, transcription, protein synthesis, techniques in molecular biology including restriction fragment length polymorphism (RFLP) and polymerase chain reaction (PCR). Also included in the biochemistry curriculum is a clinical review of enzyme deficiencies and their metabolic consequences, vitamin and mineral deficiencies and excesses, and selected drug interactions.

MEDICAL GENETICS (60 hours) - A lecture based course which includes DNA, genes, and chromosomes; restriction fragment length polymorphism (RFLP), polymerase chain answer (PCR) gene mutations; chromosome studies including banding, abnormalities, translocations, deletions and insertions karyotype nomenclature; cell division (mitosis, meiosis): loci, alleles and segregation, dominant and recessive inheritance new mutation, penetrance, and gene expression, gene maps and linkage: chromosome disorders, frequency, down, syndrome, sex chromosome  abnormalities (Klinefelter's XYY males, Turner's syndrome 47-XXX females, cancer chromosome    breakage): single gene disorders including aminoacidopathies, transport disorders, storage  disorders, connective tissue disorders: multifactorial disorders; management of genetic disorders  and genetic counseling,

MICROBIOLOGY AND IMMUNOLOGY (100 HOURS) - Lecture and laboratory including the study of infectious agents, normal flora, biology of infectious agents, bacterial genetics and action, constitutive and inducted defenses of the body, bacteria toxins, infectious agents, grain positive and gram negative bacteria, acid fast bacteria, spirochetes; viruses; fungi; virions: systemic.   The pathophysiology of infectious diseases, immunocompromised patients.   AIDS, congenital and neonatal infections, zoonoses, fever of unknown origin, nosocomial, and iatrogenic infections will also be studied.   Immunology portion will study immunity, the cellular basis of the immune

response, antibodies, humoral immunity cell-mediated immunity, major histocompatibility complexes and transplantation. complement, antigen-antibody reactions, hypersensitivity and allergy, tolerance and autoimmune diseases, tumor immunity, and immunodeficiency.

PARASITOLOGY & TROPICAL MEDICINE (80 hours) - This is a lecture and laboratory course. The parasitology portion of the will consist of the study of an introduction to Parasitology including blood and tissue protozoa, intestinal and vaginal protozoa, intestinal helminths, tissue and blood helminths, ectoparasites (scabies, lice, etc.). Tropical medicine portion will emphasize the presentation, diagnosis treatment and maintenance of tropical diseases. It will also include community and preventive measure that can be used to combat spread of tropical diseases.

GENERAL PATHOLOGY (100 hours) - A lecture and laboratory class studying general pathology including diagnosis autopsies characteristics classification and incidence of disease, disorders of growth, differentiation and morphogenesis, responses to cellular injury, inflammation, healing, metabolic and degenerative disorders, thrombosis, circulatory embolism and infarction, immunology and immunopathology, carcinogenesis, benign and malignant tumors.

BIOSTATISTICS AND MEDICAL WRITING (40 hours) -  This course is a lecture to train students in biostatistics and medical writing. Students will learn about probability theory, regression, tables and graphs, descriptive statistics, skewing, probability distributions, sampling, confidence interval hypothesis testing, analysis of variance, correlation chi-square tests, descriptive studies, analytic studies, and intervention studies, etc. Medical writing will include report preparation and history taking.

SYSTEMIC PATHOLOGY 1 (160 hours) - The systemic portion of this course will consist of the study of the pathology and pathophysiology of the cardiovascular system, central and peripheral nervous system, respiratory tract, alimentary system including the mouth, teeth, esophagus, stomach and digestive tract, liver, biliary system and exocrine pancreas.

PHARMACOLOGY (160 hours) - This course is a lecture series which include drug regulations and governmental controls, the principles of pharmacology, drug administration, pharmacokinetics, drug actions, interactions, tolerance dependence and withdrawal; drugs of the peripheral nervous system and special senses; central nervous system drugs; cardiovascular drugs; respiratory drugs; gastrointestinal agents; antibiotics; antifungals; antivirals; antiparasitic drugs; anticancer drugs; anti-inflammatory, autacoids, NSAIDs, and agents for arthritis and gout; and immunomodulating drugs; drugs affecting

the system, sexual affectious drugs, oxytocic drugs and uterine relaxants, anti-migraine drugs, vitamins and minerals, food additives, toxicology, and newly introduced drugs. Contraindications to use of drugs and drug classes will also be discussed.

BEHAVIORAL SCIENCE (120 hours)  - This is a lecture course consisting of the study of psychoanalytic theory, conditioning, child development, gender-related psychology, electroencephalograms and imaging, psychological testing, sleep, sex, psychopathology, genetic influences drug abuse, suicide and homicide, etiology, memory, neuropsychology and behavioral neurology emotions and hypothalamic functioning, behavioral neurochemistry neurotransmitters medical ethics.  The course will also include detailed lectures in psychiatry and psychiatric treatment of the following disorders: infant, childhood and adolescent disorders; delirium, dementia, amnestic and cognitive disorders; mental disorders due to medical conditions; substance-related disorders; schizophrenia and other psychotic disorders; mood disorders; anxiety disorders; somatoform disorders; factitious disorders; dissociative disorders; sexual and gender identity disorders; eating disorders; sleep disorders; impulse control disorders not elsewhere classified; adjustment disorders; and personality disorders.

CHILD & DRUG ABUSE, HUMAN SEXUALITY (40 HOURS) - This is a lecture class that includes the psychology and patterns of child abuse; physicians responsibility in suspected child and elder abuse cases, ethics, pathology signs of child abuse, diagnostic techniques is suspected child abuse cases, physical examination, reporting and counseling.  The drug abuse portion of this class involves a specific and detailed investigation of substance abuse diagnosis and treatment including but not limited to alcohol; cocaine; opiates including morphine and heroin; barbiturates and benzodiazepines; neuroexcitory drugs and stimulants; depressants; anxiolytics; marijuana; LSD; glue; and designer drugs.  The human sexuality portion of win study the development and anatomy of sexual and reproductive organs; endocrine control of sexually, psychosexual responses, sensory innervation of sex organs, the sexual response cycle in men and women, normal sexual practices, abnormal sexual behaviors, and psycho- physiological behaviors recently elucidated.

OCCUPATIONAL AND REHABILITATION MEDICINE (40 hours) - This is a lecture consisting of the study of occupational diseases including the anatomy, physiology and pathology and treatment.  This study includes psychiatric disorders, as well. Rehabilitation portion will study fundamentals of neurologic and physical rehabilitation techniques, and relearning.

NUTRITION (40 hours) - This is a lecture consisting of the study of food and its use; assessment of nutrition status; primary nutrition disorders, obesity, food sensitivity, malnutrition in disease states, nutrition support, nutrition as a cofactor in disease, nutritional factors in health promotion, nutritional factors in disease prevention.

MOLECULAR BIOLOGY (100 hours) - This course bridges the gap between histology, physiology, and biochemistry.   The course teaches students about microcellular mechanisms which include cellular transport and sorting, receptor mediated endocytosis, microtubule dynamics, cell powerhouses, translation of mRNA, membrane architecture, membrane cytochemistry, cilia structure and dynamics, cytoskeletal microfilament structure, nuclear organization, organization of chromosomes, nucleolar structure and function, movement through nuclear pores, epithelial polarity, adhesion molecules.  This course will also provide the student with more detailed information on the structure, operation and physiology of organelles and microorganelles.

SYSTEMIC PATHOLOGY 2 (160 hours) - This course is a continuation of the general and introduction to systemic pathology course described above.  It consists of lecture and laboratory study of pathology and pathophysiology of the endocrine system, breast, female genital tract, male genital tract, kidneys and urinary tract, lymphoreticular system, blood and bone marrow, skin, osteoarticular and connective tissues.

PHYSICAL DIAGNOSIS (80 hours) - This course is a pre-clinical course of lecture, laboratory, and clinical introduction.  It consists of the study and training in medical recording and confidentiality; interviewing techniques and history-taking; general physical examination, examination of the skin, nails and hair; ear; nose and throat; respiratory system; heart and cardiovascular system; abdomen; female breast and genitalia; male genitalia; bone, joint and muscle and the nervous system including the cranial nerves motor system, cerebellar system, sensory system, and the unconscious patient organ.  This course will include investigation of signs, symptoms and patient presentations, organ orientation, instrument usage and evaluation of current medical arts and sciences.  The medical diagnosis portion of the class will train students in diagnostic protocol, procedure, costs, and administration.  It will include blood counts, electrolyte panels, lipid and cholesterol studies, endocrine studies, pap smears, pathologic studies and methods, spinal taps, medical protocol, and physician referrals.

MEDICAL DIAGNOSIS (40 hours) - The medical diagnosis portion of the class will train students in diagnostic protocol, procedure, costs, and administration.  It will include blood counts, electrolyte panels, lipid and cholesterol studies, endocrine studies, pap smears, pathological studies and methods, spinal taps, medical protocol, and physician referrals

EPIDEMIOLOGY & PREVENTIVE MEDICINE (80 hours) - This is a lecture course that includes the study of causes of diseases, establishing causality, descriptive studies, incidence and prevalence, age standardization, life expectancy, analytic studies, prospective risk, risk, relative risk, retrospective studies interventional studies, methodological issues, historical and geographical controls, randomized controls, ethical issues.  Specific disease epidemiology will be discussed and analyzed such as influenza, cold, yellow fever, polio, food poisoning, etc.  The preventive medicine part of the class will include the study of medical preventive (primary-secondary) patterns of mortality and morbidity in developing countries.

INTRO RADIOLOGY (40 hours) - This is a pre-clinical class consisting a lecture, laboratory, and clinical study.  It consists of a study of radiological imaging such as X-rays, Computer Aided Tomography.  Magnetic resonant imaging, ultrasound including Doppler ultrasound, angiography, cerebral and spinal contrast studies, nuclear imaging studies, ventilation/perfusion studies, etc.

INTRO PATIENT CARE AND TREATMENT (120 hours) - This is a pre-clinical course. The purpose is to prepare the medical student to take responsibility for the care and management of patients It is a series of short courses consisting of hospitality, demeanor, physician responsibility, medical management and protocol, cost-to-patient analysis, ethics, specific training in triage, emergency techniques and protocols, basic *dental hygiene, dental care and referral,* acute cardiac and life support, chest pain protocols, bum management, electrolyte management, blood and plasma transfusions and protocols, drug abuse diagnosis and treatment, obstetrical and gynecological management, neonate management and care, pediatric care immunization, health and well-child care. This course will also include introduction to anesthesiology, surgery, and surgical techniques. Additionally, this course covers the use of intravenous fluids and solutions during emergencies, surgery, and other situations.  This course will, additionally, consists of a computerized patient simulator.  The medical student will learn blood gas calculations, acid-base analysis and treatment, and EKG interpretation, trauma, and critical life-support for cardiac arrest, arrhythmias, and sudden cardiac death.

INTRO CLINICAL MEDICINE (80 hours) - This is a preclinical course.  This course trains medical students to recognize, diagnose and treat common clinical pathologies. The course covers infections, skin diseases, diseases of the joints and bones, respiratory disorders, cardiovascular disorders, renal disease, endocrine, metabolic and nutritional disorders, gastrointestinal disorders, disorders of the liver and pancreas, disorders of the blood and lymph, disorders of muscles and connective tissue, disorders of the eye and nervous system.

All students must pass the Basic Science Comprehensive Examination and the must receive the Basic Science Completion Certificate before moving onto clinical rotations or taking the USMLE Part 1.

**CLINICAL SCIENCES**

The last six trimesters, ninety-two (92) weeks consists of sixty (60) weeks of core clerkships (Internal Medicine, Obstetrics and Gynecology, General surgery Pediatrics, Family Medicine, Psychiatry, and Emergency Medicine), twenty (20) weeks of electives, and twelve weeks of mandatory community service.

The purpose of the clinical sciences curriculum is to train the medical student to apply the concepts and principles that are important in health and diseases and that constitute the basis of safe and effective patient care.  As stated by the USMLE, St. Luke goal is to provide the medical knowledge and understanding of clinical sciences considered essential for the providing patient care under supervision, including emphasis on health promotion and disease prevention.  St. Luke's curriculum for clinical science rotations is cantered around the essentials for medical education required by the Liberia Medical and Dental Council, and the Content Description for USMLE step and the Clinical Skills Assessment Examination given by the Educational Commission for Foreign Medical Graduates.

Clerkships will be available for students for all clinical science students in Liberia. Transfer students will also permitted to do clinical rotations in Liberia.  *Clinical rotations will be available in Liberia, the United States, and other countries.*

**Clinical Science Courses - Year 3 (Core Rotations)**

| <u>CORE</u> | <u>Liberia</u><br><u>72 Weeks</u> |
|---|---|
| Internal Medicine | 12 weeks |
| Obstetrics and Gynecology | 08 weeks |
| General Surgery | 12 weeks |
| Pediatrics | 08 weeks |
| Family Medicine / Primary Care / Preventive Medicine | 06 weeks |
| | |
| Psychiatry | 06 weeks |
| Emergency Medicine | 04 weeks |
| Radiology | 04 weeks |
| Community Medicine | 12 weeks |

| <u>**ELECTIVES**</u>: 04 weeks minimum | <u>**20 weeks**</u> |
|---|---|

Any combination of the above rotations with 4 weeks minimum except the last rotation.  Twenty (20) weeks total.

Surgery Subspecialties

General Surgery, Neurosurgery, Orthopedic Surgery, Urology, Ophthalmology, Plastic Surgery, Oncology Surgery, Obstetrics and Gynecology, Pediatric Surgery, Cardiothoracic Surgery, Ear Nose and Throat, Transplant Surgery, Maxilofacial Surgery, etc.

Internal Medicine

Endocrinology, Cardiology, Neurology, Hematology, Oncology, Gastroenterology, Pneumology, Dermatology, Infectious Diseases, Preventive Medicine, Immunology, Epidemiology, etc.

Pediatrics and subspecialties

Pediatrics, neonatology, pediatric surgery, pediatric oncology, etc.

Psychiatry and subspecialties

Family Practice and subspecialties or General Medicine

Emergency Medicine and subspecialties, Critical Care Medicine

Community or Preventive Medicine

Rehabilitation Medicine

Clinical Pathology (including intro to autopsy)

Refugee Medicine

**Weeks Total**                                                **92**

Each student in clerkship will be required to submit a three-page report on a specific medical pathology, epidemiology, signs & symptoms, diagnosis, and treatment, or one interesting case history, each rotation.   The topics will be provided by St. Luke's administration and they will be  based on the contents of the Liberia Medical Licensing Examination (GMLE), the USMLE Step 2 Content Outline, and the USMLE CSA Content Outline.  The case history should be discussed with your proctor.  The purpose of these reports is two-fold:

(1)      The reports will help the student in his/her preparation for the Liberia MLE, and the USMLE Step 2 and CSA exams,
(2)      The reports will help provide information that may be used to help other students prepare for the Liberia MLE, USMLE Step 2, and CSA exams.

All reports will be kept at the school office and/or on-line and each will be available for students, staff and administrators of the school for review, if needed.

Clinical Science students will be required to participate in clerkships from six to eight hours daily.  Additionally, there will be lectures, Liberia MLE reviews, and USMLE Part 2 and CSA reviews scheduled weekly where attendance is mandatory.  The lectures are given by specialists in their fields and are to supplement the knowledge and experience they acquire doing their clerkships.  The purpose of the GMLE, USMLE Part 2 and CSA reviews is to prepare each student with the information they need to pass the GMLE, the USMLE Part 2 and CSA examinations.

**Exhibit 37 – LMB Press Release, March 2005**

LIBERIA MEDICAL BOARD (LMB)
MINISTRY OF HEALTH & SOCIAL WELFARE
MONROVIA, LIBERIA

## PRESS RELEASE

March 29, 2005

LADIES AND GENTLEMEN OF THE PRESS.

The Liberia Medical Board, in her meeting of March 15, 2005, deliberated

on the issue of "St. Luke Medical School" reportedly operating in Liberia.

While it is not our policy to run the affairs of the Board in the press, we

feel obliged at this time , to set the record straight on this very crucial issue,

for the benefit of the general public. This move is especially imperative

since "St. Luke Medical School", in the last few days, provided headlines in

the print and electronic media. Accordingly, the Liberia Medical Board is

pleased to present the following facts as contained in the records and files of

the Board for the information of the general public.

1.   During the Board Meeting of February 12, 2004,

the secretariat of the Board presented documents of "19 doctors" who

reportedly completed their course of study at St. Luke Medical School

for the degree of Doctor of Medicine (MD).

2.   The documents were presented to the office of the Board for licensure

by Dr. Meimei Dukuly, on behalf of St. Luke Medical School , since he

was the contact person.

3. The Board was greatly angered by this bold and shameless act which is considered an insult to the integrity and professionalism of the Liberia Medical Board, since in fact:

   a. The Board has no knowledge of a "St. Luke Medical School" operating in Liberia.

   b. The Board can not and does not issue license to any Doctor who

      ➢ Is not a graduate of a recognized medical school,

      ➢ Does not present a certificate of internship from the JFK Medical Center,

      ➢ Does not satisfactorily pass a comprehensive clinical assessment examination, or

      ➢ who does not present a valid license from the country where he/she was trained, or has practiced medicine.

4. The Board therefore did not admit the applications of the doctors for discussion, but rather warned the representatives of "St. Luke Medical School" to legally and properly apply to operate a medical school in Liberia by meeting all requirements thereto.

5. On March 8, 2005, the Liberia Medical Board received a letter of invitation to the "Campus of St. Luke Medical School" in Gaye Town, Old Road, Congo Town, for assessment for the purpose of granting a

permission to operate a medical School. Three documents were attached to the letter of invitation:

    a.   The Article of Incorporation from the Ministry of Foreign Affairs

    b.   An Act of Legislature legitimizing the establishment of the School

    c.   A letter of Attestation from the Commission on Higher Education, Ministry of Education.

    allowing preparatory activities for the establishment of the School.

6.   On Friday, March 18, 2005, three members of the Board visited what was supposed to be the "Campus of the St. Luke Medical School".

Those who visited were:

Assoc. Prof. Horatius Brown, MD, MSc, FWACS
Deputy Chief Medical Officer/JFK MC
Chairman, Liberia Medical Board

Assoc. Prof. Samuel Dopoe, MD, MSc (Specialist in
Otorhinolaryngology), Chairman, Department of ENT
Chief Medical Officer of JFK MC & Chairman of the Accreditation
Committee of the Board and

Prof. S. Benson Barh, BSc, MD, MPH, FWACP
Deputy Minister/Chief Medical Officer-RL and Secretary, LMB.

The findings of the Board were as follows:

    a.   The Board had difficulties in locating the so-called "Campus" due to an uneasy access to a building in obscurity .

    b.   The building was a run-down dwelling home under major renovation by a few workers.

    c.   The immediate surrounding of the building blends with the yards of dwelling homes in close proximity.

    d.   Inside the building for the so-called "St. Luke Medical School", the Board observed that there were:

> No Electricity
> No Running water
> No Library
> No Laboratory
> No Offices for faculty
> No student launch
> No class rooms –
> No staff list
> No faculty list
> No curriculum /No catalog
> No student hand book
> No rules governing aspects of the various academic domains.
> There was actually nothing in any form, shape or color of a medical school except for a few microscopes packed on one table in the living room, copies of books on the floor in one tight room, and a few arm chairs in the living room with an unpainted hard board inartistically hung up for a black board.

7.   In disgust, the Board returned and convened a regular session at 4:00p.m., on Friday, March 18, 2005.

8.   After a brief discussion of the findings of the requested

visit, the Chairman of the Board was told to reply the letter of invitation.

The Chairman's letter written March 22, 2005, noted that:

- The Building for the School is still under major renovation.
- There is no document on the academic and administrative plans of the School.
- There is no Library, no Laboratory

Page

- The site is not representative of a Medical School Campus.

The Chairman ended his letter by saying, "when these concerns are

addressed, the Board shall revisit the site to determine if the school can be

granted a permit to start the admission process".

Ladies and Gentlemen, these are the facts.  The position of the Board on this
issue is:

- There is no Medical School in Liberia called St. Luke Medical
  School.

- The Board can not and shall not discuss application of any
  "Doctor" from St. Luke Medical School unless it is accredited .

- Any attempt henceforth to abuse and insult the integrity and
  professionalism of the Liberia Medical Board will leave the Board
  with no alternative but to turn perpetrators and their collaborators
  over to the Justice Ministry for prosecution.

SIGNED:_____
               Prof S. Benson Barh, BSc, MD, MPH, FWACP
               DEPUTY MINISTER/CHIEF MEDICAL OFFICER-RL &
               SECRETARY, LIBERIA MEDICAL BOARD

APPROVED:_____
               Assoc. Prof. Horatius Brown, MD, MSc, FWACS
               Deputy Chief Medical Officer JFK MC and
               CHAIRMAN, LIBERIA MEDICAL BOARD

**Exhibit 38 – Benson Barh's Contract with SLSOM from 2004**

**Exhibit 39 – Benson Barh's Receipt of Payment from 2004**

**Exhibit 40 – George Gollin's Power Point Presentation that is Linked at Least 7 Times On the Internet**

**Exhibit 41 – The 91-page Document George Gollin Sent to the Ghana National Accreditation Board**