1 | THADDEUS J. CULPEPPER, SBN 220194
CULPEPPER LAW GROUPE
2 | 556 S. Fair Oaks Avenue, Suite 101
No. 302
3 | Pasadena, CA 91105
culpepper@alumni.pitt.edu
4 | Tele: (626) 786-2779
Facsimile: (626) 628-3083
5 | Attorneys for Plaintiffs ST. LUKE SCHOOL OF MEDICINE
and DR. JERROLL B.R. DOLPHIN, et al.,

FILED
CLERK, U.S. DISTRICT COURT

APR 1 4 2010
9:10

CENTRAL DISTRICT OF CALIFORNIA
BY                            DEPUTY

6

7

8 | **UNITED STATES DISTRICT COURT**

9 | **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

10 | ST. LUKE SCHOOL OF MEDICINE; DR.
JERROLL B.R. DOLPHIN and DR.
11 | ROBERT FARMER on behalf of himself
and all others similarly situated, as
12 | applicable,

Case No.  10-cv-01791 RGK-SH

**JURY TRIAL DEMANDED**

CLASS ACTION COMPLAINT FOR:

13 |         Plaintiffs,
vs.
14 |

REPULIC OF LIBERIA; MINISTRY OF
15 | HEALTH, a Liberian Governmental Agency;
MINISTRY OF EDUCATION, a Liberian
16 | Governmental Agency; LIBERIAN
MEDICAL BOARD, a Liberian
17 | Governmental Agency; NATIONAL
COMMISSION ON HIGHER
18 | EDUCATION, a Liberian Governmental
Agency; NATIONAL TRANSITIONAL
19 | LEGISLATIVE ASSEMBLY, a Liberian
Governmental Agency; DR. ISAAC
20 | ROLAND; MOHAMMED SHERIFF; DR.
BENSON BARH; DR. GEORGE GOLLIN;
21 | EDUCATION COMMISSION FOR
FOREIGN MEDICAL GRADUATES; a
22 | Pennsylvania Non-Profit organization;
FOUNDATION FOR ADVANCEMENT
23 | OF INTERNATIONAL EDUCATION AND
RESEARCH; a Pennsylvania Non-Profit
24 | organization, UNIVERSITY OF ILLINOIS-
URBANA CHAMPAIGN, an Illinois
25 | Institution of Higher Learning; STATE OF
OREGON, Office of Degree Authorization,

1.  **TRADE LIBEL**
2.  **FALSE IMPRISONMENT**
3.  **NEGLIGENCE**
4.  **VIOLATIONS OF DUE PROCESS**
5.  **VIOLATIONS OF EQUAL PROTECTION**
6.  **CONVERSION**
7.  **CONSPIRACY TO COMMIT CIVIL RIGHTS VIOLATIONS**
8.  **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
9.  **NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
10. **LOSS OF CONSORTIUM**
11. **LIBEL**

26 |         Defendants.

27

28





---

*FIRST* AMENDED CLASS ACTION COMPLAINT

I.      JURISDICTION

    A.      FRIENDSHIP TREATY

        (A).     ARTICLE I

1.      "The Nationals of each of the High Contracting Parties shall be permitted to enter, to travel and reside in the territories of the other; to exercise liberty of conscience and freedom of worship; to engage in professional, scientific, religious, philanthropic, manufacturing and commercial work of every kind without interference; to carry on every form of commercial activity which is not forbidden by the local law; to own, erect or lease and occupy appropriate buildings and to lease lands for residential, scientific, religious, philanthropic, manufacturing, commercial and monetary purposes; to employ agents of their choice, and generally to do anything incidental to or necessary for the enjoyment of any of the foregoing privileges upon the same terms as nationals of the State of residence or as nationals of the nation hereafter to be most favored by it, submitting themselves to all local laws and regulations duly established.

2.      The nationals of either High Contracting Party within the territories of the other shall not be subjected to the payment of any internal charges or taxes other or higher than those that are exacted of and paid by nationals of the State of residence.

3.      The nationals of each High Contracting Party shall enjoy freedom of access to the courts of justice of the other on conforming to the local laws, as well for the prosecution as for the defense of their rights, and in all degrees of jurisdiction established by law.

4.      The nationals of each High Contracting Party shall receive within the territories of the other, upon submitting to conditions imposed upon its nationals, the most constant protection and security for their person and property, and shall enjoy in this respect that degree of protection that is required by international law.  Their property shall not be taken without due process of law and without payment of just compensation." Treaty of friendship, commerce and navigation. (Article I) Entered

2

1  into force November 21, 1939. 54 Stat. 1739; TS 956; 9 Bevans 595; 201 LNTS 163. (hereinafter

2  "Friendship Treaty").

3  II.      ALIEN TORT CLAIMS ACT

4
5  5.       The Alien Tort Claims Act ("ATCA") of 1789 grants jurisdiction to US Federal Courts over

6  "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of

7  the United States."

8  III.     U.S. CONSTITUTION

9  6.       Sec. 1331. Federal question. The district courts shall have original jurisdiction of all civil

10 actions arising under the Constitution, laws, or treaties of the United States.

11 IV.      VENUE

12
   7.       The proper venue for this matter is the Western Division of the Central District of California,
13
   United States District Court, as Dr. Jerroll B. R. Dolphin is a resident of Los Angeles, California and
14
15 wherein St. Luke School of Medicine has its principal place of business.

16 V.       CLASS PARTICULARS

17 8.       Plaintiffs seek certification of the following Class pursuant to Fed. R. Civ. P. 23(b)(2):

18              All students who attended St. Luke School of Medicine between 2000-

19              present.

20
        (a). The Class is so numerous that joinder of all members is impracticable.
21
22      (b). The claims of Plaintiffs are typical of the claims of the Class.

23      (c). Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no

24 interests antagonistic to those of the Class, and he has retained counsel experienced in consumer class

25 action litigation.

26      (d). Defendant has acted or refused to act on grounds generally applicable to the Class.

27
        (e). Questions of law or fact common to the Class predominate over questions affecting only
28
                                              3

1 individual Class members.

2    (f). A class action is superior to all other forms of adjudication.

3    (g). There are multiple questions of law or fact that are common to the class, including

4 without limitation, whether Defendants' actions invalidated or devalued Plaintiff Medical Students'

5 degrees and medical licensing examination test scores.

6

7 VI.    PARTIES

8    A.    ST. LUKE SCHOOL OF MEDICINE

9 8.    Plaintiff St. Luke School of Medicine, Liberia, was, at all times relevant to this Complaint,

10 and is a Liberian corporation, 2001; and chartered by Act of Legislature, April 2003 and signed into

11 the law by President, August 2003, in Monrovia, Liberia ("SLSOM").

12    B.    DR. JERROLL B.R. DOLPHIN

13

14 9.    Plaintiff Dr. Jerroll B. R. Dolphin was, at all times relevant to the causes of action herein, and

15 is President of St. Luke School of Medicine. Dr. Dolphin is a graduate of San Jose State University

16 with a Bachelor of Science in Physics, with a minor in Mathematics. Dr. Dolphin graduated with a

17 Doctor of Medicine Degree from Spartan Health Sciences University, St. Lucia, West Indies.  Dr.

18 Dolphin is also certified by the Education Commission for Foreign Medical Graduates (ECFMG) for

19 USMLE Step 1 and Step 2.

20    C.    FRANK TEAH

21

22 10.    Frank Teah was, at all times relevant to this Complaint, was a prominent Liberian

23 businessman  He was introduced to Dr. Dolphin by the Liberian Ambassador to the United States.

24 Frank Teah was also the Superintendent of the Monrovia School District, the largest school district in

25 the Republic of Liberia.  Frank Teah was, and is, the Vice President of SLSOM and member of the

26 Bard.

27    D.    SENATOR BEATRICE SHERMAN

28                    4

11.     Sen. Beatrice Sherman was, at all times relevant to this Complaint, was a honorable member of the Senate of the Republic of Liberia until 2004 when the Senate was replace by the temporary National Transitional Legislative Assembly.  The Liberian Ambassador to the United States also introduced her to Dr. Dolphin.  Sen. Beatrice Sherman was, and is, the Secretary of SLSOM and member of the Board.

E.      DR. MEIMEI DUKULY

12.     Dr. Meimei Dukuly was, at all times relevant to this Complaint, was a consultant to the Ministry of Health of the Senate of the Republic of Liberia.  He was introduced to Dr. Dolphin by the Minister of Health of the Republic of Liberia.  Dr. Dukuly is the Treasurer of SLSOM and member of the Board.

F.      MEDICAL STUDENTS

13.     For the sake of clarity and organization the list of Plaintiff medical students are set forth in Exhibit "1 and are incorporated herein as if fully set forth verbatim ("Medical Students").  At all times relevant herein, the Medical Students were students or graduates of SLSOM and represent the Class members.

G.      REPUBLIC OF LIBERIA

14.     Defendant Republic of Liberia is a High Contracting Party to the Friendship Treaty.

H.      MINISTRY OF HEALTH

15.     At all times relevant to this Complaint, Defendant Ministry of Health was the primary institution for health care delivery services in the Republic of Liberia.  The Ministry of Health is responsible for providing health and social welfare services to the citizens of Liberia.

I.      LIBERIAN MEDICAL BOARD

5

16.   At all times relevant to this Complaint, Defendant Liberian Medical Board was the primary institution for the licensing of medical doctors in the Republic of Liberia.  It is a branch of the Ministry of Health of the Republic of Liberia.

J.   NATIONAL COMMISSION ON HIGHER EDUCATION

17.   At all times relevant to this Complaint, Defendant National Commission on Higher Education was the national accrediting agency for the Ministry of Education of the Republic of Liberia ("NCHE").

K.   NATIONAL TRANSITIONAL LEGISLATIVE ASSEMBLY

18.   Defendant National Transitional Legislative Assembly (NTLS) was the temporary legislative branch of the National Transitional Government (NTG) of Liberia that operated in Liberia after President Charles Taylor left Liberia, in 2004 until the inauguration of President Ellen Johnson-Sirleaf in January 2006.

L.   DR. ISAAC ROLAND

19.   At all times relevant to this Complaint, Defendant Dr. Isaac Roland was the Director General of the NCHE.

M.   MOHAMMED SHERIFF

20.   At all times relevant to this Complaint, Defendant Mohammed Sheriff was a member of the National Transitional Legislative Assembly of the Republic of Liberia from 2004 to 2006.  He was Chairman of the Health and Social Welfare Committee ("NTLA" or "NTLA-HSW") until June 2005, later becoming chairman of the NTLA's Executive Committee.

N.   DR. BENSON BARH

6

21.     At all times relevant to this Complaint, Defendant Dr. Benson Barh was Chief Medical Officer of Liberia and the Secretary of the Liberian Medical Board.

O.     DR. GEORGE GOLLIN

22.     Defendant Professor of Physics at the University of Illinois, Champaign, Illinois, purports to be a higher education expert in "diploma mills" and fraudulent colleges and universities.  He also claims to be a consultant to the Republic of Liberia and its Ministry of Education.

P.     EDUCATION COMMISSION FOR FOREIGN MEDICAL GRADUATES

23.     At all times relevant to this Complaint, Defendant Education Commission for Foreign Medical Graduates ("ECFMG") administers the United States Medical Licensing Examination ("USMLE") to graduates of foreign medical education institutions. The USMLE is the standard medical examination for all medical students foreign and domestic.  ECFMG qualifies foreign medical graduates for residency in the United States by issuing an ECFMG certificate based upon successful completion of the USMLE Step 1 and Step 2.

Q.     FOUNDATION FOR ADVANCEMENT OF INTERNATIONAL EDUCATION AND RESEARCH

24.     At all times relevant to this Complaint, Defendant Foundation for Advancement of International Education and Research ("FAIMER"), an ECFMG agency, maintained the International Medical Education Directory ("IMED"). The IMED is currently the sole source listing for qualified foreign medical schools in the United States.

S.     MINISTRY OF EDUCATION

24B.     At all times relevant to this Complaint, Defendant Ministry of Education was the education agency of the Republic of Liberia.

T.     STATE OF OREGON, OFFICE OF DEGREE AUTHORIZATION

7

24C.     At all times relevant to this Complaint, Defendant State of Oregon, Office of Degree Authorization purportedly provides for the protection of the citizens of Oregon and their postsecondary schools by ensuring the quality of higher education and preserving the integrity of an academic degree as a public credential.

      U.     UNIVERSITY OF ILLINOIS – URBANA CHAMPAIGN

24D.     At all times relevant to this Complaint, the University of Illinois – Urbana Champaign was an Illinois Institution of Higher Learning.

VII.     INTRODUCTION

25.     In 2005, organized conspirators and government officials, who were angered because St. Luke School of Medicine ("SLSOM") refused to pay bribes, attacked SLSOM in the media and Internet. When Dr. Dolphin refused to pay the bribe demands, these same public officials began making false public statements to the media, and sending letters with false statements worldwide to principle agencies involved in the recognition and listing of medical degrees and medical licenses.

VIII.     FACTS

26.     Dr. Jerroll Dolphin and Dr. Taliaferro Harris treated Liberian refugees in Ghana in September and October 1998 at the Bujumbura Refugee Camp, outside of Accra, Ghana. Over a course of three days in September 1998, and two days in October 1998, they treated more than 700 Liberian individuals and families. The refugees told the doctors that they were the first doctors in the ten years of the existence of the camp who touched them with their hands, gloved or otherwise, and brought medicine for the refugees.

27.     Dr. Jerroll Dolphin went to Liberia in April 2001 to meet with Minister of Health, Dr. Coleman, Frank Teah, Dr. Benson Barh, and other influential people. Dr. Dolphin brought with him 14 large boxes of medicine, mostly HIV/AIDS antiviral medicine, surgical equipment and supplies. During that visit, SLSOM, at the suggestion of Dr. Coleman, made arrangements to cooperate with

8

A.M. Dogliotti School of Medicine, the University of Liberia's medical school. A.M. Dogliotti had come to a state of disrepair from neglect and lack of funds. Most professors at A.M. Dogliotti had not been paid for more than four years. The agreement to cooperate was signed in the early summer of 2001. SLSOM would pay A. M. Dogliotti's professors a minimum of $500 USD per month and up to $1500 USD per month or more. SLSOM started advertising for medical students, mainly in Nigeria.

28.     During the one month of advertising, SLSOM had over 800 applications, to which approximately 200 students were accepted to the medical school. Most of the newly accepted students were new to medicine, however, about three-dozen students were transfer students for other medical schools, mostly in Nigeria.

29.     Dr. Dolphin came back to Liberia in early August 2001 to make arrangements for the expected 150 students to come and study at SLSOM with regular A. M. Dogliotti students and because Dr. Benson Barh, the Dean of A. M. Dogliotti Medical School quit and there was no named replacement as Dean.

30.     Without a person to discuss issues that might arise, Dr. Dolphin felt that enrollment at SLSOM in Monrovia should be postponed until suitable arrangements could be made with officials of A. M. Dogliotti. So, in early September 2001, he sent an email to all 200 of the accepted students to postpone their travel to Liberia until further notice. However, a few dozen of the students had already come to, or were in route to Liberia when the email notice was sent.

31.     So, without an organized A. M. Dogliotti staff, and without anyone to discuss enrollment, class scheduling, and many other complex issues such as payment to professors, possession of classroom and building keys, responsibility of, and security of laboratory and classroom equipment, SLSOM could not practically keep its arrangement to partner with A.M. Dogliotti.

32.     Dr. Dolphin and SLSOM decided to start instruction without using A. M. Dogliotti. Therefore, in order to accommodate the students who had already arrived in Monrovia, SLSOM

9

1   started classroom instruction at its offices in Monrovia in October 2001. Simultaneously, SLSOM

2   applied to the National Commission on Higher Education in October 2001 for approval as a tertiary

3   institution.

4
5   33.    Also during this time, Mr. Frank Teah and Senator Beatrice Sherman, Teah's wife, reported to

6   Dr. Dolphin, that Mohammed Sheriff, then head of the J. R. Kennedy Hospital in Monrovia, asked

7   for a bribe of $6,000 USD a month to make SLSOM a "credible" institution in Liberia. Frank Teah

8   and Sen. Sherman did not reply to Sheriff's request. They reported to Dr. Dolphin that Sheriff was a

9   very ruthless individual and was not to be trusted.

10  34.    In November 2001, the United States Department of State requested that Dr. Dolphin not send

11  any additional U.S. medical students to Liberia, as the State Department had received intelligence of

12  increasing rebel activity in northern Liberia and that there was an eminent threat of civil war there.

13
14  When war did break out in February 2002, SLSOM students fled Liberia in whatever and however

15  they could. Some of the Nigerian students took refuge at 'Nigeria House', the Nigerian Embassy.

16  Others took leave by boat, airplane, bus transport, and some even 'hitch-hiked' their way to Ghana.

17  None could remove to the Ivory Coast because it also was beset with rebellion. Dr. Dolphin visited

18  Liberia again in June and August 2002. The SLSOM office and classrooms were completely

19  wrecked. There were bullet holes in every wall along with shrapnel stuck in most of the walls of the

20  campus. The roof was also in disrepair. The floors were covered with dirt and mud.

21
22  35.    Dr. Dolphin and the SLSOM staff spent several thousand dollars to repair the facility. On

23  September 17, 2002, the NCHE issued to SLSOM-Liberia a Temporary Permit to Operate St. Luke

24  School of Medicine in the Republic of Liberia. See Exhibit "3"

25  36.    On April 24, 2003, the National Legislature of the Republic of Liberia granted SLSOM a

26  Charter, despite the threat of civil war. See Exhibit "31"

27

28                                        10

37.    Frank Teah was called to Accra, Ghana to negotiate peace between the Liberian government and the warring Liberian factions. In the meantime, Sen. Beatrice Sherman carried on, personally carrying the Charter to President Taylor for his approval and signature while the fierce civil war was being fought for control of the city of Monrovia. On 7 August 2003, the President of Liberia signed into law "An act to incorporate St. Luke School of Medicine of the city of Monrovia, Montserrado County, Republic of Liberia, and grant SLSOM a Charter." See Exhibit "4"

38.    On August 8, 2003, the Ministry of Foreign Affairs published "An act to incorporate St. Luke School of Medicine of the city of Monrovia, Monsterrado County, Republic of Liberia, and grant SLSOM a Charter", which, in part, states:

ARTICLE 1

SECTION 1:

St. Luke School of Medicine was established August 1, 2000, and incorporated August 22nd 2001 in the City of Monrovia, Montserrado County, Republic of Liberia, is hereby established in the name of St. Luke School of Medicine Incorporated (SLSOM), by and through its founders, Dr. Jerroll Dolphin, President. Said school is hereby further granted this charter, which endows it with all the rights, privileges and benefits existing in similar institutions of higher learning within this Republic, and shall henceforth be known by the name and title "St. Luke School of Medicine".

SECTION 2: LEGAL STATUS

The St. Luke School of Medicine (SLSOM) is hereby made a legal and corporate entity with perpetual succession, and shall have the authority to contract, sue and be sued, plead and be impleaded in any court of competent jurisdiction within the Republic; to purchase or otherwise acquire and hold property, real and mixed up to the value of one hundred and fifty million United States dollars (US$150,000,000); the said St. Luke School of Medicine

11

1  (SLSOM) shall be perpetually maintained in the Republic for medical education of the people

2  of this nation, people of the other countries and for who may have the capacity to seek

3  medical education.

4  "Article IX (page 6) <u>MISCELLANEOUS</u>

5        SECTION

6        1.      This Charter may be amended by the Legislature of the Republic of Liberia

7              upon application to them by and through the Founder of the St. Luke School of

8              Medicine (SLSOM), passed by a two-third vote of the said Board of Trustees during a

9              regular meeting of the Board of Trustees.

10  See Exhibit "31"

11  39.    Five days later, after President Charles Taylor signed the above-mentioned Charter, he

12  resigned from the office of President and fled the country to Nigeria.

13  40.    When Dr. Dolphin returned to Liberia in early September 2003, the SLSOM campus, on the

14  top floor of the Luke Building on Broad Street was, again, entirely destroyed. Dr. Dolphin and

15  SLSOM staff conducted two complete renovations of the classrooms and offices on the top floors.

16  Dr. Dolphin decided to move the campus to a new location as soon as possible.

17  41.    In November 2004, Dr. Dolphin found a suitable location for the SLSOM campus in Gaye

18  Town, a residential area on the bay side of Monrovia, for a 5-year lease. The new campus was

19  formerly used as a primary and junior secondary school.   Please see Exhibit "32"

20  42.    SLSOM assembled finances, staff, and equipment for the new campus. Dr. Isaac Roland,

21  Director General of Liberia's National Commission on Higher Education, was aware of SLSOM's

22  relocation and improvement efforts. Dr. Roland witnessed the transition of the SLSOM campus from

23  its deplorable condition when SLSOM first took possession of the property to its new refurbished

24  condition. Needless to say Dr. Roland was impressed with what he saw.  On January 18, 2005, the

12

National Commission on Higher Education, through Dr. Roland, issued a letter to Madame Carole Bede of ECFMG:

> "St. Luke School of Medicine has established an institution and is working hard towards providing the necessary physical facilities. As we speak there is large quantity of quality medical equipment including computers, modern books, microscopes, etc." See Exhibit "6"

43.     However, on January 20, 2005, Carole Bede issued a letter to Dr. Jerroll Dolphin, St. Luke School of Medicine, wherein she stated:

"ECFMG and FAIMER have received an unsigned and undated statement apparently issued from the National Commission on Higher Education, Liberia, stating the St. Luke School of Medicine is not registered or accredited as a medical school in Liberia."

"Until such time as FAIMER receives confirmation that the government of Liberia recognizes St. Luke School of Medicine and that the school is authorized by the government to issue the Doctor of Medicine degree, students currently enrolled in, and graduates of, St. Luke School of Medicine are no longer eligible to be registered for USMLE examinations or for ECFMG certification."

See Exhibit "5"

44.     ECFMG removed SLSOM from the IMED listing on January 20, 2005.

45.     On February 25, 2005, Mohammed Sheriff asked Dr. Dolphin to come to the Capitol Building to meet with him. Dr. Dolphin met him at about 2 PM that same day. Sheriff was immediately hostile, questioning Dr. Dolphin on the establishment of SLSOM, yelling incessantly all the while. Dr. Dolphin asked him to calm down.  Sheriff told Dr. Dolphin, "$6000 a month". Dr. Dolphin asked "Liberian or U.S."? Sheriff replied "U.S.". Dr. Dolphin looked around and saw several others looking at himself and Sheriff, waiting for Dr. Dolphin's answer to Sheriff's inquiry. He knew that if he said yes, then the others would be the first in the long line of others with their hands out.

46.     Dr. Dolphin, to avoid giving an answer, asked Sheriff to come see the campus. Sheriff agreed and asked if he could bring a few other 'officials' with him. Dr. Dolphin and Sheriff agreed to limit the number to three persons. They would meet at 11 AM on the next Tuesday, March 1, 2005.

47.     That Tuesday, March 1, 2005, when Dr. Dolphin arrived at the campus, Sheriff had brought 15 newspaper and radio reporters. Dr. Dolphin reminded Sheriff that they agreed to limit the number of people to three 'officials'. Sheriff sneered, and loudly announced that he had a 'Press Release' that he distributed, however, he refused to give a copy to Dr. Dolphin. Sheriff intended to smear Dr. Dolphin and SLSOM's reputation because of Dr. Dolphin's refusal to pay bribes.

48.     Then Sheriff loudly began to make a series of false accusations against Dr. Dolphin and SLSOM. Sheriff accused SLSOM of committing criminal acts. Then he insisted that the press be allowed to tour the facilities. Sheriff stated that if the press was not allowed to inspect the facilities Dr. Dolphin would be in violation of Article 44 of the Constitution of Liberia. Not knowing exactly what Article 44 was, Dr. Dolphin reluctantly allowed the reporters to enter the campus, take pictures, and ask questions. Dr. Dolphin explained to the reporters that the facility was not completed, and that it would be only a temporary campus until SLSOM's permanent campus was built.

Nonetheless, most reporters were impressed with SLSOM's campus. They saw the computers, new microscopes, new library books, Internet service, SLSOM's online curriculum, and new classroom tables and chairs. The paint on each wall was fresh. However, SLSOM had not yet bought the glass for the windows, and parts of the roof were unfinished. The reporters saw that all the rooms and laboratories were wired for electricity and all bathrooms were plumbed. Many commented that the facilities were much better than A. M. Dogliotti's facilities (the University of Liberia's medical school), which did not have microscopes or other laboratory equipment at all.

49.     After 12 PM of the same day, Dr. Dolphin bade all the reporters to leave, and they all did. Several reporters came by later to visit Dr. Dolphin at his room at the Metropolitan Hotel later that

14

evening. However, before Sheriff left SLSOM, he asked Dr. Dolphin to come to the Capitol Building at 2:00 PM to meet with him, again mentioning the bribe of $6,000 US per month. Dr. Dolphin agreed to come to the Capitol Building, however, after Sheriff left the SLSOM campus, Dr. Dolphin called his lawyer, Counselor Charles Abdullai. Abdullai told Dr. Dolphin not to go to the Capitol Building without a summons and a lawyer.

50.     At 2 PM, Sheriff called Dr. Dolphin on the telephone asking him where he was. Dr. Dolphin, knowing that Sheriff was going to again ask him outright for a bribe, told Sheriff that he was fearful of coming to the Capitol Building without the representation of a lawyer. He asked Sheriff to write a summons so that he could have time to obtain adequate representation. Sheriff became angry, telling Dr. Dolphin that he did not need a lawyer, and to "come now". Dr. Dolphin reminded Sheriff that he had made some criminal allegations against Dr. Dolphin and SLSOM at the press conference at the campus, and that he (Dr. Dolphin) had the right to be suspicious and concerned if he would walk out of the Capitol Building in handcuffs or not. Dr. Dolphin insisted on the summons, fearing that Sheriff wanted a bribe, and that without the payment of a bribe, Sheriff was going to make trouble for him and SLSOM.

51.     That evening several of the reporters who were at the SLSOM campus came over to discuss what happened earlier that morning. They told Dr. Dolphin about Sheriff. If they didn't cooperate with him, he would have their National Press Passes revoked. That meant that they would be "out of work" in a country where work was a 'privilege' of the few. The unemployment rate of Liberia at that time was approximately 80 to 85 percent of the population.

52.     On March 3, 2005, the National Commission on Higher Education issued a Statement of Attestation, attesting SLSOM's right to establish and operate a medical school. A copy of the Statement of Attestation was sent to ECFMG. See Exhibit "8".

FIRST AMENDED CLASS ACTION COMPLAINT

53.     On March 7, 2005, the Ministry of Health sent a letter to the Embassy of India in Liberia verifying that SLSOM Liberia was "…granted legislative permission to establish a college of medicine in Liberia in 2003." See Exhibit "34."

54.     Confident of the quality of its campus, and not wanting to be outwitted by Sheriff, SLSOM invited the Liberian Medical Board (LMB) to inspect its campus. Dr. Dolphin and SLSOM professor Dr. Dukuly, went to the office of Dr. Benson Barh on Tuesday, March 8, 2005, and presented SLSOM's documentation and all of its legal credentials to him. Dr. Barh appeared to be very upset and disturbed to see the documents shown to him. In fact, his face was flushed, turned red, and he shook his head slowly several times before he looked up to speak to Dr. Dukuly and Dr. Dolphin. Dr. Dukuly then presented SLSOM's Invitation for Inspection to Dr. Barh. See Exhibit "35"

55.     Barh told Dr. Dolphin, in front of Dr. Dukuly, that he wanted $3.000 a month. Dr. Dolphin told Barh that he couldn't pay that amount of money until the school was running, and Dr. Dolphin asked Barh if he would be Dean of the medical school. Barh said that he didn't have the time. Dr. Dolphin understood that Barh wanted a bribe. Over the next few minutes of the conversation Barh began more and more hostile and angry.

56.     Barh asked when SLSOM expected to start classes. Dr. Dolphin answered saying "this September." To which Dr. Barh replied, "not if I can help it. Do you have professors?" Dr. Dukuly replied, "We have plenty." Dr. Dukuly and another Liberian doctor had been working on a list of professors to teach SLSOM's medical and nursing students to start the September 2005 term. Dr. Dolphin whispered to Dr. Dukuly not give Dr. Barh the list of professors, thinking that Barh would do something to block the start of SLSOM in September. Dr. Dolphin asked Barh what documents were required for the inspection, what the criteria was for the inspection team, and regarding the amount of the inspection fee. Dr. Barh did not reply to the questions. After exchanging pleasantries,

FIRST AMENDED CLASS ACTION COMPLAINT

1    Dolphin and Dukuly left Barh's office wherewith Dolphin expressed his reservations about Dr. Barh's

2    reception of SLSOM's legal documents.

3    57.     During the meeting, Barh mentioned to Dr. Dukuly that the Liberian Medical Board had never

4    done an inspection of any medical school. A. M. Dogliotti, the University of Liberia's medical

5    
6    school, had never been inspected nor had it ever been required for an inspection. According to the

7    National Commission on Higher Education, only the NCHE had the authority to accredit tertiary

8    institutions.

9    58.     On March 12, 2005, the National Commission on Higher Education issued a letter to the

10   ECFMG, Madame Carole Bede, which, amongst other things, states:

11        "St. Luke School of Medicine is recognized by the Government of Liberia to award Doctor of

12        Medicine degrees."

13        "Recognition was granted from August 1, 2000 by the National Legislature of the Republic

14        of Liberia"

15        

16        "Liberia presently recognizes St. Luke School of Medicine."

17        "The government of Liberia previously recognized St. Luke School of Medicine."

18   See Exhibit "9"

19   59.     After receipt of the NCHE letter, ECFMG placed SLSOM back on the IMED listing on or

20   around March 22, 2005.

21   
22   60.     On or about the night of Sunday, March 13, 2005, Dr. Dolphin's friends in Liberia started

23   calling him, frantically telling him about a doctor who called himself Dr. Kpoto on the radio

24   denouncing SLSOM. They said that Kpoto stated that SLSOM was giving hundreds of 'fake' degrees

25   to Indians from the streets who came to Liberia to register as doctors. He also said that SLSOM

26   taking thousands of US dollars for these fake degrees.

27   
28                                           17

61.     The National Security Agency, NSA, came to arrest and detain Dr. Dolphin at his room at the Metropolitan Hotel at 7 AM the morning of Tuesday March 15, 2005. The NSA agent asked Dr. Dolphin to pay for the taxi ride to the agency's headquarters in Mamba Point, not far from the US Embassy. Dr. Dolphin was questioned by two NSA agents for more than 3 hours. They did allow Dr. Dolphin to make a phone call to his attorney, Counselor Charles Abdullai. Abdullai told him, and the NSA agents that he would be there, at NSA headquarters at 11:30 AM. After the three hours of questioning, Dr. Dolphin waited in a sequestered area until Cllr. Abdullai arrived around 11:30 AM. Thereafter, they both went to the top floor of the NSA headquarters to the office of Fredy Taylor, NSA Director.

62.     There, they were met by Mr. Fredy Taylor, NSA Director, and the US Embassy Deputy C'harge de Affaires, David Kraehenbuehl. Cllr. Abdullai presented SLSOM's official documentation that included the Minister of Health's letter to the World Health Organization (August 2000), SLSOM's Articles of Incorporation (August 2001), the NCHE's Permit to Operate (September 2002), the Act to Incorporate St. Luke School of Medicine approved by the Liberian legislature (April 2003), the Bill signed by President Charles Taylor (August 2003), and the Statement of Attestation (March 2005).

63.     After carefully reading the documents, Fredy Taylor told Cllr. Abdullai, the C'harge de Affaires, and Dr. Dolphin that SLSOM was operating legally in the Republic of Liberia, that there were no charges, criminal or civil, that SLSOM or its owners or operators could be charged with, and that SLSOM should go about its business. Mr. Taylor asked Dr. Dolphin to write a brief statement for the record, which Dr. Dolphin did deliver to Mr. Taylor, in person, several days later.

The following day, March 16, 2005 a Monrovia newspaper issued the following front page:

> Another Degree Granting Medical College in Liberia?, The Inquirer, Monrovia, Liberia
> March 16, 2005.

18

It has been gathered that an entity accredited by the Government of Liberia to run as Medical College has already issued degrees to individuals without running classes.

According to investigation, the St. Luke School of Medicine said to be located in Gaye Town, Sinkor, was accredited by an Act of the National Legislature to run as a medical college. But report said the school has not officially begun classes, but has already gone go-ahead issuing diplomas to some so-called graduates.

Investigation revealed that the existence of the school as a degree granting institution came to light recently when some students in Asia called the India Consul to verify the existence of the school, which has been issuing degrees.

The sources said the school was targeting students in Asia because most of the people in that part of the world want to be doctors, but can not afford the cost of acquiring such education and degree there, and have therefore decided to use the on-line program to get their "documents" since they believed that the St. Luke School of Medicine was operating in Liberia.

It was also said that the school has an affiliation with the University of Liberia, but this was denied by Dr. Al Hasan Conteh, president of the university when he was approached on the issue yesterday.

At the same time, some medical doctors contacted over the issue, expressed concern about this latest development because they said it has the potential to further damage the image of the country.

Assemblyman Dr. Mohammed Sheriff, chairman of the house standing committee on health, said the whole thing about the school is fake. He blamed some people in government for this situation.

He said, he has received complaints from some graduates of the A. M. Dogliotti College of Medicine of the University of Liberia, who said the issue of St. Like was an embarrassment to them.

He said his committee is investigating the matter as this was serious and must be dealt with accordingly. He said this was a scam that some individuals are using to extort money from people desirous of getting in the medical profession. He said these individuals went to other countries and were thrown out, but some individuals in government are working with them to bring shame to this country.

Also, a statement of attestation issued by the National Commission on Higher Education is said to be raising eyebrows. Investigation revealed that the commission had gone ahead to grant rights and a statement to operate to the institution without it meeting all the requirements, something the school is said to be using.

Health Minister Dr. Peter Coleman who was contacted on the issue yesterday, confirmed that the school has been accredited by an act of the national legislature. He said the school was now preparing to operate as it has been also accredited by the Commission of Higher Education.

Asked about the issuance of diplomas without classes, Dr. Coleman said the school also runs an "online program." But said he is not aware of the issuance of diplomas. He said the medical authorities in Liberia do not "recognize" such online program, which is said to be existing in Nigeria and Ghana.

Efforts to get a word from Education Minister, Dr. Evelyn Kandakai, the president and chief executive officer of the school, Mr. Jerroll Dolphin, MD, and the Indian Consul proved futile as their cell phones were switched off.

64.     The very next day, on Thursday morning, March 17, 2005, after coming from Cllr. Abdullai's office, Dr. Dolphin was given by hotel staff a handwritten note from an agent of the Liberia Federal Bureau of Investigation, LFBI, to come to the LFBI headquarters for questioning.  Dr. Dolphin called Clr. Abdullai, who came immediately to the hotel to read the note. Abdullai called the Director of the LFBI, personally, and made arrangements to meet, along with Dr. Dolphin, at 1:30 in the afternoon.

65.     Abdullai met Dolphin at the Metropolitan Hotel at 1:00 PM, and they walked down the road to LFBI headquarters. They waited in the office of the FBI Director for a few minutes before he was ready to interview them. His first words after our introductions were "Why should I not have Dr. Dolphin arrested?" Abdullai replied him by saying "Sir, this is why" and he presented the same series of documents that he presented at NSA headquarters only a few days earlier.

66.     After reading the documents, silently, the LFBI Director told Abdullai and Dr. Dolphin that St. Luke School of Medicine was not violating any law in Liberia, and that SLSOM's documents were in order.  Then he called Mohammed Sheriff, National Transitional Legislative Assemblyman. He told him that Dolphin was there in the LFBI office and that Dr. Dolphin or SLSOM had "done no wrong". The Director asked Abdullai if we could hurry down to the Capitol Building for a hearing. Since it was after 3:00 PM, Cllr. Abdullai stated that any meeting should be requested in writing, in advance, with enough proper notice to attend the meeting.

67.     Dr. Dolphin and Abdullai left the LFBI headquarters and walked back to the Metropolitan Hotel and discussed some of the issues. Abdullai told Dr. Dolphin that if he was arrested, he should not panic. He should call Abdullai, who would schedule a hearing for a writ of habeus corpus, after 48 hours. At the hearing, a judge could put an end to this entire harassment matter by the government by ordering a hearing for a writ of prohibition.

68.     Without warning or notice, at 9 AM on Friday, March 18, 2005, Dr. Barh called Dr. Dukuly telling him that he wanted to conduct the Liberian Medical Board's inspection of the SLSOM campus

at 11 AM. Dr. Dukuly called Dr. Dolphin and told him that Barh wanted to conduct SLSOM's inspection "today" before 10:30 AM and Barh wanted an inspection fee of $1000. Dr. Dolphin asked what the inspection fee was for because the Liberian law does not permit the LMB to charge money for inspections. Dr. Dolphin then spoke with Barh telling him, and Dr. Dukuly, that part of the roof had been removed for repair so the computers and library books had to be moved because of the possibility of rain. According to Dr. Dukuly, Dr. Barh said that it would be taken into consideration and that the inspection fee was $1000 USD. Dr. Dolphin said that he did not have that kind of money on him and that he could not get it before 11 o'clock in the morning.

69.     Dr. Dolphin said $500 was what he could pay because Barh would not accept later payment because he was traveling in the afternoon and needed the money immediately. Dr. Dolphin rushed to the Ministry of Health where the Liberian Medical Board was located and paid the $500 USD.  See Exhibit 9A.

70.     Dr. Barh immediately took the money, albeit with some apparent disappointment. Dr. Dolphin reminded Barh and Dukuly that part of the roof had been removed for repairs and the computers and library books had to be packed because of the possibility of rain.

71.     Upon arrival to the campus thirty minutes later, Dr. Barh expressed his disappointment and stated, "if this was in the United States, this would not pass inspection". Dr. Dolphin replied saying, "if this was in the United States, it would pass because they give new medical schools interim accreditation for three years, to see how the schools medical students perform on the required medical licensing examinations."

72.     Barh said to Dolphin that if he were in the United States, he would be paid at least $3,000 a month for what he was doing (as a Dean of the medical school). Dr. Dolphin told him that he would be paid more than $6000 a month for the same work, however, that "this is Liberia." Dolphin also reminded the inspection team that this was the best-equipped classroom and laboratories in all of

22

Liberia and that A. M. Dogliotti's did not have the furniture, equipment, books, computers, Internet service, electricity, painting, and other facilities that SLSOM had at its campus.

73.     Dr. Dukuly reminded the inspection team that he had a list of professors for the school in every subject and that the professors would get paid. (It was well known that the A. M. Dogliotti professors had not been paid for more than 2 years at that time.)

74.     Dr. Barh did not want to look at SLSOM's curriculum, which was available online, and on every computer as well. See Exhibit "36." He hurriedly walked to his taxi to go to the airport. After the Liberian Medical Board's inspection, Dr. Dolphin went to the United States Embassy in Liberia at the top of Mamba Point. The officials there stated that they would send some educational officers to visit the St. Luke School of Medicine campus the very next Monday morning to see for themselves.

75.     True to their word, officials from the United States Embassy called Dr. Dolphin telling him to meet them at SLSOM's campus the next Monday morning at 10 AM. On March 21, 2005, they arrived at the SLSOM campus in a United States Embassy truck. One younger man was an experienced teacher working at the United States Embassy, and the other middle-aged man was a nurse also working for the United States Embassy.

76.     They took pictures with a digital camera as they inspected the campus. The nurse noticed that the microscopes needed light sources to which Dr. Dolphin acknowledged the situation. The nurse also said that it was a simple problem to fix and it was not significant. They told Dr. Dolphin that SLSOM was the best-equipped campus, medical or otherwise, in Liberia. They were impressed that SLSOM had curriculum and studies online, and were also impressed with the quality and quantity of the CD-ROM's.

77.     Dr. Dolphin told the officials that compared to the United States the SLSOM campus is lacking, however, this is a temporary campus and it was the best that could be done at this time in

23

Liberia.  The United States Embassy officials left saying that they would leave their report and pictures with the United States Embassy.  Some of Dr. Dolphin's pictures of the SLSOM campus in March 2005 are displayed in Exhibit "33"

78.     On Tuesday afternoon, March 22, 2005, Dr. Dukuly notified Dr. Dolphin that he had received word that the inspection report from the Liberian Medical Board was available and that they should collect it together. Dolphin and Dukuly were very disappointed to see the inspection report:

79.     The LMB short report was replete with false information:

The building was not undergoing major renovation. One small portion of the roof was undergoing repair when the inspection was done. The LMB knew about the repair in advance.

  (a).     The SLSOM Student Handbook had been online for more than five years. A copy was given to the LMB officials.

  (b).     The library was set up. SLSOM had 400 library books and 100 interactive medical CD-ROM's SLSOM expected to have 30-40 students, maximum, at that campus. This represented a book to student ratio of 10:1.

  (c).     SLSOM had two laboratory rooms.  Each laboratory room could accommodate 12 students, or 24 students if working in pairs. The microscopes were displayed in one laboratory, and the stethoscopes, sphygmomanometers, various blood testing kits, centrifuges, stains, chemicals, and other lab equipment was displayed in the other laboratory.

See Exhibit "10"

80.     On Friday morning, March 25, 2005, Dr. Dolphin left Monrovia, traveling by taxi to Roberts International Airport, about 30 miles from downtown Monrovia, to catch an 11 AM flight to Accra, Ghana.  He wanted to be with his wife for Easter Sunday, March 27, 2005.  Just as he was about to board the airplane, several Immigration agents approached him, took him under arrest, took his passport, telephone, and boarding pass.

24

FIRST AMENDED CLASS ACTION COMPLAINT

81.     They did not have a warrant, nor did they give him any reason for his arrest and detention. They escorted him to the Immigration and Naturalization Office at the airport. Despite his pleas to allow him to catch the flight to Ghana so that he could be with his wife for Easter Sunday, they ignored him.

82.     Instead, they called Mohammed Sheriff and the Minister of Justice, Kabinah Janeh, former leader of LURD (Liberians United for Reconciliation and Democracy), one of the rebel coalitions that fought the civil war in 2002 and 2003 in Liberia. Mohammed Sheriff was also a known member of LURD.

83.     The immigration officers did not allow Dr. Dolphin to use his telephone until almost 2 PM, long after the airplane left for Ghana. Dr. Dolphin called Clr. Abdullai and the United States Embassy in Liberia, both of whom told him that it was Friday afternoon, and it was too late to do anything. Nothing could be done until Monday or Tuesday.

84.     On his release by the INS officers at 2:30 PM, Dr. Dolphin took a taxi back to Monrovia, to the Metropolitan Hotel. Without money, and on his word alone, they allowed him to stay at the hotel on his promise that he would pay them by the coming Tuesday. He called the airline to rearrange his flight schedule. Then he called his wife, Susana, who already knew that there was something wrong because Dr. Dolphin's flight should have already arrived in Accra, Ghana, and he would have already been home.

85.     On Monday morning, March 28, 2005, Dr. Dolphin went to the United States Embassy and discussed the situation with several deputy officials at the Embassy, namely William Douglas and Michael Hogan. That afternoon, Dr. Dolphin and Clr. Abdullai met with the Deputy Minister of Justice, Edward Gobah, at the Justice Ministry. Clr. Abdullai first discussed the arrest of Dr. Dolphin and the taking of his passport. Deputy Minister Gobah told Abdullai and Dr. Dolphin that he had

FIRST AMENDED CLASS ACTION COMPLAINT

1  talked with United States Embassy officials regarding the taking of the passport, which was a

2  violation of the Friendship Treaty.

3  86.    Clr. Abdullai then gave Gobah copies of St. Luke School of Medicine's legal documents.

4  After carefully reading the documents, Deputy Minister Gobah went on to tell Clr. Abdullai and Dr.

5
6  Dolphin that "there is no way that the Ministry of Justice would prosecute Dr. Dolphin or St. Luke

7  School of Medicine....... We would lose. St. Luke is a legal entity and a legal university. You have all

8  the required documents. You can teach whatever you choose and anyway you want to teach it."

9  Dr. Dolphin asked "What about online?" Gobah replied saying "Online instruction is not illegal in

10  Liberia. Not even for medicine."

11  87.    Just as important is what Gobah said next. "This is really a fight between Mohammed Sheriff

12  and Peter Coleman. Sheriff hates Coleman. They even had a fist fight once in Dr. Coleman's office."

13
14  He went on to elucidate more about the bad blood between the two. Gobah added "The Ministry of

15  Justice does not want to get involved in what is really a personal dispute that has spilled over into the

16  public eye."

17  88.    Deputy Minister Gobah, then called the Director of Immigration and Naturalization Service,

18  and told him "You know about Dr. Dolphin?" We heard the Director say "yes". "Do you have his

19  passport?" Back came the reply: "Yes." Gobah told him to be in his office in 10 minutes. When the

20
21  INS Director arrived he told him to "give Dr. Dolphin his passport immediately" and to never take it

22  again. The director asked Clr. Abdullai and Dr. Dolphin to come to his office Tuesday afternoon to

23  collect the passport. To which Clr. Abdullai agreed.

24  89.    On Tuesday morning, March 29, 2005, Dr. Dolphin had to go to Western Union to receive

25  money so that he could pay his bill at the Metropolitan Hotel, since it opened at 8:30 AM. He was

26  delayed at the Western Union office in the massive crowd following Easter because the banks and

27  other business were closed for what Liberians call "Easter Monday". Dr. Dukuly kept calling Dr.

28

1  Dolphin, over and over again, because Dukuly had an appointment to keep with Benson Barh and he

2  needed money from Dr. Dolphin. Dr. Dolphin did not leave the Western Union office until 10:45

3  AM. Dr. Dukuly called Dr. Dolphin at 10:50 AM to tell him that if he wasn't there "in 5 minutes it

4  would be too late". Dr. Dolphin had to catch at taxi to the Ministry of Health from downtown

5  Monrovia, which is difficult at any time of the day, especially on a busy day, as it was that morning.

6

7  90.    At 11 AM, another friend of Dr. Dolphin called to tell him that Dr. Benson Barh, the Chief

8  Medical Officer of Liberia and the Secretary of the Liberian Medical Board had called a press

9  conference and was blasting SLSOM in front of 3-dozen reporters at the Ministry of Health

10  conference room. Dr. Dolphin called Dr. Dukuly to find out if it was true. Dr. Dukuly confirmed it

11  saying "I told you to get here." Dr. Dolphin replied, "I couldn't get there any sooner." Benson Barh

12  and Dr. Horatious Browne were conducting a press conference to which they were lying outright

13  about SLSOM. United States Embassy in Liberia officials were also at the press conference. See

14  Exhibit "37". At the conference, Dr. Barh began making false statements about SLSOM, screaming

15  and condemning the school at the top of his voice. At the end of the press conference they called for

16  the arrest of Dr. Dolphin, knowing by sight that Dr. Dolphin was in the conference room to which the

17  reporters looked at Dr. Dolphin for his response, some taking pictures of Dr. Dolphin.  Later United

18  States Embassy officials also told Dr. Dolphin that Barh was lying and that they already knew that he

19  only wanted a bribe. Dr. Dolphin called Clr. Abdullai for consolation. They met at around 4 PM at

20  the INS Office, directly adjacent to the Metropolitan Hotel and waited for the INS Director.

21

22  91.    The INS Director did not show up at his office that Tuesday afternoon or night. Dr. Dolphin

23  and Clr. Abdullai waited until 7:30 PM that evening for the INS Director, nor did he answer his

24  phone. Dr. Dolphin was very worried about the situation because Dr. Dolphin's airline reservation

25  was for the same time, 11 AM, Friday morning. Clr. Abdullai called Deputy Minister Gobah to

26  complain. The INS Director called Abdullai within minutes telling him that Dr. Dolphin should go to

27
28                                              27

the airport Friday and meet a certain Colonel Koteh of the INS, who would give him his passport as he goes through customs. Abdullai agreed and Dr. Dolphin was given the officer's telephone number to call.

92.     Dr. Dolphin bought window glass and had a carpenter complete the window screens on the campus building much of the morning and afternoon of Wednesday, March 30, 2005.  When he returned to his room at the Metropolitan Hotel about 3 PM he laid down  for sleep to be awoken moments later by a knock on his door.  A strange man dressed in jeans and a T-shirt gave Dr. Dolphin a summons from Mohammed Sheriff, Chairman of the NTLA Health and Social Welfare Committee, requesting his appearance at a hearing the same afternoon, at the capitol building at 2 PM. Dr. Dolphin called Clr. Abdullai. The summons should have been delivered much sooner than the day of the hearing, and when the summons was delivered, it was after the hearing started. Dr. Dolphin told the strange man that he would not be coming to the hearing because the summons was delivered too late.

93.     That afternoon Clr. Abdullai wrote to Mohammed Sheriff, stating that delivery of a summons was not proper or enforceable unless it gave proper notice with enough time for the summoned person to acquire adequate legal representation, and time to arrange his affairs. Also in the letter he asked Mohammed Sheriff to consider the ability of Dr. Dolphin to properly comply with the summons.

94.     On the morning of Thursday, March 31, 2005, Dr. Dolphin read the bold front page newspaper headline "Medical Board Threatens to Prosecute Founder of 'Fake' Medical School". It read as follows:

> Medical Board Threatens to Prosecute Founder of 'Fake' Medical School, Alloycious David, Monrovia, Liberia The News, March 31, 2005.

28

Liberia Medical Board has threatened to turn over the founder of the "fake" St. Luke Medical School and his collaborators to the Justice Ministry for prosecution if they continue to "abuse and insult" the integrity and professionalism" of the country's Medical Board.

The Board said it cannot and will not discuss application of any doctor from the Medical School because there is no school in Liberia known as the St. Luke Medical School.

The Board noted that unless the "illegal school" can be accredited, it would not license any doctor that it has given diploma to.

Prof. S. Benson Barh, Chief Medical Officer of Liberia, told reporters Tuesday that the 'counterfeit school' through Dr. Meimei Dukuly presented a list of 19 doctors who reportedly completed studies at St. Luke Medical School for the degree of Doctor of Medicine (MD).

Annoyed over dubious existence of the institution, Dr. Barh said it was shameful to have learned that a list of reported trained doctors, who claimed to have passed through the walls of the school, was presented to the Medical Board.

"We are not aware and have no knowledge of the medical school, but we will rather warn representatives of the bogus school to legally and properly apply to operate a medical institution in Liberia," he stressed.

He, amongst many other things noted, that the Medical Broad visited the school's so-called campus and observed that what it saw does not even represent a status of an elementary school's campus, adding in reality, the building is a "run down" dwelling home under major renovation which lacks electricity, laboratory, class rooms, running water among others basic requirements for a representation of a medical institution...

29

95.     Benson Barh lied.  The previous year, 2004, Dr. Barh consulted for SLSOM to write a document on the equivalence of medical education in Liberia to medical education in the USA for a price of $3000 USD.  SLSOM paid him in full, See Exhibit 38.

96.     Furthermore, Barh failed to add that there was no college or university in Liberia with electricity, functioning laboratories, or running water.  SLSOM had three generators of different capacity for electricity, all wired to the facility; and SLSOM was newly plumbed.  Its laboratories were newly equipped and functional, and it had the only operating computer laboratory in Liberia, all computers were Internet connected.

97.     On Friday morning, April 1, 2005, Dr. Dolphin was served with another summons at 9 AM again, just as he was leaving the Metropolitan Hotel for the airport. The summons was for a hearing by the NTLA-Health and Social Welfare Committee, chaired by Mohammed Sheriff the very same day at 2 PM. Dr. Dolphin told the server that he was not coming and to talk to his attorney, Clr. Abdullai.. Dr. Dolphin proceeded to the airport where he met the Colonel. The Colonel escorted him to the desk of the Customs Department, wherewith he gave Dr. Dolphin his passport and left. Dr. Dolphin called Clr. Abdullai. Dr. Dolphin did not call his wife until the airplane landed in Accra, Ghana.

98.     Dr. Dolphin did not learn until a few weeks later that Mohammed Sheriff still conducted the hearing regarding SLSOM despite the fact that no one on the SLSOM staff was present for questioning. Some reporters who were present at the hearing, at the demand of Mohammed Sheriff, told Dr. Dolphin, later, that it was a "kangaroo court" where Sheriff had a list of 'haters' with prepared statements, with similar statements, almost word-for-word, coming forth to speak against SLSOM. The speakers did not have any facts to accuse SLSOM, only accusations such as "they are harming the people of Liberia", or " St. Luke is a 'fake' school", or " St. Luke School of Medicine does not exist in Liberia".

30

99.     Dr. Dolphin had not seen his wife in almost two months (Susana had a Non-Governmental

Charity in Ghana, and worked occasionally at SLSOM, Ghana). He was enjoying the time he spent

with her and the peace they had in Ghana. However, on Tuesday morning, April 5, 2005 to the

dismay of Clr. Abdullai, he saw the headline of a major newspaper in Monrovia which read as

follows:

Fake Medical College Boss Flees? Mensiegar Karnga, Monrovia, Liberia The Analyst, April

5, 2005.

Dr. Jerroll Dolphin, the proprietor and founder [of] the mysterious St. Luke Medical

College, has reportedly left the country for fear of being prosecuted.

Informed sources say Dr. Dolphin has "surreptitiously" abandoned his Metropolitan

hotel on Broad Street to return home in the United States of America.

There has been intense controversy over the whereabouts of the medical college.

The A. M. Dogliotti College of Medicine had denounced the existence of the alleged

fake college in Liberia, even though the school was successful in granting medical

degrees to Liberians and other foreign nationals most of whom were Nigerians and

Indians.

Defending the existence of St. Luke Medical College in Liberia, the country's Health

Minister, Dr. Peter Coleman told reporter at a new conference that the school was not

a fake one, added that it met the approval of the 57th national Legislative Assembly

during the NPP regime.

Dr. Coleman added that he was unaware whether the institution was registered with

the committee on higher institution.

It appeared that the Health Minister's statement further increases tension with his

professional colleagues at A. M. Dogliotti and the Chairman on Health at the NTLA,

31

1    Dr. Mohammed Sheriff who decided to take legal action against Dr. Dolphin [on

2    behalf of] the medical profession.

3    100.    Clr. Abdullai called Dr. Dolphin in Ghana and told him " Dr. Dolphin, you must come back to

4    Liberia." He explained that without Dr. Dolphin's appearance in Liberia, the public would assume

5    that he is running to avoid prosecution. Indeed, Dr. Dolphin, against the wishes of his wife, agreed to

6
7    return to Liberia.

8    101.    Dr. Dolphin left from Accra, Ghana, to Monrovia, Liberia, the next morning at 7 AM, April 6,

9    2005, and arrived in Monrovia at about 9 AM, and returned to the Metropolitan Hotel.  Once, in

10   Liberia, Dr. Dolphin's mother, Mrs. Ruth Dolphin, called him from Los Angeles to tell him that she

11   was worried.  She told him that there was an article in the Los Angeles Times newspaper stating that

12   he had fled Liberia for fear of prosecution and was 'thought to be hiding' in Los Angeles.

13
14   102.    On Thursday April 7, 2005, Dr. Dolphin was not surprised when he received a summons from

15   Mohammed Sheriff to appear on April 12, 2005 before the NTLA-Health and Social Welfare

16   Committee, NTLA-HSW, one week away. So with the time available to him before the hearing, he

17   and Clr. Abdullai planned on what to do before, during, and after the hearing.

18   103.    Meanwhile, Mohammed Sheriff was also planning. He was pressuring Dr. Isaac Roland to

19   reverse the Statement of Attestation that he recently gave to St. Luke School of Medicine.

20   Threatening Dr. Roland, Sheriff forced Dr. Roland sign a document that was typed on the typewriter

21
22   of the Congressional Office at the Capitol Building. That letter had a devastating effect on SLSOM,

23   an effect that the medical school is still suffering from.

24   104.    On April 11, 2005 the National Commission on Higher Education issued a letter to Madame

25   Carole Bede, which stated SLSOM "does not exist" and was a "computer school." Upon receipt of

26   this letter, the ECFMG-IMED without corroboration of the evidence or claims stated in this letter

27

28                                    32

1   immediately withdrew SLSOM from the IMED, and canceled the USMLE test results for all of its

2   students and graduates, past and present.

3

4

5   105.    On April 12, 2005, at about 3 PM, Dr. Dolphin and Clr. Abdullai went to the Capitol Building

6   to the office of Mohammed Sheriff. The hearing started about 3:30 PM and it was a farce. After being

7   called to order by Mohammed Sheriff, a line of about a dozen people came to speak to the so-called

8   committee that consisted of Sheriff and another LURD member of the NTLA, a friend of Sheriff.

9   106.    The first person to speak was Dr. Kpoto, whom Dr. Dolphin did not know personally. He

10  accused Dr. Dolphin and SLSOM of fraudulently issuing medical diplomas to hundreds of Indians

11  and Liberians 'off the streets', and that SLSOM "does not exist in Liberia." Kpoto offered no proof of

12  his allegations.  Next to speak was Benson Barh who said SLSOM was a 'fake' school and that it

13  "does not exist in Liberia." Several other Liberian doctors, most of whom Dr. Dolphin did not know

14  at all, also came to speak. They all made similar false allegations about SLSOM harming the health

15  and safety of Liberians and that "it does not exist in Liberia." Towards the end of the line was Dr.

16  Isaac Roland, who was shaking. He ended his short speech again with "it does not exist in Liberia."

17  Minister of Education. Dr. Evelyn Kondikai, came to the podium with a canned speech, which also

18  ended with the phrase "it does not exist in Liberia."

19

20

21  107.    In between Kpoto and Kondikai came several doctors that Dr. Dolphin did know, Dr. Dopoe,

22  Dr. Nathanial Bartee, and Dr. J. J. Jones.  Each said they know Dr. Dolphin and they knew about

23  SLSOM and that was all they knew and left the podium.

24  108.    The next to last person to speak was the Minister of Health, Dr. Peter S. Coleman. Dr.

25  Coleman spoke highly of St. Luke School of Medicine for several minutes then he stopped talking

26  and held his head down. Mohammed Sheriff prodded Coleman for a few moments to continue by say

27

28                                              33

1 "and, Dr. Coleman…and Dr. Coleman…" several times. Dr. Coleman looked and Dr. Dolphin and

2 nodded his head, then he looked at Mohammed Sheriff. Mohammed Sheriff said "and, Dr. Coleman",

3 then Dr. Coleman said, "I was misled" and the room went quiet with awe. Dr. Coleman went on to

4 say that his advisers mislead him and he made mistakes in giving SLSOM the support he had given it

5 in the past.

6

7 109.    Dr. Dolphin was shocked and knew that there would be more controversy. After Dr. Coleman

8 was dismissed from the podium, Dr. Dolphin was called to answer questions. Clr. Abdullai objected

9 to many questions. Mohammed Sheriff started to yell at Abdullai saying that he should not be

10 representing Dr. Dolphin. However, neither Clr. Abdullai nor Dr. Dolphin backed down from

11 Mohammed Sheriff or the other member of the committee or some of SLSOM's angry accusers.

12 Towards the end of the hearing, around 6 – 6:30 PM, the advantage had left Mohammed Sheriff and

13 was steadily shifting to the support of Dr. Dolphin.

14

15 110.    Dr. Dolphin told Mohammed Sheriff and the audience that the speakers made allegations

16 about SLSOM, most of them false allegations, and that they had no facts to prove anything about

17 what they were saying. Even Mohammed Sheriff, with all of his allegations had no facts to support

18 his claims and he was only misusing his position in the temporary National Transitional Legislative

19 Assembly to abuse Dr. Dolphin and SLSOM. Sheriff started yelling, threatening to jail Dr. Dolphin

20 for contempt of the NTLA. Dr. Dolphin yelled back saying that he would go to jail, and then to a

21

22 court of law, and, in the court of law, he would put an end to these farce hearings and this 'kangaroo

23 court'.

24 111.    Soon afterward, after 6:30, Mohammed Sheriff adjourned the hearing and told Dr. Dolphin

25 that he must remain in the room because he was "held in contempt" of the NTLA. Abdullai had to

26 leave for another meeting but he reminded Dr. Dolphin of what to do. It was already dark, and the

27 Capitol Building was without electricity. Mohammed Sheriff lit a few candles.

28

34

112.    Soon thereafter, Sheriff and another hoodlum-looking fellow discussed matters amongst themselves for about 10 minutes. Then Mohammed Sheriff came to Dr. Dolphin and said he was going to take my passport. He took Dr. Dolphin's passport saying that he was going to copy it for NTLA purposes and use and left the room. Dr. Dolphin called the United States Embassy, when Sheriff refused to return his passport, and an embassy official answered. Dr. Dolphin told him that he was at the Capitol Building for an NTLA hearing. The official said that he knew Dr. Dolphin and identified himself. Dr. Dolphin explained that he was at the Liberia Capitol building for a NTLA – HSW hearing on SLSOM and that Mohammed Sheriff had taken his passport without his permission. The official asked if Sheriff was available and that he wanted to talk to Sheriff.

113.    Dr. Dolphin called aloud for Sheriff, telling him that a United States Embassy official was on Dolphin's telephone and that the official wanted to speak with Sheriff. When Sheriff took the telephone Dr. Dolphin could hear the United States Embassy officer yelling at Sheriff through his telephone. Sheriff was trying to allege that Dr. Dolphin's school was 'fake' and 'illegal.' However the United States Embassy officer did not want to hear any excuses from Sheriff about taking Dr. Dolphin's passport. After about 10 minutes of listening to the United States Embassy official screaming at Sheriff, Sheriff said "yes, sir" to the official and gave Dr. Dolphin the telephone.

114.    Then he went to another room and returned, and gave Dr. Dolphin his passport. Then Sheriff asked Dr. Dolphin if he could use his telephone to explain something to the US Embassy official, to which Dr. Dolphin refused. After another 30 minutes waiting for Sheriff and his hoodlum-looking friend conversing, Sheriff told Dr. Dolphin that he could leave because he did not want to make Dr. Dolphin a martyr, however, he could not leave Liberia and he would be stopped if he tried.

115.    Outside, waiting for Dr. Dolphin were several reporters who were concerned about Dr. Dolphin being left alone with Mohammed Sheriff. They all took a taxi back to downtown Monrovia and together went to Dr. Dolphin's room at the Metropolitan Hotel. At the Metropolitan Hotel, they

35

talked about Sheriff and what he had been doing since he had been at the NTLA. They said that

Sheriff's concentration had been on upsetting and insulting the Minister of Health, Dr. Peter

Coleman.

116.    On April 14, 2005, Dr. Dolphin went to the United States Embassy in Liberia and reported

what happened at the Capitol Building in the hearing and with Mohammed Sheriff after the hearing.

He opened a "human Rights Violation Report" against Mohammed Sheriff and the Republic of

Liberia.

117.    On April 16, 2005, two of Dr. Dolphin's in-laws from Ghana, Benjamin Ofori-Atta and Fugah

Benoni, came to assist the campus upgrade. They arrived in Liberia on Saturday, April 16, 2005.

Their background was in construction and drafting.

118.    On or about Tuesday April 19, 2005, Dr. Dolphin's two in-laws from Ghana were arrested by

INS agents in the "Red Light" District of Monrovia while shopping for food. They were taken for

questioning to INS Headquarters in downtown Monrovia when they mentioned that they were in

Liberia to work at SLSOM. Clr. Abdullai was called to get the two men out of INS detention. Dr.

Dolphin went to the Ghana High Commission (Embassy) and asked the Ambassador to intervene, to

which he did.

119.    As it turned out the Director of the INS was also a LURD member and a friend to Mohammed

Sheriff. The INS, nightly, before the airplane leaves and after the airplane lands, examines the roster

of every airplane entering or leaving Liberia. Dr. Dolphin's travels to Ghana were always available to

the INS Director, who would contact Mohammed Sheriff, who would insist that the INS Director stop

Dr. Dolphin from traveling.

120.    The INS agents were looking for Dr. Dolphin's in-laws because the immigration records from

the airport stated that they traveled to Liberia for SLSOM business. They were released from INS

FIRST AMENDED CLASS ACTION COMPLAINT

headquarters in the early night. Their passports were seized and they were told, that they would not get their passports back until they proved that they had return tickets to Ghana.

On or around April 20-22, 2005, Dr. Dolphin was contacted by the Hon. Frank Teah and Senator Beatrice Sherman. They were, and still are, officers of SLSOM. Frank Teah and Sen. Sherman told Dr. Dolphin that he was doing the wrong thing by not going to the press to fight the false allegations being made against SLSOM.

121.    Frank Teah gathered together a few honest newspaper reporters to help SLSOM counter the numerous false allegations that were being made to the public through various and numerous newspaper articles and radio broadcasts.

122.    SLSOM was featured in several large newspaper articles that countered the false statements previously made in Liberia's press. Dr. Dolphin, Frank Teah, and Sen. Sherman made sure that they had organized opposition against Mohammed Sheriff and his friends. Most of the pro SLSOM newspaper articles featured pictures of the SLSOM campus, its rooms, equipment, library, computers, and laboratories.

123.    Dr. Dolphin, Frank Teah, and Sen. Sherman spoke on several radio broadcasts and mood was shifting. Teah wanted Dr. Dolphin to understand that in Liberia you must use the press to win support and counter any opposition. Otherwise, once accused, what was said against you would be considered to be true.

124.    On Friday April 22, 2005, Frank Teah, Sen. Sherman, Dr. Dukuly and Dr. Dolphin, all, received summonses from the NTLA-HSW Committee to appear on Tuesday August 26, 2005 for another hearing. SLSOM was supposed to provide documentation on several topics to which Dr. Dolphin said he would refuse to do so.

125.    Earlier that day Dr. Dolphin, Frank Teah and Sen. Sherman were disturbed by the Analyst newspaper's headlines:

FIRST AMENDED CLASS ACTION COMPLAINT

1 | Health Minister Confesses: Says "My Advisers Misled Me", The Analyst, Monrovia, Liberia

2 | April 22, 2005.

3
4
5
6
7
8
9 | After fiercely defending the existence of a purported medical college which his professional colleagues had rowdily denounced, Health Minister Peter S. Coleman now appears to have realized that he was being "misled" by his "expert advisers." Leading members of the Liberia Medical Board had challenged Coleman's claim that the school exists and threatened to "prosecute those attempting to insult the integrity and professionalism of the board."

10
11
12 | Two of the board members, Dr. Benson Barh and Dr. Horatius Brown, told reporters at the Health Ministry that the board "has no knowledge of the existence of a medical school named "St. Luke Medical School" in Liberia.

13
14
15
16
17 | The fiasco about the existence of the college hit the news last January when the Dean of the A. M. Dogliotti College of Medicine, University of Liberia, Dr. Robert Kpoto, who is also a proprietor of the Med-Link Clinic in Monrovia, investigated the entire episode.

18
19
20 | After a careful research, Kpoto discovered that the non-existing medical school was "clandestinely issuing diplomas and medical degrees to Liberians and other foreign nationals to form part of the medical labor force..."

21
22
23
24 | [Health Minister Coleman] declared his intention to "suspend all interactions with St. Luke Medical School effective immediately pending the results of the various inquiries currently underway."

25
26
27 | Coleman also said the ministry will conduct an independent inquiry "to ensure that the procedures and vetting mechanism by which expert advice is preferred for the

28 | 38

FIRST AMENDED CLASS ACTION COMPLAINT

Minister of Health is beyond reproach and that another St. Luke fiasco is never again allowed occurring.

Observers say the Health Minister's latest concession that the St' Luke Medical College does not actually exist seems to have ended the intense controversy over doubts about the school's presence in Liberia.

126.   At no time before, during, or after these announcements did anyone from the Ministry of Health, the NTLA-HSW committee, or from A. M. Dogliotti School of Medicine interview or question any staff member or executive of SLSOM. No one other than Dr. Isaac Roland knew or even asked anything about SLSOM's curriculum, students, or graduates. Nor was any written report about any investigation of SLSOM ever seen by anyone other than, if he did, Mohammed Sheriff. No agency or person who has publicly stated to have investigated SLSOM has ever produced any evidence to newspaper reporters or to a court of law.

127.   On April 23-25, 2005, SLSOM and staff prepared for the hearing to be conducted on April 26, 2005 at the Capitol Building. Parts of the SLSOM campus in Gaye Town were concreted and pavement was placed in areas where needed.

128.   The hearing got started around 2 PM on Tuesday, April 26, 2005. The hearing was held in Mohammed Sheriff's office at the Capitol Building. The room was full of reporters, many with cameras, and a few 'witnesses' that Mohammed Sheriff had brought to impress the reporters. This time everyone was sworn-in by someone holding a Bible. Then there was a prayer ceremony. Dr. Dolphin, Frank Teah, Sen. Sherman, and Dr. Dukuly were in attendance, as were Dr. Dolphin's in-laws, Benjamin Ofori-Atta and Fugah Benoni, both Ghanians appearing as witnesses for SLSOM. A representative of the United States Embassy was also present during the hearing, at Dr. Dolphin's request.

129.     After the prayer Mohammed Sheriff began his 'inquiry' by introducing the Consul General of India. He accused SLSOM of being a 'diploma mill' that sold medical diplomas to more than 700 Indians off of the streets. He offered no proof. Sheriff then called Dr. Dukuly. He questioned the authenticity of Dukuly 's credentials, forgetting that Dr. Dukuly was once the Minister of Health of Liberia. Dukuly informed Sheriff that he was a graduate of Temple University, Philadelphia, Pennsylvania, medical school in 1966.

130.     Then Sheriff turned his attention to the Hon. Frank Teah who answered all questions with authority and facts. Frank Teah was questioned about the each of SLSOM's authorizing legal documents. He gave detailed facts about how each document was approved. Mohammed Sheriff backed off questioning Frank Teah because Sheriff saw the mood of the crowd, and more importantly the mood of the reporters, change to the favor of SLSOM during Teah's questioning..

131.     Then he called Dr. Dolphin's in-laws, who stood up in a corner of the room. He accused them of coming to teach medicine at SLSOM. When they replied that they were construction workers who had come only to help Dr. Dolphin finish the landscaping and fencing for the SLSOM campus in Gaye Town, the audience laughed loudly. Mohammed Sheriff was very embarrassed.

132.     Then Sheriff called Senator Beatrice Sherman to testify. She told how she met Dr. Dolphin and how she, the Hon. Frank Teah, Health Minister Dr. Peter Coleman, and Dr. Dukuly and others worked hard to get the SLSOM charter passed in the congress and senate of Liberia. Then she told of how she carried the Act and Bill to then President Charles Taylor, personally, risking her life due to the heavy fighting in Monrovia during the last days of the civil war in August 2003. She was at Taylor's home when he signed the documents. Then she carried them back to the Capitol Building where the Act and Bill were put into the Congressional and Senatorial records, and then the documents were also officially recorded in the Presidential records and the Ministry of Foreign Affairs.

FIRST AMENDED CLASS ACTION COMPLAINT

133.    Mohammed Sheriff could not continue to question Sen. Sherman because now the mood had shifted even further and the audience turned against Sheriff. Sheriff said loudly "the Act is a fake". Then Sen. Sherman broke a 'bombshell'. She turned to Sheriff and very loudly said, "You are a fake. You asked us for a bribe of $6,000 United States Dollars a month."

134.    The Hon. Frank Teah immediately contributed, yelling, " St. Luke School of Medicine did not want you to be a part of this school. We knew your reputation as a troublemaker. Why would we pay you $6000 a month? Who are you?" The audience went crazy, some reporters accused Sheriff of a vendetta. Dukuly added, "You are the fake. You are not a real doctor. You are only trying to get back at Minister Coleman". Dr. Dolphin yelled "You wanted a $6000 a month bribe from me, and Benson Barh wanted a bribe, too."

135.    The entire room was abuzz. Cameras were flashing. Reporters were running over to Sen. Sherman and Frank Teah for more comments, ignoring Mohammed Sheriff 's call to come to 'order' He immediately called the meeting to adjourn. Dr. Dolphin, Frank Teah, Sen. Sherman, Dr. Dukuly all stepped outside into the hallway to a circus of reporters wanting more information. Mohammed Sheriff walked quickly away to the stairway with a few reporters following him asking questions on the allegations made by Sen. Sherman, Frank Teah, Dr. Dolphin, and Dr. Dukuly.

136.    Needless to say there was no mention of the hearing in any newspaper the next day nor any other day to follow. From that time on, Mohammed Sheriff had difficulty getting any comment about SLSOM into any newspaper in Liberia. Some papers publicly criticized him for threatening to revoke the press passes reporters and newspapers that did not do what he wanted done.

137.    Dr. Dolphin was awakened at about 4 AM on Thursday April 27, 2005 by a call from a St. Luke School of Medicine student in Maryland, Masilomony Pauliah. He told Dr. Dolphin that the ECFMG would not allow him to register for the United States Medical Licensing Examination, USMLE. He said that SLSOM was taken out of the International Medical Education Directory.

41

Dr. Dolphin immediately called Ms. Carole Bede at the Educational Commission for Foreign Medical Graduates in Philadelphia, Pennsylvania. She told Dr. Dolphin that she just received a letter from Dr. Isaac Roland that revoked his previous letter that she received in March 2005. Dr. Dolphin asked her to send a copy of that letter immediately to him for his record.

138.    On 27 April 2005, Carole Bede issued a letter to St. Luke School of Medicine, which states: "On April 25, 2005, FAIMER received a letter dated April 11, 2005 from Isaac Roland, Ed. D. Director General, National Commission on Higher Education, Ministry of Education, Liberia. In his letter, Dr. Roland stated that although the Commission had issued a "letter of attestation to St. Luke School of Medicine," after investigation, it has been determined that St. Luke School of Medicine does not exist in the Republic of Liberia and that "the Secretariat of the National Commission therefore revokes the attestation effective immediately." A copy of this letter is enclosed."

139.    "Therefore, although previously listed in IMED, St. Luke School of Medicine-Liberia is no longer listed in IMED and students and graduates of the school are not eligible for the USMLE or ECFMG certification."

140.    Completely discrediting the documentation ECFMG-FAIMER-IMED received from trustworthy Liberian government officials prior to 2005, ECFMG, with bias removed St. Luke School of Medicine-Liberia from the IMED on April 27, 2005. ECFMG did not bother to corroborate SLSOM's removal with the NCHE, or verify the authenticity of the letter, the only letter concerning SLSOM sent to ECFMG from the NCHE using a typewriter instead of it being a word-processed document..

141.    Several days later Dr. Dolphin received the document that NCHE mailed to the Educational Commission for Foreign Medical Graduates that the ECFMG received on April 25, 2005. The National Commission on Higher Education never sent a copy of this letter to St. Luke School of Medicine, as required by law. See Exhibit "11". Seeing that the press was no longer interested in

42

1  running stories about SLSOM because of its improved relations and because most of the press agents

2  and reporters were witnesses to the 2nd NTLA-Health and Social Welfare Committee hearing where

3  Mohammed Sheriff was accused by SLSOM officers of extortion. Mohammed Sheriff went to the

4  National Transitional Legislative Assembly to do his 'dirty work'.

5

6  142.   Dr. Dolphin was scheduled to leave Liberia Tuesday morning, May 10, 2005. At 6:30 AM.

7  Frank Teah called Dr. Dolphin telling him that he could not leave Liberia. He asked Dr. Dolphin to

8  turn on the radio and listen to any station. Dr. Dolphin did only to hear that the NTLA had ordered

9  the closure of SLSOM and that all property of SLSOM would be seized immediately, and that all

10  officers of SLSOM would be arrested and prosecuted. The radio broadcast went on to say that Dr.

11  Dolphin was prohibited from leaving Liberia and that his passport would be seized and Dr. Dolphin

12  will be arrested at Roberts International Airport. The Dr. Dolphin called Clr. Abdullai, who said he

13  was coming to the SLSOM campus immediately

14

15  143.   Dr. Dolphin told one of his staff members to run and buy a newspaper about St. Luke School

16  of Medicine. When the staff member returned Dr. Dolphin saw the headlines:

17          NTLA Orders 'Bogus' St. Luke University Closed, James West, Liberian Observer,

18          Monrovia, Liberia May 10, 2005.

19              Lawmaking body of Liberia says it has established that the school of medicine is a

20              fake medicine institute, has endangered the health of Liberians.

21

22              Following several weeks of investigation into its operations in Liberia, the National

23              Transitional Legislative Assembly (NTLA) says the management of St. Luke School

24              of Medicine has endangered the health of the public and should be turned over to the

25              Justice Ministry for prosecution.

26              The transitional assembly said it has been established that St. Luke School of

27              Medicine is a fake medical institute and is not a legal establishment.

28                                              43

The NTLA's Joint Committee on Health and Education which conducted the probe recommended to plenary that the purported medical school be closed down immediately and all banks be instructed to freeze their assets pending the conclusion of the Justice Ministry's inquiry.

144.    Frank Teah and Sen. Sherman called Dr. Dolphin telling him that they were lobbying lawmakers in the NTLA and they would vote that morning for reconsideration of the act that was passed late the previous night when most NTLA members had already gone home.

145.    Dr. Dolphin told his in-laws, Benjamin Ofori-Atta and Fugah Benoni to go on to the airport and fly to Ghana. When Abdullai arrived, he got into the waiting taxi and escorted Dr. Dolphin's in-laws to the airport in case there was any trouble. Dr. Dolphin called his wife to tell her what was happening and waited for Frank Teah and Sen. Sherman to call.

146.    About noon, Frank Teah and Sen. Sherman, again, called Dr. Dolphin to tell him that the NTLA did vote in favor of a reconsideration of the Act, and that the Act was tabled and would not be reconsidered for at least 30 days. As it turned out the act was never reconsidered and Sheriff was removed as Chairman of the NTLA-Health and Social Welfare Committee in June 2005. From then, he served as Chairman of the NTLA – Executive Committee that interfaced with the National Transitional Government President Gyude Bryant.

147.    Dr. Dolphin, nor SLSOM, nor any of its officials were ever investigated or charged for any crime by the Justice Ministry, however, because of the threats of Mohammed Sheriff, Benson Barh, and other Liberian government officials, Dr. Dolphin had lived in fear, and still lives in fear.

148.    On or around June 2005, Mohammed Sheriff did not waste time. He announced the formation of a "5-member Executive Committee" to study St. Luke School of Medicine. The five-members included:

    1.    Soko V. Sackor, LURD, NTLA Assemblyman

FIRST AMENDED CLASS ACTION COMPLAINT

2.    Kabinah Janneh, LURD, Minister of Justice

3.    Vamba Kanneh , LURD, Minister of Transportation

4.    Dr. Evelyn Kondikai, Minister of Education

5.    Dr. Peter Coleman, Minister of Healthcare

149.    During the interim period Frank Teah, Sen. Sherman, Dr. Dolphin, and Dr. Dukuly worked to get the NTLA to approve the reconsideration. However, Mohammed Sheriff lobbied very hard to postpone the vote. Dr. Dolphin was forbidden to leave Liberia, constantly under threat, public and private by Mohammed Sheriff.

150.    On July 13, 2005, within 3-weeks of its formation, the "Five-Member Committee", approve a report concerning SLSOM. Through the Ministry of Information on Friday, July 15, 2005 the announcement below was broadcast on radio and television throughout Liberia. It was also published in the newspapers on Tuesday, July 19, 2005:

> Gov't Finally Closes St. Luke, Monrovia, Liberia The Inquirer, July 19, 2005.
>
> The Government of Liberia has ordered the immediate closure of the St. Luke School of Medicine for illegally operating in the country.
>
> According to an Information Ministry release issued over the weekend, the government's decision is based on the findings and recommendations of a five-member committee constituted last March to probe the existence of St. Luke.
>
> A full criminal investigation is to be conducted against the proprietor of the school and others who may have knowingly aided the process of opening the school.
>
> All medical degrees issued by St. Luke School of Medicine are nullified and the school pronounced non-existent in Liberia, in keeping with the committee's recommendations approved by the Chairman of the National Transitional Government of Liberia, His Excellency Charles Gyude Bryant.

45

1    The committee had observed that an Act to Incorporate St. Luke was approved in
2    2003, but was never enacted by the legislature in session.

3    The cabinet committee further observed that the St. Luke School issued medical
4    degrees in December 2001, January 2002, June 2002, August 2002, February 2003
5    and June 2003 when Monrovia was under attack.
6
7    The Cabinet Committee chaired by Justice Minister Kabinah Ja'neh, included
8    Education Minister Evelyn Kandakai, Transport Minister Vamba Kanneh, Health
9    Minister Peter Coleman and the Director General of the Cabinet, Soko V. Sackor.

10   151.   On July 21, 2005, SLSOM filed a "Writ of Prohibition" in Liberia's Supreme Court against
11   the Liberian Government seeking redress against the false claims made by Liberian government
12   officials that SLSOM "does not exist" and prohibit further actions against SLSOM by the
13   government. The defendants named were the Minister of Justice, the Minister of Education, The
14   Five-Member Committee chaired by the Justice Minister, and any other Liberian agency.  See Exhibit
15   "12"
16

17   152.   On the same day, July 21, 2005, simultaneously to SLSOM filing a "Writ of Prohibition" in
18   Liberia's Supreme Court against the Liberian Government, the Minister of Justice, the Minister of
19   Information, and Mr. Mohammed Sheriff accompanied by more than 2-dozen members of the Liberia
20   National Police illegally raided the SLSOM campus, declared "non-existent" by select Liberian
21   government officials, and arrested an innocent SLSOM employee, Jessie Sackie, who was held
22   illegally for 24 hours.
23

24   153.   They were looking to arrest and detain Dr. Dolphin, who was filing at the Supreme Court of
25   Liberia.  Note that the Minister of Justice and the Minister of Information were members or the Five-
26   member committee, members of LURD, and friends of Mohammed Sheriff.  They did not present a
27   warrant to enter and search the SLSOM premises, nor to arrest Jessie Sackie or Dr. Dolphin.
28

Dr. Dolphin went into hiding. With the aid of a friend, Dr. Dolphin hid for the next two days outside of Monrovia until July 23, 2005, venturing into Monrovia to conduct SLSOM's business hidden under a cloth in a friend's car.

154.    On July 22, 2005, the Supreme Court issued an Order to Show Cause that prohibited the Liberian government from taking action against SLSOM. The 'show cause' hearing was scheduled for Monday, July 24, 2005. A Supreme Court justice ordered the Minister of Justice by telephone to release the SLSOM employee, Jessie Sackie. See Exhibit "14"

155.    On July 24, 2005, only SLSOM attorneys and officials showed for the 'show cause' hearing. The order to 'prohibit Liberian government action against SLSOM was extended. Another hearing on the "Writ of Prohibition" was scheduled for August 4, 2005.

156.    On August 4, 2005, only SLSOM attorneys and officials showed for the 'Writ of Prohibition' hearing. The order to 'prohibit Liberian government action against St. Luke School of Medicine was extended, and another hearing on the "Writ of Prohibition" was scheduled for August 10, 2005 to which all defendants were duly served notices to appear by the Colonel Amos Dixon of the Court Marshall's Office. See Exhibit "15".

157.    On August 10, 2005, only SLSOM attorneys and officials showed for the 'Writ of Prohibition' hearing. The Supreme Court granted relief to SLSOM, ordering all agencies of the Liberian government to restore SLSOM to "status quo ante", that being an accredited medical school, complete with a charter, and an attestation. Additionally, the Supreme Court permanently ordered to "prohibit Liberian government action against SLSOM". A final Supreme Court hearing was scheduled on August 20, 2005 to which all defendants were duly served notices to appear by the Colonel Amos Dixon of the Court Marshall's Office.. An original copy of this order was sent to Madame Carole Bede at ECFMG, which was ignored. See Exhibit "16"

47

158.   On August 20, 2005, only St. Luke School of Medicine attorneys and officials showed for the 'Writ of Prohibition' hearings. On August 22, 2005, the Supreme Court granted SLSOM a "Clerk's Certificate", a default certificate indicating that Liberian government failed to respond or petition against SLSOM's "Writ of Prohibition." See Exhibit "17". All of the defendants were duly served copies of the "Clerk's Certificate" by the General Amos Dixon of the Court Marshall's Office on two occasions.

159.   Madame Carole Bede at ECFMG, told Dr. Dolphin both by telephone and by e-mail that she would not comply with the Supreme Court order in September 2005.  ECFMG would change SLSOM's status on the IMED only if it received instructions from the NCHE.  Dr. Dolphin objected stating that it was the very same organization that sent the false documentation in the first place.

160.   [Reserved]

161.   On October 3, 2005, the National Commission on Higher Education for Liberia sent a letter to ECFMG:

"Based upon the ruling of the Supreme Court of the Republic of Liberia regarding St. Luke School of Medicine, the court has ordered the medical school reinstated to its previous status it was during the accreditation process."

"Abiding by the Supreme Court Order, the National Commission on Higher Education hereby revokes the letter, dated April 11, 2005 (paragraph 12), which denied the existence of St. Luke School of Medicine and further advises that it should continue its existence" .........

"We also request that the St. Luke School of Medicine be included in the International Medical Education Directory as it was previously."

See Exhibit "18"

FIRST AMENDED CLASS ACTION COMPLAINT

162.   ECFMG completely disregarded the NCHE letter. SLSOM was not listed on the IMED as it was previously, and has not been since.

163.   [Reserved]

164.   After staying only six days in Los Angeles, he returned to Ghana, where his wife insisted that he recover from the trauma he experienced in Liberia before returning. He returned to Liberia the third Tuesday of November 2005.

165.   On December 7 2005, the National Commission on Higher Education for Liberia sent another letter to ECFMG:

> "that a campus of the St. Luke School of Medicine has been formally established in Gaye Town, Monrovia. The National Commission on Higher Education has inspected the campus before, and re-inspected it recently, and found it to be satisfactory and ready to operate."

See Exhibit "19"

166.   On 26 January 2006, Carole Bede representing Foundation for Advancement of International Medical Education and Research, Philadelphia, PA, issued a letter to Dr. Isaac Roland, National Commission on Higher Education, Republic of Liberia, which stated:

> 1.   "What is the status of medical degrees awarded by St. Luke School of Medicine for the years 2000 to 2005? Are holders of degrees issued during those years recognized as physicians by the government of Liberia, and are they eligible to apply for medical licensure in Liberia?
>
> 2.   Are graduates of St. Luke School of Medicine who receive their medical degrees beginning January 2006 eligible for medical licensure in Liberia? If so, as of what date are (or will) these graduates be eligible for medical licensure in Liberia?
>
> 3.   Please confirm that instruction has begun at the campus of St. Luke School of Medicine in Gaye Town, Monrovia, and the date on which instruction began.

49

167.     The National Commission on Higher Education, NCHE, has NEVER replied to, or answered this inquiry from Madame Carole Bede, of the Foundation for Advancement of International Education and Research, FAIMER, an ECFMG foundation. Similar questions about SLSOM's accreditation and campus were answered in a March 12, 2005, letter to ECFMG. See Exhibit "13"

168.     In the meanwhile, on December 30, 2005, Dr. Dolphin was informed that his mother, Mrs. Ruth Dolphin, died at an Inglewood, California hospital on December 29, 2005 from a stroke. Dr. Dolphin now being a pauper, Dr. Dolphin's family bought return airplane tickets for Dr. Dolphin and his wife, Susana, to come to Los Angeles to attend his mother's funeral scheduled for Saturday, January 7, 2006. Dr. Dolphin and his wife, both traumatized by the experience in Liberia, stayed in Los Angeles until the middle of February 2006. Dr. Dolphin, almost immediately after his arrival in Accra, Ghana, left for Monrovia, Liberia to further continue with SLSOM's business there.

169.     In February 2006, SLSOM bought two acres of land along the highway between Monrovia and Roberts Intentional Airport. It is across the highway from the military base and the new campus of the Methodist University.

170.     In March 2006, Dr. Dolphin filed for a building permit on the SLSOM land for a 15,000 building for basic sciences. The Department of Public Works would not give SLSOM the building permit because the Director knew of the SLSOM controversy. SLSOM did not obtain the building permit until July 2007.

171.     In June 2006, the Liberian President Ellen Johnson-Sirleaf dismissed several government officials for "acts of impropriety."

172.     One of the officials dismissed, Dr. Benson Barh, Chief Medical Officer and Executive Secretary of the Liberian Medical Board, was a primary government official involved with misrepresenting SLSOM's Liberia Accreditation and Charter status worldwide. See Exhibit "20"

FIRST AMENDED CLASS ACTION COMPLAINT