FILED

1   JERROLL DOLPHIN, M.D.
    P.O. BOX 941009
2   Los Angeles, CA 90064
3   310-384-4483
    IN PRO PER

2010 JUL -2  PM 4:09

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY_____

4

5

6              UNITED STATES DISTRICT COURT

7              CENTRAL DISTRICT OF CALIFORNIA

8   ST. LUKE SCHOOL OF          Case No.: 10-CV-1791 RGK
                                (SHx)
9   MEDICINE, et al,
                                PLAINTIFF'S
10          Plaintiff,          OPPOSITION TO
                                DEFENDANT
11       vs.                    UNIVERSITY OF
                                ILLINOIS MOTION TO
12   REPUBLIC OF LIBERIA, et al, DISMISS FOR LACK OF
                                JURISDICTION AND
13          Defendant           FAILURE TO STATE A
                                CLAIM
14
                                DECLARATION BY
15                              JERROLL DOLPHIN IN
                                SUPPORT THEREOF
16
                                DATE:   JULY 6, 2010
17                              TIME:   9:00 AM
                                CRT:    850
18

19   PLAINTIFF'S OPPOSITION

20

21   **TABLE OF AUTHORITIES**

22

23   **FEDERAL CASES**

24   Louisiana State Board of Education of Baker (denial of education)
     (1964, CA5 La) 339 F2d 911
25   Gagne v Maher
26   (1979. CA2 Conn) 594 F2d 336, affd (1980) 448 US 122, 65 L Ed 2d 653, 100 S C
27   t 2570
28

1  Wilson v Beebe

2  (1985, CA6 Mich) 770 F2d 578
   Will v. Michigan Dept. Of State Police

3  491 U. S. 58 (1989)

4  Griffin v. Breckenridge

5  403 U.S. 88 (1971)

6  Means v. Wilson

7  522 F. 2d 833
   Collins v. Hardyman

8  341 U.S. 651 (1951)

9  Tenney v. Brandhove

10 341 U.S. 367 (1951)

11 United Bhd. of Carpenters & Joiners, Local 610 v. Scott

12 463 U.S. 825; 103 S. Ct. 3352; 77 L. Ed. 2d 1049
   Continental Ins. Co. v Illinois Dep't of Transp

13
   (1983, CA7 Ill) 709 F2d  471.
14 Wisconsin v. Constantineau

15 400 U.S. 433; 91 S. Ct. 507

16 Melinda Benton v Oregon Student Assistance Commission, Oregon Office of
       Degree Authorization, and Alan Contreras
17
   421 F.3d 901, 2005 U. S. App. Lexis 18301
18

19

20

21 **RULES**

22 Federal Rules of Civil Procedure        Rule 8(a)(2)

23 Federal Rules of Civil Procedure        Rule 8(d)(1)

24 Federal Rules of Civil Procedure        Rule 8(e)(2)

25 Federal Rules of Civil Procedure        Rule 11

26

27 **RULES**

28 Local Rule 23-2

**CONSTITUTIONAL PROVISIONS**

U.S. Constitution Amendments      1, 3,  4, 5,  6, 7, 8, 9, 10, 11 and 14

**PLAINTIFF'S EXHIBITS**

EXHIBIT A

EXHIBIT B

EXHIBIT C

EXHIBIT D

EXHIBIT E

EXHIBIT F

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.  INTRODUCTION

Plaintiffs' 71-page, 211-paragraph [First Amended] Class Action Complaint (hereinafter "complaint") does state more than ten causes of action against a dozen different defendants, ranging from the government of Liberia and its current or former officials, to the University of Illinois and one of its professors. The defendant is responsible for the tortious acts of its employees.  The plaintiff and his counsel did not have to accept the position of the defendant.  Therefore, sanctions are not warranted, since plaintiffs have filed and are litigating this action in good faith. Consequently, Defendant's motion in its entirety, including its request for sanctions, should be denied.

## II. FACTUAL BACKGROUND

Contrary to the defendants Motion to Dismiss, SLSOM was an accredited medical school in the Republic of Liberia.  Furthermore, it obtained its "charter" in the Republic of Liberia, Exhibit 31, Legislative Enactment, signed by President Charles Taylor in August 2003, Exhibit 4, President Signed SLSOM Charter Act in August 2003.

SLSOM operated without disruption until September 2004.  Until that time, SLSOM was listed as an accredited medical school on the website of the Embassy of Liberia, Washington D.C.  In September 2004, SLSOM was attacked by officials of the National Transitional Legislative Assembly (NTLA) who were members of a rebel group LURD, an opposition group that fought against the government of Charles Taylor.  The Liberian Embassy in Washington DC, posted the 'Disclaimer', FAC Exhibit 6.

1

2  The Educational Commission for Foreign Medical Graduates (ECFMG), through

3  controversy on the Internet, removed SLSOM from the International Medical

4  Education Directory (IMED) in January 2005. The National Commission on

5  Higher Education (NCHE) of the Republic of Liberia requested the ECFMG to

6  include SLSOM in the IMED in March 2005.

7

8  Then, the NCHE sent a fraudulent letter to the ECFMG in April 2005 claiming that

9  SLSOM was a "computer school" and the ECFMG removed SLSOM from the

10  IMED.

11

12  In July 2005, SLSOM filed a Writ of Prohibition in the Supreme Court of Liberia

13  against the Government of Liberia requesting an end to the harassment of SLSOM

14  and the restoration of its status. The Government of Liberia failed to respond to

15  the summons and complaint.

16

17  In August 2005, the Liberian Supreme Court ordered a "return to status quo ante"

18  and issued a stay order to the Republic of Liberia that "no further action" is taken

19  against SLSOM. SLSOM was also awarded a "Clerk's Certificate" (default

20  certificate) because the government failed to make an argument against SLSOM's

21  complaint even though it was summonsed to four different hearings.

22

23  Despite receiving two requests from the NCHE and despite receiving the Liberian

24  Supreme Court Order from September through December 2005, the ECFMG

25  refused to restore SLSOM listing on the IMED, even until now.

26

27  In September 2006, SLSOM initiated a "Damages for Wrong" lawsuit against the

28  Republic of Liberia in the Civil Court of the Republic of Liberia. The Republic of

1    Liberia defaulted and SLSOM was awarded another "Clerk's Certificate" in
2    October 2006.

3

4    However, neither the Liberian Supreme Court nor the Civil Court has met for a
5    judgment due to maneuvering of those same Liberian officials who were sued.

6

7    In summary of the events in Liberia, the Liberian government has not complied
8    with their own Supreme Court's order to restore SLSOM's status to "status quo
9    ante"

10

11   SLSOM's complaint does not assert that Gollin relied on information from the
12   Liberian government.  It asserts that Gollin relied on false information from
13   Internet articles about SLSOM to compile the false information he posted about
14   SLSOM on the Internet and elsewhere.  SLSOM in its lawsuit and complaint has
15   displayed all the official, legal, and judicial governmental information authorizing
16   SLSOM's existence and accreditation in Liberia.

17

18   Furthermore, SLSOM asserts that Gollin knew that SLSOM had obtained a default
19   certificate and an order to restore its accreditation and status from the Liberia
20   Supreme Court in 2005, and further Gollin knew that SLSOM had also obtained a
21   default certificate in its civil court "Damages for Wrong" lawsuit against the
22   Republic of Liberia in 2006.

23

24   The defendant's assertion that SLSOM has graduated medical doctor candidates
25   who have never actually attend classes is absolutely false and is an attempt by the
26   defendant to bias this court through fear.  SLSOM has never graduated anyone who
27   has not completed appropriate course work and it welcomes the opportunity to
28   present evidence before a jury of this court.

SLSOM and Dr. Jerroll Dolphin sued the Republic of Liberia in two court cases in Liberia. If SLSOM or Dr. Dolphin had committed any fraud, issued any phony diplomas, graduated medical doctor candidates who never attended classes, or graduated medical doctor candidates on Internet studies alone.

The Republic of Liberia had the opportunity to present its case of claims against SLSOM in both the Supreme Court and the Civil Court of the Republic of Liberia. The Government of Liberia did not present any case at all against SLSOM in either court lawsuit, but instead defaulted.

This plaintiff asks this honorable court if newspaper and Internet articles quotations posted by Dr. Gollin (and ostensibly supported by the University of Illinois) have precedent over official court documents? Again, the unproven statements made by the defendant are an effort of the defendant to bias the court with fear.

## III.   LEGAL STANDARD

The plaintiff's complaint is not a mindless "rambling" of facts against the University of Illinois and 11 other defendants in violation of Rule 8 of the Federal rules of Civil Procedure and the sovereign immunities clause of the 11th Amendment to the United States constitution. The plaintiff's complaint sets out in specific detail all the events that showed the violations of the law and theirs rights by the country of Liberia and all the other defendant's that violated their rights, including Dr. Gollin and the University of Illinois. On the contrary, the cause of action against the University of Illinois is focused. U.S. Const. amend. XI does not bar an action against a state official or employee individually for his tortious

1  conduct. The University of Illinois was complicit in its support of the actions of

2  Professor George Gollin in his tortious acts of:

3  1.  Trade libel against St. Luke School of Medicine (SLSOM) and libel against

4      Dr. Jerroll Dolphin.  When a person acting under color of state law violates

5      rights embodied in a substantive guarantee of the Constitution, such as the

6      Amendments 1, 3, 4, 5, 6, 7, 8, and 9, it makes no difference that the state

7      affords a remedy; the victim may choose to pursue his federal remedy under

8      42 U.S.C.S. § 1983, without resorting to the courts of the state. Will v.

9      Michigan Dept. Of State Police 491 U. S. 58 (1989), Wilson v Beebe (1985,

10     CA6 Mich) 770 F2d 578 and Wisconsin v. Constantineau 400 U.S. 433; 91

11     S. Ct. 507.

12 2.  Intentional Interference with Prospective Business

13     Advantage. The court recognizes a cause of action

14     under 42 U.S.C.S. § 1983 for the intentional

15     deprivation of a liberty interest by one acting

16     under color of state law. Will v. Michigan Dept. Of State

17     Police 491 U. S. 58 (1989), Wilson v Beebe (1985, CA6 Mich) 770 F2d 578

18     and Wisconsin v. Constantineau 400 U.S. 433; 91 S. Ct. 507.

19 3.  Negligence. All of Professor Gollin's misrepresentations were made under

20     the authority and power of the University of Illinois, an arm of the State of

21     Illinois.  The University has the responsibility to assure the public that the

22     rights of all citizens and residents of the United States are not violated by its

23     agencies, officers, and employees under the provisions of Amendments 1, 3,

24     4, 5, 6, 7, 8, and 9, and the jurisdiction of federal court is provided by

25     Amendment 14.

26 4.  Loss of Consortium. 42 U.S.C.S. § 1983 is implicated only when the acts of

27     a defendant under color of state law violate rights protected by the

28     constitution or laws of the United States, specifically the pursuit of

happiness.  Dr. Dolphin's wife stated that the sole reason for her divorce from Dr. Dolphin was the publication in Ghana of the 91-page document sent by Professor Gollin to the National Accreditation Board of Ghana in October or November 2009.  Gagne v Maher (1979, CA2 Conn) 594 F2d 336, affd (1980) 448 US 122, 65 L Ed 2d 653, 100 S Ct 2570.

5.     Deprivation of Due Process (see III. LEGAL STANDARD, A. Deprivation of Due Process, below)

6.     Denial of Equal Protection (see IV. PLAINTIFF'S CAN PURSUE A FEDERAL COURT ACTION AGAINST THE UNIVERSITY OF ILLINOIS AS A MATTER OF LAW, below)

7.     Conspiracy to Commit Civil Rights Violations.  Since 2003, Professor George Gollin, "Professor of Physics, University of Illinois, Champaign-Urbana", and Alan Contreras, Director of the Oregon ODA, have conspired against SLSOM by placing SLSOM on the ODA's "diploma mill" list without due cause and without due process of law.  Griffin v. Breckenridge 403 U.S. 88 (1971)  On or about October and November of 2009, Professor George Gollin and Dr. Brad Schwartz (both of the University of Illinois), and Alan Contreras (State of Oregon, Office of Degree Authorization) all conspired to violate the civil rights of Dr. Jerroll Dolphin and the owners of SLSOM, by sending defaming documents and letter to the Republic of Ghana in an effort to deprive the plaintiffs of their civil rights.  United Bhd. of Carpenters & Joiners, Local 610 v. Scott 463 U.S. 825; 103 S. Ct. 3352; 77 L. Ed. 2d 1049.  Please see Exhibits A, B, C, D, E, and F attached to this Reply.  These actions also violate United States criminal codes

- TITLE 18, PART I, CHAPTER 13 § 241 Conspiracy to Commit Human Rights Violations. "If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment

of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured".

- TITLE 18, PART I, CHAPTER 41 § 876. Mailing threatening communications "(d) Whoever, with intent to extort from any person any money or other thing of value, knowingly so deposits or causes to be delivered, as aforesaid, any communication, with or without a name or designating mark subscribed thereto, addressed to any other person and containing any threat to injure the property or reputation of the addressee or of another, or the reputation of a deceased person, or any threat to accuse the addressee or any other person of a crime, shall be fined under this title or imprisoned not more than two years, or both."

- TITLE 18, PART I, CHAPTER 41 § 878. Threats and extortion against foreign officials, official guests, or internationally protected persons

    (a) Whoever knowingly and willfully threatens to violate section 112, 1116, or 1201 shall be fined under this title or imprisoned not more than five years, or both, except that imprisonment for a threatened assault shall not exceed three years.

    (b) Whoever in connection with any violation of subsection (a) or actual violation of section 112, 1116, or 1201 makes any extortionate demand shall be fined under this title or imprisoned not more than twenty years, or both.

8. Intentional Infliction of Emotional Distress & Negligent Infliction of Emotional Distress. United States Constitution, Amendments and 14.

9.    Internet Stalking.  Professor Gollin in the 91-page document that he sent to the Ghana National Accreditation Board surely demonstrates the crime of Internet Stalking.

10.   The Federal Courts have already ruled that the Oregon Student Assistance Commission, Office of Degree Authorization has committed Civil Rights violations on a previous occasions. Melinda Benton v Oregon Student Assistance Commission, Oregon Office of Degree Authorization, and Alan Contreras, 421 F.3d 901, 2005 U. S. App. Lexis 18301.

## A.    *Deprivation of Due Process*

Professor Gollin has more than 800 defamatory postings online against the plaintiffs.  In all of his postings, he uses "Professor of Physics, University of Illinois, Champaign-Urbana". In 2003 the University of Illinois told Dr. Gollin to stop posting his list of "Diploma Mills" to avoid potential lawsuits (FAC ¶¶ 179(p), 195(p)). The University of Illinois has negligently violated the civil rights of Dr. Dolphin and the owners of SLSOM by permitting the use of its authority and power by its employees to commit grivious infringement of rights of the plaintiffs by law.

The "diploma mill" list that the University of Illinois ordered Dr. Gollin to remove from the University's website in 2003 was moved to the Oregon's Office of Degree Authorization (ODA) website. The ODA's website states that the authority and definitions of "diploma mills" and "fraudulent schools" in contained on the University of Illinois website.  The ODA's "diploma mill" list, authored by Dr. Gollin, is referenced as the source of unapproved colleges and universities by the states of Texas, Maine, Michigan, Indiana, North Dakota, and numerous other states and foreign countries.

In some states such as Oregon and Texas, it is a **crime** to use diplomas from the schools on the "diploma mill" list and the graduate may face prosecution. The use of this list, produced by Dr. Gollin and supported by the University of Illinois, improperly sanctions the schools, their students and graduates without due process of the law. Tenney v. Brandhove , 341 U.S. 367 (1951) and Collins v. Hardyman 341 U.S. 651 (1951). Consequently, the schools, their students and graduates are denied

- rights to education, Louisiana State Board of Education of Baker (1964, CA5 L a) 339 F2d  911
- right to employment and opportunity,
- pursuit of happiness,
- due process, Tenney v. Brandhove, Collins v. Hardyman
- equal protection, Griffin v. Breckenridge
- and rights to assemble

The schools on the "diploma mill" list, their students and graduates are subject to
- Harassment
- Prosecution to felony or misdemeanor charges
- Fines or imprisonment

All the above violations of are done without due process of law.

The use of the "diploma mill" list, authored by Professor Gollin and endorsed and supported by the University of Illinois, Oregon, Texas, Maine, Michigan, Indiana, North Dakota and other violates the rights protected by the Bill of Rights, Bill of Rights, of Amendments 1, 3, 4, 5, 6, 7, 8, and 9 of the United States Constitution to which the 14th amendment authorizes the jurisdiction of violations of these protected rights be in the federal courts.

Again, contrary to the defendant's statements, although normally the University of Illinois may be entitled to immunity from lawsuits in federal court under the 11th Amendment of the United States Constitution, all violations of civil rights are entitled to be heard in United States Federal Court in accordance to the 14th Amendment of the United States Constitution.

## IV.   PLAINTIFF'S CAN PURSUE A FEDERAL COURT ACTION AGAINST THE UNIVERSITY OF ILLINOIS AS A MATTER OF LAW

The defendant is wrong.  Regents of the University of California v John Doe, Thompson v. City of Los Angeles, Cannon v University of Health Sciences/the Chicago Medical School and other cases cited by the defendant are not dispositive of this issue. Although these cases stand for the proposition that in certain circumstances sovereigns are entitled to immunity, they do not stand for the proposition that in all circumstances a sovereign cannot be sued in a federal forum.

The law is clear that a sovereign that has condoned civil rights violations and other tortious conduct of one of its employees (professors and officers of the state) can be sued in the federal court. TITLE 18, PART I, CHAPTER 13 § 242, Deprivation of rights under color of law. "Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined under this title or imprisoned not more than one year, or both …….".  Consequently, this honorable Federal Court has jurisdiction over the subject matter and person of the University of Illinois, so, accordingly, the University should not be dismissed.

The defendant implicitly concedes that sovereign immunity is not applicable. Then defendant goes to their fall-back argument, that the complaint violates Rule 8

of the Federal Rules of Civil Procedure, as not setting forth "a short and plain statement of the claim showing that the pleader is entitled to relief".

Although, the complaint is long and complex it was necessary to present the case in that manner. Each and every defendant is put on notice of what the claims are, and how they are implicated in the claims and the damages being sought. All plaintiffs, Dr. Dolphin, SLSOM, its students and graduates are clearly included in the tortious wrong doings of the defendants in this complaint.  The torts committed by the Liberian defendants violated the plaintiff's rights:

- rights to education, Louisiana State Board of Education of Baker (1964, CA5 L a) 339 F2d  911
- right to employment and opportunity, and the pursuit of happiness
- pursuit of happiness,
- denial of Due Process, Tenney v. Brandhove, Collins v. Hardyman.
- Denial of Equal Protection, Griffin v. Breckenridge
- Conspiracy to Commit Civil Rights Violations, United Bhd. of Carpenters & Joiners, Local 610 v. Scott
- Intentional Infliction of Emotional Distress,
- Negligent Infliction of Emotional Distress,
- and rights to assemble.

The University of Illinois, in its actual support, or its negligent support, of George Gollin furthered the Liberians extortion and bribery attempt of Dolphin and SLSOM, and therefore violated the very same civil rights.  Therefore, the proper jurisdiction is in the federal court, according to the 14th amendment.

### B. Plaintiffs Have Properly Alleged A Class Action

The defendant is clearly wrong.  The complaint states that the students, graduates and undergraduates of SLSOM are suing as plaintiffs.  They are the defined class

are required by law. Consequently, Local Rule 23-2 and Rule 12(f) are not violated.

All plaintiffs, particularly the students have been denied or subjected to

- rights to education, Louisiana State Board of Education of Baker (1964, CA5 L a) 339 F2d 911
- right to employment and opportunity,
- pursuit of happiness,
- denial of Due Process, Tenney v. Brandhove, Collins v. Hardyman
- Denial of Equal Protection, Griffin v. Breckenridge
- Conspiracy to Commit Civil Rights Violations, United Bhd. of Carpenters & Joiners, Local 610 v. Scott, Means v. Wilson 522 F. 2d 833
- Intentional Infliction of Emotional Distress,
- Negligent Infliction of Emotional Distress,
- And the right to assemble.

## C. Sanctions are not Proper

Although Plaintiff's counsel did not accept defendant's position there is no legal theory that says plaintiff's counsel has to accept a defendant's position or suffer sanctions. Defendant has argued its position but their said position is not controlling. The Plaintiffs have complied with Federal rules and are entitled to have their case decided on its merits. Therefore, defendant's request for sanctions in all forms should be denied.

The Plaintiff seeks injunctive, declaratory, equitable relief and other relief as available to this honorable court.

# V. PLAINTIFFS' COMPLAINT DOES SATISFY BASIC PLEADING REQUIREMENTS

The defendant is wrong.  The plaintiff has followed the rules. The plaintiff's lack of experience or lack of knowledge of law has compelled the plaintiff to write more detail into his complaint.

The Federal Rules do not require the claimant to detail the facts upon which he bases his claim. They only require a "short and plain statement of the claim" that will give fair notice to the Defendants of the claim and the grounds on which it rests. The Forms in the rules are an example. Any further facts needed to more narrowly define the scope of the claim and the possible defenses can be obtained through pretrial discovery. Rule 8(f) states that all pleadings shall be "construed as to do substantial justice." Thus, their purpose is to facilitate a proper decision on the merits, not to become a deceptive trap for the less skilled litigant.

I. Multiple Claims

A. Rule 8(e)(2) allows a party to set forth two or more statements of a claim in the alternative, either in one or more separate counts or defenses.

    1.    assists a plaintiff who may be genuinely uncertain about what substantive law will apply, and what he will have to prove.

    2.    the pleader can take any version of the claim.

B. Definition of a Claim

    1.    analogous to "cause of action"

    2.    can be defined either by a single legal theory or a single natural grouping of events.

        a.    Rule 18(a) minimizes the distinction by permitting a plaintiff to join all of his claims either independently or in the alternative.

C. Consistency

1.   Rule 8(e)(2) allows a party to claim as many separate claims as he has regardless of consistency.

2.   Rule 11 requires that the signature constitute a certification that there is good ground to support it and that it is not interposed for improper purpose.

## VI. CONCLUSION

The defendant is wrong.  The University of Illinois is subject to this court's jurisdiction under the mandate of the Fourteenth Amendment of the United States Constitution.

For the reasons stated above, this Court should deny the motion to dismiss.  In the alternative, if the Court does dismiss Plaintiff's complaint, Plaintiff requests that the Court grant him leave to amend the complaint.

**Respectfully Submitted**

**DATED: July 2, 2010**

Sign: _____

**JERROLL DOLPHIN**
**Plaintiff in pro per**



In case of reply the
number and date of this
letter should be quoted

My Ref. No.   NAB/A/02/PTE/114
Tel. No.:   021 – 518630/518570/286013-4
Fax No.:   021 – 518629
E mail:   nabsec@busb.gov.gh
Website:   www.nab.gov.gh

National Accreditation Board
Ministry of Education
P. O. Box CT 3256
Cantonments Accra

Republic of Ghana

Filed on 15-12-2009
2.55 pm

December 11, 2009

THE HON. ATTORNEY-GENERAL &
MINISTER FOR JUSTICE
ATTORNEY-GENERAL'S DEPARTMENT
ACCRA

Dear Madam,

RE: IN THE MATTER OF THE REPUBLIC VS. NATIONAL ACCREDITATION BOARD
& ANOR EXPARTE: ST LUKE SCHOOL OF MEDICINE

We forward herewith, copies of letters we have received from the Dean of the
University of Illinois College of Medicine, the Administrator of the Oregon
Student Assistance Commission, Office of Degree Authorisation and a covering
letter to the latter from the Ministry of Foreign Affairs and Regional Integration
with regard to the pending case.

We would be grateful if you consider these letters in your further applications
and submissions to the Court.

Yours faithfully,

RICHARD K. ADJEI
SENIOR ASSISTANT SECRETARY
FOR: EXECUTIVE SECRETARY



In Case of reply the
number and date of this
letter should be quoted

TEL: 664951-3/664970/663750/
676765/664650/675027
FAX: 665363/667823

My Ref. No. **SCR. PO/USA**

Your Ref. No. .......................

REPUBLIC OF GHANA

MINISTRY OF FOREIGN AFFAIRS
AND REGIONAL INTEGRATION,
P. O. BOX M 53,
ACCRA, GHANA.

DATE: **20TH NOVEMBER, 2009.**

## CAUTION AGAINST GRANTING OF APPROVAL/ACCREDITATION TO
## ST. LUKE SCHOOL OF MEDICINE TO ISSUE MEDICAL DEGRESS IN GHANA

I have been directed to forward, herewith, for your attention and urgent action, letter reference No. WA/INF/4 dated 17th November, 2009 and its attachment received from our Mission in Washington DC.

2.   The Oregon Student Assistance Commission Office of Degree Authorization is by the letter cautioning the National Accreditation Board, (NAB) of Ghana against granting approval to St. Luke "School of Medicine", to enable the latter to issue medical degrees to Ghanaians due to the fact that the activities the school do not confirm with foreign degrees accreditation practices of the U.S.A.

3.   It would be most appreciated if the National Accreditation Board (NAB) could take urgent action to avert possible sanction against Ghanaian educational institutions.

*For:*   MINISTER FOR FOREIGN AFFAIRS
& REGIONAL INTEGRATION
**GLORIA POKU (MRS)**
DEPUTY DIRECTOR/AMERICAS BUREAU

**MR. KWAME DATTEY,**
**NATIONAL ACCREDITATION BOARD (NAB),**
**NO. 6 BAMAKO STREET, EAST LEGON,**
**P. O. BOX CT 3256,**
**ACCRA.**

Encl.

EXHIBIT C



# Oregon

Theodore R. Kulongoski, Governor

Oregon Student Assistance Commission
Office of Degree Authorization
1500 Valley River Drive, Suite 100, Eugene, OR 97401
(541) 687-7452, Fax: (541) 687-7419
www.osac.state.or.us/ODA

October 30, 2009

Mr. Kwame Dattey
National Accreditation Board (NAB)
No. 6 Bamako Street, East Legon
P. O. Box CT 3256
Accra
GHANA

**RECEIVED**
NOV 16 2009
FILE No. _____
REG. No. _____
(EMBASSY OF THE REPUBLIC OF GHANA — WASHINGTON D.C.)

Dear Mr. Dattey:

It has come to our attention that your agency may be about to issue an approval or accreditation to the notorious entity that does business under the name St. Luke "School of Medicine" or the like. We are concerned that an entity with the unsavory history of the St. Luke business might be allowed to issue so-called "medical degrees" that could be used by unscrupulous people around the world to practice medicine on unsuspecting patients.

We are concerned about what such a decision would mean to the reputation of Ghanaian colleges around the world. Oregon banned the use of St. Luke degrees several years ago, and we would have to ban the use of all Ghanaian degrees if St. Luke is approved. The reason for this is that Oregon law requires us to base acceptance of foreign degrees on the accreditation practices of the nation in question.

If the government of Ghana authorizes St. Luke to issue "medical degrees" we will have no choice but to conclude that Ghana does not have a meaningful postsecondary approval process, in which case degrees issued by the 23 colleges now operating in Ghana would no longer be usable in Oregon.

Oregon is a small state far from Ghana and it may be that a ban on all degrees issued in Ghana would not affect your country very much. However, we urge you to consider the consequences of other states and nations making similar decisions if you issue an approval to grant medical degrees to the entity called St. Luke.

It is possible that decision-makers in Ghana simply did not have all of the information about St. Luke's past practices and its desperate search for a government willing to allow it to sell degrees from a site outside the United States, where it began operating illegally in California some years ago. St. Luke is not and has never been a legitimate provider of medical degrees.

Sincerely,

Alan Contreras
Administrator

cc: Mr. Adelphus K. Arthur, Deputy Chief of Mission, Embassy of Ghana, Washington, D.C.
Akunna Cook, Desk Officer for Ghana, U.S. Department of State, Washington, D.C.
Dr. E. Stephen Hunt, USNEI, International Affairs, U.S. Department of Education, Washington D.C.
Mary Scott, Public Affairs Officer, Embassy of the United States, Accra, Ghana

*Celebrating 50 years 1959-2009*



**Oregon**

Theodore R. Kulongoski, Governor

Office of Degree Authorization
1500 Valley River Drive, Suite 100, Eugene, OR 97401
(541) 687-7452; Fax: (541) 687-7419
*www.osac.state.or.us/ODA*

October 30, 2009

Mr. Kwame Dattey
National Accreditation Board (NAB)
No. 6 Bamako Street, East Legon
P. O. Box CT 3256
Accra
GHANA

Dear Mr. Dattey:

It has come to our attention that your agency may be about to issue an approval or accreditation to the notorious entity that does business under the name St. Luke "School of Medicine" or the like. We are concerned that an entity with the unsavory history of the St. Luke business might be allowed to issue so-called "medical degrees" that could be used by unscrupulous people around the world to practice medicine on unsuspecting patients.

We are concerned about what such a decision would mean to the reputation of Ghanaian colleges around the world. Oregon banned the use of St. Luke degrees several years ago, and we would have to ban the use of all Ghanaian degrees if St. Luke is approved. The reason for this is that Oregon law requires us to base acceptance of foreign degrees on the accreditation practices of the nation in question.

If the government of Ghana authorizes St. Luke to issue "medical degrees" we will have no choice but to conclude that Ghana does not have a meaningful postsecondary approval process, in which case degrees issued by the 23 colleges now operating in Ghana would no longer be usable in Oregon.

Oregon is a small state far from Ghana and it may be that a ban on all degrees issued in Ghana would not affect your country very much. However, we urge you to consider the consequences of other states and nations making similar decisions if you issue an approval to grant medical degrees to the entity called St. Luke.

It is possible that decision-makers in Ghana simply did not have all of the information about St. Luke's past practices and its desperate search for a government willing to allow it to sell degrees from a site outside the United States, where it began operating illegally in California some years ago. St. Luke is not and has never been a legitimate provider of medical degrees.

Sincerely,

Alan Contreras
Administrator

cc:  Mr. Adolphus K. Arthur, Deputy Chief of Mission, Embassy of Ghana, Washington, D.C.
     Akosua Cook, Desk Officer for Ghana, U.S. Department of State, Washington, D.C.
     Dr. E. Stephen Hunt, USNEI, International Affairs, U.S. Department of Education, Washington D.C.
     Mary Scholl, Public Affairs Officer, Embassy of the United States, Accra, Ghana

*Celebrating*
**50**
*years of ...*
1959 - 2009

EXHIBIT L

# UNIVERSITY OF ILLINOIS COLLEGE OF MEDICINE

Office of the Regional Dean
at Urbana-Champaign

190 Medical Sciences Building, MC-714
506 South Mathews Avenue
Urbana, IL 61801-3618

November 16, 2009

Mr. Kwame Dattey
National Accreditation Board (NAB)
No. 6 Bamako Street, East Legon
P.O. Box CT 3256
Accra
GHANA

Dear Mr. Dattey: ...

As the Dean of a medical school that recruits from the most accomplished graduates of non-U.S. medical schools into its residency, I have concerns about the impending accreditation decision for what purports to be the St. Luke School of Medicine. I have had the opportunity to review data in the public domain about this alleged school, and about individuals who claimed to have earned a medical degree from it. There is no evidence whatsoever that this alleged school really exists, or that there are adequate facilities for the most rudimentary components of a medical curriculum. In fact, all evidence says that only a small empty unimproved room is at the location advertised for the St. Luke's School of Medicine.

Understanding that high quality is not absolutely dependent upon physical structures, I took the opportunity to review the publicly available records of individuals who claim to have graduated from this alleged school for evidence of a bona fide education. There are records of twelve individuals who claim to have degrees from St. Luke's. None of those people are licensed to practice medicine, and at least two have been incarcerated for practicing medicine without a license.

I bring this to your attention because accreditation or approval of the alleged St. Luke School of Medicine by officials in Ghana would make medical schools in the United States worry about the quality of any medical school in Ghana. As a result, such approval of St. Luke would put the graduates of legitimate medical schools in your country at a distinct disadvantage when attempting to gain advanced medical training.

Hence, by denying accreditation to St. Luke School of Medicine you will protect the reputations of legitimate medical school graduates from Ghana. Moreover, by denying St. Luke any hint of legitimacy you will protect innocent patients from abuse at the hands of potential pseudo-graduates.

Telephone: (217) 333-5465 / Fax: (217) 333-8868 / Email: comuc@med.uiuc.edu / www.med.uiuc.edu

UIC • Chicago • Peoria • Rockford • Urbana-Champaign

The entity that passes itself off as the St. Luke School of Medicine has never been a legitimate educator of medical practitioners, and I urge you to make the owners of this entity own up to their dishonesty.

Sincerely,

Brad S. Schwartz, M.D.
Dean
Professor of Biochemistry and Medicine

EXHIBIT E

# An Analysis of the Practices and Policies of The St. Luke School of Medicine in Recent Years

George Gollin
Professor of Physics
University of Illinois at Urbana-Champaign

November 5, 2009

Filed on 15-12-2009
2.55 p.m.
Registrer Court of Appeal

Introduction ............................................................................................. 4

Immediate disqualifications ...................................................................... 5

Past practices as predictors of future conduct ........................................... 6

The international stake in quality assurance and postsecondary oversight .......... 6

The St. Luke School of Medicine's approach to Ghana gives cause for concern ......... 7

The current presentation of the St. Luke School of Medicine .......................... 8

An overview of the current St. Luke School of Medicine ................................. 8

Jerroll Dolphin and Susana Dolphin are SLSOM's California-based principals ........... 9

The Dolphins' request for Ghanaian accreditation of SLSOM and their history of claiming SLSOM is accredited ............................................................. 11

Jerroll Dolphin, MD is unlicensed ........................................................... 12

Jerroll Dolphin is the primary provider of curriculum and training ................... 12

The ongoing award of MD degrees to previously matriculated SLSOM students? ...... 15

SLSOM is a California entity, operating in the jurisdiction of the State of California 15

SLSOM is not registered as a California corporation ...................................... 16

The St. Luke Medical Foundation is associated with SLSOM and the Dolphins ......... 17

The internet domain registration for SLSOM specifies a Ghanaian postal address ..... 19

The physical location of SLSOM in Ghana ................................................. 20

G-gollin@illinois.edu

1

2

Summary: SLSOM now...................................................................................... 21

Vital International Foundation and its connection to SLSOM ............................... 22

An overview of the Vital International Foundation........................................... 22

Susana Mitchell Dolphin heads VIF and Jerroll Dolphin runs its training programs... 23

Medical/clinical/instructional tourism run by VIF ........................................... 24

Corporate and nonprofit registrations of VIF in California ............................... 25

The Vital International Foundation shares infrastructure and personnel with SLSOM 26

VIF's California and Ghana addresses ........................................................... 27

Is there a VIF – SLSOM – Eartheare International connection?......................... 29

Other VIF personnel .................................................................................... 31

Summary: the Vital International Foundation ................................................. 31

The St. Luke School of Medicine, from 2000 to the present.................................. 32

The St. Luke School of Medicine appears to have been created in 1999 or 2000........ 32

The troubling rosters of SLSOM faculty and administration ............................ 33

June 2001 SLSOM faculty........................................................................ 33

More about Professor Taliaferro Harris, MD: connection to Jerroll Dolphin ........ 34

More about Professor Taliaferro Harris, MD: practicing medicine without a license
in Ghana in collaboration with Jerroll Dolphin ........................................... 36

More about Professor Taliaferro Harris, MD: conviction for felony medical fraud in
2009 for his activities in 2005 and earlier.................................................. 39

June 2002 SLSOM faculty........................................................................ 40

Professor Egbert Phipps runs unsavory degree providers widely described as
diploma mills ........................................................................................ 40

Steve Arnett is unlicensed and has significant involvement with other medical
diploma mills ........................................................................................ 40

Early registrations of the SLSOM internet domain used a California postal address ..41

Internet domain registration history............................................................. 42

The changing SLSOM faculty and administration ............................................................ 42

    Glory Dolphin was  SLSOM "CEO" and "Chief Business Development Officer" in 2001 .................................................................................................................................. 42

    Self-presentation: brochure with Dugliotti school photo (mention author property): course catalog ........................................................................................................... 44

    Glory Dolphin is named in a 2001 SLSOM brochure's "properties" as the document's author ....................................................................................................... 44

Physical locations associated with SLSOM infrastructure ........................................... 46

    Inglewood, California ................................................................................................... 46

    SLSOM identifies a Ghanaian address for its finance and admissions officers ....... 46

    David Karam's El Paso, Texas address received surface mail for SLSOM in 2006 47

Outcomes in medical education: the SLSOM classes of 2002 ...................................... 48

    The standard for comparison: U.S. medical education ................................................ 48

    The classes .................................................................................................................... 49

    David W. Karam ........................................................................................................... 49

    Karam operates the "Institute for Adaptogenic Science" ........................................... 49

    David Karam claims an SLSOM MD and also a LaSalle University diploma mill degree ...................................................................................................................... 50

Personnel of the St. Luke School of Medicine faculty and administration ...................... 51

    "Students" who immediately assumed leadership roles in SLSOM ............................ 51

    Dolphin and Harris appear to arrange medical tours of western Africa ...................... 51

Disturbing connections to other organizations ............................................................... 53

    Southern Graduate Institute ......................................................................................... 53

    University of Science Arts and Technology Medical College of London ................... 53

    Lady Malina Memorial Medical College ...................................................................... 53

The St. Luke School of Medicine in November 2009, and before ................................... 53

St. Luke School of Medicine students ........................................................................... 59

Larry Lammers....................................................................................................... 59

Connected organizations......................................................................................... 59

St. Luke Medical Foundation................................................................................. 59

Project Africa 2000 ................................................................................................ 61

The Economic Development Fund Foundation ..................................................... 62

Edwin Muniz .......................................................................................................... 63

Herbert W. Winstead ............................................................................................. 65

Early version of SLSOM on pacbell.net ............................................................... 68

Medical tourism ..................................................................................................... 68

## Introduction

The insufficient capacity of postsecondary institutions in the developing world to place students in local facilities, in combination with the economic advantage afforded to those who obtain university degrees, generates an attractive market for foreign degree providers.[2] Most of these foreign schools create legitimate programs featuring instruction by qualified faculty who teach college-level material to engaged students. But government oversight of universities that are international in extent is a challenging task, even when all the stakeholders—students, the university faculty and administration, and the governmental oversight agency—share the common goal of providing students with a quality education. When one of the participants is not acting in good faith, it can be fiercely difficult to detect and suppress the activity. Sometimes there is a dishonest degree provider. Sometimes an accreditor lacks the skill to detect misrepresentations.[3] Sometimes there are structural problems that prevent an agency from responding, even when it is aware that it appears to bestow legitimacy on an entirely fraudulent entity posing as a university.[4] Quality assurance is not a simple matter.

[2] This subject has been discussed extensively in the higher education literature. See, for example, "The Private Nature of Cross-Border Higher Education," Jason E. Lane and Kevin Kinser, *International Higher Education*, 53, Fall 2008.

[3] For example, "Accreditation of College in Former Soviet Republic Raises Questions of Oversight," Burton Bollag, *Chronicle of Higher Education*, September 8, 2006. See also "When Criminals Control the Ministry of Education," George D. Gollin, *International Higher Education*, 54, Fall 2008.

[4] "Wolves in Chancellors' Clothing," George D. Gollin, *International Higher Education*, 55, Spring 2009.

5

*Immediate disqualifications*

Central to any effort at suppression of bogus schools is the accumulation of clear, irrefutable evidence documenting the unsavory practices and willful misrepresentations of an illegitimate degree provider. Some of the attributes that are warning flags are discussed in the best practices document *Toward Effective Practice: Discouraging Degree Mills in Higher Education* released by the Council for Higher Education Accreditation (CHEA) and the United Nations Educational, Scientific and Cultural Organization (UNESCO).[5]

The list of findings that should immediately disqualify a degree provider from receiving an operating license is long. A single determination of any of the following is likely to provide adequate grounds for immediate rejection of a school's application for licensure:

- The school's catalog misrepresents its physical facilities, either through inaccurate descriptions in text, or deliberately misleading photographs of buildings and grounds that could reasonably be thought to represent a campus, but do not;

- A significant number of the school's instructors or administrators do not hold the academic credentials appropriate for successful discharge of their responsibilities, or claim bogus credentials from unrecognized degree providers;

- The school operates, or has a history of operating, without legal authority from the appropriate government agency in its home jurisdiction;

- In the case of the licensed professions, the school's graduates fail to obtain licenses, or fail to thrive as practitioners, with unusually large probability;

- A significant portion of the school's graduates use their credentials for commercially deceptive or criminally fraudulent activities, indicating that the school is complicit in their deceptions;

- The school awards academic credit without requiring demonstration of mastery of the subject matter for which the credits are awarded;

- The school's articulation agreements with other schools reveal that the school awards transfer credits regardless of the level of mastery of the subject matter associated with the transferred credits;

- The school masks its internet domain registration information behind a privacy service, hiding the identities of its administrative officers;

---

[5] *Toward Effective Practice: Discouraging Degree Mills in Higher Education*, Council for Higher Education Accreditation and the United Nations Educational, Scientific and Cultural Organization, 2009. http://www.chea.org/pdf/degree_mills_effective_practices.pdf.

5

**PROOF OF SERVICE**

I, _Jerroll Dolphin_ (name), declare as follows.  I am over the age of 18 years. My address is:

_P.O. Box ~~90064-007~~ 941009_

_Los Angeles CA 90064_

_____

On _July 2, 2010_ (date), I served the foregoing document described as:

_Opposition to Motion to Dismiss_

_____

_____

on all interested parties in this action by placing a true and correct copy thereof in a sealed envelope, with first-class postage prepaid thereon, and deposited said envelope in the United States mail in _Los Angeles CA_, addressed to:
(city, state)

_all service list_ _____ (name)          _____ (name)

_____ (address)          _____ (address)

_____ (address)          _____ (address)

I declare under penalty of perjury under the laws of the states of the United States that the foregoing is true and correct.

Executed on _2 July 2010_ at _Los Angeles_ .
(date)                        (place of signing)

_____ (signature)

_Jerroll Dolphin_ (name)

Page Number

Service List

Nicole C. Rivas
Alston & Bird LLP
333 South Hope Street 16th Fl
Los Angeles, CA  90071

James Rogers
125 S. Highway 101 Suite 101
Solana Beach, CA  92075

Seth T. Karpinski
Oregon Dept of Justice
1162 Court Street NE
Salem, OR 97301