**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

RECEIVED & RETURNED
CLERK, U.S. DISTRICT COURT

SEP 21 2010

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

**NOTICE OF DOCUMENT DISCREPANCIES**

To: ☐ U.S. District Judge / ☐ U.S. Magistrate Judge   *Klausner*

From: *Michele Nuera* , Deputy Clerk   Date Received: *09-17-10*

Case No.: *CV 10-1791 RGK (SHx)*   Case Title: *St. Luke School of Medicine -vs- Republic of Liberia*

Document Entitled: *Plaintiff's Argument Clarifying the Basis for the Court's Subject Matter Jurisdiction*

Upon the submission of the attached document(s), it was noted that the following discrepancies exist:

FILED
CLERK, U.S. DISTRICT COURT

SEP 20 2010

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| | | |
|---|---|---|
| ☐ Local Rule 11-3.1 | Document not legible | |
| ☐ Local Rule 11-3.8 | Lacking name, address, phone and facsimile numbers | |
| ☐ Local Rule 11-4.1 | No copy provided for judge | |
| ☐ Local Rule 19-1 | Complaint/Petition includes more than ten (10) Does or fictitiously named parties | |
| ☐ Local Rule 15-1 | Proposed amended pleading not under separate cover | |
| ☐ Local Rule 11-6 | Memorandum/brief exceeds 25 pages | |
| ☐ Local Rule 11-8 | Memorandum/brief exceeding 10 pages shall contain table of contents | |
| ☐ Local Rule 7.1-1 | No Certification of Interested Parties and/or no copies | |
| ☐ Local Rule 6.1 | Written notice of motion lacking or timeliness of notice incorrect | |
| ☐ Local Rule 56-1 | Statement of uncontroverted facts and/or proposed judgment lacking | |
| ☐ Local Rule 56-2 | Statement of genuine issues of material fact lacking | |
| ☐ Local Rule 7-19.1 | Notice to other parties of ex parte application lacking | |
| ☐ Local Rule 16-6 | Pretrial conference order not signed by all counsel | |
| ☐ FRCvP Rule 5(d) | No proof of service attached to document(s) | *Plaintiff represented* |
| ☒ Other: | *Case Closed 7/29/2010; by counsel* | |

**Note: Please refer to the court's Internet website at www.cacd.uscourts.gov for local rules and applicable forms.**

---

**ORDER OF THE JUDGE/MAGISTRATE JUDGE**

IT IS HEREBY ORDERED:

☐ The document is to be filed and processed. The filing date is ORDERED to be the date the document was stamped "received but not filed" with the Clerk. Counsel* is advised that any further failure to comply with the Local Rules may lead to penalties pursuant to Local Rule 83-7.

_____
Date

_____
U.S. District Judge / U.S. Magistrate Judge

☒ The document is **NOT** to be filed, but instead **REJECTED**, and is ORDERED returned to *counsel. *Counsel shall immediately notify, in writing, all parties previously served with the attached documents that said documents have **not** been filed with the Court.

*09.20.10*
_____
Date

_____
U.S. District Judge / U.S. Magistrate Judge

*The term "counsel" as used herein also includes any pro se party. See Local Rule 1-3.

---

CV-104A (12/03)   NOTICE OF DOCUMENT DISCREPANCIES

GPO U.S. GOVERNMENT PRINTING OFFICE 2007 672-579

JERROLL DOLPHIN, M.D.
P.O. BOX 941009
Los Angeles, CA 90064
310-384-4483
IN PRO PER



RECEIVED & RETURNED
CLERK, U.S. DISTRICT COURT

SEP 2 1 2010

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ST. LUKE SCHOOL OF
MEDICINE, et al,

        Plaintiff,

    vs.

REPUBLIC OF LIBERIA,
et al,

        Defendant

Case No.: 10-CV-1791 RGK (SHx)

PLAINTIFF'S ARGUMENT CLARIFYING
THE BASIS FOR THE COURT'S SUBJECT
MATTER JURISDICTION

DATE: SEPTEMBER 13, 2010
TIME: 8:30 AM
CRT:  850
JUDGE: Honorable R. Gary Klausner

TO THE HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE,

Plaintiff hereby, pursuant to the Court's Order of July
2nd 2010, submits his arguments establishing Federal
Question Jurisdiction under 28 USC §§ 1331 and
Diversity Jurisdiction under 28 USC §§ 1332.



RECEIVED
BUT
NOT FILED

SEP 1 7 2010
10:09

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

Dreyfus v. Von Finck, 534 F.2d 24

Abi Jaoudi v. Cigna Worldwide Ins. Co., 1992 U.S. Dist. LEXIS 19257

CONSTITUTIONAL PROVISIONS

U.S. Constitution Articles          1, 2, 3, and 6

U.S. Constitution Amendments     1, 3,  4, 5,  6, 7, 8, 9, 10, 11 and 14

**UNITED STATES CODES**

28 USC §§ 1331

28 USC §§ 1332

I.      Federal Question Jurisdiction under 28 USC §§ 1331

The federal question that gives this court jurisdiction is the application of the Liberian Friendship Treaty. The principle clauses of the Liberian and US Treaty gives the court jurisdiction to decide issues arising pursuant to that treaty as it pertains to St. Luke School of Medicine, Dr. Jerroll Dolphin, and the students and graduates of St. Luke School of Medicine.

*Article I*

*"The nationals of each of the High Contracting Parties shall be permitted to enter, travel and reside in the territories of the other; to exercise liberty of conscience and freedom of worship; to engage in professional, scientific, religious, philanthropic, manufacturing and commercial work of every kind without interference; to carry on every form of commercial activity which is not forbidden by the local law; to own, erect or lease and occupy appropriate buildings and to lease lands for residential, scientific, religious, philanthropic, manufacturing, commercial and mortuary purposes; to employ agents of their choice, and generally to do anything incidental to or necessary for the enjoyment of any of the foregoing privileges upon the same terms as nationals of the State of residence or as nationals of the nation hereafter to be most favored by it, submitting themselves to all local laws and regulations duly established."*

*"The nationals of either High Contracting Party within the territories of the other shall not be subjected to the payment of any internal charges or taxes other or higher than those that are exacted of and paid by nationals of the State of residence."*

*"The nationals of each High Contracting Party shall enjoy freedom of access to the courts of justice of the other on conforming to the local laws, as well for the prosecution as for the defense of their rights, and in all degrees of jurisdiction established by law."*

*"The nationals of each High Contracting Party shall receive within the territories of the other, upon submitting to conditions imposed upon its nationals, the most constant protection and security for their persons and property, and shall enjoy in this respect that degree of protection*

1  *that is required by international law.  Their property shall not be taken without due process of*

2  *law and without payment of just compensation."*

3  *"Nothing contained in this Treaty shall be construed to affect existing statutes of either of the*

4  *High Contracting Parties in relation to emigration or to immigration or the right of either of the*

5  *High Contracting Parties to enact such statutes, provided, however, that nothing in this*

6  *paragraph shall prevent the nationals of either High Contracting Parties from entering,*

7  *traveling and residing in the territories of the other Party in order to carry on international*

8  *trade or to engage in any commercial activity related to or connected with the conduct of*

9  *international trade on the same terms as nationals of the most-favored nation."*

11  *Article II*

12  *"The dwellings, warehouses, manufactories, shops, and other places of business, and all*

13  *premises thereto appertaining of the nationals of each of the High Contracting Parties in the*

14  *territories of the other, lawfully used for any purposes set forth in Article I, shall be respected. it*

15  *shall not be allowable to make a domiciliary visit to, or search of any such buildings and*

16  *premises, or there to examine and inspect books, papers or accounts, except under the*

17  *conditions and in conformity with the forms prescribed by the laws, ordinances and regulations*

18  *for nationals of the State of residence or nationals of the nation most favored by it."*

20  **Dreyfus v. Von Finck, 534 F.2d 24**

21  Plaintiff foreign Jew alleged that defendant West German citizens wrongfully confiscated

22  property in Germany in 1938. Plaintiff claimed jurisdiction under 28 U.S.C.S. § 1331 for conduct

23  violating several treaties and jurisdiction under 28 U.S.C.S. § 1350 for violations of the law of

24  nations. The lower court held that plaintiff failed to state a claim, and the court affirmed. The

25  court held that § 1331 dealt with treaties between the United States and other nations, and that

26  the treaties between the United States and other nations relied upon by plaintiff only governed

27  relations between the sovereign nations and did not create any private rights of action applicable

28  to plaintiff. Similarly, the court ruled that § 1350 dealt with international law and that generally

international law did not create a private right of action. In particular, the court held that international law did not create private rights of action when the aggrieved party, as was the plaintiff, was a national in the acting state at the time of the wrongdoing.

Contrary to Dreyfus, the Liberian Treaty does create private rights of action applicable to the plaintiffs in its Articles I, and II, cited above. A dozen different general causes of action against the defendants from violations of the Liberian Treaty. Please see below.

**Abi Jaoudi v. Cigna Worldwide Ins. Co., 1992 U.S. Dist. LEXIS 19257**

The plaintiff, The Abi Jaoudi and Azar Trading Corporation ("AJA"), cause of action  sued the Cigna Worldwide Insurance Company.  What is pertinent to this lawsuit is that Treaties are considered self-executing unless "the agreement manifests an intention that it shall not become effective as domestic law without the enactment of implementing legislation, or in those rare cases where implementing legislation is constitutionally required." *Rainbow Navigation, Inc. v. Department of Navy*, 686 F.Supp. 354 (D.D.C. 1988). Courts have held that friendship, commerce and navigation treaties are self-executing treaties, that is, they need no implementing legislation. *Spiess v. C. Itoh & Company (America), Inc.*, 643 F.2d 353 (5th Cir. 1981); *Zenith Radio Corp. v. Matsushita Electric Industrial Co., Ltd.*, 494 F.Supp. 1263 (E.D.Pa. 1980). The Liberian Treaty, gives no indication that it required implementing legislation before it became law, thus, the court views the Liberian Treaty as self-executing. However, because the Liberian Treaty is self-executing, the inquiry into whether it confers jurisdiction upon the federal courts does not end.

One of AJA's theories was that the court had subject matter jurisdiction under art. III, § 2, cl. 1 of Constitution because the claim "arises under" the Liberian treaty. This theory was rejected because AJA did not "attempt to delineate the direct relationship between its claim and the treaty

| No. | Name | Country/State | Damages |
|-----|------|---------------|---------|
| 61 | Dr. Rita Patangia | Arkansas | $1,600,000 |
| | Does 1 through 99 | Various States of the USA, and worldwide | $35,000,000 |
| | **TOTAL STUDENT AND GRADUATE DAMAGES** | | **$88,000,000** |
| | Dr. Jerroll Dolphin | USA | $110,000,000 |
| | St. Luke School of Medicine | Liberia | $120,000,000 |
| | **TOTAL DAMAGES** | | **$318,000,000** |

The citizenships of the defendants to the lawsuit are as follows:

| No. | Name | Country/State |
|-----|------|---------------|
| 1 | Republic of Liberia | Liberia |
| 2 | Educational Commission for Foreign Medical Graduates | Pennsylvania |
| 3 | Foundation for Advancement of Medical Education and Research | Pennsylvania |
| 4 | University of Illinois | Illinois |
| 5 | Dr. George Gollin | Illinois |
| 6 | Oregon Office of Degree Authorization | Oregon |
| 7 | MINISTRY OF EDUCATION | Liberia |
| 8 | LIBERIAN MEDICAL BOARD | Liberia |
| 9 | NATIONAL COMMISSION ON HIGHER EDUCATION | Liberia |
| 10 | NATIONAL TRANSITIONAL LEGISLATIVE ASSEMBLY | Liberia |

JERROLL DOLPHIN, M.D.
P.O. BOX 941009
Los Angeles, CA 90064
310-384-4483
IN PRO PER

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ST. LUKE SCHOOL OF
MEDICINE, et al,

       Plaintiff,

   vs.

REPUBLIC OF LIBERIA,
et al,

       Defendant

Case No.: 10-CV-1791 RGK (SHx)

PLAINTIFF'S ARGUMENT CLARIFYING
THE BASIS FOR THE COURT'S SUBJECT
MATTER JURISDICTION

DATE: SEPTEMBER 13, 2010
TIME: 8:30 AM
CRT: 850
JUDGE: Honorable R. Gary Klausner

TO THE HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE,

Plaintiff hereby, pursuant to the Court's Order of July
2nd 2010, submits his arguments establishing Federal
Question Jurisdiction under 28 USC §§ 1331 and
Diversity Jurisdiction under 28 USC §§ 1332.

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

Dreyfus v. Von Finck, 534 F.2d 24

Abi Jaoudi v. Cigna Worldwide Ins. Co., 1992 U.S. Dist. LEXIS 19257

CONSTITUTIONAL PROVISIONS

U.S. Constitution Articles          1, 2, 3, and 6

U.S. Constitution Amendments      1, 3,  4, 5,  6, 7, 8, 9, 10, 11 and 14

**UNITED STATES CODES**

28 USC §§ 1331

28 USC §§ 1332

I.    Federal Question Jurisdiction under 28 USC §§ 1331

The federal question that gives this court jurisdiction is the application of the Liberian Friendship Treaty. The principle clauses of the Liberian and US Treaty gives the court jurisdiction to decide issues arising pursuant to that treaty as it pertains to St. Luke School of Medicine, Dr. Jerroll Dolphin, and the students and graduates of St. Luke School of Medicine.

*Article I*

*"The nationals of each of the High Contracting Parties shall be permitted to enter, travel and reside in the territories of the other; to exercise liberty of conscience and freedom of worship; to engage in professional, scientific, religious, philanthropic, manufacturing and commercial work of every kind without interference; to carry on every form of commercial activity which is not forbidden by the local law; to own, erect or lease and occupy appropriate buildings and to lease lands for residential, scientific, religious, philanthropic, manufacturing, commercial and mortuary purposes; to employ agents of their choice, and generally to do anything incidental to or necessary for the enjoyment of any of the foregoing privileges upon the same terms as nationals of the State of residence or as nationals of the nation hereafter to be most favored by it, submitting themselves to all local laws and regulations duly established."*

*"The nationals of either High Contracting Party within the territories of the other shall not be subjected to the payment of any internal charges or taxes other or higher than those that are exacted of and paid by nationals of the State of residence."*

*"The nationals of each High Contracting Party shall enjoy freedom of access to the courts of justice of the other on conforming to the local laws, as well for the prosecution as for the defense of their rights, and in all degrees of jurisdiction established by law."*

*"The nationals of each High Contracting Party shall receive within the territories of the other, upon submitting to conditions imposed upon its nationals, the most constant protection and security for their persons and property, and shall enjoy in this respect that degree of protection*

1   *that is required by international law. Their property shall not be taken without due process of*
2   *law and without payment of just compensation."*

3   *"Nothing contained in this Treaty shall be construed to affect existing statutes of either of the*
4   *High Contracting Parties in relation to emigration or to immigration or the right of either of the*
5   *High Contracting Parties to enact such statutes, provided, however, that nothing in this*
6   *paragraph shall prevent the nationals of either High Contracting Parties from entering,*
7   *traveling and residing in the territories of the other Party in order to carry on international*
8   *trade or to engage in any commercial activity related to or connected with the conduct of*
9   *international trade on the same terms as nationals of the most-favored nation."*

10
11   *Article II*

12   *"The dwellings, warehouses, manufactories, shops, and other places of business, and all*
13   *premises thereto appertaining of the nationals of each of the High Contracting Parties in the*
14   *territories of the other, lawfully used for any purposes set forth in Article I, shall be respected. it*
15   *shall not be allowable to make a domiciliary visit to, or search of any such buildings and*
16   *premises, or there to examine and inspect books, papers or accounts, except under the*
17   *conditions and in conformity with the forms prescribed by the laws, ordinances and regulations*
18   *for nationals of the State of residence or nationals of the nation most favored by it."*

19
20   **Dreyfus v. Von Finck, 534 F.2d 24**

21   Plaintiff foreign Jew alleged that defendant West German citizens wrongfully confiscated
22   property in Germany in 1938. Plaintiff claimed jurisdiction under 28 U.S.C.S. § 1331 for conduct
23   violating several treaties and jurisdiction under 28 U.S.C.S. § 1350 for violations of the law of
24   nations. The lower court held that plaintiff failed to state a claim, and the court affirmed. The
25   court held that § 1331 dealt with treaties between the United States and other nations, and that
26   the treaties between the United States and other nations relied upon by plaintiff only governed
27   relations between the sovereign nations and did not create any private rights of action applicable
28   to plaintiff. Similarly, the court ruled that § 1350 dealt with international law and that generally

international law did not create a private right of action. In particular, the court held that international law did not create private rights of action when the aggrieved party, as was the plaintiff, was a national in the acting state at the time of the wrongdoing.

Contrary to Dreyfus, the Liberian Treaty does create private rights of action applicable to the plaintiffs in its Articles I, and II, cited above. A dozen different general causes of action against the defendants from violations of the Liberian Treaty. Please see below.

## Abi Jaoudi v. Cigna Worldwide Ins. Co., 1992 U.S. Dist. LEXIS 19257

The plaintiff, The Abi Jaoudi and Azar Trading Corporation ("AJA"), cause of action  sued the Cigna Worldwide Insurance Company.  What is pertinent to this lawsuit is that Treaties are considered self-executing unless "the agreement manifests an intention that it shall not become effective as domestic law without the enactment of implementing legislation, or in those rare cases where implementing legislation is constitutionally required." _Rainbow Navigation, Inc. v. Department of Navy,_ 686 F.Supp. 354 (D.D.C. 1988). Courts have held that friendship, commerce and navigation treaties are self-executing treaties, that is, they need no implementing legislation. _Spiess v. C. Itoh & Company (America), Inc.,_ 643 F.2d 353 (5th Cir. 1981); _Zenith Radio Corp. v. Matsushita Electric Industrial Co., Ltd.,_ 494 F.Supp. 1263 (E.D.Pa. 1980).  The Liberian Treaty, gives no indication that it required implementing legislation before it became law, thus, the court views the Liberian Treaty as self-executing. However, because the Liberian Treaty is self-executing, the inquiry into whether it confers jurisdiction upon the federal courts does not end.

One of AJA's theories was that the court had subject matter jurisdiction under art. III. § 2, cl. 1 of Constitution because the claim "arises under" the Liberian treaty. This theory was rejected because AJA did not "attempt to delineate the direct relationship between its claim and the treaty

under which it allegedly arises." Indeed, AJA's claim does not arise out of a claim of rights violated under the Liberian Treaty.

St. Luke School of Medicine's (SLSOM) case significantly differs from that of AJA in that the Plaintiffs' claims of rights arise out of violations of the Liberian Treaty. After not paying bribes, plaintiff Dr. Jerroll Dolphin suffered constant and serious harassment from Liberian government officials such as threats of incarceration, fines, penalties. He suffered the loss of the value of his property (St. Luke School of Medicine) and income from his business. His passport was taken from him on two occasions by Liberian officials. He was not permitted to leave Liberia for more than 8 months without being charged for a crime. Even after he sued the Liberian government in the Liberian Supreme Court (2005) and Civil Court (2006), corrupt Liberian officials have prevented SLSOM and he from obtaining final judgments in both courts. The former Liberian Minister of Justice in 2005-2005, Kabinah Janeh, was sued by the Plaintiffs in their Supreme Court "Writ of Prohibition" in 2005. Now, Janeh, is an Associate Justice of the Supreme Court. He refuses to recuse himself from the proceedings of this case. He has not scheduled SLSOM's final judgment hearing in the Supreme Court of Liberia since 2007.

Liberian officials violated the Liberian Treaty in the following ways:

1.  *"The nationals of each of the High Contracting Parties shall be permitted to enter, travel and reside in the territories of the other"*

    (a)  Dr. Dolphin was denied the opportunity to leave Liberia on 3 occasions (1) Easter Friday in March 2005; (2) April 14, 2005; and June 2009 as he tried to leave Liberia at Roberts International Airport.

    (b)  Several foreign SLSOM staff members were arrested in Liberia on several occasions without due cause.

    (c)  Students and graduates of SLSOM were threatened with arrest and prosecution on more than 6 occasions by Liberian officials.

2.  *"to engage in professional, scientific, religious, philanthropic, manufacturing and commercial work of every kind without interference"*

    (a)    SLSOM (owned by American and Liberia citizens) was denied the opportunity to operate by constant harassment, fraud, and libel conducted by Liberian officials and furthered in the United States by the defendants ECFMG-FAIMER, Dr. George Gollin, the University of Illinois, the Oregon Office of Degree Authorization, other not yet named as defendants such as Alan Contreras and Dr. Brad Schwartz, hereafter referred to as the defendants, other not yet named as defendants.

    (b)    Dr. Dolphin was denied the opportunity to work and conduct business in Liberia by constant harassment, fraud, and libel conducted by Liberian officials and furthered in the United States by the defendants.

    (c)    The students and graduates of SLSOM were denied the opportunity to obtain an education from SLSOM (denial of civil rights); their lawfully earned certificates were revoked, denied, or suspended as a result of the constant harassment, fraud, and libel conducted by Liberian officials and furthered in the United States by the defendants.

3.  *"to carry on every form of commercial activity which is not forbidden by the local law"*

    (a)    Although SLSOM corporate charter was established by law in Liberia, Liberian officials denied the SLSOM, Dr. Jerroll Dolphin, and the students and graduates of SLSOM, hereafter referred to as the Plaintiffs, of their rights to do business in Liberia in accordance to Liberian law.

    (b)    Dr. Jerroll Dolphin, lawful graduates of SLSOM, and other qualified medical practitioners from the United States and other nations had their licenses unlawfully revoked by the Liberian Medical Board without due process.

4.  *"erect or lease and occupy appropriate buildings and to lease lands for residential, scientific, religious, philanthropic, manufacturing, commercial and mortuary purposes"*

      (a)    Officers of the Ministry of Health conspired with SLSOM's landlord, Rebecca J. Moore, an employee of the Ministry of Health, to violate the quiet enjoyment of their 5-year lease from the landlord.

      (b)    Despite having won a judgment against the landlord, Liberian police have refused to enforce the court order to evict the landlord from SLSOM's building.

5.    *"to employ agents of their choice, and generally to do anything incidental to or necessary for the enjoyment of any of the foregoing privileges upon the same terms as nationals of the State of residence"*

      (a)    Liberian officials conspired to prevent SLSOM's hiring of almost 2-dozen professors of medicine in 2005 and 2006.

      (b)    Liberian officials conspired to send a fraudulent document to the ECFMG-FAIMER in April 2005, the result of which was the removal of SLSOM from the IMED.

      (c)    Liberian officials have conspired with other defendants to violate the civil rights of each and every one of the Plaintiffs, jointly and severally, in Liberia and the United States.

6.    *"The nationals of either High Contracting Party within the territories of the other shall not be subjected to the payment of any internal charges or taxes other or higher than those that are exacted of and paid by nationals of the State of residence."*

      (a)    Liberian officials demanded bribes from SLSOM and Dr. Jerroll Dolphin.

      (b)    After Dr. Dolphin's refusal, also on behalf of SLSOM, Liberian officials began to falsely lambast SLSOM and Dr. Jerroll Dolphin in the press and other media in an effort to "shakedown" the Plaintiffs.

      (c)    Even after the Supreme Court order to restore SLSOM to "status quo ante", Liberian officials demanded extraordinary payments from the Plaintiffs to complete their unfinished documentation.

7.  *"The nationals of each High Contracting Party shall enjoy freedom of access to the*
    *courts of justice of the other on conforming to the local laws, as well for the prosecution*
    *as for the defense of their rights, and in all degrees of jurisdiction established by law."*

    (a)   Since November 2006, SLSOM has not had access to the civil court of Liberia to
    obtain a final judgment after obtaining a "Clerk's Certificate" in its $120,000,000
    USD "Damages for Wrong" lawsuit in the Republic of Liberia.

    (b)   Sin June 2007, SLSOM has not had access to the Supreme Court for a final
    judgment after obtaining a "Clerk's Certificate" in its "Writ of Prohibition" lawsuit
    in the Republic of Liberia. This primarily due to the opposition of Associate
    Justice Kabinah Janeh, who was a defendant (Minister of Health) in the original
    lawsuit (2005), Janeh also participated in an unlawful raid at the SLSOM campus
    with more than 20 Liberian National Police Officers in July 2005.

8.  *"The nationals of each High Contracting Party shall receive within the territories of the*
    *other, upon submitting to conditions imposed upon its nationals, the most constant*
    *protection and security for their persons and property,"*

    (a)   Mohammed Sheriff, using the color of law, forced Dr. Dolphin, against his will to
    show the SLSOM campus to reporters by use of threat of prosecution, in February
    2005.

    (b)   Officials of the Liberian Medical Board in March 2005 wrote a letter with false
    statements after their inspection of the SLSOM campus, then they lambasted Dr.
    Dolphin and the SLSOM campus at an official press conference at the Ministry of
    Health building in Monrovia, a week later, state that St. Luke School of Medicine
    "does not exist" in Liberia.

    (c)   The National Commission on Higher Education (NCHE), of the Ministry of
    Education of the Republic of Liberia, sent three documents to the ECFMG in
    January, March, and April 2005, stating that there they had inspected the campus
    of SLSOM, and it had computers, microscopes, new medical books, and other

equipment.  Then in April 2005, they send a fraudulent letter to the ECFMG
stating that SLSOM is a "computer school" and that it "does not exist".

(d)     The accreditation that SLSOM had enjoyed from August 2000 in Liberia was
taken away without due process of law in 2004, and again in 2005 by the NCHE
on false pretenses usurping the right of the Supreme Court and the Congress of
Republic of Liberia.

(e)     The campus of SLSOM was raided by the Minister of Justice, the Minister of
Information, Mohammed Shariff, and more than 20 Liberian National Police on
July 21, 2005, without a warrant or due cause.

9.   *"Their property shall not be taken without due process of law and without payment of*
*just compensation"*

(a)     In March 2005, Dr. Bensen Barh of the Liberian Medical Board announced at a
press conference that SLSOM is illegal.  SLSOM's officers and staff should be
arrested.  Its students and graduates should be arrested.  Its equipment and bank
accounts should be seized  All these threats without due process of law, and
without just compensation.

(b)     Officials of the Liberian Medical Board in March 2005 wrote a letter with false
statements after their inspection of the SLSOM campus, then they lambasted Dr.
Dolphin and the SLSOM campus at an official press conference at the Ministry of
Health building in Monrovia, a week later, state that St. Luke School of Medicine
"does not exist" in Liberia.  The accreditation of SLSOM was taken away without
due cause and without just compensation.  The certificates and examination scores
of the students and graduates of SLSOM were denied, revoked, and discredited by
the ECFMG-FAIMER without due cause or just compensation.  Licenses of more
than a dozen graduates of SLSOM in the United States and worldwide were
denied or revoked without due cause or just compensation as a result of the action
of the NCHE.

(c) In April 2005, Mohammed Sheriff of the National Transitional Legislative Assembly (NTLA) announced that the President Jyude Bryant had signed an executive order declaring that SLSOM is illegal. SLSOM's officers and staff will be arrested. Its students and graduates will be arrested. Its equipment and bank accounts will be seized All these threats without due process of law, and without just compensation. The campus of SLSOM was raided by the Minister of Justice, the Minister of Information, Mohammed Shariff, soon thereafter with more than 20 Liberian National Police on July 21, 2005, without a warrant or due cause.

(d) In July 2005, Mohammed Sheriff of the National Transitional Legislative Assembly (NTLA) announced that the President Jyude Bryant had signed an executive order declaring that SLSOM is illegal. SLSOM's officers and staff will be arrested. Its students and graduates will be arrested. Its equipment and bank accounts will be seized All these threats without due process of law, and without just compensation. The campus of SLSOM was raided by the Minister of Justice, the Minister of Information, Mohammed Shariff, soon thereafter with more than 20 Liberian National Police on July 21, 2005, without a warrant or due cause.

10. *"that nothing in this paragraph shall prevent the nationals of either High Contracting Parties from entering, traveling and residing in the territories of the other Party in order to carry on international trade or to engage in any commercial activity related to or connected with the conduct of international trade on the same terms as nationals of the most-favored nation"*

(a) Dr. Dolphin was denied the opportunity to leave Liberia on 3 occasions (1) Easter Friday in March 2005; (2) April 14, 2005; and June 2009 as he tried to leave Liberia at Roberts International Airport.

(b) Several foreign SLSOM staff members were arrested in Liberia on several occasions without due cause.

(c) Students and graduates of SLSOM were threatened with arrest and prosecution on more than 6 occasions by Liberian officials.

11.  *"The dwellings, warehouses, manufactories, shops, and other places of business, and all premises thereto appertaining of the nationals of each of the High Contracting Parties in the territories of the other, lawfully used for any purposes set forth in Article I, shall be respected."*

   (a)  Mohammed Sheriff, using the color of law, forced Dr. Dolphin, against his will to show the SLSOM campus to reporters by use of threat of prosecution, in February 2005.

   (b)  Officials of the Liberian Medical Board in March 2005 wrote a letter with false statements after their inspection of the SLSOM campus, then they lambasted Dr. Dolphin and the SLSOM campus at an official press conference at the Ministry of Health building in Monrovia, a week later, state that St. Luke School of Medicine "does not exist" in Liberia.

   (c)  The National Commission on Higher Education (NCHE), of the Ministry of Education of the Republic of Liberia, sent three documents to the ECFMG in January, March, and April 2005, stating that there they had inspected the campus of SLSOM, and it had computers, microscopes, new medical books, and other equipment.  Then in April 2005, they send a fraudulent letter to the ECFMG stating that SLSOM is a "computer school" and that it "does not exist".

   (d)  The accreditation that SLSOM had enjoyed from August 2000 in Liberia was taken away without due process of law in 2004, and again in 2005 by the NCHE on false pretenses usurping the right of the Supreme Court and the Congress of Republic of Liberia.

   (e)  The campus of SLSOM was raided by the Minister of Justice, the Minister of Information, Mohammed Shariff, and more than 20 Liberian National Police on July 21, 2005, without a warrant or due cause.

12.  *"it shall not be allowable to make a domiciliary visit to, or search of any such buildings and premises, or there to examine and inspect books, papers or accounts, except under the conditions and in conformity with the forms prescribed by the laws, ordinances and*

*regulations for nationals of the State of residence or nationals of the nation most favored by it."*

(a)   Mohammed Sheriff, using the color of law, forced Dr. Dolphin, against his will to show the SLSOM campus to reporters by use of threat of prosecution, in February 2005.

(b)   Officials of the Liberian Medical Board in March 2005 wrote a letter with false statements after their inspection of the SLSOM campus, then they lambasted Dr. Dolphin and the SLSOM campus at an official press conference at the Ministry of Health building in Monrovia, a week later, state that St. Luke School of Medicine "does not exist" in Liberia.

(c)   The National Commission on Higher Education (NCHE), of the Ministry of Education of the Republic of Liberia, sent three documents to the ECFMG in January, March, and April 2005, stating that there they had inspected the campus of SLSOM, and it had computers, microscopes, new medical books, and other equipment. Then in April 2005, they send a fraudulent letter to the ECFMG stating that SLSOM is a "computer school" and that it "does not exist".

(d)   The accreditation that SLSOM had enjoyed from August 2000 in Liberia was taken away without due process of law in 2004, and again in 2005 by the NCHE on false pretenses usurping the right of the Supreme Court and the Congress of Republic of Liberia.

(e)   The campus of SLSOM was raided by the Minister of Justice, the Minister of Information, Mohammed Shariff, and more than 20 Liberian National Police on July 21, 2005, without a warrant or due cause.

The actions of Liberian officials against SLSOM were criminal and fraudulent Officials of the Republic of Liberia, in April 2005, sent the Educational Commission for Foreign Medical Graduates (ECFMG) a fraudulent document claiming that SLSOM did "not exist" in Liberia and that SLSOM was a "computer school". The ECFMG immediately removed SLSOM from the

International Medical Education Directory (IMED). Up until now, and despite an order of the
Liberia Supreme Court, neither have Liberian officials or the ECFMG taken action to restore
SLSOM's listing on the IMED. SLSOM has suffered the loss income and loss of reputation from
this defamation and fraud. There was fraud committed by Liberian officials who knew that the
credentials of SLSOM were valid, and upheld in Liberia Supreme Court, and that they had no
authority to claim that an authorized corporation in Liberia does not exist. Furthermore, those
same officials knew that SLSOM had been established by law (charter) in Liberia, approved by
the Congressional Act and signed by the President, in August 2003.

Dr. Dolphin suffered a great loss of reputation as a result of the libel, slander, and defamation in
Liberia. He endured mental torture at the hands of viscious Liberian officials such as
Mohammed Shariff and Dr. Bensen Barh. He was arrested on four occasions by Liberian
officials and questioned for hours by them. He was threatened by Shariff, Barh, and other
officials of the National Transitional Government, especially those members of the LURD
organization such as Kabinah Janeh, now an Associate Justice of the Liberia Supreme Court. Dr.
Dolphin's civil rights and privileges guaranteed by the Liberian Treaty were violated. Violations
of Treaties are the jurisdiction of the Federal Courts.

The students and graduates of SLSOM also suffered great loss through the actions of the
defendants. As a result of the same extortion, defamation and fraud perpetrated by Liberian
officials, and negligently or intentionally furthered by the American defendants, they have
suffered the loss of their rights and privileges guaranteed by the laws and the Constitution of the
Republic of Liberia, and also guaranteed by the laws and the Constitution of the United States.
They have suffered loss of income, loss of employment, loss of reputation. The students and
graduates of SLSOM, Dr. Dolphin, and SLSOM have been denied their civil rights guaranteed by
the Constitution of the United States. Without due process of law, they are branded as criminals
and risk prosecution, sanction, and censure. Consequently, the Federal Question to be decided
before this honorable court is established.

## I. Diversity Jurisdiction 28 USC §§ 1332

This court has diversity jurisdiction because all of the Plaintiffs and all of the Defendants are citizens of the United States or citizens of the Republic of Liberia. Plaintiffs citizenship are as follows:

| No. | Name | Country/State | Damages |
|-----|------|---------------|---------|
| 1 | Dr. Robert S. Farmer, Jr | Maryland | $1,200,000 |
| 2 | Suleiman Adekunle Omipidan | Nigeria | $300,000 |
| 3 | Pauline Ugochi Chilaka | Nigeria | $50,000 |
| 4 | Raymond Y Ofori | United Kingdom | $100,000 |
| 5 | Dr. Muhammed A.S.M. Al-Anzi | Saudi Arabia | $1,200,000.00 |
| 6 | Dr. Sid R. Rogers | Colorado | $1,200,000 |
| 7 | Dr. Karriem S. Watson | Illinois | $1,200,000 |
| 8 | Dr Emmanuel Okoye | Canada | $1,600,000 |
| 9 | Dr. Keith Patrick Steinhurst | Texas | $1,600,000 |
| 10 | Dr. David Belshaw | California | $1,200,000 |
| 11 | Linda Halisky | New York | $200,000 |
| 12 | Joseph Aiyegbusi | Nigeria | $50,000 |
| 13 | Ken Jordon | South Carolina | $200,000 |
| 14 | Larry Lammers | Michigan | $500,000 |
| 15 | Dr. O. B. G. Nmorsi | Nigeria | $1,200,000 |
| 16 | Dr. Gbenga Gbayesola | Nigeria | $600,000 |
| 17 | Dr. Pius Ndubisi | Nigeria | $1,200,000 |
| 18 | Dr. Godwin Okonkwo | Nigeria | $1,200,000 |

| No. | Name | Country/State | Damages |
|---|---|---|---|
| 19 | Dr. Chijioke Ejiogu | Nigeria | $1,200,000 |
| 20 | Steve Monday | Nigeria | $300,000 |
| 21 | Dr. Robin Ellsworth | Illinois | $1,200,000 |
| 22 | Dr. Miklos Major, III | Texas | $1,200,000 |
| 23 | Dr. Amin Sain | United Kingdom | $1,200,000 |
| 24 | John Toluwani Oladele | Nigeria | $200,000 |
| 25 | Dr. Stanley Paul | Georgia | $1,200,000 |
| 26 | Darlington Esemuze | South Africa | $100,000 |
| 27 | Victoria Ofele | Nigeria | $100,000 |
| 28 | Dr. Mary Hulve | New Jersey | $1,200,000 |
| 29 | Dr. Michael Hejazi | New Jersey | $1,200,000 |
| 30 | Dr. Peter Kolosky | Conneticut | $1,200,000 |
| 31 | Dr. Laurie Berg Kolosky | Conneticut | $1,200,000 |
| 32 | Dervanna Troy Mckoy | New York | $300,000 |
| 33 | Armand Dixon | Tennesee | $500,000 |
| 34 | Carroll Braddy | Georgia | $100,000 |
| 35 | Christopher Sauda | Nigeria | $200,000 |
| 36 | Chukwuyem Obia | Nigeria | $500,000 |
| 37 | Dr. David Fyles | United Kingdom | $1,200,000 |
| 38 | Debrah Berger | New York | $400,000 |
| 39 | Felicia Jatto | Nigeria | $500,000 |

| No. | Name | Country/State | Damages |
|-----|------|---------------|---------|
| 40 | Robert Hayes | Kentucky | $300,000 |
| 41 | Dr. James Kyle | Ohio | $1,200,000 |
| 42 | Robert Irving | Kentucky | $300,000 |
| 43 | Dr. Jason Payor | Florida | $1,200,000 |
| 44 | Dr. Jerry Charles | Kentucky | $1,200,000 |
| 45 | Dr. Kenneth Andronico | Florida | $1,200,000 |
| 46 | M. C. K. Madubuike | Georgia | $300,000 |
| 47 | Dr. Manuel Faria | Florida | $1,200,000 |
| 48 | Dr. Masilamony Pauliah | Maryland | $1,200,000 |
| 49 | Kathy Menefee | Illinois | $600,000 |
| 50 | Rebecca Hopkins | New York | $300,000 |
| 51 | Dr. Alexandra Schick | France | $1,200,000 |
| 52 | Dr. Wendy Westbrooks | Michigan | $1,200,000 |
| 53 | Dr. Yuri Soyferman | California | $1,200,000 |
| 54 | Dr. Antwi Boakye | Maryland | $1,200,000 |
| 55 | Dr. Astara Burlingame | Washington | $1,200,000 |
| 56 | Dr. David Karam | Texas | $2,400,000 |
| 57 | Dr. Joan Nielsen | North Carolina | $1,200,000 |
| 58 | Withdrawn | | |
| 59 | Dr. Mathew Skaria | California | $1,600,000 |
| 60 | Dr. Peace Jessa | Kentucky | $1,200,000 |

| No. | Name | Country/State | Damages |
|-----|------|---------------|---------|
| 61 | Dr. Rita Patangia | Arkansas | $1,600,000 |
| | Does 1 through 99 | Various States of the USA, and worldwide | $35,000,000 |
| | **TOTAL STUDENT AND GRADUATE DAMAGES** | | **$88,000,000** |
| | Dr. Jerroll Dolphin | USA | $110,000,000 |
| | St. Luke School of Medicine | Liberia | $120,000,000 |
| | **TOTAL DAMAGES** | | **$318,000,000** |

The citizenships of the defendants to the lawsuit are as follows:

| No. | Name | Country/State |
|-----|------|---------------|
| 1 | Republic of Liberia | Liberia |
| 2 | Educational Commission for Foreign Medical Graduates | Pennsylvania |
| 3 | Foundation for Advancement of Medical Education and Research | Pennsylvania |
| 4 | University of Illinois | Illinois |
| 5 | Dr. George Gollin | Illinois |
| 6 | Oregon Office of Degree Authorization | Oregon |
| 7 | Ministry of Education | Liberia |
| 8 | Liberian Medical Board | Liberia |
| 9 | National Commission on Higher Education | Liberia |
| 10 | National Transitional Legislative Assembly | Liberia |
| 11 | Dr. Isaac Roland | Liberia |
| 12 | Mohammed Sheriff | Liberia |
| 13 | Dr. Benson Barh | Liberia |
| 14 | Alan Contreras | Oregon |
| 15 | Dr. Brad Schwartz | Illinois |

## III    Conclusion

Plaintiff, Dr. Jerroll Dolphin submits to this honorable court that on this date, September 16, 2010, learned that this court scheduled a sanctions and dismissal hearing on September 13, 2010.. At this time, Dr. Dolphin also learned that the attorney of record did not appear nor file an opposition, nor did he notify Dr. Dolphin of the hearing so that he could file an opposition. Dr. Dolphin is at this time complying with the court's July 2, 2010 instruction to establish Federal Question Jurisdiction and Diversity of Citizenship Jurisdiction as illustrated above.

The Plaintiff, respecfully ask this court to deny sanctions against Dr. Jerroll Dolphin, who has acted in good faith,  However, this court did not accept his oppositions because he is not the attorney of record for the plaintiffs.

This Plaintiff also asks this court to order Thaddeus Culpepper to properly file the Substitution of Attorney that Plaintiff requested in July 2010.  It is obvious that Attorney Culpepper has abandoned this case and plaintiffs relied on his word and professional conduct..

The Plaintiff respecfully asks this court to continue this case to trial for Dr. Dolphin in Pro Per, so that Plaintiff can proceed in Pro Per or obtain new counsel; or dismiss this case without sanctions or prejudice against the plaintiffs.

This Plaintiff respecfully ask this court to restrict access to this document because Defendant George Gollin has recently used similar other court documents to intimidate and frighten other Plaintiffs by posting their names and complaints on his University of Illinois website.

**Respectfully Submitted**

**DATED: September 16, 2010**

**Sign:** _____

**JERROLL DOLPHIN, Plaintiff in pro per**

NAME, ADDRESS AND TELEPHONE NUMBER OF ATTORNEY(S)

Jerroll Dolphin
P.O. Box 941009
Los Angeles, CA 90054
310-384-4483

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| St. Luke School of Medicine, et al <br><br> PLAINTIFF(S). | **CASE NUMBER** <br><br> 10-CV-01791 RGK (SHx) |
| v. <br><br> Republic of Liberia, et al <br><br> DEFENDANT(S). | **PROOF OF SERVICE - ACKNOWLEDGMENT OF SERVICE** |

I, the undersigned, certify and declare that I am over the age of 18 years, employed in the County of Los Angeles, State of California, and not a party to the above-entitled cause. On September 17, 2010, I served a true copy of PLAINTIFF'S ARGUMENT CLARIFYING THE BASIS FOR THE COURT'S SUBJECT MATTER JURISDICTION by personally delivering it to the person (s) indicated below in the manner as provided in FRCivP 5(b); by depositing it in the United States Mail in a sealed envelope with the postage thereon fully prepaid to the following: (list names and addresses for person(s) served. Attach additional pages if necessary.)

Place of Mailing: Los Angeles, California

Executed on September 17, 20 10 at Los Angeles, California

Please check one of these boxes if service is made by mail:

☐ I hereby certify that I am a member of the Bar of the United States District Court, Central District of California.

☐ I hereby certify that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

☒ I hereby certify under the penalty of perjury that the foregoing is true and correct.

_Signature of Person Making Service_

## ACKNOWLEDGEMENT OF SERVICE

I, _____, received a true copy of the within document on _____.


_Signature_                                   _Party Served_


CV-40 (01/00)                    **PROOF OF SERVICE - ACKNOWLEDGMENT OF SERVICE**